# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
DIANE CLOUTIER,                          )
                                         )
        Plaintiff,                       )
                                         )        Civil Action No.
        v.                               )        15-12780-FDS
                                         )
CITY OF LOWELL;                          )
BERNARD F. LYNCH, in his official and    )
individual capacities;                   )
CHRISTINE P. O'CONNOR, in her            )
official and individual capacities;      )
MARY M. CALLERY, in her official and     )
individual capacities;                   )
KAREN A. GAGNON, in her official and     )
individual capacities;                   )
VICTORIA B. WOODLEY, in her official     )
and individual capacities;               )
SUSAN FOUGSTEDT, in her official and     )
individual capacities;                   )
SARAH E. GILBERT, in her official and    )
individual capacities;                   )
ROBERT SPARKS, individually and          )
as President of Absolute                 )
Investigations, Inc.; ABSOLUTE           )
INVESTIGATIONS, INC.;                    )
and DOES 1-10,                           )
                                         )
        Defendants.                      )
_____)

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTIONS TO DISMISS

**SAYLOR, J.**

This is a case involving, among other things, alleged disability discrimination and

retaliation.  Plaintiff Diane Cloutier, a former assistant in the Lowell Public Library, has brought

suit against the City of Lowell, various city employees, a private corporation, and a private

individual.

The complaint is considerably over-inflated.  Among other things, it alleges 21 separate counts under federal and state law against 10 named and 10 unnamed defendants, with various sub-parts (such as claims against individuals in both their individual and official capacities).  In response, all defendants have moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

The Court is effectively forced to do what plaintiff's counsel should have done in the first instance:  sort through the claims and ascertain which ones are sufficiently plausible to survive a motion to dismiss.  That process has already consumed considerable resources of the defendants and the Court; undoubtedly, the Court will be called upon to prune the claims further as the litigation progresses.  The present task, however, is to ascertain what parts of the complaint can survive the relatively low threshold of Rule 12(b)(6).

For the reasons set forth below, the motions to dismiss will be granted in part and denied in part.

## I.      **Background**

The facts are as drawn from the complaint unless otherwise noted.

### A.      **The Parties**

Diane Cloutier worked as a librarian assistant at the Pollard Memorial Library in Lowell, Massachusetts, from January 1998 until her alleged termination on October 29, 2013.  (Compl. ¶ 1).  The essential functions of her job included assisting patrons, retrieving books, and performing administrative tasks.  (*Id.*).

The City of Lowell operates the library where Cloutier worked.  (*Id.* at ¶ 2).  Bernard F. Lynch is the former City manager and directly managed the City's department heads, including Mary Callery, Christine O'Connor, and Victoria Woodley.  (*Id.* at ¶ 4).  Callery is the City's

human relations manager.  (*Id.* at ¶ 6).  O'Connor is the City solicitor and head of the law

department.  (*Id.* at ¶ 7).  Woodley is the director of the library.  (*Id.* at ¶ 10).  Karen A. Gagnon

works in the law department of the City and reports to O'Connor.  (*Id.* at ¶ 8).  Sarah E. Gilbert

is a physician for the City and also reports to O'Connor.  (*Id.* at ¶ 9).  Susan Fougstedt is the

assistant director of the library.  (*Id.* at ¶ 11).  The City and the various city employees will be

collectively referred to as "the City defendants."

Robert Sparks is a licensed private detective.  (*Id.* at ¶ 12).  He owns Absolute

Investigations, Inc., a company that allegedly specializes in the "latest in GPS" and "unmanned

surveillance."  (*Id.*).

### B.    Cloutier's Physical Impairments

The complaint alleges that Cloutier was born with visual impairments.  (*Id.* at ¶ 18).  To

correct those impairments, she allegedly underwent many unsuccessful surgeries, and her

impairments "substantially limit the major life activity of seeing."  (*Id.* at ¶¶ 19-22).  The

complaint alleges that Cloutier is unable to "easily focus and refocus" or "read tiny print."  (*Id.* at

¶ 21).  It further asserts that her impairments are permanent and cannot be corrected.  (*Id.*).

The complaint also alleges that Cloutier has severe chronic asthma that causes her to

experience "shortness of breath, chest tightness and pain, inflammation in the airways, and

coughing and wheezing."  (*Id.* at ¶ 23).  Her asthma allegedly "substantially limits the major life

activity of breathing" and is complicated by a malfunction of her respiratory muscles that cannot

be corrected.  (*Id.* at ¶ 24).  According to the complaint, for years, Cloutier has received

treatment for her asthma and uses daily inhalers and rescue medicine to manage her condition.

(*Id.*).

In June 2012, Woodley instructed Cloutier to close some of the library's windows.  (*Id.* at

¶ 54).  The complaint alleges that as a result of closing "ten heavy windows," Cloutier developed adhesive capsulitis in her right shoulder.  (*Id.*).

### C.   Defendants' Alleged Discriminatory and Retaliatory Actions

The complaint further alleges that from 2004 to 2011, Cloutier made several accommodation requests that her coworkers and superiors mocked and ridiculed.  (*Id.* at ¶ 25).  It alleges that the City and/or Lynch, O'Connor, Callery, Woodley, and Fougstedt, individually or in concert, engaged in unlawful conduct, including attempting to force her to read "tiny print on 'hold slips'" and refusing to allow a small fan near her desk to relieve symptoms of her asthma.  (*Id.*).

On February 1, 2012, Cloutier filed a complaint with the Massachusetts Commission Against Discrimination (MCAD) against the City, Lynch, Woodley, Fougstedt, and two other librarians alleging disability discrimination and retaliation.  (*Id.* at ¶ 46).  On May 17, 2012, the MCAD held an investigative conference where the investigator allegedly requested a list of witnesses to corroborate the complaint.  (*Id.* at ¶ 50).  Cloutier contends that Woodley and Fougstedt "immediately" attempted to "harass and intimidate" those witnesses who they believed would support her.  (*Id.* at ¶ 52).  The complaint alleges that Woodley and Fougstedt began to reprimand Donna Deuso, Cloutier's best friend at work, for interacting with her.  (*Id.* at ¶ 53).

On June 25, 2012, after suffering her shoulder injury, Cloutier gave Woodley a doctor's note limiting her to "light duty."  Woodley and Fougstedt, however, allegedly began assigning her tasks involving heavy and repetitive lifting.  (*Id.* at ¶ 55).  Several days later, Cloutier presented the defendants with a second, more detailed note limiting her to "light duty."  (*Id.* at ¶ 55).  Woodley then allegedly issued Cloutier a "Work Instruction" reprimanding her for seeking a coworker's assistance to lift books.  (*Id.* at ¶ 56).

On July 27, 2012, the library security guard allegedly warned Cloutier that Woodley and Fougstedt had placed a hidden camera in the circulation office to watch her.  (*Id.* at ¶ 59). According to the guard, Fougstedt wanted to monitor Cloutier's communications, the times that she worked, and how long her breaks were.  (*Id.* at ¶ 63).  The guard also expressed concern that he was afraid Woodley would fire him for talking to Cloutier, and that Woodley had instructed him to not speak to Cloutier because she was "suing" the library supervisors and the City.  (*Id.* at ¶ 64).  On August 29, 2012, Cloutier spoke with the security guard, who confirmed that he had seen Fougstedt using the cameras to watch her.  (*Id.* at ¶ 65).

On September 6, 2012, Woodley provided Cloutier with a "Work Instruction" to perform a "one-armed task" that actually required repetitive lifting and the use of two arms.  (*Id.* at ¶ 67). When she informed Woodley that her doctor prohibited her from completing the task, Woodley allegedly became "incensed" and stated that the law department had already approved the task. (*Id.* at ¶ 68).  On September 7, 2012, Cloutier called in sick and spent the day in the emergency room because she was having chest pains and breathing difficulties.  (*Id.* at ¶ 71). That same day, she received a letter from the law department stating that she was required to perform the "one-armed task."  (*Id.* at ¶ 72).

On September 24, 2012, Cloutier's attorney sent a letter to the members of the City Council complaining about the library supervisors' ongoing discriminatory and retaliatory conduct, which allegedly included the involvement of Lynch and O'Connor.  (*Id.* at ¶ 73).  On October, 21, 2012, Cloutier received a letter from the City instructing her to report to City Hall for a medical examination by Gilbert, the city physician.  (*Id.* at ¶ 74).  Gilbert allegedly conducted the examination in a public restroom, and Gilbert informed Cloutier that the purpose of the exam was to determine whether she could perform the "one-armed task."  (*Id.* at ¶ 77).

Following the exam, Cloutier requested a copy of the results, but was initially unsuccessful in retrieving them. (*Id.* at ¶¶ 78-79). On November 9, 2012, Woodley handed Cloutier another "Work Instruction" requiring her to wear a headset while working at a public desk as assigned "intermittently throughout the 7-hour workday." (*Id.* at ¶ 82). The task allegedly violated her vision accommodation, which had been in place for years, and her doctor's restriction preventing Cloutier from performing tasks that required repetitive heavy lifting or the use of two arms. (*Id.*). On November 20, 2012, Cloutier received the examination report, which indicated that she had "adhesive capsulitis, that there was no reason she could not work or do her job exactly as she did before . . . but that new tasks that involved repetitive and/or heavy lifting [ ] should be accommodated." (*Id.* at ¶ 81).

On January 2, 2013, Cloutier's best friend at the library, Donna Deuso, resigned after eighteen years of employment. (*Id.* at ¶ 83). In her resignation letter, Deuso explained that ever since Cloutier had filed her MCAD complaint, she had been harassed by Woodley for their friendship. (*Id.* at ¶ 84). A few weeks later, Deuso allegedly received a post-termination letter from the law department personally attacking and retaliating against her. (*Id.* at ¶ 85).

On March 20, 2013, a library patron threatened Cloutier with physical violence, but Fougstedt allegedly failed to follow library protocol by either banning the patron or calling the police. (*Id.* at ¶ 85). The patron returned on March 28, 2013, forcing Cloutier to call the police herself and file her own complaint because Fougstedt again refused to take action. (*Id.* at ¶ 87). After the incident, Cloutier alleges that she repeatedly asked Woodley for copies of the video footage so that she could provide it to the police. Woodley allegedly failed to answer until April 18, 2013, claiming that she had "lent" the footage to O'Connor in the Law Department. (*Id.* at

¶ 88).  Cloutier contends that O'Connor refused to provide a copy of the footage even after the Assistant District Attorney prosecuting the case asked for it.  (*Id.* at ¶ 89).

On May 13, 2013, Woodley suspended Cloutier from work after calling her into a meeting and allegedly stating that she could "do what she wanted [to Cloutier]" regardless of the law.  (*Id.* at ¶ 90).  The next day, Cloutier's union representative, Corey Robinson, went to the library and informed Woodley that she needed to produce a written order that Cloutier had been suspended.  (*Id.* at ¶ 92).  Woodley allegedly gave him a typed note that read "Diane is suspended."  (*Id.*).  Later that day, Cloutier, Robinson, and Woodley met with Callery to discuss the suspension.  (*Id.* at ¶ 93).  After Callery allegedly claimed that Woodley "had every right" to send Cloutier home, Robinson informed her that Woodley needed to issue a verbal and written warning before suspension, and also needed a legitimate reason for the suspension.  (*Id.* at ¶ 95).  When Cloutier requested that the suspension letter be rescinded, Callery stated that she was unaware of a suspension letter, "brushed [off]" the suspension, and allowed Cloutier to return to work.  (*Id.* at ¶ 97).  On May 17, 2013, Cloutier's attorney notified the City Council about the allegedly ongoing discriminatory and retaliatory conduct.  (*Id.* at ¶ 98).

From June to September 2013, Cloutier requested to open the library windows multiple times.  She provided Woodley and Fougstedt a doctor's note stating "that [d]ue to [Ms. Cloutier's] breathing difficulties, she needs a functioning air conditioning system [in the library] or to be allowed to open windows for fresh air while at work."  (*Id.* at ¶¶ 99-105).  Cloutier contends that Woodley and Fougstedt repeatedly refused her requests.  (*Id.*).  She further contends that on September 10, 2013, after sending Woodley an instant message about opening the windows, Woodley "came screaming at [her] in a fit of rage."  (*Id.* at ¶¶ 106-07).  Cloutier allegedly "feared imminent bodily harm" and suffered further injury to her right shoulder in the

process of shielding herself from Woodley, who was "enraged and out-of-control [and] continued to emotionally unravel." (*Id.* at ¶¶ 108-09).  Cloutier's union representative reported the incident to Callery, but she took no action. (*Id.* at ¶ 110).  Cloutier underwent an MRI the next day that allegedly confirmed "an aggravation of the adhesive capsulitis," and her doctor ordered her "to remain out of work for several weeks following the assault in order to recover[,] and for her own safety." (*Id.* at ¶ 111).

In September and October 2013, Cloutier allegedly sent two letters to O'Connor describing the assault, asking for an investigation, and requesting a transfer to another branch of the library to distance herself from Woodley. (*Id.* at ¶¶ 112-13).  O'Connor never responded. (*Id.*).  The complaint alleges that "the City took [Cloutier] 'off' the payroll" while she was recovering from the alleged assault instead of offering her FMLA leave or letting her use her accrued vacation and sick time. (*Id.* at ¶ 114).

Cloutier returned to work on October 7, 2013, allegedly "with much hesitancy, fear, and trepidation." (*Id.* at ¶ 116).  The complaint alleges that Woodley sent her a memorandum the next day explaining that she disagreed with the recommendation of Cloutier's doctor about her needing open windows, and taking issue with Cloutier missing work from September 11 through October 6. (*Id.* at ¶¶ 117-18).

On October 23, 2013, O'Connor allegedly received another letter from Cloutier stating that her request for reasonable accommodation with respect to her asthma had been ignored and that as a result, she had been suffering severe asthma attacks while at work. (*Id.* at ¶ 120).  The letter also stated that "O'Connor would be held personally responsible for her long-standing gross indifference and reckless disregard for Ms. Cloutier's legally protected rights and utter refusal to do anything to address [it]." (*Id.* at ¶ 121).

On October 28, 2013, "the Defendants [allegedly] conspired to have Defendant Sparks and Absolute secretly video-record Ms. Cloutier" while at work.  (*Id.* at ¶ 122).  On October 29, 2013, Callery and Gagnon asked Cloutier to leave the library and handed her a letter signed by Gagnon, copied to Lynch, O'Connor, Callery, and Woodley, stating that the Law Department recommended that she "'not be allowed to work [for] the City' unless [she] can work 'full unrestrictive duty' or 'when the City can implement a reasonable accommodation.'"  (*Id.* at ¶¶ 124-26).  The letter further stated that Gilbert had concluded that Cloutier could not do her job.  (*Id.* at ¶ 126).  Cloutier contends that the letter did not explain why she was no longer allowed to work, and that while she was escorted from the library, Callery and Gagnon "purposefully and with the intent to humiliate her, paraded her through the main public floor of the [l]ibrary . . . ."  (*Id.* at ¶¶ 127-28).

On November 14, 2013, Cloutier filed a second complaint with the MCAD, naming the City, Lynch, O'Connor, Callery, Gagnon, Woodley, and Fougstedt as defendants.  (*Id.* at ¶ 129).  That same day, the City Defendants allegedly authorized Sparks and Absolute to conduct a "new round of surveillance of Ms. Cloutier."  (*Id.* at ¶ 130).  The complaint alleges that in December 2013, after the local media published several news articles about the City's discriminatory and retaliatory termination of Cloutier, Lynch and O'Connor disclosed that they had "surveillance" that showed her "committing fraud."  (*Id.* at ¶ 132).

On January 2, 2014, the City appealed a Department of Unemployment Assistance (DUA) decision awarding benefits to Cloutier.  (*Id.* at ¶ 133).  At the end of April 2014, the DUA held a hearing on the City's appeal regarding Cloutier's unemployment benefits, and the City allegedly paid Gilbert and another witness to testify against Cloutier.  (*Id.* at ¶ 135).  The DUA hearing examiner suggested that Cloutier subpoena Callery and Gagnon for the continued

hearing on June 3, 2014.  (*Id.* at ¶ 136).  During that hearing, the City allegedly asserted that Cloutier's vision impairment rendered her "unable to do her job," and Gagnon testified that "Gilbert and O'Connor were directly involved in both ordering the unlawful surveillance and in . . . terminat[ing] [Cloutier]."  (*Id.* at ¶¶ 139-40).

On April 22, 2014, a Division of Industrial Accidents (DIA) judge held the City liable for Woodley's September 2012 assault and time away from work.  (*Id.* at ¶ 134).  On June 9, 2014, the City allegedly turned over a "small portion" of the surveillance video created by Sparks and Absolute, along with two investigation reports and an affidavit signed by Sparks to Cloutier in the DIA proceeding.  (*Id.* at ¶ 148). The affidavit stated that Absolute took approximately forty hours of surveillance video of Cloutier during the day and night, including footage that zoomed in on several bedrooms of her home.  (*Id.* at ¶¶ 149-51).  The complaint further alleges that the defendants acted in concert to violate Cloutier's civil rights without a warrant authorizing the surveillance.  (*Id.* at ¶¶ 152, 155).  On July 11, 2014, the law department allegedly sent Cloutier a letter, refusing to provide all of their surveillance because Cloutier had "no reasonable expectation of privacy" as to any of the depictions in the video.  (*Id.* at ¶ 158).  On July 22, 2014, Cloutier demanded that the law department produce all of the surveillance footage.  (*Id.* at ¶ 159).  Several days later, the City allegedly dropped its appeal of the DIA Judge's order.  (*Id.* at ¶ 160).

In August 2014, the City Manager Kevin Murphy, Mayor Rodney Elliot, and other members of the City Council publicly commented on the City's surveillance of Cloutier, and the Mayor allegedly "demanded a probe into the issue."  (*Id.* at ¶ 162).  O'Connor allegedly refused to comply with the City Council's requests for any non-law enforcement surveillance dating back to 2009 and Mayor Elliot "filed a motion requiring the City Auditor, Hannah York, to

gather and supply the information to the City Council." (*Id.* at ¶ 163). On August 22, 2014,

York submitted a report to the City Council, allegedly stating that she had been unsuccessful in

locating the records "because there was very little information entered into Munis [software used

by the City]." (*Id.* at ¶ 165). York also allegedly reported that numerous invoices were missing,

that the law department had issued at least "one 'blank' check for over $30,000" to Absolute, and

that "the overwhelming majority of the public monies used for surveillance of City employees—

a total of $158,000—was for surveillance commissioned by the [l]aw [d]epartment." (*Id.* at

¶ 167).

    **D.**    **Procedural Background**

    On August 15, 2014, Cloutier filed a complaint in Massachusetts Superior Court, and at

the same time withdrew her second MCAD charge. On January 26, 2015, Cloutier voluntarily

dismissed that complaint. Cloutier's first MCAD charge from February 2012 is still pending and

she does not seek to recover damages from the events alleged in that complaint.

    Cloutier filed the complaint in this matter on June 24, 2015. As noted, it contains 21

counts against 10 named and 10 unnamed defendants. In summary, it alleges as follows: (1)

failure to accommodate in violation of Title I of the Americans with Disability Act (ADA)

against the City; (2) disability discrimination in violation of Title I of the ADA against the City;

(3) unlawful medical examination in violation of Title I of the ADA against the City; (4)

disability discrimination by a public entity in violation of Title II of the ADA against the City;

(5) retaliation in violation of Title V of the ADA against the City; (6) failure to accommodate in

violation of Section 504 of the Rehabilitation Act of 1973 against the City, Lynch, O'Connor,

Callery, and Woodley; (7) disability discrimination in violation of Section 504 of the

Rehabilitation Act of 1973 against the City, Lynch, O'Connor, Callery, and Woodley; (8)

retaliation in violation of Section 504 of the Rehabilitation Act of 1973 against the City, Lynch,

O'Connor, Callery, and Woodley; (9) failure to accommodate in violation of Mass. Gen. Laws

ch. 151B, §§ 4(16) against the City, Lynch, O'Connor, Callery, Gagnon, Woodley, Fougstedt,

and Gilbert; (10) disability discrimination in violation of Mass. Gen. Laws ch. 151B, § 4(16)

against the City, Lynch, O'Connor, Callery, Gagnon, Woodley, Fougstedt, and Gilbert; (11)

retaliation in violation of Mass. Gen. Laws ch. 151B, § 4(4) against the City, Lynch, O'Connor,

Callery, Gagnon, Woodley, Fougstedt, and Gilbert; (12) violations under 42 U.S.C. § 1983

against all of the defendants; (13) invasion of privacy in violation of Mass. Gen. Laws ch. 214,

§ 1B against all of the defendants; (14) violation of the common-law right to privacy against all

of the defendants; (15) assault against Woodley; (16) violations of the Massachusetts Civil

Rights Act (MCRA) under Mass. Gen. Laws ch. 12, § 11(I) against all of the defendants; (17)

violations of the Massachusetts Equal Rights Act (MERA) under Mass. Gen. Laws ch. 93, § 103

against all of the defendants; (18) civil conspiracy against all of the defendants; (19) intentional

infliction of emotional distress against all of the defendants; (20) interference with contractual or

advantageous business relations against Lynch, O'Connor, Callery, Gagnon, Woodley,

Fougstedt, and Gilbert; and (21) defamation against Callery and Gagnon.

## II.   Legal Standard

On a motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and

give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness*

*Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir.

1999)).  To survive a motion to dismiss, the complaint must state a claim that is plausible on its

face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  That is, "[f]actual allegations must

be enough to raise a right to relief above the speculative level, . . . on the assumption that all the

allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if the facts as alleged do

not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer*

*Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (alterations omitted) (internal quotation marks

omitted).

## III.   <u>Analysis</u>

Defendants urge the Court that it should, without converting their motion into one for

summary judgment, take judicial notice of documents referred to by the complaint and official

public records from prior proceedings.  (Defs.' Mem. 2).  However, given the state of the record

and the parties' seeming inability to agree on even routine issues, the Court will focus only on

the complaint's allegations and whether, if assumed to be true, they state a claim for which relief

can be granted on each of the 21 counts.

### A.   <u>Counts One, Two, Three, and Five:  Title I and Title V ADA Claims</u>

The complaint alleges violations of Title I of the ADA for failure to accommodate (Count

One), disability discrimination (Count Two), and unlawful medical examination (Count Three)

against the City.  The complaint also alleges a violation of Title V of the ADA for retaliation

(Count Five) against the City.  The City contends that those counts should be dismissed for

failure to exhaust administrative remedies before the MCAD and the EEOC.  Specifically, the

City contends that Cloutier has failed to file a right-to-sue letter with her complaint.

"[T]he ADA mandates compliance with the administrative procedures specified in Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and that, absent special

circumstances, . . . , such compliance must occur before a federal court may entertain a suit that seeks recovery for an alleged violation of Title I of the ADA." *Bonilla v. Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 277 (1st Cir. 1999); *see also Rivera-Diaz v. Humana Ins. of P.R., Inc.*, 748 F.3d 387, 389 (1st Cir. 2014) ("Claims of employment discrimination and retaliation under the ADA are subject to the procedural requirements of Title VII."). The Title VII provisions require that before filing suit, a plaintiff must file a claim with the EEOC "'within one hundred and eighty days after the alleged unlawful employment practice occurred' or within 300 days if 'the person aggrieved has initially instituted proceedings with [an authorized] state or local agency,'" in this case the MCAD. *Bonilla*, 194 F.3d at 278 (quoting 42 U.S.C. § 2000e-5). The employee may sue in federal court only if the EEOC or MCAD dismisses the administrative charge, or if it does not bring civil suit or enter into a conciliation agreement within 180 days of the filing of the administrative charge. 42 U.S.C. § 2000e-5(f)(1); *see also Franceschi v. U.S. Dep't of Veterans Affairs*, 514 F.3d 81, 85 (1st Cir. 2008). "In either case, the EEOC must send the employee notice, in the form of what is known as a right-to-sue letter." *Franceschi*, 514 F.3d at 85; *see also Goldstein v. Brigham & Women's Faulkner Hosp., Inc.*, 80 F. Supp. 3d 317, 323-24 (D. Mass. 2015) ("[A] plaintiff cannot file a federal claim until she has received a notice of right-to-sue from the EEOC, which is provided upon dismissal by the EEOC or at the request of the plaintiff after the EEOC has had the complaint for 180 days.").

Here, on August 15, 2014, Cloutier filed a request with the MCAD for permission to dismiss her second MCAD claim and bring a private right of action. That same day—despite not receiving permission from the MCAD or obtaining a right-to-sue letter—she filed suit in Middlesex Superior Court. The MCAD dismissed her claim on December 29, 2014. On January 26, 2015, Cloutier dismissed the action pending in state court, and filed her complaint in this

Court on June 24, 2015.  Cloutier did not file a right-to-sue letter with the complaint, nor is there any evidence in the record that Cloutier ever requested a right-to-sue letter from the MCAD.

Under Titles I, V, and VII, the "unexcused failure to exhaust administrative remedies effectively bars the courthouse door." *Jorge v. Rumsfeld*, 404 F.3d 556, 564 (1st Cir. 2005). "Administrative remedies [can]not be considered to [be] exhausted . . . until the EEOC [or MCAD] issue[s] [the plaintiff] a right-to-sue-letter." *Franceschi*, 514 F.3d at 85 (citing 42 U.S.C. § 2000e-5(f)(1)).  Therefore, by not filing a right-to-sue letter from the MCAD or EEOC, Cloutier appears to have failed to exhaust the administrative remedies required in order to file her ADA claims in this Court.

Accordingly, Counts One, Two, Three, and Five will be dismissed in their entirety.

**B.      Counts Six, Seven, and Eight:  Rehabilitation Act Claims**

Two sets of federal laws govern disability discrimination:  the ADA, which applies to private employers with more than fifteen employees and state and local governments, and the Rehabilitation Act, 29 U.S.C. § 794, which applies to federal agencies, contractors, and recipients of federal financial assistance.[1]  Cloutier has sued under both statutes.  The complaint alleges violations of Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 705(9)(B), 20(B) for failure to accommodate (Count Six), disability discrimination (Count Seven), and retaliation (Count Eight) against the City, Lynch, O'Connor, Callery, and Woodley in their official and individual capacities.

Defendants contend that the claims under the Rehabilitation Act should be dismissed to

---

[1] The Rehabilitation Act states that:

[n]o otherwise qualified individual with a disability in the United States, as defined in [29 U.S.C. § 705(20)], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.  *See* 29 U.S.C. § 794(a).

the extent that they are filed against defendants in their individual capacities because they are not recipients of federal financial assistance.  It is well-established that individual defendants cannot be sued in their individual capacities under the Rehabilitation Act; however, they can be sued for injunctive or equitable relief in their official capacities.  *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 29 n.17 (1st Cir. 2006) (noting that "Rehabilitation Act claims against [ ] individual defendants [are] correctly dismissed); *see also Doe v. Town of Bourne*, 2004 WL 1212075, at *3 (D. Mass. May 28, 2004) (collecting cases and noting that "individuals in their individual capacities are not liable under § 504 [of the Rehabilitation Act], which applies only to recipients of federal financial aid").

Accordingly, Counts Six, Seven, and Eight will dismissed as to the defendants in their individual capacities.

### C.     Count Twelve:  Section 1983 Claim

The complaint alleges a violation of Cloutier's Fourth Amendment rights to be free of unlawful searches and seizures, naming the City, the City defendants, Sparks, and Absolute as defendants.  Specifically, the complaint alleges that the defendants violated her Fourth Amendment rights by placing a GPS monitoring device on her car without a warrant.  (Compl. ¶ 150).

The claims in Count Twelve against Sparks and Absolute will be dismissed because they are not state actors.  Section 1983 "creates a private right of action for redressing abridgements or deprivations of federal constitutional rights."  *McIntosh v. Antonino*, 71 F.3d 29, 33 (1st Cir. 1995).  "A claim under § 1983 has two 'essential elements':  the defendant must have acted under color of state law, and his or her conduct must have deprived the plaintiff of rights secured by the Constitution or by federal law."  *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st Cir. 2008).

Only in limited circumstances, where their actions are "fairly attributable to the State," are private individuals and entities found to be state actors liable under § 1983. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). Those circumstances include where the private actor (1) "assumes a traditional public function," (2) "the challenged conduct is coerced or significantly encouraged by the state," or (3) the state and private party are in a "position of interdependence." *Santiago v. Puerto Rico*, 655 F.3d 61, 68 (1st Cir. 2011).

The actions of Sparks and Absolute, as alleged in the complaint, do not fit into any of those three categories. They were allegedly hired and paid by the City to conduct surveillance of Cloutier. But being hired and paid by a city, alone, does not constitute being "significantly encouraged by the state." *See id.* at 72 ("A private party cannot be transformed into a state actor simply because it is paid with government funds for providing a service.").

Furthermore, the City defendants contend that Count Twelve should be dismissed because they are entitled to qualified immunity. A government official facing a § 1983 or *Bivens* action is protected from suit unless the official's conduct violated clearly established law at the time of the alleged wrongdoing. *See Pearson v. Callahan*, 555 U.S. 223, 227 (2009). Qualified immunity shields officials "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Qualified immunity does not protect "those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), but a plaintiff may overcome the qualified immunity defense only if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. Government officials are entitled to immunity for their actions unless "in the light of pre-existing law the unlawfulness [is] apparent." *Id.*

In January 2012, the Supreme Court, relying on a trespass theory, held that installing a GPS tracking device on a vehicle and using the device to monitor the vehicle's movements intrudes on an individual's reasonable expectation of privacy and violates the Fourth Amendment.  *See United States v. Jones*, 132 S. Ct. 945 (2012).  However, there were also two concurring opinions, including Justice Alito's "mosaic theory" concurrence, joined by three other Justices, which concluded that the Court should "analyze the question . . . by asking whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove."  *Id.* at 958 (Alito, J., concurring).

Normally, questions of qualified immunity should be resolved at the earliest possible stage, and courts can address them on a motion to dismiss.  *See Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011) (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).  However, the Court will defer on the issue at this early stage of the case for several reasons.  First, the allegations of an unlawful search in the complaint are unclear, and although they currently state a plausible claim for relief, they nevertheless appear tenuous.  The only allegations in the complaint concerning a GPS device are based on "information and belief."  (Compl. ¶ 150).  Moreover, it is unclear from the complaint when exactly the defendants allegedly installed the GPS tracker on Cloutier's car, and for how long they tracked her movements.  Furthermore, the Supreme Court decided *Jones* relatively close in time to the alleged actions of the defendants here, and the Court's three opinions in *Jones* relied on different Fourth Amendment theories.  In short, a more settled factual record is necessary before the Court can determine whether the defendants' alleged surveillance even violated Cloutier's Fourth Amendment rights at all, and whether they did so at a time when the law was clearly established.

Accordingly, Count Twelve will be dismissed as to Sparks and Absolute.

18

**D.**     **Counts Thirteen, Eighteen, and Nineteen:  Intentional Tort Claims**

The complaint alleges that the defendants violated Cloutier's statutory privacy rights under Mass. Gen. Laws ch. 214, § 1B (Count Thirteen), committed common-law civil conspiracy (Count Eighteen), and committed intentional infliction of emotion distress (Count Nineteen). However, the City cannot be held liable for intentional torts under the Massachusetts Tort Claims Act, and therefore those three counts will be dismissed as to the City.  *See* Mass. Gen. Laws ch. 258, § 10(c) (municipalities are immune for "any claim arising out of an intentional tort, including . . . intentional mental distress . . . [and] invasion of privacy").

Accordingly, Counts Thirteen, Eighteen, and Nineteen will be dismissed as to the City.

**E.**     **Count Fourteen:  Common-Law Invasion of Privacy Claim**

The complaint alleges that the defendants violated Cloutier's common-law right of privacy.  However, Massachusetts does not recognize a common-law cause of action for invasion of privacy.  *See Spencer v. Roche*, 659 F.3d 142, 151 n.6 (1st Cir. 2011) ("To the extent that the appellant couches his invasion of privacy claim in the common law, Massachusetts has never recognized such a tort and it is not our place to create new causes of action under state law.").

Accordingly, Count Fourteen will be dismissed in its entirety.

**F.**     **Count Fifteen:  Assault Claim**

The complaint alleges that Woodley assaulted Cloutier on September 10, 2013. Specifically, it alleges that Woodley angrily approached Cloutier, placing her in fear of imminent bodily harm, after she had asked to open the library windows.  (Compl. ¶¶ 99-111).  Woodley contends that the claim should be dismissed because the Massachusetts Worker's Compensation Act (MWCA) is the exclusive remedy for the assault claim.

The exclusivity provision of the MWCA precludes common-law actions for both

negligence and intentional torts against employers that arise "out of and in the course of [the plaintiff's] employment." *Doe v. Purity Supreme, Inc.*, 422 Mass. 563, 565 (1996) (claims for negligence, assault and battery, false imprisonment, and negligent and intentional infliction of emotional distress barred by Act; summary judgment properly granted for defendant-employer). "'An injury arises out of the employment if it arises out of the nature, conditions, obligations, or incidents of the employment; in other words, out of the employment looked at in any of its aspects.'" *Id.* at 566 (quoting *Caswell's Case*, 305 Mass. 500, 502 (1940)).  Injuries do not arise out of employment if a plaintiff is engaged in purely personal activity on the employer's premises, but only if he is "occupying himself consistently with his contract of hire in some manner pertaining to or incidental to his employment." *Souza's Case*, 316 Mass. 332, 335 (1944).

The Act not only bars suits for negligence and intentional torts against an employer, but also against co-workers "if the fellow employee also was acting in the course of employment." *Anzalone v. Massachusetts Bay Transp. Auth.*, 403 Mass. 119, 124 (1988); *see also Mulford v. Mangano*, 418 Mass. 407, 410 (1994) (if employee commits an intentional tort in the course of his employment, he is immune from liability under the MWCA).  "Conduct of an agent is within the scope of employment if it is of the kind he is employed to perform . . . ; if it occurs substantially within the authorized time and space limits . . . ; and if it is motivated, at least in part, by a purpose to serve the employer . . . ." *Purity Supreme*, 422 Mass. at 568 (citations omitted).  Courts must apply an "objective test which assesses what the employee did and other facts in order to determine whether he acted at least in part for a job-related purpose." *Mulford*, 418 Mass. at 412; *see also Grant v. John Hancock Mut. Life Ins. Co.*, 183 F. Supp. 2d 344, 365 (D. Mass. Jan. 8, 2002) (dismissing assault claim against security officers because they "were

escorting [plaintiff-employee] at the direction of [his supervisor], and were supervising his departure as part of their responsibilities as security officers . . . [defendants] were engaged in the type of action that [the company] employed them to perform").  Even the fact that an employee may have been acting illegally "will not automatically bring an intentional tort claim out of the class of those torts barred by the Worker's Compensation Act" because "[t]he key remains whether the acts of the offending employer or agent were in the course of the employment relationship and whether she acted in furtherance of the employer's interest."  *See Boyle v. Boston Found., Inc.*, 788 F. Supp. 627, 631 (D. Mass. 1992) (dismissing a claim of intentional infliction of emotional distress in the context of an employee's firing as being barred by the MWCA because the supervisor was acting in the interest of the defendant corporation in firing plaintiff); *but see O'Connell v. Chasdi*, 400 Mass. 686, 690 (1987) (finding that defendant's conduct in making unwanted sexual advances toward the plaintiff and criticizing plaintiff for rejecting such advances "was in no way within the scope of employment furthering the interests of the employer").

Here, Cloutier's injury clearly arises out of her employment; therefore, the question is whether Woodley committed the alleged assault in the course of her employment as the director of the library and purportedly did so in furtherance of her employer's interest.  *See O'Connell*, 400 Mass. at 690 ("Where a fellow employee commits an intentional tort not related to the interests of the employer . . . the policies behind the act would not be served by immunizing the coemployee.").  According to the complaint, Cloutier notified Woodley several times during the summer of 2013 that the air conditioning was not working properly and repeatedly asked if she could open a window to alleviate her asthma symptoms.  (Compl. ¶¶ 99-105).  Woodley apparently decided that the windows should remain closed.  (*Id.* at ¶¶ 100-02).  On September

10, Cloutier sent Woodley an instant message asking her again to open the windows. (*Id.* at ¶ 106). In response, Woodley allegedly reprimanded Cloutier by "screaming" at her in a "fit of rage." (*Id.* at ¶ 107). She also "physically backed her into a closed office and forced her to sit in a chair" and "gesticulated" at her. (*Id.* at ¶¶ 107-08). Cloutier allegedly raised her arm in fear of being hit by Woodley and aggravated her shoulder injury. (*Id.*).

Even assuming the truth of those allegations, it is nonetheless clear that Woodley was acting in the course of her employment as the supervisor of the library. She was responding to an employee (Cloutier) concerning actions taken by the employee in the course of her employment (making complaints about the workplace) by taking disciplinary action (reprimanding her for her conduct). Woodley was not acting on her own personal account or dealing with personal matters. Moreover, Woodley was purportedly acting in furtherance of the library's interests, not her own. The fact that she may have acted improperly or unprofessionally, by raising her voice and gesticulating in a manner that Cloutier believed was menacing, does not transform the event into an intentional tort that falls outside the protections of the MWCA. Even an employee's unlawful actions, if done in furtherance of his employer's interests, fall within the scope of the MWCA. *See Boyle*, 788 F. Supp. at 631.[2]

In summary, Cloutier's claim against Woodley for assault falls within the scope of the MWCA and is therefore barred. Accordingly, Count Fifteen will be dismissed.

### G.     Count Sixteen:  Massachusetts Civil Rights Act Claim

The complaint alleges that the defendants, by video recording Cloutier and using that video to pressure her to drop her MCAD actions, attempted to interfere with her civil rights

---

[2] That conclusion is reinforced by the fact that Cloutier has already recovered compensation from the City under the MWCA for Woodley's alleged assault. (*See* Compl. ¶ 134) (stating that in April 2014 Cloutier was awarded $1,500 in connection with her § 34 worker's compensation claim).

through threats, intimidation, and coercion in violation of the Massachusetts Civil Rights Act (MCRA), Mass. Gen. Laws ch. 12, § 11(I).

The MCRA provides a cause of action "whenever any person or persons . . . interfere by threats, intimidation or coercion . . . with the exercise or enjoyment . . . of rights secured by the Constitution of law of the United States . . . ."  Mass. Gen. Laws ch. 12, § 11(H).  However, it is well-established that cities and city officials in their official capacities are not "persons" subject to suit under the MCRA.  *See, e.g.*, *Wentworth Precious Metals v. City of Everett*, 2013 WL 441094, at *12 (D. Mass. Feb. 4, 2013) ("[A]s a matter of well-settled Massachusetts law, the City is not a 'person' subject to suit, as the MCRA contemplates that term . . . .  Claims against city officials in their official capacities are subject to the same restrictions as claims against the City itself . . . .").

Sparks and Absolute further contend that Count Sixteen should be dismissed because the complaint does not allege that they used threats, intimidation, or coercion.  Although they conducted surveillance of Cloutier, and the City defendants allegedly may have used that surveillance footage after-the-fact to intimidate her, there are no allegations in the complaint that Sparks or Absolute threatened, intimidated, or coerced Cloutier in any way.  In fact, Cloutier concedes that she did not know about the surveillance until the City defendants sent it to her. The SJC has consistently held that, in the context of the MCRA, "the direct violation of a right by itself is not the equivalent of coercion."  *Currier v. National Bd. of Med. Examiners*, 462 Mass. 1, 13 (2012); *see also Longval v. Commissioner of Corr.*, 404 Mass. 325, 333-34 (1989) (direct violation of a person's rights does not by itself involve coercion; even unlawful conduct lacks this quality when all it does is take someone's rights away directly); *Pheasant Ridge*

*Assocs. Ltd. P'ship v. Town of Burlington*, 399 Mass. 771, 781 (1987) (unlawful taking did not itself interfere with or attempt to interfere with plaintiff's rights by coercion).

Accordingly, because the City and City defendants are not persons under the MCRA, and because the complaint contains no allegations of threats, intimidation, or coercion specifically against Sparks and Absolute, Count Sixteen will be dismissed as to the City, the City defendants in their official capacities, Sparks, and Absolute.

H.      **Count Seventeen:  Massachusetts Equal Rights Act Claim**

The complaint alleges that the defendants, by unlawfully video recording Cloutier based on her disabilities, discriminated against her in violation of the Massachusetts Equal Rights Act (MERA), Mass. Gen. Laws ch. 93, § 103(a).  MERA provides that:

> Any person within the Commonwealth, regardless of handicap or age as defined in chapter [151], shall, with reasonable accommodation, have the same rights as other persons to make and enforce contracts, inherit, purchase, lease, sell, hold and convey real and personal property, sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, including, but not limited to, the rights secured under Article CXIV of the Amendments to the Constitution

Mass. Gen. Laws ch. 93, § 103(a).

While there appear to be few cases interpreting § 103, cases interpreting § 102 of MERA, which prohibits discrimination based upon sex, race, color, creed, or national origin, are instructive.  Courts have held that for a person to be held liable under § 102, "[o]nly discrimination that is both purposeful and based on [protected characteristics] comes within the reach of the statute; if any element is missing, a claim under the statute fails."  *LaCava v. Lucander*, 58 Mass. App. Ct. 527, 535 (2003).

Here, even if Sparks and Absolute did violate Cloutier's protected privacy rights in conducting surveillance, the complaint does not allege that Sparks and Absolute purposefully

discriminated against her—that is, decided to monitor her—because of her disabilities.  The complaint does not even allege that Sparks and Absolute were aware of her alleged disabilities.  In short, the only fair inference from the complaint is that Sparks and Absolute conducted surveillance of Cloutier because the City hired them to do so, not because of any discriminatory animus toward her.  The alleged discriminatory animus of the City defendants does not automatically transfer to Sparks and Absolute because the City hired them.

Accordingly, the complaint does not sufficiently allege that Sparks and Absolute were even aware of Cloutier's disabilities, much less that they discriminated against her based on those disabilities.  Therefore, Count Seventeen will be dismissed as to Sparks and Absolute.

### I.      Cloutier's Other Claims

For Cloutier's other claims, the complaint appears to state a plausible claim for which relief could be granted.  Whether any of the remaining claims should be dismissed on summary judgment will await development of the evidence.

### IV.     Conclusion

Accordingly, the motions to dismiss are granted in part and denied in part.  For the foregoing reasons:

1.  The motion to dismiss Counts One, Two, Three, and Five is GRANTED.

2.  The motion to dismiss Counts Six, Seven, and Eight as to the defendants in their individual capacities is GRANTED.

3.  The motion to dismiss Count Twelve as to Sparks and Absolute is GRANTED.

4.  The motion to dismiss Counts Thirteen, Eighteen, and Nineteen as to the City is GRANTED.

5.  The motion to dismiss Count Fourteen is GRANTED.

6.   The motion to dismiss Count Fifteen is GRANTED.

7.   The motion to dismiss Count Sixteen as to the City, the City defendants in their official

capacities, Sparks, and Absolute is GRANTED.

8.   The motion to dismiss Count Seventeen as to Sparks and Absolute is GRANTED.

9.   The motions to dismiss all other claims are otherwise DENIED without prejudice to

defendants renewing their defenses at the summary judgment stage.

**So Ordered.**


/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated: December 14, 2015                           United States District Judge