```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3                        No. 1:15-cv-12780-WGY

 4

 5   DIANE CLOUTIER,
          Plaintiff
 6

 7
     vs.
 8

 9

10   CITY OF LOWELL, et al,
          Defendants
11

12                    * * * * * * * * *
13

14
                  For Jury Trial Before:
15                Judge William G. Young

16

17                United States District Court
                  District of Massachusetts (Boston)
18                One Courthouse Way
                  Boston, Massachusetts 02210
19                Wednesday, February 28, 2018

20

21                    * * * * * * * *
22
              REPORTER: RICHARD H. ROMANOW, RPR
23                 Official Court Reporter
              United States District Court
24      One Courthouse Way, Room 5510, Boston, MA 02210
                  bulldog@richromanow.com
25
```

```
 1                    A P P E A R A N C E S

 2

 3   LANA SULLIVAN, ESQ.
        Law Office of Lana Sullivan
 4      233 Needham Street
        Newton, Massachusetts 02464
 5      (617) 454-1015
        E-mail: Lana@lanasullivanlaw.com
 6      For the plaintiff

 7

 8   RACHEL M. BROWN, ESQ.
     HANNAH B. PAPPENHEIM, ESQ.
 9      City of Lowell Law Department
        375 Merrimack Street, 3rd Floor
10      Lowell, Massachusetts 01852
        (978) 670-4050
11      Email: Rbrown@lowellma.gov
        For the defendants
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2
     WITNESS                 DIRECT  CROSS  REDIRECT  RECROSS
 3

 4   BERNARD F. LYNCH  (Continued.)

 5       By Ms. Sullivan:    4

 6       By Ms. Brown:

 7
     CHRISTINE P. O'CONNOR
 8
         By Ms. Sullivan:    15
 9
         By Ms. Brown:
10

11   DR. SARAH E. GILBERT

12       By Ms. Sullivan:    43            113

13       By Ms. Brown:              80

14
     BERNARD F. LYNCH  (Recalled.)
15
         By Ms. Brown:     116
16
         By Ms. Sullivan:         136
17

18   CHRISTINE P. O'CONNOR  (Recalled.)

19       By Ms. Brown:     137

20       By Ms. Sullivan:

21
                    E X H I B I T S
22

23       EXHIBIT 83................................    72

24       EXHIBIT 84................................    90

25
```

```
1                    P R O C E E D I N G S
2               (Jury enters, 9:00 a.m.)
3               THE COURT:  Good morning, ladies and
4     gentlemen.  Thank you again.  We're all ready to go.
5     Would you remind the witness.
6               THE CLERK:  I'd like to remind you, sir, that
7     you're still under oath.  Do you understand?
8               THE WITNESS:  I do.
9               THE COURT:  Ms. Sullivan, you may continue.
10              MS. SULLIVAN:  Thank you, your Honor.
11
12    DIRECT EXAMINATION BY MS. SULLIVAN:  (Continued.)
13    Q.  Mr. Lynch, have you ever been alleged to have
14    engaged in retaliation or harassment in your
15    professional career as a City Manager against an
16    employee?
17              MS. BROWN:  Objection.
18    A.  No.
19              THE COURT:  Sustained.  No.  His answer is
20    "No."
21         Do you want to press your objection?
22              MS. BROWN:  I'll withdraw it, your Honor.
23              THE COURT:  Withdrawn.
24    Q.  Mr. Lynch, you're aware that retaliation for
25    engaging in protected activity is unlawful, correct?
```

1    A.   Yes.

2    Q.   Okay.  And I'd like to draw your attention to what's

3    been marked as Exhibit 6.

4    A.   (Looks.)

5    Q.   Can you see that, Mr. Lynch?

6    A.   Yes.

7    Q.   Okay.  Now, what's been marked as Exhibit 6 is the

8    City's sexual harassment policy and it's signed by you

9    and dated as of January 5th, 2013.  Do you see that?

10   A.   Yes, I do.

11   Q.   Okay.  Now, even though, um, this is a sexual

12   harassment policy, would you agree with me that, um,

13   this policy states that "Retaliation against" -- if you

14   look at Page 2, "Retaliation against any individual who

15   has complained about sexual harassment and retaliation

16   against individuals for cooperation with an

17   investigation of a sexual harassment complaint is

18   unlawful and will not be tolerated by the City of

19   Lowell," correct?

20            MS. BROWN:   Objection.

21            THE COURT:   This is my fault, I'm talking to

22   the Clerk, would you ask the question again.   I

23   apologize.

24            MS. SULLIVAN:   Sure.

25   Q.   We were talking about Exhibit Number 6 and this is a

1    sexual harassment policy that you signed on January 5th,

2    2013, correct?

3    A.  That's correct.

4    Q.  Okay, and the policy at Page 2 prohibits retaliation

5    against any individual for engaging in protected

6    activity, is that fair to say?

7    A.  (Reads.)

8              MS. BROWN:  I'll object.

9              THE COURT:  Well, that's sustained, the

10   document speaks for itself.  It says what it says.

11   Q.  In anyone -- if an employee feels like they are

12   being retaliated against, who handles that within the

13   city?

14   A.  (Pause.)  Could you repeat the question?

15   Q.  Certainly.

16        If an employee feels that he or she is being

17   retaliated against while working in the City of Lowell,

18   who would handle that under your administration?

19   A.  Well, this article -- the Exhibit 6 speaks

20   specifically of sexual harassment, but I would say just

21   a retaliation -- a complaint for retaliation would be

22   filed with the HR department or it could be reported to

23   the City Manager.

24   Q.  Would you agree with me that retaliation for

25   engaging in any protected activity, not just sexual

1   harassment, is prohibited in the City of Lowell?

2   A.  Yes.

3   Q.  Okay.  And, um, you stated a moment ago that if

4   there were any such complaints, those would be directed

5   appropriately to HR, is that right?

6           MS. BROWN:  Objection.

7           THE COURT:  Well, you just asked him that and

8   he's answered that question.  So let's build from there.

9           MS. SULLIVAN:  Okay.

10  Q.  At some point in time -- well at some point in time

11  you became aware that Ms. Cloutier was complaining of

12  retaliation for filing her MCAD complaint and that the

13  complaints of retaliation were against Ms. O'Connor

14  and/or Ms. Gagnon, correct?

15          MS. BROWN:  Objection.

16          THE COURT:  Well, I guess he's being asked --

17  no, that's all right.

18      Did you become aware that she was -- she,

19  Ms. Cloutier, was complaining of being retaliated

20  against by those two individuals?

21          THE WITNESS:  I'm not sure I -- I never saw a

22  specific complaint of that, that was not directed to me

23  in any way, and there was not a complaint directed to

24  the, um -- an official complaint directed to the HR

25  department.  I am aware that there were letters that

1    alleged retaliation but they weren't -- they seemed to

2    indicate that there was ongoing retaliation.  But there

3    was never an official complaint filed.

4    Q.  Do you only investigate official complaints of

5    retaliation?

6    A.  Official?  I guess I would say that, um, that would

7    have been helpful if there had been an actual documented

8    official complaint of retaliation.  These seem to be

9    letters that were drafted up to, um, that included the

10   word "retaliation," but it wasn't an actual complaint

11   per se.  And they weren't directed to me, they were just

12   -- I came across copies of them that people may have

13   shown me.

14   Q.  If Ms. Cloutier's complaints, um, were directed to

15   the law department, who would you direct to investigate

16   that, if anyone?

17              MS. BROWN:  Objection.

18              THE COURT:  Sustained.  It's hypothetical.

19              MS. SULLIVAN:  Okay.

20              THE COURT:  You may of course ask him about

21   any procedures that he's directed or which he knows or

22   you may ask him what happened.  But if this, then that,

23   I'm sustaining it.

24              MS. SULLIVAN:  Okay.

25   Q.  During your time at the City of Lowell when you were

1   the City Manager, when it came to a complaint of

2   retaliation, ultimately you're the one that's supposed

3   to be the one dealing with such an issue, correct?

4               MS. BROWN:  Objection.

5               THE COURT:  No, she may have it.

6   A.   I guess in the end it would show up on my desk.

7   Q.   And would you agree with me that you never directed

8   anyone to investigate any of the complaints that

9   Ms. Cloutier was making including those against

10  individuals in the law department, um, by anyone either

11  inside your administration or outside your

12  administration?

13  A.   Um, I mean I think we reviewed the letters and

14  believe that not to be the case.  I mean we were

15  following normal protocol and normal procedures and we

16  didn't see that, you know in my mind, as retaliation.

17  Q.   And no investigation was ever conducted, correct?

18  A.   No formal investigation that I can recall.

19  Q.   And no informal investigation was ever conducted

20  either?

21  A.   Well, in terms of, as I previously stated, reviewing

22  the letters that came to me, um, by copy -- again

23  nothing was ever forwarded to me by Ms. Cloutier, or for

24  that matter her attorney, alleging that, um, there was

25  retaliation and asking for action, there were just

1    letters, informal letters being sent off to other people

2    that somehow came across my desk from those other

3    people.

4    Q.  And when you said "we" earlier, or a moment ago, who

5    were you referring to?

6    A.  Um, myself, the law department, the HR department,

7    the library.  You know we'd go over these matters and

8    say, you know, "Are we being retaliatory?"  And the

9    answer would be "No."

10   Q.  So in effect you were policing yourselves over your

11   own actions, is that fair to say?

12             MS. BROWN:  Objection.

13             THE COURT:  Sustained in that form.  You can

14   argue it.

15   Q.  You recall that there was surveillance of

16   Ms. Cloutier done in 2012 and 2013, correct?

17   A.  Yes.

18   Q.  Do you recall the first time that you personally

19   ever disclosed any part of that surveillance to anyone?

20   A.  Um, no.

21   Q.  Okay.  Now, isn't it true that the surveillance of

22   Ms. Cloutier ended on December 5th, 2013?

23   A.  I don't know the exact date, but that sounds

24   probably close to right.

25   Q.  Okay.  And you would have no reason to doubt me if I

1    were to represent that that's the last date as reflected

2    on the invoice from Absolute Investigations?

3    A.   I wouldn't.  No.  That's fine.

4    Q.   All right.  Now, on or around December 16th, which

5    is 2013, which is about a week later, that was in fact

6    the first time any of the six rounds of surveillance of

7    Ms. Cloutier was ever released by anyone and it was

8    released by you and Ms. Cloutier to the Lowell Sun,

9    correct?

10             MS. BROWN:  Objection.

11             THE COURT:  Put the question again.  I'm

12   sorry.

13             MS. SULLIVAN:  Sure.

14   Q.   On or around September -- December 16th, 2013, which

15   is about a week later after the surveillance ended, that

16   was in fact the first time any of the six rounds of

17   surveillance of Ms. Cloutier was ever released by anyone

18   and it was released by you and Ms. O'Connor to the

19   Lowell Sun newspaper?

20             THE COURT:  The objection's sustained.

21   Q.   And do you recall ever releasing --

22             THE COURT:  The objection is sustained.  Let's

23   move on.

24             (Pause.)

25   Q.   Do you recall any articles being written about

1   Ms. Cloutier's MCAD claim in the newspaper?

2               MS. BROWN:   Objection.

3               THE COURT:   Sustained.

4               (To jury.)   Look, I've been reflecting on how

5   to explain this to you and when I get to charge you at

6   the end of the case I'll give some detailed

7   explanations, but I've now thought it through and I

8   simply want to explain to you why I'm doing what I'm

9   doing.

10          I keep saying to you that this case is a

11  retaliation case and it has four elements that

12  Ms. Cloutier has to prove by a fair preponderance of the

13  evidence, she's got to prove protected activity, she's

14  got to prove that in retaliation for that protected

15  activity they took some job action against her, she has

16  to prove they did in fact take some job action against

17  her because of or in retaliation for her protected

18  activity, and then she has to prove pretext.   That's

19  what she has to prove.   And so that's the focus of our

20  case.   And yet I have been allowing a lot of testimony,

21  and we've taken up a fair amount of time about other

22  things, about the Department of Industrial Accidents's

23  proceeding, about Worker's Comp status, um, and other

24  matters, some of which -- physical examinations and the

25  like, which are not protected activity, where they

1   occurred, and things like that.

2        So why are -- am I, at least within some limits,

3   why am I letting you hear all this?  Because at bottom

4   the key question here is, "Was anything that was done

5   and meant for Ms. Cloutier in retaliation for that MCAD

6   complaint that is an exhibit in the case?"  And they

7   really differ on that.  Obviously Ms. Cloutier's

8   position is, it was, the City's position and the people

9   in the city who are sued, they say it was not.  And this

10  is one of those cases where people give different

11  versions -- they're both under oath or they're all under

12  oath, and you can watch them, but they give different

13  versions of the same event -- the same events, they say

14  -- some say this happened and others say it didn't

15  happen and this was said and others say it wasn't said.

16  And so this is a case where it falls to you -- and I

17  have nothing to say about it, it falls to you whether

18  you believe a witness or not.

19       And so I'm trying to give you enough context --

20  because in addition each one says the other side's lying

21  about it, and the fact they're lying about it, that

22  tells you something.  They're going to argue that to

23  you.

24       So I'm trying to give you enough context so that

25  you'll be in a position to make up your judgment about

1    where the truth lies.  That's why we're going into some

2    of these other things and necessarily that takes some

3    time.  And I'm responsible for that.  But there are

4    limits.  And hook that into the papers, act as she had

5    left, I won't characterize why or how, but she had left,

6    but we're not getting into that.  I'll try not to talk.

7            (Laughter.)

8            THE COURT:  But you ought to know what I'm

9    trying to do here.  Context, yes, but -- because you

10   have to decide who you believe and what you believe.

11   But the four elements, that's what's before us.

12        Go ahead, Ms. Sullivan.

13            MS. SULLIVAN:  Your Honor, I'd like to reserve

14   at this time.

15            THE COURT:  That's it for this witness?

16            MS. SULLIVAN:  Yes.

17            THE COURT:  Well, I'm not so sure what you

18   mean by "reserve"?  What I understand you to mean is if

19   you need to call him back for rebuttal, you will ask for

20   that.

21        Is that right?

22            MS. SULLIVAN:  Yes.

23            THE COURT:  All right.

24        Now, do you wish to examine this witness at this

25   time or reserve until you present your case?

```
 1              MS. BROWN:  We're going to reserve until we
 2   present our case.
 3              THE COURT:  Then he may step down.  Very well.
 4         And you may call your next witness.
 5              MS. SULLIVAN:  Oh, thank you, your Honor.
 6         I'd like to call Ms. O'Connor, please.
 7              THE COURT:  She may be called.
 8              (CHRISTINE P. O'CONNOR, sworn.)
 9
10              **************************
11              CHRISTINE PATRICIA O'CONNOR
12              **************************
13
14   DIRECT EXAMINATION BY MS. SULLIVAN:
15   Q.  Ms. O'Connor, you are the City Solicitor for the
16   state of Lowell, correct?
17   A.  Correct.
18   Q.  And you're the head of the law department, is that
19   right?
20   A.  That's correct.
21   Q.  Okay.  How many employees do you supervise?
22   A.  I don't know the number offhand, it's probably
23   somewhere around 20, 23, something like that.  We
24   service, um, under the law department umbrella, we have
25   the election office, we have the worker's comp office,
```

1  we have the license commission, we have the tax title

2  division, um, the hearing officer, and then the sort of

3  "law department proper," if you will.

4          THE COURT:  And maybe I missed it, but if I

5  did, I apologize, but I don't know that anyone asked you

6  to state your full name.  Would you state your full

7  name.

8          THE WITNESS:  Absolutely, your Honor.  My full

9  name is Christine Patricia O'Connor.

10          THE COURT:  Thank you.

11      And go ahead, Ms. Sullivan.

12          MS. SULLIVAN:  Thank you, your Honor.

13  Q.  Do you supervise Ms. Brown and Ms. Pappenheim?

14  A.  I do.

15  Q.  And are you directing their work in this case?

16          MS. BROWN:  Objection.

17          THE COURT:  No, overruled.

18          THE WITNESS:  I'm sorry, I didn't hear the

19  question?

20          THE COURT:  "Are you directing their work in

21  this case?"

22          THE WITNESS:  No, not specifically, but

23  obviously in a general supervisory role.  They can

24  certainly come to me if they have a question about

25  something.  But other than that, um, I'm not handling

1   the case, no.

2   Q.   And they report to you and you evaluate their

3   performance, correct?

4   A.   Correct, we do performance evaluations and then

5   again they report to me as the supervisor.

6   Q.   How long have you been employed at the City of

7   Lowell?

8   A.   A little over 20 years in three different positions

9   within the law department.

10  Q.   Okay.  What was your first position at the law

11  department?

12  A.   When I first started with the City I started as an

13  Assistant City Solicitor and then, um, after about 6 or

14  7 years in that position I was promoted to the First

15  Assistant City Solicitor position, and again after about

16  6 years in that position I was promoted to the position

17  that I hold today.

18  Q.   And what legal experience did you have before you

19  came to the City of Lowell?

20  A.   Um, I had -- I can go into it in some bit of detail.

21  I had worked at the District Attorney's Office both in

22  District Court level as well as in the Appellate

23  Division and had argued, um, two cases in the Court of

24  Appeals and had handled a handful of trials just at the

25  District Court level.  My real experience, I would say

1    -- and I had worked in a private law firm as well.  But

2    my real experience were the years of, um, being an

3    Assistant City Solicitor.

4    Q.  So the experience you just described was while you

5    were a student in law school, correct?

6    A.  Um, yes, right, during that time during the summers

7    when I was not in school.

8    Q.  Okay.  And so you didn't have any other formal

9    experience other than -- in the law other than with the

10   City of Lowell, is that fair to say?

11            MS. BROWN:  Objection.

12   A.  Actually I had --

13            THE COURT:  Well -- no, I'm going to sustain

14   that.  She isn't called as an expert witness here.

15       Go ahead.

16   Q.  Do you have any, um, medical training?

17   A.  No.

18   Q.  So would it be fair to say that there's no reason

19   for you to be involved in an employee's work

20   restrictions request or issue, if there were any?

21   A.  From a medical standpoint, no, I would have no role

22   in that.

23   Q.  Your aware Ms. Cloutier has asthma, correct?

24   A.  I have come to become aware of that, yes.

25   Q.  And you were aware that she requested an

1   accommodation for her asthma at the library, right?

2   A.   Could you clarify the time that you're asking?

3   Q.   Yeah, 2013.

4   A.   So in 2013 I did not have a clear understanding that

5   there was a request for a workplace accommodation.  I

6   wouldn't necessarily, um -- it wouldn't be typical, I

7   guess, that I would know that, it would generally go to

8   the HR if there was such a request.

9   Q.   When did you become aware that Ms. Cloutier had

10  provided a doctor's note to Ms. Callery, who is the HR

11  head, and her supervisor, Ms. Woodley, for an asthma

12  accommodation?

13            MS. BROWN:  Objection.

14            THE COURT:  Ask the question again?  I'm

15  sorry.

16            MS. SULLIVAN:  Sure.

17  Q.   At what point in time did you become aware that

18  Ms. Cloutier had provided a doctor's note to

19  Ms. Callery, who is the head of HR, as well as her

20  supervisor, Ms. Woodley, for an asthma accommodation?

21            MS. BROWN:  Objection.

22            THE COURT:  Did you become aware of those

23  things?

24            THE WITNESS:  I don't believe, your Honor,

25  that I became aware of them, um, at the time period that

1    we're talking about.

2              THE COURT:  All right.

3              THE WITNESS:  I wouldn't see such a request

4    typically.

5              THE COURT:  And you -- and we're not just

6    talking typically, but this request, are you testifying

7    that back at the time you were not aware of it?

8              THE WITNESS:  Right, to the best of my --

9    sure, to the best of my knowledge I do not recall having

10   seen a request for an asthma accommodation.

11             THE COURT:  Thank you.

12             MS. SULLIVAN:  Your Honor, if I'd may I'd like

13   to show the witness Exhibit BK, which is a log to

14   refresh her recollection.

15             THE COURT:  You may.

16             MS. SULLIVAN:  Thank you.

17             (On screen.)

18   Q.  Ms. O'Connor, I'm showing you a log, um, and I'm

19   going to direct your attention to Page 30, assuming I

20   can scroll down there.  (Scrolls on screen.)  Actually

21   it's not coming up on my computer at the moment.

22        But would you have any reason to disagree with me

23   that you had at least two communications with

24   Ms. Woodley and Mr. Lynch on August 5th, 2013 and August

25   9th -- um, September 5th, 2013 regarding the, um,

1    Ms. Cloutier's request for accommodation?

2    A.   Actually I do recall that there was a communication

3    that went from Ms. Woodley to your client regarding the

4    policy of opening the windows, but at the time I didn't,

5    I guess, understand the nature of, um, the issues

6    regarding the windows, in other words that it was, um --

7    that there was this workplace accommodation on a medical

8    basis.

9    Q.   What was it that you didn't understand about her

10   request to open windows?

11              MS. BROWN:   Objection.

12              THE COURT:   No, overruled.

13   A.   I didn't understand, I guess, the, um -- that it was

14   somehow medically necessary.  I came to eventually see

15   the, um, note from the doctor that you're talking about

16   regarding the, um -- the need to open a window because

17   of asthma.

18   Q.   And that note, um -- you've seen that note before,

19   correct, it appears at Exhibit 55?

20   A.   Yes.

21   Q.   This is the note we're talking about?

22   A.   Yes.  I don't recall whether I've seen it as a

23   result of litigation or, um, when I would have seen that

24   note.

25   Q.   Okay.  Now you mentioned earlier that you had no

1   medical training and -- is that fair to say?

2   A.   Again that is fair to say.

3   Q.   Okay.  So there would be no reason for you to

4   actually be involved in Ms. Cloutier's accommodation

5   request, right?

6   A.   I wouldn't be, um, for that purpose -- I would not

7   be involved in a request of that nature for the purpose

8   of the actual accommodation.  I might be asked -- I

9   might be involved for some other reason if there were

10  say a legal issue that somebody was concerned about or

11  somebody wanted me to read something over to make sure

12  that, um, it didn't create any liability issues for the

13  City.

14  Q.   Did you believe that a request to open a window

15  created any liability issues for the City?

16  A.   Well, put in that way, um, without any further

17  context, no, I mean opening a window wouldn't create

18  liability for the City, but a communication from a

19  library director to an employee over what apparently had

20  been this issue, this controversy regarding opening

21  windows, may, um, particularly if the department head

22  was already the subject of a lawsuit by the employee.

23  Q.   All right.  Now, would you have any reason to --

24  isn't it true that between August 1st, 2013, the date

25  that Ms. Cloutier requested an asthma accommodation, and

```
1    October 29th, 2013, the date that she was escorted out

2    of her job, there were over 100 e-mails sent back and

3    forth between you, Ms. Gagnon, Mr. Lynch, Ms. Woodley,

4    and Ms. Callery, all about Ms. Cloutier's request to

5    simply open windows in the library for her asthma?

6    A.   It's possible.  I wouldn't -- I certainly wouldn't

7    know the number, but that's certainly possible.  And I

8    would add that, um, like the City Manager, I actually

9    have, um, more e-mails than the, um, than the manager.

10   We have stats for the City and we keep track of these

11   things for our budget.  So I average about 100 e-mails a

12   day.  And I can tell you, as a matter of practice with

13   the worker's comp office, for every firefighter or

14   police officer I would typically, as sort of a protocol,

15   get CCed.

16             MS. SULLIVAN:  Well, your Honor, may I have a

17   sidebar?

18             THE COURT:  Well, she hadn't finished her

19   answer.

20             MS. SULLIVAN:  Well, she's not being

21   responsive so I would --

22             THE COURT:  Well, if that's what you're saying

23   --

24             MS. SULLIVAN:  Yes.

25             THE COURT:   -- then we'll stop her at this
```

1   point, and you may ask another question.

2            MS. SULLIVAN:   Thank you.

3            THE COURT:   I don't necessarily express an

4   opinion on your characterization, but we'll stop her and

5   you can ask another question.

6            MS. SULLIVAN:   Okay.

7   Q.   Now, would you agree with me that, um, between

8   August 1st, 2013 and October 29th, 2013, over 55 percent

9   of the entire e-mails written about Ms. Cloutier, who is

10  one employee within a city of many employees, um, were

11  about her asthma accommodations?

12  A.   I wouldn't know.

13  Q.   Okay.   But you wouldn't have any reason to disagree

14  with me though, would you?

15  A.   I don't know, I may disagree if I looked into it.   I

16  don't know.

17  Q.   Now, isn't it true that Ms. Cloutier, um, was

18  escorted out of the library because she had requested an

19  accommodation for her asthma and because she had written

20  you a letter six days earlier threatening to file a

21  second MCAD claim over her asthma?

22  A.   Absolutely not.   The, um -- apart from the letter

23  speaking --

24  Q.   Now I'd like to move on to the next question.

25            THE COURT:   Now you understand?

1          THE WITNESS:  Yes, I understand.

2          THE COURT:  Your attorneys will have a chance

3    to ask questions as well.

4          THE WITNESS:  Yes, your Honor.

5          THE COURT:  Your answer was "Absolutely not."

6    That may stand.

7          And go ahead, Ms. Sullivan.

8          MS. SULLIVAN:  Thank you, your Honor.

9    Q.  I want to ask you a question about the, um, October

10   8th memo that Ms. Woodley had delivered to Ms. Cloutier.

11   Were you familiar with the testimony that you've heard

12   over the past few days regarding that memo?

13   A.  I guess generally I would be, yes.  If there's

14   something specific?

15   Q.  I'm happy to pull it up and show it to you so you

16   can see it.

17   A.  Oh, okay.  Thanks.

18   Q.  This is Exhibit 5.

19   A.  (Looks.)  Yes.

20   Q.  Okay.  And you're familiar with this memo, correct?

21   A.  I was CCed on this memo, yes.

22   Q.  Okay.  You would agree with me that there was a

23   meeting between Ms. Woodley and at least some of the

24   people copied on this memo who included yourself,

25   Ms. Callery, Ms. Gagnon, and Ms. Fougstedt, correct,

1    sometime between the time this memo was delivered to

2    Ms. Cloutier on October 8th and the day she was escorted

3    out on October 29th, 2013?

4              MS. BROWN:  Objection.

5              THE COURT:  She may answer.

6              THE WITNESS:  Thank you.

7    A.  I don't recall a meeting taking place about windows

8    or asthma.

9    Q.  Thank you.  And this memo, would you agree with me

10   that -- states that the City will not accommodate

11   Ms. Cloutier's asthma by opening the windows, correct?

12   A.  Is there a particular -- I can read through it, but

13   is there a particular section that you're calling my

14   attention to?  Just to speed things up or --

15   Q.  I'm just asking for -- would you agree with me that

16   this memo, as a whole, um, essentially states that the

17   City will not accommodate Ms. Cloutier's request to have

18   windows open for her asthma, do you see anything in

19   there that would say otherwise?

20   A.  If I could just take a quick moment to read it?

21   Q.  Sure.

22   A.  I'm sorry.  Would you mind scrolling back down?

23   Q.  Oh, sure.

24   A.  Yes.  Sorry.  (Reads.)  Okay, would you mind just

25   scrolling to the last paragraph?  I'll be very quick.

1  (Scrolls.)  There you go.  (Reads.)   Okay.

2        In response to your question I would say --

3  Q.  Do you want me to repeat it for you?

4  A.  Okay.

5  Q.  So my question was simply, after having reviewed

6  this memo, you would agree with me, would you not, that

7  the City has expressed its position that it will not

8  accommodate Ms. Cloutier because of her asthma, correct?

9  A.  No.  This memo is speaking to --

10  Q.  Thank you.  Let's move on.

11              THE COURT:  Her answer stands.  Go ahead.

12              MS. SULLIVAN:   Thank you.

13  Q.  Now, at the end of this memo Ms. Woodley indicates

14  to Ms. Cloutier that she will need union representation

15  at an upcoming meeting about this issue and that she

16  will likely be disciplined, correct?

17  A.  I'm sorry, is there a particular section?  I'm not

18  seeing that.  Is there a particular section of this memo

19  that you're referring to?

20  Q.  The last two sentences where it states --

21  A.  -- "Based on the information I received" --

22  Q.  Yes.

23  A.  -- "I may suggest that you have a union" -- excuse

24  me, "a representative from the union present, I will be

25  requesting that HR be present as well."  But that's not

1    about the windows, I don't believe, it's about her

2    recent absence.

3    Q.   Okay.

4    A.   And she also was advising her --

5    Q.   Thank you for your answer.

6         Now, are two of the people who are copied on this

7    memo Ms. Gagnon and Ms. Callery?  I'll scroll up for

8    you.

9    A.   (Reads.)  Yes, that's what it says.

10   Q.   Okay.  And, um, one of those two individuals,

11   Ms. Gagnon, reports to you, correct?

12   A.   She does.

13   Q.   Okay.  And Ms. Callery reports to the City Manager,

14   is that correct?

15   A.   No, HR reports to the Chief Financial Officer.

16   There's a smaller group of people that are direct

17   reports to the City Manager.

18   Q.   And ultimately she has this -- Ms. Callery has, um,

19   close contact, in terms of HR matters, with the City

20   Manager, correct?  She is, after all, the HR director?

21   A.   She is the HR director and her direct report is to

22   the CFO.  If there's a matter that involves the manager,

23   um, then I --

24   Q.   Thank you.

25              THE COURT:  Well, no, no, no, let's let her

1    answer what is responsive to the question.

2          And her direct report is to the CFO, which I take

3    it means "Chief Financial Officer"?

4                THE WITNESS:  It does.  I'm sorry.  It's the

5    "Chief Financial Officer."

6                THE COURT:  And you said you were explaining a

7    matter that would go to the City Manager.  What is that

8    practice?

9                THE WITNESS:  Correct.  So if it was a matter

10   that HR was dealing with say like, for example, a

11   termination and she would have to have direct --

12               MS. SULLIVAN:  Your Honor, I'd like to --

13               THE COURT:  No, I've asked the question, and

14   you can object to my question if you want, but I'll let

15   her answer.

16         Go ahead.  What is the procedure --

17               THE WITNESS:  Thank you.

18               THE COURT:  -- that would get it before the

19   City Manager?

20               THE WITNESS:  So if there were a discrete

21   issue that required the manager's attention, then HR

22   would deal directly with the manager on say like a

23   termination and there wouldn't be a need to be, um, I

24   guess involving the CFO if it wasn't an issue -- if it

25   was an issue like that.

1   Q.  All right.  And the two individuals I just

2   identified, Ms. Callery and Ms. Gagnon, who are CCed on

3   this memo, are in fact, just as Ms. Woodley predicted in

4   her memo, the two women who actually escorted out

5   Ms. Cloutier of the library on October 29th, 2013 and

6   told her that due to her physical impairments she could

7   no longer work at the library, correct?

8                MS. BROWN:  Objection.

9   A.  In that a question?

10  Q.  That is a question.

11               THE COURT:  I didn't understand it, so you'll

12  have to ask it again.

13               MS. SULLIVAN:  Sure.

14  Q.  Isn't it true that the two women who escorted

15  Ms. Cloutier out of the library on October 29th, 2013

16  were Ms. Callery and Ms. Gagnon?

17               THE COURT:  Well, do you know of your own

18  knowledge?

19               THE WITNESS:  No, I wasn't there so.

20               THE COURT:  Right.  She doesn't know.

21               THE WITNESS:  But that's my understanding.

22  Q.  Now, Ms. Gagnon reported to you, after Ms. Cloutier

23  had been escorted out, that she had in fact been

24  escorted out, correct, that's what her testimony was the

25  other day?

```
 1   A.   Ms. Gagnon, after she had met with Diane at the

 2   library reported back to me and informed me that Diane

 3   was informed that because of the new work restrictions

 4   we could at this time not accommodate her.

 5   Q.   Is it your memory under oath that that's the first

 6   time you learned that Ms. Cloutier was going to be

 7   escorted out of the library?

 8   A.   Actually the escorting out of the library, I don't

 9   believe came up.  My involvement was -- ahead of time

10   was being aware of the delivery of these new

11   restrictions.  And then as to the particulars of how it

12   was done, other than having HR present, um, that was

13   probably the extent of our conversation over it.

14   Q.   Why is -- why did you have an understanding that

15   Ms. Cloutier was being escorted out of the library over

16   her work restrictions?

17   A.   I don't think I said that I did have an -- the focus

18   of my discussions with Ms. Gagnon would have been

19   focused on having these new restrictions and informing

20   an employee that at this time they couldn't be

21   accommodated, and having it in writing and bringing it

22   to her.

23   Q.   Why did they tell you she was escorted out for the

24   medical restrictions?

25              MS. BROWN:   Objection.
```

1           THE COURT:  Overruled.  But let's be specific.
2    Why did they?
3        Did anyone tell you about her being escorted out?
4           THE WITNESS:  It's possible it was mentioned
5    to me, but that's not the focus, I guess, is what my
6    testimony is.
7           THE COURT:  All right.  Who made such report?
8           THE WITNESS:  Karen Gagnon would have, um,
9    returned from the -- from the library visit and just
10   updated me that basically she had completed her, um,
11   delivery of the information in the letter.
12          THE COURT:  As best you recall, what did she
13   say?
14          THE WITNESS:  I actually, your Honor, don't
15   have a specific recollection of that conversation, but
16   that would have been the --
17          THE COURT:  My question was as best you
18   recall.
19          THE WITNESS:  Yeah.  So as -- I apologize.  As
20   best I recall, she would have returned and again she
21   would have told me that, um, pursuant to our discussion
22   prior to her going to the library, that the employee was
23   informed that the City could no longer accommodate the
24   late-duty restrictions, um, and that there was a letter
25   detailing it, as well as the denial of her worker's comp

1    claim.

2    Q.  But you have no specific recollection of that, as

3    you just testified a moment ago, correct?

4    A.  No.

5    Q.  So are you --

6    A.  You were asking whether I had a specific

7    recollection of -- of Karen Gagnon coming back to the

8    law department and reporting that they escorted her out

9    of the library, and what I'm trying to explain to you

10   is --

11   Q.  Let me start there because actually the Judge --

12             THE COURT:  Wait.  Wait.  Wait.

13             MS. SULLIVAN:  Okay.

14             THE COURT:  Have you answered her question?

15             THE WITNESS:  Well, I'm not sure, your Honor.

16             THE COURT:  All right.  Well, then we'll let

17   her ask another.

18             THE WITNESS:  Okay.

19   Q.  Okay.  Now here's my question.  You're not involved

20   in an employee's medical restrictions or accommodations

21   typically, correct?

22             MS. BROWN:  Objection.

23             THE COURT:  Well, you've asked that and we

24   know what her position is.

25             MS. SULLIVAN:  Okay.

1    Q.  So my question is, why were you involved in this

2    particular issue?

3    A.   It was an issue for the worker's comp office, it was

4    a change in the status of an employee, and so I would

5    have been aware of it in the same way that I'm aware of

6    other worker's comp issues.

7    Q.   What was the change in status?

8    A.   She had been receiving light-duty assignments for,

9    um, about 16 months, I believe, and with the new

10   doctor's restrictions we were unable to continue to

11   accommodate a light-duty restriction.

12   Q.   What were the new doctor's restrictions?

13   A.   As has been testified earlier, the original

14   restrictions were that she could lift things up to 10

15   pounds.  With the new doctor's restrictions, she could

16   not lift anything over 0 pounds.  And so the letter was

17   informing her that, with those restrictions in place,

18   she could not be safely accommodated in the workplace.

19   Q.   And you just testified a moment ago that you didn't

20   actually know that or have any specific recollection, is

21   that fair to say?

22   A.   No.

23   Q.   Okay.

24   A.   That is not fair to say.

25   Q.   And you don't have any medical training whatsoever,

```
 1   right?

 2            MS. BROWN:  Objection.

 3            THE COURT:  Yeah, asked and answered.

 4   Sustained.

 5            MS. SULLIVAN:  Okay.

 6   Q.  Now, I want to talk to you about the last letter

 7   that Ms. Cloutier wrote to you, it's dated December --

 8   I'm sorry, October 21st, 2013.  It's Exhibit 27.  I'll

 9   show it to you in a moment.  (On screen.)  Okay.

10        Do you see that letter, I think it's Exhibit 27?

11   A.  (Looks.)  Would you mind scrolling just to the --

12   (Scrolls.)  Okay.  Yes.

13   Q.  Do you recall receiving that letter on October 23rd,

14   2013?

15   A.  I have a general recollection of receiving letters,

16   um, and so this one's dated, um -- what was it again?

17   Q.  Well, the law department stamps this October 23rd,

18   right?

19   A.  Yes.

20   Q.  Okay.  And, um, October 23rd, 2013 was a Wednesday,

21   correct?

22   A.  Um, I would rely on -- I don't know offhand.

23   Q.  Okay.  And Ms. Cloutier was escorted out the

24   following Tuesday, October 29th, so approximately 6 days

25   later, would you agree with me?
```

1    A.   I would agree that it was October 29th, right, that

2    the letter was delivered.

3    Q.   Okay.   And would you also agree with me that this

4    letter, that's Exhibit 27, um, in this letter

5    Ms. Cloutier stated that she, um, intended to sue the

6    law department and the HR department, um, as

7    participating in the retaliation against her, and by

8    "sue" she meant by filing a second MCAD complaint,

9    correct?

10                MS. BROWN:   Objection.

11                THE COURT:   You're asking her does the letter

12   say that?

13                MS. SULLIVAN:   Yes.

14                THE COURT:   And did you understand the letter

15   said that?

16                THE WITNESS:   I did, your Honor, several of

17   her letters had that theme.

18                THE COURT:   All right, that was her

19   understanding.

20   Q.   Okay.   This letter specifically, for the first time,

21   actually said that she was going to file a second MCAD

22   complaint, did it not?

23                THE COURT:   Is this the first notification

24   that that was her position, that's your question?   Is

25   that what you understood?

1          MS. SULLIVAN:  Yes.

2          THE COURT:  All right.

3    A.  Um, this may be the first letter that she is stating

4    the -- a second MCAD complaint, but the letters in

5    general, um, spoke to the same issue of bringing further

6    lawsuits.

7    Q.  And this was the first letter that named you

8    specifically as a participant, um, as someone she

9    intended to hold accountable, correct?

10          THE COURT:  You're asking what the letters say

11   and so the letters, which are in evidence, say whatever

12   they say.  I assume you're asking, "Did you understand

13   that this was the first letter that named you as a

14   participant and a potential defendant?"

15          MS. SULLIVAN:  Thank you, yes.

16          THE COURT:  Did you?

17          THE WITNESS:  No, it's named --

18          THE COURT:  Please clarify that.

19          THE WITNESS:  Correct, it's the -- she's

20   stating that it would name the law department and Human

21   Resources, but it's not saying that it would name me

22   specifically as a defendant.

23          THE COURT:  So that was your understanding,

24   correct?

25          THE WITNESS:  Correct.

1    Q.   Okay.  So to be clear is it your testimony that you

2    did not understand the statement, "I hope the City is

3    prepared to spend another $100,000 or more to defend

4    against a second MCAD claim which will name the law

5    department and Human Resources as participants," as

6    something that would exclude you, was that your

7    understanding?

8                MS. BROWN:  Objection.

9                THE COURT:  Sustained.

10               MS. SULLIVAN:  Okay.

11   Q.   I want to ask you a couple of -- actually one more

12   question on this topic.

13        Isn't it true that this letter is what pushed you

14   over the edge and caused you to order the firing of

15   Ms. Cloutier?

16   A.   Not at all.

17               MS. BROWN:  Objection.

18               THE COURT:  The objection's overruled.  Her

19   answer may stand.

20   Q.   Now, I want to ask you a couple of questions about

21   the surveillance that was done of Ms. Cloutier.

22        Isn't it true that you received a memo in 2007

23   regarding surveillance guidelines as they pertain to the

24   City of Lowell?

25   A.   In 2007?

1   Q.   Yes.

2   A.   Oh, I apologize.   There was a communication when,

3   um, we were, um, making certain changes to our worker's

4   comp procedures, we received a memo from an outside

5   nurse case manager who was advising the City that this

6   is what they used for potential guidelines if we were to

7   adopt surveillance as an example.

8   Q.   All right.

9        MS. SULLIVAN:   I'd like to show the witness

10  AR -- what's been marked for identification as AR and it

11  is the memo that we were just discussing a moment ago.

12  Q.   Do you see that, Ms. O'Connor?

13       MS. BROWN:   Objection.

14       THE COURT:   Well --

15       MS. SULLIVAN:   I'm going to ask her about --

16  just about her understanding of the document, that's

17  all.

18       THE COURT:   Well, does she see the document?

19  I'll allow that.

20       Do you see this?

21       THE WITNESS:   I do, your Honor.

22       THE COURT:   Is that the document to which you

23  just made reference?

24       THE WITNESS:   Yes, it is, your Honor, that's

25  the document.

1           THE COURT:  All right.

2           MS. SULLIVAN:  I'd like to move for admission

3   of this into evidence, your Honor.

4           MS. BROWN:  I object.

5           THE COURT:  Sustained.

6           MS. SULLIVAN:  Okay.

7   Q.  Now, Ms. O'Connor, you just described a moment ago a

8   memo regarding surveillance guidelines.  And would you

9   agree with me that, um, this memo generally, um --

10  "Generally speaking 8 hours of surveillance during

11  strategic hours most often proves adequate to get a

12  sense of the situation and determine if additional

13  surveillance is warranted."

14          THE COURT:  No, no, the document -- I excluded

15  the document on this foundation.  You may certainly ask

16  about any policies that the City had with respect to,

17  um, surveillance and you may ask whether things were

18  done differently at all with respect to Ms. Cloutier.

19  All of those questions you may ask.  But this memo from

20  some outside person back in 2007, what it may have said,

21  is excluded.  Move on.

22          MS. SULLIVAN:  Okay.

23  Q.  You -- isn't it true that you included the -- that

24  you personally included this memo in a packet you sent

25  to the City Council in August of 2014 when they

1   requested information about your surveillance program?

2           MS. BROWN:  Objection.

3           THE COURT:  The objection is sustained.

4           MS. SULLIVAN:  Okay.

5   Q.  Now, isn't it true that, um, generally the policy of

6   the City was 8 hours of surveillance is sufficient, um

7   -- is sufficient, correct?

8   A.  No.  While we had a policy with respect to

9   surveillance, um, we had never developed a specific

10  policy with respect to time limits.

11  Q.  And you did over 150 hours of surveillance of

12  Ms. Cloutier, is that fair to say?

13          MS. BROWN:  Objection.

14          THE COURT:  No, overruled.

15  A.  I know from these proceedings that that's the number

16  that's mentioned and, um, I don't have a sort of

17  personal knowledge as to exactly how many hours, but it

18  would be, I suppose, in that ballpark.  She had two

19  separate claims, so there were two separate instances of

20  surveillance with Ms. Cloutier.

21  Q.  Actually there were six rounds of surveillance and

22  you signed off on each and every one of the surveillance

23  invoices, did you not?

24  A.  I have to sign off on all invoices --

25  Q.  The question is just "Yes" or "No."

```
1              THE COURT:  No.  No.  No.  You interrupted
2    her, but the question was just "Yes" or "No."
3         Can you answer it just "Yes" or "No"?
4              THE WITNESS:  I can, your Honor.
5    A.  Yes.
6              THE COURT:  The answer is "Yes."
7              MS. SULLIVAN:  Thank you, your Honor.
8    Q.  Now, um, isn't it also true that at some point in
9    time the City Council got wind of how much surveillance
10   had been done of Ms. Cloutier and shut the program down,
11   correct?
12             MS. BROWN:  Objection.
13             THE COURT:  The objection's sustained.
14             MS. SULLIVAN:  Okay.
15   Q.  And would you also agree with me, um, that following
16   the surveillance of Ms. Cloutier, you instructed that no
17   further surveillance of --
18             THE COURT:  The objection is sustained.  When
19   I make rulings, they are rulings.  Now move on.
20             (Pause.)
21             MS. SULLIVAN:  I'd like to reserve, your
22   Honor.
23             THE COURT:  Understanding what you mean by
24   that now, that's fine.
25         And, Ms. Brown, do you wish to examine this
```

1   witness now or reserve until your presentation of your

2   case?

3              MS. BROWN:  I'd like to reserve, your Honor.

4              THE COURT:  Very well.  You may step down.

5   And thank you.

6         Call your last witness.

7              MS. SULLIVAN:  Thank you.  I'd like to call

8   Ms. Gilbert.

9              THE COURT:  She may be called.

10             (DR. SARAH ELIZABETH GILBERT, sworn.)

11             THE COURT:  And just so I don't forget, let's

12   start by asking you your full name.

13             THE WITNESS:  Dr. Sarah Elizabeth Gilbert.

14             THE COURT:  Yes.  And maybe you can pull that

15   mic a little bit closer to you.

16             THE WITNESS:  Thank you, your Honor.

17             THE COURT:  Go ahead, Ms. Sullivan.

18             MS. SULLIVAN:  Thank you.

19

20             * * * * * * * * * * * * * * * * * * * * * * * * *

21             DR. SARAH ELIZABETH GILBERT

22             * * * * * * * * * * * * * * * * * * * * * * * * *

23

24   DIRECT EXAMINATION BY MS. SULLIVAN:

25   Q.  Ms. Gilbert, isn't it true you're a full-time

1    emergency room doctor in Western, Massachusetts?

2    A.   Central Massachusetts, yes.

3    Q.   I'm sorry?

4    A.   I practice in Central.

5    Q.   Okay.  And you also moonlight as a contract city

6    physician for the City of Lowell, correct?

7    A.   I work part-time as a contract physician for the

8    City of Lowell.

9    Q.   Okay.  And you're contracted by the task, is that

10   fair to say?

11   A.   I'm sorry, I don't understand your question?

12           THE COURT:  It is piecework, you're contracted

13   by a specific examination, you don't have specific

14   hours.

15   A.   That is correct.

16           THE WITNESS:  Thank you, your Honor.

17   Q.   Okay.  And you work in the law department, is that

18   fair to say?

19   A.   I work out of the law department, yes.

20   Q.   And you report to Ms. O'Connor, right?

21   A.   Not on a daily basis.

22   Q.   But you do report to her in connection with any work

23   that you perform for the City, right?

24   A.   Um, I don't report to her on every case that I see,

25   it's not necessary.  I work out of the law department,

1    she is the head of the law department, but I do not need

2    to report to her on every case.

3    Q.   Okay.  And you have a contract with the City through

4    Ms. O'Connor, correct?

5    A.   I have a contract through the City.  Ms. O'Connor is

6    one of the people who signs my contract.

7    Q.   Who else signs it?

8    A.   Um, usually one of the Assistant City Solicitors and

9    the City Manager.

10   Q.   Okay.  And you're paid at least $35,000 by the City

11   to basically come in a few days a week and do the tasks

12   that have been assigned to you, correct?

13            MS. BROWN:   Objection.

14            THE COURT:   No, her pay is fair.

15        How is your stipend worked out?

16            THE WITNESS:   I bill based on the time that I

17   spend with patients' record review, termination

18   conferences regarding the patients, and that usually

19   amounts to around $35,000 a year.

20            THE COURT:   But the way she phrased it, just

21   so I can pin it down, is you have a minimum of 35,000

22   and maybe more, but they'll pay you at least $35,000 to

23   be sure of your services over a year period?

24            THE WITNESS:   No, actually there is no

25   minimum, the salary was capped originally at 35,000.  If

1  I am doing extra work and it goes over that amount in a

2  year's time, I can petition the City for extra income.

3  THE COURT:  Okay.

4  MS. SULLIVAN:  Thank you.

5  Q.  And you're being paid to be here today, correct?

6  A.  That has not been arranged at this point.

7  Q.  And you appeared in a deposition in connection with

8  this matter about a year and a half ago, is that fair to

9  say?

10  A.  Yes.

11  Q.  And you were paid for your time at that deposition

12  as well, right?

13  A.  That I was.

14  Q.  Okay.  Do you know how much monies you -- how much

15  in total monies you received from the City in 2017?

16  A.  It was approximately $36,000.  I don't remember the

17  exact amount.

18  MS. BROWN:  Objection.

19  THE COURT:  The objection's overruled.  The

20  answer may stand.

21  MS. SULLIVAN:  Thank you.

22  Q.  And do you know how much approximately you received

23  from the City in 2016?

24  A.  It was approximately $35,000.  Again I don't have

25  the exact figures memorized.

1    Q.   Okay.  And, um, do you know how much your contract

2    says you get per hour to review medical records?

3    A.   Yes.

4    Q.   And what is that amount?

5    A.   It's $400 an hour.

6    Q.   Okay.  And do you know what you get to, um -- you

7    get paid to make a phone call?

8    A.   For nonmedical record review my billables are at

9    $240 an hour.

10   Q.   All right.  And how about when you do an exam, do

11   you have a particular rate for that?

12   A.   Yes.

13   Q.   What is it?

14   A.   I bill $150 for each medical exam that I perform.

15   Q.   Okay.  And, um, you bill the City for the work that

16   you perform, isn't that correct?

17   A.   Yes.

18   Q.   Okay.  And so you keep records of what you do so you

19   can prove that you did the work and get paid, is that

20   fair to say?

21   A.   I keep records of the work that I do, yes.

22   Q.   Okay.  And those records, um, would include

23   documentation of work you performed, the date you

24   performed it, and the purpose of the work and the hours

25   spent, correct?

```
1    A.   Correct.

2    Q.   Okay.  And you're aware that in the course of this

3    lawsuit you never provided a single invoice or purchase

4    order or anything indicating that you ever reviewed

5    Ms. Cloutier's medical records, is that fair to say?

6    A.   Can you repeat the question please?

7    Q.   Sure.

8         Isn't it true that in connection with this lawsuit

9    you've never provided a single invoice or a single

10   record indicating that you performed any work reviewing

11   the records in connection with Ms. Cloutier's case?

12   A.   To the best of my recollection I don't believe that

13   to be true.

14   Q.   Is it your claim that you did provide records that

15   reflect that you actually performed work in this case?

16   A.   Before I --

17   Q.   At any point in time.

18             THE COURT:  Wait.  Wait.  Wait.  We need to go

19   a little slower here.  All right, I take it you withdrew

20   that question and now you're going to try another.  Go

21   ahead.

22             MS. SULLIVAN:  Yes.

23   Q.   What if any records have you provided in connection

24   with this case demonstrating that you actually billed

25   for any records review of Ms. Cloutier's records?
```

1   A.  I would have to go back and look at what I billed

2   for in regards -- in conjunction with this case.  I see

3   obviously lots of patients.  I don't remember.

4              MS. SULLIVAN:  Your Honor, may I have a

5   sidebar?

6              THE COURT:  You may.

7

8              AT THE SIDEBAR

9              THE COURT:  Well, this is going swimmingly and

10  I couldn't be happier.

11       Now, first of all, she didn't provide anything,

12  it's you, the defendants, who provide the things, and

13  we're unclear as to what was requested.  So there really

14  isn't any foundation for this.  But I suppose Ms. Brown

15  will tell us whether the City, the defendants, provided

16  any documents with evidence that she reviewed

17  Ms. Cloutier's medical records?

18              MS. BROWN:  I'm looking at the production and

19  I don't really know off the top of my head, but -- I

20  would just say that the time of discovery was a while

21  ago, and if there were objections to what was produced

22  --

23              MS. SULLIVAN:  It was subpoenaed for trial,

24  your Honor.  Not only were they requested in --

25              MS. BROWN:  We've --

1           THE COURT:  Okay, so there's a -- so you're

2    depending upon a subpoena?

3           MS. SULLIVAN:  Well, the request it in

4    discovery --

5           THE COURT:  I understand.

6           MS. SULLIVAN:  We requested it in discovery

7    and it was not provided --

8           THE COURT:  All right.  Wait a minute.  Wait a

9    minute now.  Wait a minute.  Let's talk about this.

10         This is not a medical malpractice case.  We're not

11   going to get into anything like that.  I assumed you

12   were going to -- if you wanted to, you were going to ask

13   her about where the physical exam took place.  I suppose

14   they might want to ask her whether she developed a view

15   or an opinion that Ms. Cloutier's malingering, because

16   that's germane to this case.

17         But other than that, tell me why you've called

18   her, how does she help your case?

19         MS. SULLIVAN:  Your Honor, their whole defense

20   is premised on medical advice she allegedly gave.

21   There's not a single record that she ever looked at

22   Ms. Cloutier's records.  None.  There's no invoice.

23   There's no records she wrote.  Nothing.

24         THE COURT:  Well, did she give the advice?

25         MS. SULLIVAN:  That's what they're claiming.

```
 1              THE COURT:  Do you think -- you've taken her
 2    deposition, does she say she did?
 3              MS. SULLIVAN:  Yes, and there's nothing to
 4    show that.
 5              THE COURT:  Well, okay.  Okay.  And she has
 6    nothing to back it up, as you say?
 7              MS. SULLIVAN:  Correct.
 8              THE COURT:  All right.  Now, one imagines --
 9    now, with the subpoena, the subpoena calls for these
10    records?
11              MS. SULLIVAN:  Yes.
12              MS. BROWN:  But the objection's been
13    sustained.  The records, if they were relevant to the
14    case, the claim has been otherwise requested in
15    discovery and we provided a lot of documents in
16    discovery --
17              THE COURT:  No one denies that.  The motion to
18    quash the subpoena is denied.
19              MS. BROWN:  There was no motion to compel
20    these, there was no mention at the depositions --
21              THE COURT:  It's not her burden to compel
22    them, in fact it's your duty to supplement.  So I've
23    denied the motion to quash the subpoena, I assume you
24    have the records supportive of the subpoena, and where
25    are they?  Or you could take the position that none of
```

1    them have been produced.  And that's fine.

2               MS. BROWN:  I -- I mean her invoices -- I just

3    don't know.

4               THE COURT:  You don't know?

5               MS. BROWN:  It doesn't --

6               MS. SULLIVAN:  It's --

7               THE COURT:  Well, wait a minute.

8               MS. SULLIVAN:  That's --

9               THE COURT:  Wait a minute.  You have to

10   produce what you have or there isn't any.  And, you

11   know, you can either stipulate to it or she can inquire

12   about it.

13        Do you want to stipulate?

14               MS. BROWN:  Yes, these records were all

15   produced in --

16               THE COURT:  Well, fine, but we're standing at

17   the sidebar, can you -- where's your -- you know the way

18   it works is with respect to the actual -- remember I'm a

19   seceding judge on this.  You've got all the docket of

20   this case.  You've got all the various requests.  Once

21   the request is out there, the burden is on you, not her,

22   to make some motion to compel.  Though she could have.

23   But that's not the way litigation works.

24        Okay I'm getting the impression, I'm getting a

25   sense that there is no evidence, but that doesn't mean

```
 1    she didn't do it, but you're going to have to look into
 2    a stipulation that there's no evidence of it.
 3           So are you willing to stipulate to that?  And then
 4    we have this and you can argue about it.
 5                  MS. BROWN:  I'm not willing to stipulate to
 6    it.  I believe that --
 7                  THE COURT:  Well, where are they?
 8                  MS. BROWN:  Well, I think they are part of the
 9    production.
10                  THE COURT:  Well, look, let's not beat around
11    the bush, I've denied the motion to quash the subpoena
12    --
13                  MS. BROWN:  Yes, all right.  I have a problem
14    then.
15                  THE COURT:  -- and it's your obligation to
16    have these records.
17           So where are they?
18                  MS. BROWN:  I do not know at this time.
19                  THE COURT:  Well, you know, you're not going
20    to extend this case over this.  Is that what you want me
21    to tell the jury about this, that you didn't bring this
22    and therefore we have to come back next week?  Come on.
23                  MS. BROWN:  No, no, no, um, I mean I -- we can
24    stipulate that we don't have them.
25                  THE COURT:  All right.  Fine.  All right.
```

```
1              MS. SULLIVAN:  Thank you.

2              THE COURT:  Then I'll frame it in a neutral

3     way and see if you both agree.

4

5              (In open court.)

6              THE COURT:  To save time, and the lawyers are

7     actually both interested in saving time, first of all,

8     the way Ms. Sullivan is asking it, "Can you produce any

9     records?"  Well, she's not a party to this case, she's

10    not a defendant, no one sued her, and she's under no

11    obligation to produce any records.  But just as with

12    depositions, um, lawyers get ready for trial by asking

13    the other side, "Give us records" and so on and so

14    forth.  So to save time now, after talking with the

15    lawyers over there, the City of Lowell and the three

16    individual defendants, are willing to stipulate that

17    they do not have the records or they have not produced

18    the records that about which Ms. Sullivan is asking,

19    specifically records which show that she reviewed

20    medical records -- she, Dr. Gilbert, reviewed medical

21    records of Ms. Cloutier.

22         So stipulated, Ms. Brown?

23              MS. BROWN:  Yes, as to Ms. Cloutier.

24              THE COURT:  As to Ms. Cloutier, of course.

25         Ms. Sullivan, so stipulated?
```

1          MS. SULLIVAN:  Yes.  Thank you, your Honor.

2          THE COURT:  So the stipulation, they agree, so

3    even though I say it, it is evidence, and that's special

4    evidence, it's evidence as to which nobody disagrees to

5    that.  They agree.  The people sued and the City are

6    unable to produce the records as I just described them.

7    We'll see what the witness has to say about what was

8    done, if she remembers, but no records.

9          Go ahead, Ms. Sullivan.

10          MS. SULLIVAN:  Thank you, your Honor.

11    Q.  Ms. Gilbert --

12          THE COURT:  It's "Dr. Gilbert," but go ahead.

13          MS. SULLIVAN:  Oh, I'm sorry.

14    Q.  Dr. Gilbert, in October of 2012, you examined

15    Ms. Cloutier at City Hall, correct?

16    A.  Yes.

17    Q.  Okay.  Did you ever produce any reports pertaining

18    to that examination?

19    A.  I did.

20    Q.  Okay.  And do you know approximately how long that

21    report was in terms of pages?

22    A.  It was several pages.  I don't remember exactly how

23    many.

24    Q.  Okay.  And do you recall when you produced that

25    report?

1    A.   After I examined her.   I don't remember exactly on

2    what day.

3    Q.   Okay.   And, um, did you produce anything else in

4    connection with your report?

5              THE COURT:   She's not under any obligation to

6    produce, but now this is different, the stipulation was

7    about looking over medical records.

8         So now here we have a physical.   Do you remember

9    examining her?

10             THE WITNESS:   Yes, sir.

11             THE COURT:   Okay.   And you remember you

12   prepared a written report of several pages?

13             THE WITNESS:   Yes, sir.

14             THE COURT:   And to whom does that go in the

15   ordinary course?

16             THE WITNESS:   Um, after I see patients I

17   dictate my reports into a Dictaphone, it is then

18   transcribed by one of the City law department employees.

19   I'm given the dictation back to review to correct.   Once

20   it's corrected in final form, I sign it, and it is

21   placed in the patient's record.

22             THE COURT:   Okay.

23        Go ahead, Ms. Sullivan.

24   Q.   Did you also generate, in connection with your

25   report, a checklist pertaining to Ms. Cloutier?

1    A.   I'm not sure what you're referring to, what kind of

2    "checklist"?

3    Q.   In the course of your work for the City from time to

4    time, have you been asked to fill out any checklists

5    pertaining to a person's work capabilities?

6    A.   I don't generate checklists generally, no.

7    Q.   You don't recall ever filling out a checklist?

8    A.   A "checklist" per say which would be a -- I'm not

9    sure exactly what kind of "checklist" you're asking me

10   about.

11   Q.   A document that has boxes where you put checkmarks

12   in them.

13   A.   A document with checkmarks?  Are you referring to a

14   "Work Status Form"?

15   Q.   Is that what you prefer to call it?

16   A.   I will fill out a paper which lists what an

17   employee, in my opinion, my medical opinion, is capable

18   of performing and it is a one-sheet piece of paper that

19   has a grid on it and it lists different abilities to

20   lift, push, pull, carry, climb, things of that nature.

21   Q.   And my question is do you recall filling out the

22   document that you refer to as the "Work Status Form"

23   in -- well, shortly after you examined Ms. Cloutier in

24   October of 2012?

25   A.   Yes.

1   Q.   Okay.  So would it be fair to say that, um, after

2   your examination of Ms. Cloutier, you generated a report

3   and a completed checklist or a Work Status Form?

4   A.   Yes.

5   Q.   Okay.  Did you ever request to examine Ms. Cloutier,

6   um, again after October of 2012?

7   A.   I did not.

8   Q.   Okay.  So the only time that you ever examined

9   Ms. Cloutier was -- was in October of 2012,

10  approximately a year before she was escorted out of her

11  job, correct?

12  A.   The only time I examined Ms. Cloutier was October of

13  2012.

14  Q.   Okay.  At some point you became aware that

15  Ms. Cloutier was placed under surveillance by the City,

16  is that also fair to say?

17  A.   Yes.

18  Q.   Are you familiar with a man named Sean Mustaffa?

19  A.   Yes.

20  Q.   And how do you know him?

21  A.   He's a private investigator that, um, I had used for

22  some personal business.

23  Q.   And in fact he was a business partner of yours as

24  well, isn't that fair to say?

25  A.   We invested in some real estate together --

1          MS. BROWN:  Objection.

2          THE COURT:  The objection's overruled.  And

3    you may and you are answering the question.

4          THE WITNESS:  Sorry.

5          THE COURT:  What's your business relationship

6    to the gentleman?

7          THE WITNESS:  We invested in some real estate

8    together.  Excuse me, your Honor.

9    Q.  And you're aware that Mr. Mustaffa is a private

10   investigator, correct?

11   A.  I am.

12   Q.  And were you aware that the City retained him to do

13   private surveillance of Ms. Cloutier?

14   A.  No, not at the time that that occurred.

15   Q.  Okay.  And at some point did you become aware that

16   Mr. Mustaffa was paid approximately $2,000 to, um, put

17   Ms. Cloutier under surveillance for approximately 35

18   hours?

19   A.  I am not aware of how much he was paid, I know that

20   the City hired him to put Ms. Cloutier under

21   surveillance.

22   Q.  Okay.  At some point in time in or around September

23   of 2013, um, you were made aware that Ms. Cloutier was

24   out of work, is that fair to say?

25   A.  Yes.

1    Q.   Okay.  And how were you made aware of that?

2    A.   Um, excuse me.  A letter that, um, she sent to the

3    City Solicitor was brought to my attention.

4    Q.   Okay.  Do you recall who brought that to your

5    attention?

6    A.   I don't remember if it was Karen Gagnon or the nurse

7    case manager at the time.

8    Q.   Okay.  And do you know, um, the date that

9    Ms. Cloutier went out of work in or around September of

10   2013?

11   A.   I don't recall off the top of my head, no.

12   Q.   Okay.  I'd like to show you what's been marked as

13   Exhibit 56.  (On screen.)  This is Ms. Cloutier's out of

14   work -- can you see that?

15   A.   Yes, I can.  Thank you.

16   Q.   This is Ms. Cloutier's out of work note dated

17   September 12th, 2013.

18   A.   (Looks.)

19   Q.   Does this refresh your memory as to when you were

20   alerted to the fact that Ms. Cloutier was out of work?

21   A.   Well, I remember seeing this document.  I don't

22   remember on what day I saw this document.

23   Q.   Okay.  What if anything did you do once you learned

24   that Ms. Cloutier was out of work?

25   A.   I'm not sure I understand the question.

1        THE COURT:  Well, I understand the question,

2   but, um --

3        Upon learning that -- another way to ask it, upon

4   learning that, did you do anything?

5             THE WITNESS:  I did not.

6             THE COURT:  Okay.

7   Q.  Okay.  Would you agree that you didn't generate any

8   type of medical record -- medical documentation about

9   Ms. Cloutier or anything like that?

10  A.  Are you talking in regards specific to this

11  out-of-work note?

12  Q.  After you -- well, after -- I'm talking about after

13  you learned of the fact that she was out of work.  My

14  question was what if any documentation did you generate

15  at that time?

16  A.  At this time?  Nothing.

17  Q.  Okay.  Did you ever, um -- and would you agree with

18  me that at some point you were made aware that

19  Ms. Cloutier stated she was out of work between

20  September 11th and October 7th, 2013 due to an assault

21  by her supervisor?

22  A.  I was aware that she had alleged that there was an

23  assault, yes.

24  Q.  Okay.  Did you ever see an injury report filled out

25  by Ms. Cloutier about this altercation?

1  A.   I don't remember.

2  Q.   Okay.  Did you have any view -- once you learned

3  that Ms. Cloutier was, um, claiming an injury as a

4  result of this altercation, um, that this was a new

5  injury or did you believe that it was just an extension

6  of the old injury for which you had examined her?

7  A.   I believe that it could have been an extension of an

8  old injury that -- that what she was claiming was

9  inconsistent with the actions as they had been described

10  to me.

11  Q.   Was it your view that Ms. Cloutier would need to

12  fill out a new injury report, um, as part of law

13  department policy, in order for you to begin any process

14  of records review or anything like that?

15          MS. BROWN:  Objection.

16          THE COURT:  No, she may have it.

17  A.   Every time there's been an injury at work we require

18  that employees fill out a work injury report, whether it

19  be a fresh injury or an aggravation of an underlying

20  injury.  Every time someone's been injured at work, we

21  ask that they fill out a work injury report.

22  Q.   And why do you do that?

23  A.   So we can know who has been injured doing what.

24  Q.   Is there a medical release on that form?

25  A.   The City -- the City law department obtains medical

1    releases as required or as is necessary on any patients.

2              THE COURT:  I've got a juror question here.

3    If we could go back to this Mr. Mustaffa.

4         What role did you play, if any, in the City hiring

5    Mr. Mustaffa to do some surveillance?

6              THE WITNESS:  None.  I was unaware of it.

7              THE COURT:  All right.

8         Go ahead.

9              MS. SULLIVAN:  Thank you.

10   Q.  So, um, if Ms. -- just to back up a minute.

11        So do you have any knowledge as to whether

12   Ms. Cloutier signed a medical release in or around

13   September of 2013?

14   A.  I know that it's department policy to get medical

15   releases on all of our patients so that I can look at

16   medical records.  I cannot recall if I specifically saw

17   a medical release, um, on her at that time.

18   Q.  Would it surprise you if there was no medical

19   release obtained from Ms. Cloutier?

20   A.  Yes.

21   Q.  And would you agree with me that without a medical

22   release one has no right to obtain any medical records

23   about the person in issue?

24   A.  That is correct.

25   Q.  Okay.  At some point in time you reviewed medical

1   documentation, um, from Ms. Cloutier's physician

2   pertaining to the injury of September of 2013, correct?

3   A.  I did.

4   Q.  Okay.  Any idea how the law department got it

5   without a signed injury report or a medical release?

6   A.  I have no idea.

7   Q.  Okay.  Now, do you have any recollection of, um, any

8   specific -- well, what specific medical records, if any

9   of Ms. Cloutier, that you reviewed prior to her return

10  to work on October 7th of 2013?

11  A.  I had reviewed doctors' notes from Dr. Flynn and

12  Dr. Casparian as well as their out-of-work notes for

13  her.

14  Q.  Okay.  And do you recall specifically in September

15  or October, um, of 2013, before she returned to work,

16  what you reviewed?

17  A.  As I just stated, I looked at her -- some medical

18  records from her treating physicians as well as their

19  out-of-work notes.

20  Q.  Okay.  I'd like to direct you to -- I'd like to

21  direct you to what was marked yesterday as Exhibit 82.

22  A.  (Looks.)

23          MS. BROWN:  Your Honor, may I -- could I call

24  a sidebar?

25          THE COURT:  You may.

1          MS. BROWN:  Actually I don't need one.  I

2    apologize.

3          THE COURT:  Very well.  It's not necessary.

4    All right.

5    Q.  My question, um, starting with the --

6          MS. BROWN:  Actually I would like a sidebar.

7    I apologize.

8          THE COURT:  You would like one.  All right.

9

10          AT THE SIDEBAR

11          THE COURT:  Now this is a document in

12    evidence.

13          MS. BROWN:  The document has been changed,

14    what's being shown now isn't exactly the same as -- I

15    mean it's a 6-page order -- it had an order, it says

16    Page 1, Page 2, and that was the order entered into

17    evidence.  Now the order of the pages is altered.  And I

18    mean --

19          THE COURT:  They can't be altered.  It has to

20    be the same.

21          MS. SULLIVAN:  I don't have -- they never

22    provided me with what was -- but it's the same document,

23    all 6 pages, the same thing.

24          THE COURT:  Well, it's not in the same order.

25          MS. SULLIVAN:  Well, I don't have theirs.

```
 1                    THE COURT:  Well, fine.  They'll help you.
 2       You put up yours.
 3                    MS. SULLIVAN:  Okay.  Thank you.
 4
 5                    (In open court.)
 6                    THE COURT:  It's an electronic world so the
 7       lawyers are going to cooperate and we'll get the
 8       document as it was received in evidence before you.
 9                    (On screen.)
10                    MS. SULLIVAN:  Can you scroll up.  (Scrolls.)
11       All right stop there.  Thank you.
12       Q.  All right.  Dr. Gilbert, did you see what appears
13       before you as a chart note, which is dated 10-2-2013,
14       um, prior to Ms. Cloutier's return to work on October
15       7th, 2013?
16       A.  I know I saw this MRI report, but I don't remember
17       if I saw it as part of the records before she returned
18       to work or after.
19       Q.  Okay.  And, um, there's also a checklist in here.
20                    MS. SULLIVAN:  Can you please scroll down.  I
21       think it's the next page.  (Scrolls down.)
22       Q.  And, um, did you see this as well?
23       A.  I did.
24       Q.  Okay.  Um --
25                    MS. SULLIVAN:  Would you mind scrolling back
```

1    up, please, to the chart note.

2                MS. BROWN:  This page?

3                MS. SULLIVAN:  Yes, please.  If you would just

4    go a little bit more.  Just to the top.  (Scrolls.)

5    Okay, thank you.  That's perfect.

6    Q.  Okay.  So the document -- this particular page of

7    what appears at Exhibit 82, um, is stamped "Received" in

8    the law department on 10-10-2013, correct?

9    A.  Yes.

10   Q.  Okay.  And I want to draw your attention to the top

11   of the document where it says "preliminary document not

12   finalized."  Do you see that?

13   A.  Yes.

14   Q.  Okay.  As a medical doctor, do you understand what

15   that means?

16   A.  Yes.

17   Q.  And what does that mean?

18   A.  It's a preliminary document.  The doctor who

19   generated it hasn't reviewed it and signed off on it

20   officially.

21   Q.  So any idea how the law department got these records

22   from Ms. Cloutier's orthopedic office?

23   A.  They were received by the law department as it's

24   stated.  I don't get involved in -- I look at the

25   records when they're put in front of me.  I don't get

1   involved with how they got there.

2   Q.   Okay.

3            MS. SULLIVAN:   Would you kindly scroll down to

4   the checklist, please.

5            (Scrolls down on screen.)

6   Q.   Okay.   Now, you also took a look at this checklist,

7   is that fair to say?

8   A.   Yes.

9   Q.   Okay.   Now, um, would you agree with me that nowhere

10  in this document does it say that -- anything to the

11  effect of "Ms. Cloutier cannot work at all"?

12  A.   It doesn't say it in those words, no.

13  Q.   Okay.   In fact it says "light duty data entry,"

14  correct?

15  A.   That's what it says.

16  Q.   Okay.   Can you show me on here, um, on this

17  checklist, where it mentions any of the tasks that

18  Ms. Cloutier does at the library?

19  A.   It doesn't list them specifically.

20  Q.   Okay.   In fact there aren't any of the tasks she

21  does at the library listed on this form, correct?

22  A.   They are not enumerated, no.

23  Q.   Okay.   So you would agree with me that, based on the

24  medical records you just looked at, the chart note and

25  this, um, that Ms. Cloutier's doctor did not, in any

1  way, shape, or form, say that she couldn't work,

2  correct?

3  A.  He listed specifically what her restrictions are.

4  Q.  And he didn't say that she couldn't work, did he?

5  A.  He does not say, in those words, that she cannot

6  work.

7  Q.  And he does not insinuate in any way, shape, or

8  form, that she couldn't work?

9          THE COURT:  Well, that's ultimately for the

10  jury.

11          MS. SULLIVAN:  All right.

12  Q.  All right.  Do you have any idea -- well, looking at

13  this checklist, um, that -- why there are, um,

14  checkmarks or there's a checkmark that appears whited

15  out?

16  A.  I do not.

17  Q.  Okay, and you don't -- and just correct me if I'm

18  wrong, but you don't have any knowledge, one way or

19  another, as to, um, who actually signed and filled out

20  this form, correct?

21  A.  It's stamped from Dr. Casparian's office.

22  Q.  But you don't --

23  A.  I can't --

24  Q.  I'm sorry?

25  A.  I can't verify if that's his signature or not.  I

1    don't know who exactly filled it out.

2    Q.  Okay.  Do you recall the first time you saw that

3    note -- or this checklist?

4    A.  It was around the time that it was received at the

5    law office.

6    Q.  Okay.  And when it came in, did you review it?

7    A.  Yes.

8    Q.  Okay.  And did you form an opinion on it at that

9    time?

10   A.  I did.

11   Q.  Okay.  Um, were you aware, um, after this came in,

12   that, um, Ms. Cloutier started to become assigned

13   particular tasks on the library schedules?

14              MS. BROWN:  Objection.

15              THE COURT:  I'll allow the question.

16        Were you aware of that, the way she characterized

17   it?

18              THE WITNESS:  No, I was aware she had returned

19   to work, I was not aware of what specifically at this

20   time she was doing on a day-to-day basis.

21   Q.  All right.  I'd like to just show you Exhibit 34.

22   A.  (Looks.)

23   Q.  My question to you is -- these are library

24   schedules.

25              MS. SULLIVAN:  You can go -- sorry, you can go

1    back to my computer.

2                MS. BROWN:  Or I can pull it up.

3                MS. SULLIVAN:  That's all right, it can go to

4    mine.  (On screen.)  Thank you.  All right.

5    Q.  Do you see now what's been marked as Exhibit 34?

6    A.  I do see it.

7    Q.  Okay.  And my question to you is have you ever seen

8    these library schedules from October of 2013 before?

9    A.  I don't recall having seen them before.

10   Q.  Okay.  Now, um, I want to show you another exhibit,

11   um, what's been marked as AQ.

12   A.  (Looks.)

13   Q.  Do you see what's been marked as AQ?  This is an

14   e-mail dated, um, October 10th, 2013 from you to

15   Ms. Svrcek.  Do you see that?

16   A.  Yes.

17   Q.  Okay.  Did you write this e-mail?

18   A.  I did.  Or part of it.

19   Q.  Okay.

20               MS. SULLIVAN:  Your Honor, I'd like to move to

21   enter this item into evidence.

22               THE COURT:  Any objection?

23               MS. BROWN:  Yes, and I'd request a sidebar.

24               THE COURT:  Well, let me see it.

25

```
1              AT THE SIDEBAR
2              THE COURT:  Well, isn't it an admission?  I
3    mean it's relevant.
4              MS. BROWN:  I do object to the part where
5    she's attributing -- well, I'm sorry, I didn't really --
6              THE COURT:  I understand, I just read it.
7              MS. BROWN:  We filed a motion, it's
8    attributing a belief to Ms. O'Connor that I don't think
9    she has personal knowledge of, and it's prejudicial.  So
10   I would ask that if it comes into evidence, that it
11   comes in in a redacted form.
12             THE COURT:  Well, let me look at it again and
13   I'll rule.  Thank you.
14
15             (In open court.)
16             THE COURT:  Overruled, the document may be
17   admitted.  It will be number -- AQ is admitted in
18   evidence, Exhibit 83.
19             (Exhibit 83, marked.)
20             MS. SULLIVAN:  Thank you, your Honor.
21   Q.  I'm going to ask you a question about this in a
22   moment, but before I do, um, the e-mail
23   "gbihealth@verizon.net," um, would you agree with me
24   that that's the e-mail you used in 2013 when
25   communicating with City officials regarding City
```

1    business?

2    A.  Yes.

3    Q.  You didn't have a City e-mail at that time, correct?

4    A.  I did not.

5    Q.   Okay.  All right.

6         Now, you wrote an e-mail to Ms. Svrcek on

7    Thursday, October 10th, 2013 regarding Ms. Cloutier, is

8    that fair to say?

9    A.  That's correct.

10   Q.  Okay.  And, um, you wrote "Shoot me, LMAO, amazing

11   how she functions, and we know she can lift and use our

12   arm.  Can't wait to see what Chris had to say, write,

13   'not feeling safe.'"  Do you see that?

14   A.  I do.

15   Q.  Now, what does "LMAO" stand for?

16   A.  It stands for "Laughing My Ass Off."

17   Q.  Okay.  And who is "Chris" in this e-mail that you're

18   referring to?

19   A.  Ms. O'Connor.

20   Q.  Okay.  And your remark here, um, about "laughing

21   your ass off," refers to a paragraph in Ms. Cloutier's

22   October 2nd chart note in which she confided to her

23   physician that she didn't feel safe at work, correct?

24   A.  No.

25   Q.  And would you agree with me that is your opinion

1    that Ms. Cloutier could work based on your comments in

2    this e-mail?

3    A.   My comments in the e-mail, which I based on the fact

4    that I had seen surveillance video showing that

5    Ms. Cloutier could use her right arm.   That was all it

6    was referring to.

7    Q.   Correct, and as of October 10th you believed

8    Ms. Cloutier could work, correct?

9    A.   I believed she could use her right arm.

10   Q.   Now, on October 2013 -- October 29th, 2013, were you

11   aware that Ms. Callery and Ms. Gagnon hand-delivered a

12   letter to Ms. Cloutier stating that she couldn't work?

13   A.   I became aware, but I don't remember exactly what

14   time or what exact date, that she was notified that the

15   City could not make accommodations based on her treating

16   physician's Work Status Form.

17   Q.   And that wasn't true, was it?

18   A.   Based on her physician's -- her treating physician's

19   Work Status Form, which we have looked at, she was --

20   the City did not have tasks where they could accommodate

21   the work restrictions as listed by her treating

22   physicians.

23   Q.   And that was, um, your opinion, correct?

24   A.   That is my opinion.

25   Q.   And you never met with Ms. Cloutier, um, in

1    September or October of 2013, correct?

2    A.   I did not.

3    Q.   And you never spoke with Ms. Cloutier in September

4    or October of 2013, correct?

5    A.   I did not.

6    Q.   And you never spoke to Ms. Woodley, her supervisor

7    at the library, um, about what she was doing at work at

8    that time, correct?

9    A.   I didn't speak to Ms. Woodley, no.

10   Q.   Okay.  And you also did not speak to Ms. Cloutier's

11   physician in September or October of 2013, correct?

12   A.   I had requested that the nurse manager, um, get

13   clarification from Dr. Casparian regarding that work

14   status note, did he mean for it to be as restrictive as

15   it's filled out?  And we never received a reply.

16   Q.   And so you would agree with me that you never spoke

17   with Ms. Cloutier's physician in September of 2013 or

18   October of 2013, correct?

19   A.   I did not speak with him directly.

20   Q.   And you never observed her working in the library at

21   any point in time between October 7th and October 29th,

22   2013, correct?

23   A.   I did not.

24   Q.   Okay.  You mentioned surveillance a moment ago.  Did

25   you review the surveillance of Ms. Cloutier on October

1    28th, um, demonstrating that she was in the stacks,

2    bending down, helping patrons, and doing her job, was

3    that something you reviewed?

4    A.   Not at that time, no.

5    Q.   Okay.  And the surveillance footage you did review

6    all clearly showed that she had the capacity to work

7    and/or was working, correct?

8    A.   The surveillance video that I reviewed showed her

9    having full use of her right arm.

10   Q.   And it also showed that she could do her job,

11   correct?

12   A.   The surveillance video specifically observed her

13   doing things outside of work.  So I can only comment on

14   she was able to use her right arm in those surveillance

15   videos.

16   Q.   Isn't it true that you never generated any --

17   generated any invoices or documentation or anything in

18   writing to indicate that you actually looked, um, at or

19   spent time reviewing Ms. Cloutier's medical records in

20   or around September of 2013 or October of 2013?

21   A.   I would have generated -- I do not remember at this

22   point exactly what I generated or billed for.  I would

23   have generated an invoice for time spent reviewing

24   records, um, reviewing e-mails, um, correspondence.

25   Q.   And as you sit here today you have no specific

1   recollection of what if anything you generated, is that

2   fair to say?

3   A.  I don't remember exactly what I generated.

4   Q.  So you can't say one way or another whether you in

5   fact did generate anything, correct?

6   A.  I have no specific recollection.  I keep careful

7   logs of the time I spend reviewing records, having

8   discussions regarding patients' work status, examining

9   patients, so -- but I can't at this point clearly say

10  exactly what I generated an invoice on.

11  Q.  And when you came to your deposition about a year

12  and a half ago when I asked you that same question, you

13  couldn't recall either, correct?

14  A.  I didn't recall at the time.

15  Q.  Okay.

16          MS. SULLIVAN:  Your Honor, um, I'd like to

17  reserve.

18          THE COURT:  Very well.

19      Do you wish to examine this witness now or call

20  her as part of your case?

21          MS. BROWN:  We'll examine her now.

22          THE COURT:  Well, we're close on the break, so

23  we'll take the break, start at 10 minutes after 11:00,

24  and you may.

25          MS. BROWN:  Yes, your Honor.

1          THE COURT:  Now, we are moving right along.

2    Keep your minds suspended, though we haven't heard all

3    the evidence.  Do not discuss the case either among

4    yourselves nor with anyone else.  We'll go in recess

5    here until 10 minutes after 11:00, and we'll proceed.

6    The jury may stand in recess.

7          THE CLERK:  All rise for the jury.

8          (Jury leaves, 10:40 a.m.)

9          THE COURT:  Now please be seated.  And you may

10   step down.  I just want to take a minute here to raise

11   this.

12        Now, having concluded the direct examination of

13   Dr. Gilbert, but for the cross-examination of

14   Ms. Woodley, which you are of course entitled to, you

15   are -- you're resting, right?

16        MS. SULLIVAN:  Exactly, your Honor.

17        THE COURT:  Fine.  So we'll understand how I

18   want to proceed.

19        On Monday I expect Ms. Woodley, and, um --

20        MS. BROWN:  She can come on Monday, your

21   Honor.

22        THE COURT:  That's fine.  So we're going to

23   start with her first thing on Monday morning.  When

24   she's through with cross and redirect and the like, when

25   she's done, Ms. Cloutier will rest.  I will receive

1    motions at that time, but I won't entertain them, we'll

2    do that Monday afternoon and resolve that.  So you've

3    got to be ready to put on your case on Monday morning.

4    All right?

5              MS. BROWN:  Yeah, I just had a question.  I

6    guess I had understood Ms. Woodley's been part of our

7    case in chief?

8              THE COURT:  You are quite right, she is part

9    of your case in chief.  But having introduced her out of

10   order, I don't think it's right to hear motions for a

11   directed verdict until Ms. Sullivan has had a chance to

12   cross-examine her, that to me would just be unfair.

13             MS. BROWN:  I see.

14             THE COURT:  But you are correct, naturally she

15   gets a chance to cross-examine her, it is part of your

16   case, you're quite right, and if I said something to the

17   contrary, I misspoke.  But that's how we're going to do

18   it on Monday and we'll see where we are.

19        All right.  We'll stand in recess till 10 after

20   11:00.  We'll recess.

21             THE CLERK:  All rise.

22             (Recess 10:45 a.m.)

23             THE COURT:  Go ahead, Ms. Brown.

24             MS. BROWN:  Thank you, your Honor.

25

CROSS-EXAMINATION BY MS. BROWN:

1

Q.   And, Dr. Gilbert, how long have you been the City

physician?

A.   Since the fall of 2011.

Q.   And how long have you been an emergency room doctor?

A.   Since 1987.

Q.   Are you board certified?

A.   Yes.

Q.   In what?

A.   Emergency medicine.

Q.   And when did you obtain that?

A.   1997.

Q.   Just briefly, what's the typical work week like for

you?

A.   Um, I work 5 to 6 days a week right now in the

emergency room, we work 12 hour shifts, which usually

means 14-hour shifts.  It's the flu season, we're

incredibly busy.  And then I'm at the City's law

department sometimes one day a week.  Three to four days

a month max.

Q.   And you're part of the worker's comp team, correct?

A.   That's correct.

Q.   What do you do for the City of Lowell when you come

to the city?

A.   I evaluate injured employees, I review the records,

1   I will examine them, determine their fitness for duty,

2   opine as to whether their disability is causally related

3   to their injury.  Things like that.

4   Q.  When you make medical -- when you give medical

5   opinions, who at the City do you report to?

6   A.  I don't really report to anybody, as a City

7   physician I work out of the law office but I work

8   independently.  So that I will inform the work comp team

9   of my recommendations or my findings.

10  Q.  And how do you submit bills to the City?

11  A.  Um, I submit invoices, um, usually in e-mail form,

12  and then they are submitted -- detailed invoices for the

13  time I spent doing work for the City, and then they're

14  submitted for reimbursement once or twice a month.

15  Q.  So you mentioned one of the things you do is

16  render -- give medical opinions about fitness for duty.

17       Now, if you give an opinion that an employee is

18  not fit for duty, what happens?

19  A.  If their treating physician is in accordance with

20  me, then the employee is notified that they may not

21  work, um, and then their supervisor would also be

22  informed that we need to pull them from work.  If I

23  think the employee is at risk, either to themselves or

24  for example in the case of police or fire, where they're

25  not physically capable of doing their job, where

1    somebody else could be injured, then I can ask that they

2    be removed from duty.  And then if their treating

3    physician is not in agreement with me, we'll obtain an

4    independent medical exam.

5    Q.  And how do you make a medical determination about

6    fitness for duty of an employee?

7    A.  I'm aware of what their job description is, for

8    example how much weight they have to lift on a daily

9    basis, in other words what their job entails, and then I

10   examine them, and with years of experience I know with

11   certain injuries certain things that you can and cannot

12   perform.

13   Q.  Anything else that you look at?

14   A.  I mean I'll look at their -- you're talking about

15   their job description?  I will examine them, I will read

16   their treating physician or physicians' notes or Xrays,

17   or MRIs, CAT scans that they've had, or lab work in some

18   cases.

19   Q.  Now, the worker's compensation office, I think it's

20   been established as part of the law department at

21   Lowell, do you consult with the lawyers at Lowell?

22   A.  Sometimes I will need to sit and talk with a lawyer.

23   I have my medical opinion, but then we discuss how it

24   relates to their disability, um, does it fall under the

25   statutes of workman's comp, you know, legally what are

```
 1   we obligated to provide care for -- for example
 2   sometimes people have underlying conditions that
 3   affect -- and so it's not true workman's comp, although
 4   they may have been injured at work, so those kind of
 5   discussions, and then the legal team will make
 6   determinations whether something qualifies under the
 7   statute under worker's comp and how benefits are paid and
 8   things like that.
 9   Q.   Now, had you met the plaintiff, Diane Cloutier,
10   while she was working at Lowell?
11   A.   I did, once.
12   Q.   And when was that?
13   A.   When I examined her, um, in October of 2012.
14   Q.   Had you interacted with her or communicated with
15   her?
16   A.   None whatsoever.
17   Q.   And since October of 2012 and before, um, what if
18   any correspondence have you had with Ms. Cloutier?
19   A.   I've had no direct correspondence with her.
20   Q.   Now you said you examined Ms. Cloutier?
21   A.   Yes.
22   Q.   Why?  Why did you do that?
23   A.   Um, the nurse case manager and the workman's comp
24   agent were concerned that, um, her disability had been
25   going -- excuse me.  I'm sorry.  Her disability had been
```

1    going on for longer than they originally anticipated

2    based on her initial treatment and out-of-work notes and

3    so they asked me, as they often do, to examine an

4    employee who doesn't seem to be healing as fast as, you

5    know, somebody else with a similar condition.

6    Q.   When you say a "disability," what are you referring

7    to?

8    A.   Um, somebody who's been injured at work and not able

9    to perform their full job because of the injury.  So I

10   evaluate, as I mentioned, the extent of their injury and

11   their fitness for duty given their job description.

12   Q.   My question was a little bit simplistic.

13   A.   Sorry.

14   Q.   What injury or disability of Ms. Cloutier's are you

15   taking about?

16   A.   Specifically about her shoulder injury and her arm

17   injury.

18   Q.   And, um, you mentioned, um, work restrictions.  Did

19   you have an understanding of how long the work

20   restrictions were intended to be in place?

21   A.   Well, some of her original notes, when I reviewed

22   them, mentioned like two-week periods, and obviously she

23   was injured in June of 2012 and I saw her in October and

24   she was still on work restrictions, so it had gone on

25   several months.

1    Q.  And if you'd --

2              MS. BROWN:  Hannah, if you could pull up

3    Exhibit 48 and, um, can you -- yeah, scroll in so we can

4    see the whole thing.  (Scrolls on screen.)  thanks.

5    Q.  Are you familiar with this kind of note?

6    A.  Yes.

7    Q.  Is there a part of this note that you -- that tells

8    you, um, the anticipated amount of time in your

9    understanding of the note?

10   A.  Yes, it says that she's anticipated to be on light

11   work for two weeks -- in this specific note.

12   Q.  All right.  You've mentioned "light work."  What

13   does that term mean to you, "light work" or "light

14   duty"?

15   A.  It means able to do some portion of your job but not

16   the full extent of your job.  And in this specific case

17   it is restricting how much she can lift, um, according

18   to the note, um, that she may not climb ladders, but she

19   can stand, walk, sit, kneel.  Everybody is -- it's

20   individual to each person and each injury and their job

21   description, what they can and cannot do.

22             MS. BROWN:  And we can take down that exhibit.

23   Thanks.

24   Q.  So what is your role, if you have one, with respect

25   to light duty work assignments for city employees?

1    A.   If I have an employee who's been injured, um, and

2    they are out of work, I may determine that they do have

3    some work capacity, um, and can return to work light

4    duty, or, um, I can agree with their treating physician

5    with their work restrictions, or sometimes I feel

6    somebody, um, is at work and they should not be and I

7    may ask that they go out completely.

8    Q.   Now, you performed an examination of Ms. Cloutier.

9    Under what circumstances generally do you perform

10   physical examinations of city employees?

11   A.   I usually see, um, injured employees where, um,

12   they're either having complications or they're not

13   returning to work as quickly as was originally

14   anticipated based on their treating physician's notes.

15   Q.   And was that the case with Ms. Cloutier?

16   A.   Yes.

17   Q.   Now where did you examine Ms. Cloutier?

18   A.   In the examining room that's been set up for me in

19   the City Hall in Lowell.

20   Q.   Ms. Cloutier has described that room as a "public

21   restroom."  What's your response to that?

22             MS. SULLIVAN:  Objection.

23             THE COURT:  Well, what's her response?  How

24   would you characterize it?

25             THE WITNESS:  It's my exam room.  It's a

1    private room with a locked door.  It has an exam table,

2    a sphygmomanometer to take blood pressures, a scale,

3    some medical equipment like a reflex hammer, a

4    stethoscope, whatever I need.  It has a sink and it has

5    a separate toilet as part of the exam room with a door

6    so patients can get undressed in private, and a place to

7    hang their clothes.  So City Hall's an old building but,

8    you know, it's my private exam space.  It's locked and

9    nobody has access to it other than myself and the nurse

10   case manager.

11   Q.  During the exam of Ms. Cloutier, did you perform any

12   tests?

13   A.  I did not personally perform any tests, just I

14   examined her.

15   Q.  Did you form any opinions about her work -- about

16   her physical capabilities?

17   A.  I was concerned because her complaints of her

18   limitations, when I examined her, um, there were some

19   inconsistencies between what I observed her able to do

20   and what she was stating she was able to do.

21   Q.  And when you say "observed her able to do," how did

22   you make those observations?

23   A.  Just as part of a general physical exam, there are

24   certain things -- everybody's body can and cannot do.  A

25   specific example, um, was she was claiming that her arm

```
 1    gravitated up to a flexed position so the elbow was bent
 2    and up against her body, um, and that's how her arm
 3    preferred to be.  The laws of gravity tell you that your
 4    arm will relax down automatically to your side unless
 5    you have something called a frozen elbow or frozen
 6    shoulder where you are not able to move that joint.  But
 7    if that is the case, if you have a fixed frozen joint or
 8    what's called a "contracture" where the joint doesn't
 9    move, it doesn't move at all.  So you can't willingly
10    move it.  And your arm does not gravitate up, it would
11    gravitate down.  And it became apparent, when she stood
12    up for me, that her arm was able to extend down.  So
13    that's not consistent with the laws of nature and the
14    physical exam, as one example.
15    Q.  Did you record your observations when you examined
16    her?
17    A.  Yes, I dictated a whole report and that was filed.
18    Q.  And I believe you testified to that already.
19         So sitting here today, do you recall what was in
20    that report?
21    A.  I don't remember all the specific details, it was a
22    quite detailed note.  I mentioned one example.  But
23    there were some other things.
24         MS. BROWN:  I'd like to show the witness
25    what's been marked for identification as EH.
```

```
 1                    THE COURT:  EH?
 2                    MS. BROWN:  EH, yes.  And because it's a
 3      multipage document, I do have a copy for the witness,
 4      although it's also on the screen.  It may be easier.
 5                    THE WITNESS:  All right.
 6                    (Gives to witness.)
 7                    THE WITNESS:  Thank you.
 8      Q.  And do you recognize that, Dr. Gilbert?
 9      A.  Yes, I do, it is my note.
10      Q.  It is -- sorry, what?
11      A.   It's my note of my examination of Ms. Cloutier.
12                    MS. BROWN:  I move to enter it into evidence
13      under 803, '4 and '5.
14                    THE COURT:  Any objection?
15                    MS. SULLIVAN:  Yes, to one extent.  She's not
16      a treating physician --
17                    THE COURT:  Please, I didn't ask for argument.
18      You object.
19           You have the document.  May I see it?
20                    THE WITNESS:  Absolutely, your Honor.
21                    (Hands to judge.)
22                    (Reads.)
23                    THE COURT:  I'm going to admit it except for
24      the second paragraph which deals with somebody else or
25      the presence of somebody else and isn't for the purpose
```

```
1    of diagnosis or treatment.
2           You're satisfied with that, Ms. Brown?
3               MS. BROWN:  Yes, that's fine, we can provide a
4    redacted copy.
5               THE COURT:  Very well.  So you can take care
6    of that.
7           But as redacted, EH is admitted, it will be
8    Exhibit 84.
9               (Exhibit 84, marked.)
10              THE COURT:  Redacted" means we'll blank it
11   out.  No one's hiding anything from you.  Ms. Sullivan's
12   objection is fine to that extent, so we're knocking that
13   paragraph out because it doesn't deal with statements
14   she made for the purpose of diagnosis and treatment of
15   Ms. Cloutier, it deals with other things.
16              MS. BROWN:  Thank you.
17   Q.  All right.  You mentioned that you observed some
18   inconsistencies between Ms. Cloutier's representations
19   and your observations and you explained an example
20   regarding her arm.
21          Were there any other examples that you recorded in
22   this report?
23   A.  Um, yes.  She, um --
24   Q.  Actually if you could direct our attention, then we
25   can perhaps bring up the part of the document.
```

1   A.   It's the first paragraph on the second page.

2            THE COURT:   Oh, Ms. Gaudet raises a very

3   important point.

4       If I've taken out the second paragraph, how are

5   you going to show it to the jury?  You're not until it's

6   redacted.

7            MS. BROWN:   Okay, we're on the second page, so

8   can I show them that?

9            THE COURT:   Of course because there's nothing

10  --

11           MS. BROWN:   But we won't go back to the --

12           THE COURT:   That's fine.  We'll have to

13  physically redact it.   That's all.

14           MS. BROWN:   Yes.   Thank you.

15           THE COURT:   No one's doing anything wrong,

16  Ms. Gaudet is just properly careful as to what's in

17  evidence.

18      Go ahead, Ms. Brown.

19  Q.   You were directing our attention to a particular

20  paragraph, I believe?

21  A.   Yes, um, I wrote, "She states even when doing left-

22  arm work, which is not her injured side, um, when she

23  has to reach down across her body and lift a box or a

24  book with her left hand, it causes pain across her neck,

25  that it's, you know, difficult and painful for her to

1   even lift a book up."  At the end of the examination she

2   bent down and lifted what was a very full, um, shoulder

3   bag up over her left arm without any difficulty

4   whatsoever.  There's the issues obviously of the range

5   of motion of the right shoulder, um, that she can only

6   extend it or abduct it -- "abduct" means bringing it out

7   to the side to 90 degrees, which would be at this level,

8   and that she couldn't get it up further either this way

9   or this way.  (Indicates.)

10  Q.  And did you observe something that was inconsistent

11  with that?

12  A.  Um --

13          MS. SULLIVAN:  Objection.

14          THE COURT:  No, overruled.  She may ask the

15  question.  We haven't any answer.

16  A.  (Pause.)  I don't want to misspeak, that's why I'm

17  just reading -- rereading the bottom paragraph on that

18  same page.  (On screen.)

19      On the bottom of the page, um, she had some

20  weakness in her, um, finger abductors, the ability to

21  spread your fingers apart against resistance.  She was

22  saying that doing it against resistance caused pain in

23  her shoulder.  Pain or weakness at a site down an

24  extremity from an injury usually implies some sort of

25  nerve impingement or nerve damage and I haven't seen any

 1    prior documentation of any nerve impingement, um, given

 2    what I have reviewed regarding this patient.

 3    Q.   What action did you take following -- what did you

 4    do after the exam?

 5    A.   Well, I was concerned about the inconsistencies, um,

 6    I, you know, stated that she should continue her current

 7    plan of medication and physical therapy as ordered by

 8    Dr. Flynn, who was her treating physician at the time,

 9    but that I requested an Independent Medical Exam, or an

10    IME, because I wanted the benefit of another orthopedic

11    surgeon who had not been involved in her care to give an

12    independent review of what they thought her actual

13    injury was, the extent of her injury, and the

14    limitations.

15    Q.   Anything else?

16    A.   Um, I did recommend, um, discussing with the City,

17    the work comp department, that we begin surveillance to

18    determine if her limited range of motion of her elbow

19    and shoulder was being carried out in day-to-day life.

20    Q.   Have you recommended surveillance in worker's comp

21    cases before?

22    A.   Yes.

23    Q.   Under what circumstances?

24             MS. SULLIVAN:  Objection.

25             THE COURT:  No, we're not going to go into

1   circumstances of other cases.  Well, you may ask a

2   general question, or I'll ask her, I guess.

3         In comparable circumstances have you made similar

4   recommendations?

5               THE WITNESS:  Yes, sir, where there's

6   inconsistencies.

7               THE COURT:  Where there's inconsistencies.

8   All right.  That's sufficient.

9               MS. BROWN:  Thank you.

10  Q.  How common is it for you to recommend an IME after

11  you have -- an Independent Medical Exam after you have

12  performed your own exam?

13              MS. SULLIVAN:  Objection.

14  A.  We do it very routinely --

15              THE COURT:  Overruled.

16        And we didn't catch your answer?

17              THE WITNESS:  I'm sorry.

18              THE COURT:  We do it what?

19              THE WITNESS:  We do it regularly.

20              THE COURT:  Thank you.

21  Q.  Do you know whether Ms. Cloutier attended it?

22  A.  She did not.

23  Q.  What was your reaction to that?

24              MS. SULLIVAN:  Objection.

25              THE COURT:  What was her reaction?  Is that

1    your question?

2                MS. BROWN:  Yes.

3                THE COURT:  She -- I guess I don't understand.

4    You recommended an Independent Medical Exam, she

5    attended it --

6                THE WITNESS:  No, she did not.  She refused.

7                THE COURT:  Oh, she did not.  She refused.

8    All right.

9         And your reaction?

10               THE WITNESS:  I was dismayed.  Usually

11   patients welcome Independent Medical Exams when they're

12   having protracted problems to get a second opinion on

13   what is going on with them so they could hopefully go

14   down a course of treatment where they might improve

15   their, um -- well, you know, improve in their problem,

16   or get better quicker.

17   Q.  All right.  So you said you recommended some

18   surveillance be performed, um, and some surveillance was

19   performed.

20        Did you see any of the surveillance that was done?

21   A.  Yes, I did.

22   Q.  What did you see?

23   A.  Well, most notably, um, as I had explained, the

24   shoulder wouldn't go above 90, but there were pictures

25   of Ms. Cloutier driving and raising her right hand up to

1   adjust the mirror and her hair all above 90 degrees,

2   there were pictures of her reaching up with her right

3   arm on shelves in stores, pictures of her uncoiling with

4   an extended arm a garden hose, reaching into her car

5   again with an extended right arm, um, and carrying a

6   large -- what appeared to be plastic animal crate with

7   both of her arms extended in front of her, and it

8   appeared -- obviously I don't know what was in it, but

9   just carrying the crate out in front with both arms

10  extended, um, requires some force in lifting.  It

11  appeared to be heavy.

12  Q.  Did you think what you had observed was consistent

13  with what Ms. Cloutier had represented?

14  A.  I did not.

15              MS. SULLIVAN:  Objection.

16              THE COURT:  No, that was her conclusion.

17  She's just testifying as to her conclusion.

18  Q.  Now I'm going to direct your attention --

19              MS. BROWN:  And we can actually take down

20  this, Hannah.  Thank you.  And we can redact it.

21  Q.  I direct your attention to September of 2013.  But

22  actually let me first ask you this.

23       Between your exam of Ms. Cloutier, in October of

24  2012, and September of 2013, um, were you involved in

25  Ms. Cloutier's worker's comp case?

1    A.    I was kept apprised of what was --

2              MS. SULLIVAN:   Objection.

3              THE COURT:   Overruled.  You may give your

4    answer.

5    A.    I was kept apprised of what was her ongoing

6    treatment with her orthopedic physicians.

7    Q.    What about her work restrictions, did you have any

8    knowledge of those?

9    A.    I was informed of -- when the workmen's -- excuse

10   me.  When the work restriction notes came in from her

11   physicians, that they were shown to me.

12   Q.    All right.  Now, I think when Attorney Sullivan was

13   asking you questions, um -- well, actually I don't

14   remember exactly what you said, so I'm just going to

15   start again.

16        Did you become aware that Ms. Cloutier had claimed

17   an injury in September of 2013?

18   A.    I did.

19   Q.    And how did you become aware of that?

20   A.    I saw both the letter that was sent to Ms. O'Connor.

21   I was also shown notes from her treating physician at

22   the time, Dr. Casparian, her MRI, which you saw earlier,

23   and the notes from her doctor included the office visit

24   note as well as the work restriction notes.

25   Q.    Do you know why you were shown those materials?

1    A.   To keep me apprised of what was going on.   This is a

2    patient who is an injured city employee who now has had

3    a protracted course, um, with a potentially new injury.

4    Q.   And what did you do with that information?

5    A.   Um, initially nothing and then a note came in from

6    Dr. Casparian that said "Continue current work

7    restrictions."   It had been quite a long time, months --

8    and I don't remember the exact date, I apologize, since

9    somebody had actually written out a work status form

10   specifically delineating what she could and could not

11   do, so I requested that the comp manager, Karen Gagnon,

12   inquire of Dr. Casparian clarification of what he wanted

13   her work restrictions to be.

14   Q.   And just going back to the September event.   With

15   regard to Ms. Cloutier's claimed injury, did you form

16   any opinions about that?

17   A.   Yes, I was concerned that she claimed there was new

18   injury to her shoulder, that the way I understood the

19   incident to happen was that she felt she was being

20   attacked at work and had to raise her hands to defend

21   herself, but she was not struck, pushed, or pulled, she

22   merely raised her arms.   Usually just raising your arms

23   above your head, um, will not cause serious injury.

24   Q.   How do you know what Ms. Cloutier did or didn't do?

25             MS. SULLIVAN:   Objection.

1    A.  All I have --

2              THE COURT:  How do you know?

3              THE WITNESS:  All I have is the information

4    that was put in front of me of her description of --

5    Ms. Cloutier's description in the --

6              THE COURT:  Well, tell the jury.

7              THE WITNESS:  Oh, I'm sorry.  I apologize.

8    A.  So I had the letter that Ms. Cloutier sent to

9    Ms. O'Connor describing the incident at work.

10             THE COURT:  So you weren't there but you're

11   basis of understanding was what she -- the person you

12   were examining, Ms. Cloutier, had said happened?

13             THE WITNESS:  Right, I based it on

14   Ms. Cloutier's report of the incident.

15   Q.  All right.  Let's look at Exhibit 81, please.

16   A.  (On screen.)

17             MS. BROWN:  And if you can both make it a

18   little smaller and scroll the screen.  Great.  Scroll

19   down to the next page.

20             (Scrolls on screen.)

21   Q.  Dr. Gilbert, do you recognize this page of the

22   document?

23   A.  Yes.

24   Q.  And what is it?

25   A.  Um, the worker's comp agent, Karen Gagnon, is

1    sending a note to Dr. Casparian, um, that he provide

2    clarification detailing the patient's limitations and

3    work capabilities.  That was after we got the note that

4    said "continue current work restrictions."

5    Q.  And what happened next regarding Ms. Cloutier?

6    A.  We got a work status form that was extremely

7    restrictive.

8            MS. BROWN:  And actually if we could bring up

9    the next exhibit, Exhibit 82, and go to the last page of

10   that.  (On screen.)

11   Q.  Is this what you're referring to?

12   A.  Yes, I am.

13           MS. BROWN:  I know there's a jury question.

14           (Pause.)

15           THE COURT:  Since we're pausing, we have a

16   question.

17       "In your experience as an emergency room

18   physician, can a person be injured by raising their

19   hands or arms in a defensive manner?"

20           THE WITNESS:  If there's no force being

21   applied to the arms, like somebody pushing or pulling

22   against you, just raising your arms should not cause

23   considerable injury.  Usually it requires a force

24   pulling on the arm or pushing against it.

25           THE COURT:  Go ahead, Ms. Brown.

Q.  And on that, did you in fact come to learn whether

Ms. Cloutier had sustained an injury in that event?

            THE COURT:  Well, you may answer "Yes" or "No"

to that.

A.  Um, I came to learn --

            THE COURT:  Well, no, no --

            THE WITNESS:  You want "Yes" or "No"?  Can you

restate the question please?

            THE COURT:  The question is where did she get

her information?  Because it may be hearsay.

            MS. BROWN:  Yeah, I'll withdraw that question,

your Honor.

            THE COURT:  It's withdrawn.

            MS. BROWN:  So we can move on.

Q.  So we were looking at this form.

      Now, what did you understand this form to mean?

A.  That she is not able, with either arm, to lift

anything more than 0 pounds.  Anything you pick up

weighs more than 0 pounds, whether it be a cup, a shirt,

a pencil, your car keys.  And there are other

restrictions on here, but that was the one that stood

out.  So basically you cannot pick up anything with

either hand according to this work status form.

Q.  And what was your reaction to these restrictions?

A.  I was very surprised to see the note written like

1    this.

2    Q.  Why?

3    A.  Because the note contradicts itself.  It says she

4    may do light duty, but how can you do light duty in a

5    library if you can't use your hands?

6    Q.  We looked at an e-mail just now where you had said

7    "laughing my ass off."  Why did you say that?

8    A.  I was, you know, inappropriate in saying that, but I

9    was shocked, surprised by the way this note was written

10   out, and I just responded to it.

11   Q.  And that e-mail also had a comment about Chris, do

12   you remember that?

13   A.  Yes, ma'am.

14   Q.  Did you have any personal knowledge of Chris's

15   thoughts about this -- about anything?

16           MS. SULLIVAN:  Objection.

17           THE COURT:  That's sustained.

18   Q.  Did you have any personal knowledge about Chris's

19   reaction to Ms. Cloutier's medical note?

20           MS. SULLIVAN:  Objection.

21           THE COURT:  Well, I'm assuming you did not?

22           THE WITNESS:  That is correct.

23           THE COURT:  Well, I'll let that stand.  She

24   didn't.

25           MS. BROWN:  Okay.

```
 1   Q.   Okay, so you got that form.
 2        What did you do next?
 3   A.   I requested, um, Karen -- Karen Gagnon, the comp
 4   agent, was out of the office and I requested that the
 5   nurse manager contact Dr. Casparian's office for more
 6   clarification, did he mean this note to say what it says
 7   in writing here or was that an error?
 8   Q.   And just to be clear, that would be the second
 9   request for clarification to Dr. Casparian?
10   A.   That's correct.
11   Q.   And what happened?
12   A.   She was -- we never heard back from them.  She
13   called numerous times from what I was told.
14             MS. SULLIVAN:  Objection.
15             THE COURT:  Yeah, you can't tell us what was
16   told.
17        But so far as you know, you heard nothing back?
18             THE WITNESS:  That is correct.
19             THE COURT:  Move on from there.
20   Q.   And then what happened?
21   A.   We had a meeting of the work comp team.
22   Unfortunately she had been returned, by her treating
23   physician, to light duty and now we have a note by her
24   treating physician stating that she may lift nothing.
25   So there is no way the City library department can
```

1   accommodate that work limitation and still have a

2   functional position in the library.  So I recommended --

3              MS. SULLIVAN:  Objection, your Honor.

4              THE COURT:  No, she may finish her answer.

5   You recommended?

6   A.  I recommended that she go out on full disability,

7   that we were not able to make a work accommodation so

8   she was unable to work given the current limitations as

9   written by her treating physician.

10             THE COURT:  To whom did you make that

11  recommendation?

12             THE WITNESS:  I made the recommendation to the

13  work comp team who would then have to notify the

14  patient.  I make the medical recommendation --

15             THE COURT:  No, no, I've been following your

16  testimony.

17             THE WITNESS:  Yeah.

18             THE COURT:  But the work comp team is what

19  people?

20             THE WITNESS:  That would be, um, Karen Gagnon

21  and the nurse case manager.

22             THE COURT:  All right.  When did you make that

23  recommendation?

24             THE WITNESS:  Shortly after we were unable --

25  we gave Dr. Casparian some time to get back to us, I

1    never heard anything back, so all I have was this note.

2                    THE COURT:  Can you be specific at all as to

3    that?

4                    THE WITNESS:  Probably two weeks.

5                    THE COURT:  All right.  And how did you make

6    the recommendation, and I mean orally or in writing or

7    how?

8                    THE WITNESS:  I'm sure that I made the

9    recommendation orally.  I honestly don't remember at

10   this time whether I actually put something in writing or

11   not.

12                   THE COURT:  Go ahead, Ms. Brown.

13   Q.  Were you asked to provide a medical opinion about

14   this form?

15   A.  Yes.

16   Q.  And was that what you were just referring to, that

17   was your opinion?

18   A.  Yes.

19   Q.  All right.  Now you testified that you -- you

20   testified earlier that you were skeptical about whether

21   these restrictions were accurate, is that fair to say?

22                   MS. SULLIVAN:  Objection.

23                   THE COURT:  No, it's cross-examination.

24   A.  Yes.

25                   THE WITNESS:  Oh, I'm sorry.

1          THE COURT:  You may have the question.  And

2    the answer may stand.

3    A.  Yes, I was skeptical.

4    Q.  So why did you give this opinion if you were

5    skeptical?

6    A.  Because we had asked her treating physician to

7    provide clarification.  He had not done so.  I had

8    requested an Independent Medical Exam.  The patient had

9    refused to go for it.  So I have to go on the treating

10   physician's recommendations.  That's all I have.  I

11   don't have another independent opinion.

12   Q.  Why didn't you examine Ms. Cloutier again?

13   A.  If I examined her and found inconsistencies again,

14   I'm allowed to provide an opinion, but her treating

15   physician is telling us, the work comp department in

16   Lowell, that she may not lift anything, and I have to go

17   on, in this case, his recommendations -- in absence of

18   --

19   Q.  I'm sorry, were you finished?

20   A.  I was going to say in absence of another dissenting

21   opinion.

22   Q.  And another dissenting opinion, how would you get

23   that?

24   A.  Through an Independent Medical Exam.

25   Q.  So why didn't -- why didn't you ask for an

1    Independent Medical Exam?

2    A.   She had already refused to go for one.

3               MS. SULLIVAN:  Objection.

4               THE COURT:  No, that may stand.

5    Q.   Did anyone influence your opinion that Ms. Cloutier

6    couldn't be accommodated?

7    A.   No.

8               MS. SULLIVAN:  Objection.

9               THE COURT:  That may stand.

10   Q.   Did anyone request that you give a particular kind

11   of opinion about Ms. Cloutier's work capacity?

12              MS. SULLIVAN:  Objection.

13              THE COURT:  Overruled.

14   A.   No, they did not.  It was my medical opinion and

15   mine alone.

16   Q.   So who is -- you probably -- whose decision was it

17   that she couldn't be accommodated at Lowell?

18              MS. SULLIVAN:  Objection.

19              THE COURT:  Do you know?

20   A.   I made a medical recommendation based on her job

21   description, which is in writing, and what she had been

22   at -- if her doctor is saying that she cannot lift

23   anything, that means how do you get dressed in the

24   morning?  How do you pick up your car keys?  How do you

25   feed yourself?  It's a very restrictive note.  So that I

1    did not feel medically that if he's telling us that she

2    may not use either arm to lift anything, that it wasn't

3    safe to have her at the law department until the

4    treating physician opined otherwise.  I didn't want her

5    getting injured lifting a book, for example, lifting a

6    mouse.

7    Q.  You said "until a treating physician had opined

8    otherwise."  If you had received an updated work

9    restriction later from Dr. Casparian or another treating

10   physician, what would you have done?

11              MS. SULLIVAN:  Objection.

12              THE COURT:  Sustained, it's hypothetical.

13   Q.  What did you do after you had formed this medical

14   opinion?

15   A.  I informed the nurse manager and the work comp agent

16   that, um, I was recommending that she not be allowed to

17   work because it wasn't safe based on her doctor's notes.

18   Q.  And what happened next?

19   A.  As I subsequently found out -- once I make a medical

20   decision it's not up to me how the work comp department

21   notifies the patient, um, and/or their supervisors that

22   we're removing a patient from -- an employee from their

23   position.  I subsequently found out that she was

24   escorted out of the library because we could not --

25              THE COURT:  Well, I didn't hear you object to

1    that, but you don't know yourself, so -- and we've been

2    over that.  And we have witnesses who were there.  So

3    I'll stop you there.

4          Anything else for this witness, Ms. Brown?

5               MS. BROWN:  Just a couple more questions.

6    Yes.

7          If I could just pull up Exhibit 45.  And if you

8    can just make it -- yeah, great.

9    Q.  And do you recognize this document, Dr. Gilbert?

10   A.  Yes.

11   Q.  And what do you understand it to be?

12   A.  It was the document generated from the work comp

13   department informing Ms. Cloutier that the City could

14   not accommodate her --

15              MS. SULLIVAN:  Objection.

16              THE COURT:  No, she's describing what the

17   document is.  The document speaks for itself.  But

18   that's the document.  All right.

19              MS. BROWN:  Okay, so the jury can obviously

20   read the letter.

21   Q.  This letter contains references to a number of

22   determinations that you made?

23              MS. SULLIVAN:  Objection.

24              THE COURT:  Well, it's just a question.  It's

25   pretty clear it does.  Now ask a question.

1    Q.   Are those statements in the letter accurate

2    representations of your determinations?

3                   MS. SULLIVAN:   Objection.

4                   THE COURT:   Overruled.   She may tell us.

5    A.   Yes.   Based on Dr. Casparian's note --

6                   MS. SULLIVAN:   Objection.

7                   THE COURT:   No, overruled, she may give her

8    answer.

9         Go ahead.

10                  THE WITNESS:   Thank you.

11   A.   As the note, the third paragraph down says, "I

12   reviewed Dr. Casparian's note and her job description

13   and I opined that she was unable to continue with work,

14   that the City didn't have a job description that could

15   accommodate these restrictions."

16   Q.   Now, in October of 2013, were you aware that

17   Ms. Cloutier had filed a complaint with the

18   Massachusetts Commission Against Discrimination?

19   A.   I was not.

20                  MS. SULLIVAN:   Objection.

21                  THE COURT:   No, the answer may stand, she was

22   not.

23   Q.   And were you aware that Ms. Cloutier had sent

24   letters to City employees about discrimination or

25   harassment at that time?

1   A.  Not at that time, I was not aware of those.

2   Q.  The letter that you read, you said -- in September

3   of 2012, um, regarding Ms. Cloutier's account of the

4   injury, what did you, um, understand that letter to be

5   reporting?

6               MS. SULLIVAN:  Objection.

7               THE COURT:  Sustained, the document speaks for

8   itself and it's in evidence.

9               MS. BROWN:  It is, but I don't have the number

10  of it.

11              THE COURT:  Well --

12              MS. BROWN:  I know.  Hannah can find it

13  quickly.

14  Q.  But in any event, what if any was the connection

15  between that letter and your medical opinion that

16  Ms. Cloutier couldn't be accommodated?

17              MS. SULLIVAN:  Objection.

18              THE COURT:  Well, that assumes there was a

19  connection.  Was there a connection?

20          Do you know what she's talking about?

21              THE WITNESS:  Yes.

22              THE COURT:  Okay, well, you know.

23              THE WITNESS:  Well, I think I know.

24              THE COURT:  All right, you think you know.

25          It might be good if we view these documents.

```
1              MS. BROWN:  If we can show the witness Exhibit
2      25.
3              THE COURT:  Thank you.
4              MS. BROWN:  Thank you, Hannah.
5              (On screen.)
6              THE COURT:  Do you see that exhibit?
7              THE WITNESS:  Yes.
8              THE COURT:  Now your question, Ms. Brown.
9   Q.  The first question, what did you understand this
10     document to be reporting?
11             THE COURT:  No, sustained.  Now we've got
12     documents in evidence.  Let's move on.  The jury can
13     read these documents and the jury can make sense of
14     them.  If we need any interpretation, that's fine.  But
15     just asking a witness to say "What does a document say?"
16     We're not having any more questions like that.  Go
17     ahead.
18  Q.  What if any was the connection between this document
19     and the medical opinion you rendered that Ms. Cloutier
20     couldn't be accommodated?
21             MS. SULLIVAN:  Objection.
22             THE COURT:  Overruled.
23  A.  There was no connection.  I reviewed this document
24     as the employee in question, Ms. Cloutier, um,
25     purporting what is in the document.  The fact of the
```

1   matter was -- is when I rendered my decision, it's -- I

2   can't speak to Dr. Casparian, all I know is he was

3   saying that now this employee is not able to use either

4   arm, either hand, based on the October 9th note that he

5   sent, the work status form that you saw earlier.  So

6   this isn't germane to that other than if he felt she did

7   have an injury where she wasn't able to work, the fact

8   of the matter is her treating physician was saying she

9   could not use either hand to lift even a piece of paper.

10          MS. SULLIVAN:  Objection and move to strike,

11  your Honor.

12          THE COURT:  That may stand.

13          MS. BROWN:  I have no further questions at

14  this time.

15          THE COURT:  Any redirect for this witness?

16          MS. SULLIVAN:  Just a few, your Honor.

17          THE COURT:  Go ahead.

18

19  REDIRECT EXAMINATION BY MS. SULLIVAN:

20  Q.  Dr. Gilbert, you don't have any training in

21  orthopedics, is that fair to say?

22  A.  I am not an orthopedic surgeon, no.

23  Q.  Okay.  Who do you think is in a better position to

24  opine as to Ms. Cloutier's condition, her two treating

25  orthopedic physicians at the Lahey Clinic or yourself?

```
 1    A.  I have enough training and experience treating work
 2    comp injuries that are orthopedic in nature, but I do
 3    abide by her treating -- in this case orthopedic
 4    surgeon's notes, and I was basing my opinion on her
 5    treating orthopedic surgeon's note.
 6    Q.  And you would agree with me that nowhere in her
 7    orthopedic surgeon's note does it say she can't work, is
 8    that fair to say?
 9              MS. BROWN:  Objection.
10              THE COURT:  Overruled.  She may ask it as I --
11    A.  The note states "She may not lift anything that
12    weighs more than 0 pounds."
13    Q.  And you would agree with me that nowhere in that
14    note does it say that Ms. Cloutier can't work, correct?
15    A.  As the city physician --
16    Q.  It's just a "Yes" or "No" answer.  Would you agree
17    with me?
18              MS. BROWN:  Objection.
19              THE COURT:  Well, the note speaks for itself.
20        I think what she's trying to get at is, you got
21    back this document that you thought came from Casparian?
22              THE WITNESS:  Correct.
23              THE COURT:  All right, and it had this
24    limitation in there about what you've testified
25    extensively, correct?
```

```
 1                    THE WITNESS:  Yes, sir.
 2                    THE COURT:  But it also says "fit for light
 3     duty"?
 4                    THE WITNESS:  Correct, it's inconsistent.
 5     That's why I --
 6                    THE COURT:  That's why you sent back asking
 7     for something else?
 8                    THE WITNESS:  Correct.
 9                    THE COURT:  So the document she's asking you
10     about doesn't say "She can't work," except that it's got
11     this limitation in it that, in your mind anyway, is
12     inconsistent with someone, anybody working, is that
13     right?
14                    THE WITNESS:  Yes, sir.
15                    THE COURT:  Anything else for this witness?
16                    MS. SULLIVAN:  Um, no, thank you, your Honor.
17                    THE COURT:  Nothing further for this witness?
18                    MS. BROWN:  Nothing further.  Thank you.
19                    THE COURT:  Very well, you may step down.
20                    THE WITNESS:  Thank you, your Honor.
21                    (Witness steps down.)
22                    THE COURT:  Now, that's all the witnesses that
23     Ms. Cloutier's going to call, but there's a very
24     important part of the case that we've got to give her
25     attorney, Ms. Sullivan, a chance.  Because I allowed
```

1   Ms. Woodley to testify out of order, so we've heard what

2   Ms. Woodley had to say, but based upon Ms. Brown's

3   questions, and so I'm not going to ask Ms. Cloutier's,

4   attorney, Ms. Sullivan, to rest today, but in essence

5   all she's got left to do in presentation is cross-

6   examine, which she wants to and that's her right,

7   Ms. Woodley.  Ms. Woodley will be back on Monday.

8        So now, having heard her direct testimony, we're

9   going on with the case of the three individuals and the

10  City of Lowell and Ms. Brown will call her next witness.

11           MS. BROWN:  Thank you, your Honor.  We'll call

12  Bernard Lynch.

13           THE COURT:  He may be recalled.

14           (Pause.)

15           THE COURT:  Now you may sit down.

16           THE WITNESS:  Thank you.

17           THE COURT:  And you were reminded this

18  morning, when we came out, but you understand you are

19  still under oath.

20           THE WITNESS:  I do.

21           THE COURT:  Very well.

22        And, Ms. Brown, you may continue.

23           MS. BROWN:  Thank you, your Honor.

24

25  DIRECT EXAMINATION BY MS. BROWN:  (Recalled witness.)

1    Q.   Mr. Lynch, what is your present occupation?

2    A.   I'm presently, I guess, self-employed.  After

3    leaving the City of Lowell in 2014, I established a

4    consulting business to provide services to

5    municipalities and to organizations that interact with

6    municipalities, I'm setting up a nonprofit peer-to-peer

7    lending program, um, doing recruiting for various

8    communities, some municipal management studies.  I'm

9    also a senior fellow at the Moakley Center for Public

10   Affairs at Suffolk University.

11   Q.   Thank you.  While you were at Lowell, just briefly,

12   what were your primary duties?

13   A.   Well, as City Manager you're the -- I think we've

14   gone over it, I'm the Chief Executive Officer of the

15   city.  The City operates under a Plan E form of

16   government, it's known here in Massachusetts, it's also

17   known as a Council Manager Form.  We have the

18   legislative body, which is the City Council, and then we

19   have the executive branch, which is the City Manager

20   and, um, his or her administration.  It's, um, you know,

21   budgeting, personnel matters, procurement, um, it really

22   runs the gamut.  It's a very challenging position in

23   terms of dealing with the issues facing the city, um,

24   economic development, the social issues, we had gang

25   issues in the city, we had poverty.  You know it really

1    runs the gamut in terms of the activities that I -- but

2    primarily it's to oversee the city administration.

3    Q.   How big is the City of Lowell?

4    A.   The City of Lowell is the fourth largest community

5    in Massachusetts, 110,000 people roughly, a budget of

6    approximately $350,000,000, I think, when I left in

7    2014.

8    Q.   You mentioned personnel functions.  What's your

9    involvement in that?

10   A.   Well, I hire and fire all employees of the city, um,

11   deal with the disciplinary matters of all employees.

12   Obviously I don't oversee each 1,000 employees on a

13   day-to-day basis.  I'm also responsible for collective

14   bargaining with all of the unions in the city and that

15   includes involvement with the school unions, um, another

16   2,000 employees that are represented within that part of

17   the organization.  The benefits that we provide to the

18   city employees, health insurance, for instance, which

19   was a big issue when I was there, I tried to deal with

20   that problem.

21   Q.   And what's the role of the City Council with regard

22   to personnel issues?

23   A.   Um, the City Council has no -- they have three

24   people that they hire, they hire the City Manager, the

25   City Clerk, and the City Auditor, and all of the other

1  employees are hired by the City Manager, and the City

2  Council is actually expressly prohibited in the state

3  law from participating in anything having to do with

4  personnel matters.

5  Q.  All right.

6  A.  It was an attempt to take politics out of the

7  governmental process.

8  Q.  All right.  Now thinking about the library.  What

9  was your interaction with -- just generally what was

10  your interaction with employees at the library?

11  A.  The only employees I really dealt with at the

12  library was the Library Director, because the library

13  director was a department head.  I might run into, you

14  know, have some dealings with library employees if they

15  were sitting at the bargaining table for their union.

16  That, you know, if they were employees that had a

17  particular issue, that they could bring to me in a form

18  of a grievance or work it through their union to, um,

19  bring issues to my attention.

20  Q.  Outside of anything to do with this litigation, when

21  have you -- have you ever met the plaintiff?

22          MS. SULLIVAN:  Objection.

23          THE COURT:  Overruled.

24  A.  I have.

25  Q.  When have you met her?

1    A.   The first time I met Ms. Cloutier was probably 2007,

2    I don't have an exact date, but, um --

3              MS. SULLIVAN:  Objection.

4              THE COURT:  The objection is overruled.

5    A.   -- um, she came to see me with --

6              MS. SULLIVAN:  Objection.

7              THE COURT:  No, I'll stop you at this time,

8    the question was only "When."

9         Listen to her questions, answer her questions

10   fully and completely, but just what she says.

11   Q.   And did you meet her on any other occasions?

12   A.   I also met her, um, when she came to the City

13   Council meetings.

14   Q.   And if you recall when was the last time -- again

15   outside of matters to do with this litigation, when was

16   the last time that you met her?

17             MS. SULLIVAN:  Objection.

18             THE COURT:  Outside of this litigation.  All

19   right.

20             THE WITNESS:  May I answer that?

21             THE COURT:  You may.

22   A.   I think it was 2011 or thereabouts.

23   Q.   Do you recall why you met the plaintiff at that

24   time?

25             MS. SULLIVAN:  Objection.

1          THE COURT:  In 2011?  The objection is

2    sustained.

3    Q.  Ms. Cloutier has claimed, testified that you

4    publicly brushed aside a serious threat against her as a

5    "joke"?

6          MS. SULLIVAN:  Objection.

7    Q.  Did you do that?

8          THE COURT:  No, overruled.

9    A.  I didn't publicly do that -- well, I suppose I

10   publicly did do it, I was contacted by the newspaper of

11   where a story had been placed, um, detailing the

12   incident in question where there was some e-chat, um,

13   correspondence that she came across that, um, I was

14   contacted by the reporter and asked if this was a case

15   of, um, a threat to murder, as indicated by

16   Ms. Cloutier, and I said I didn't see it as that, that,

17   um, you know I saw it as just a bad joke or an

18   inappropriate joke by some library staff.

19   Q.  What did you do about that joke?

20          MS. SULLIVAN:  Objection.

21          THE COURT:  Overruled.

22   A.  I had the, um, two employees that were involved in

23   it come to my office where I confronted them with the

24   details about that, um, we discussed it, and I told them

25   I found it to be offensive, inappropriate, and I

1  reprimanded them.

2  Q.  Were you aware of a shoulder injury that

3  Ms. Cloutier had in June of 2012?

4  A.  I'm aware of it, yes.  I wasn't aware of all the

5  details surrounding it.  I know that she had some type

6  of shoulder injury.

7  Q.  And do you know if it affected her duties?

8          MS. SULLIVAN:  Objection.

9          THE COURT:  Does he know of his own knowledge?

10          MS. BROWN:  Yeah.

11          THE COURT:  Well, do you know of your own

12  knowledge?

13          THE WITNESS:  Well, of my own knowledge I know

14  that she sustained an injury and that she was placed

15  on --

16          THE COURT:  Well, you know what was done, but

17  of your own knowledge, it's that you're over there

18  looking at her.

19          THE WITNESS:  Oh, I wasn't over there looking

20  at her, I was just notified of it.  Yes.

21          THE COURT:  It's what people within your

22  administration told you?

23          THE WITNESS:  Correct.

24          THE COURT:  Or reported to you?

25          THE WITNESS:  Correct.

1    Q.  And are you familiar with the term "light duty"?

2    A.  Yes.

3               MS. SULLIVAN:  Objection.

4               THE COURT:  No, overruled.  You may answer.

5    A.  Yes, I am.

6    Q.  What does it mean?

7    A.  It essentially means that someone who isn't able to

8    do 100 percent of the duties that are contained within

9    their job description and so you place some restrictions

10   on what they do to have them stay on the job.

11   Q.  Is the City required to offer light duty?

12              MS. SULLIVAN:  Objection.

13   A.  Not --

14              THE COURT:  That's a legal question and I

15   think I'm going to sustain it.

16   Q.  Did you always offer light duty as City Manager?

17              MS. SULLIVAN:  Objection.

18              THE COURT:  Yeah, sustained, I mean in other

19   cases.

20       I mean the law is that -- there's a federal law

21   and the federal law is, and it -- it deals with that you

22   can't discriminate against people with disabilities.  So

23   that means that if someone is able to do the job -- and

24   of course the devil is always in the details, but if

25   someone is able do the job with reasonable

1    accommodation, then, um, the law requires that a person

2    who is disabled -- and the law defines what that means,

3    that even though they're able to do the job, it requires

4    any employer, a private employer, a municipal employer,

5    to accommodate that person.

6         And something that has nothing to do with this

7    case, but to give you an example.  We have the steps up

8    here in the courtroom.  Suppose there was someone whose

9    mobility -- someone in a wheelchair, we've got portable

10   ramps that we will put in place so someone who's

11   wheelchair bound can sit on a jury, can testify as a

12   witness, right up on the witness stand.  They don't have

13   to sit down in their wheelchair on the floor to testify,

14   they testify at the same level as any other witness.  We

15   are complying with the law that applies to everyone.

16        So with respect to the employees, the person has

17   to be able to do the job, but if they can do the job

18   with reasonable accommodations, then the law requires

19   any employer to make that reasonable accommodation.

20        Go from there, Ms. Brown.

21   Q.  What if any was your involvement in the specifics of

22   Ms. Cloutier's work restrictions?

23   A.  I wasn't involved in any of that directly, I was

24   just kept abreast of that.

25   Q.  And why would you be -- why were you kept abreast of

1    it?

2    A.  Well, in terms of people keeping me up to date on

3    what's going on in their departments, that, um, you know

4    someone who's out or injured on duty leave or worker's

5    compensation -- in most cases people on worker's

6    compensation are out completely.  At times we do try to

7    minimize or we make the adjustments in the work to allow

8    them to stay and receive -- under workman's compensation

9    you only receive 66 percent of your pay and under, um --

10   if we can somehow accommodate, we can keep them at 100

11   percent.  So we try to do that.

12   Q.  Did the City use surveillance in worker's comp cases

13   when you were the City Manager?

14   A.  Yes, we did.  I had had some experience with that

15   when I sat on the worker's compensation board of

16   directors for the Commonwealth back in the 1990s --

17   actually all the way up to 2006, and we had been very

18   successful in holding down fraud claims.

19   Q.  So what was the purpose of the surveillance used

20   while at Lowell?

21              MS. SULLIVAN:  Objection.

22              THE COURT:  No, you may testify generally,

23   briefly, what was the purpose of surveillance in those

24   cases?

25   A.  It was to help prevent fraud from occurring and

```
1   cutting down on our worker's compensation costs.
2   Q.  Was it successful?
3               MS. SULLIVAN:  Objection.
4               THE COURT:  Sustained.
5   Q.  Did the City have a surveillance policy?
6   A.  I don't think we actually had a policy, um, written
7   out that I ever saw, but we did utilize it as a tool.
8   Q.  Now, at some point the City commenced surveillance
9   of Ms. Cloutier.  Do you know why that happened?
10  A.  Because there was a sense that she had stayed on
11  worker's compensation or been under the restrictions
12  through worker's compensation for a very extended period
13  of time, I think it was 15 or 16 months, and it was only
14  --
15              MS. SULLIVAN:  Objection, your Honor.
16              THE COURT:  Well, no, he may finish his
17  answer.
18  A.  It was only intended to be, and I think her injury
19  was only expected to be a couple of weeks so, you
20  know --
21              MS. SULLIVAN:  Objection again, your Honor.
22              THE COURT:  Overruled.
23  A.  -- so there was a failing based upon the input of
24  the city physician that we should do some surveillance.
25              THE COURT:  Now, understand, and I respect
```

```
 1   Ms. Sullivan's suggestions, but he's only testifying to
 2   what he thinks.  People report to him.  I'm not hearing
 3   anything from his testimony that with respect to the
 4   specific incident, that incident about authorizing
 5   surveillance, that he himself personally was out there
 6   investigating.  This is what people reported to him and
 7   he's telling you what he thinks.  But he doesn't know,
 8   he's basing it on the people within his administration.
 9           And I think in order to be fair to everyone, have
10   I properly characterized what your testimony is, sir?
11                   THE WITNESS:  So far.
12                   THE COURT:  Well, it's as far as I'm going.
13   (Laughter.)  And I'll try not to go too far.  My job is
14   only to help you.  I have -- and I'll tell you straight,
15   and I'm going to tell you in the charge, that I don't
16   care how this case comes out.  A very famous judge once
17   told me, you know, if she cared how the case came out,
18   she shouldn't sit as the judge, and that's true.  I
19   don't care how this case comes out.  But it's very
20   important that you understand it, and I do try to assist
21   in that respect.
22           Go ahead.
23   Q.  Did you review any of the surveillance taken of
24   Ms. Cloutier?
25   A.  I did see it, yes.
```

1   Q.   When did you do that?

2   A.   Um, I think it was late 2012.

3   Q.   And, um, what did you observe?

4   A.   I observed Ms. Cloutier taking actions that were

5   inconsistent with what I understood to be her work

6   restrictions.  She was carrying a large animal crate.

7   She was reaching overhead.  She was crawling into the

8   trunk of a car.  She was reeling up a garden hose and

9   doing some yard work.  All of which was inconsistent

10  with the limitations she had asked for at the workplace.

11  Q.   And did you take any action at that time?

12  A.   I did not.  I held it, um -- I held off.

13  Q.   Did you consider taking any action at that time?

14  A.   I did.

15          MS. SULLIVAN:  Objection.

16          THE COURT:  Sustained.  The answer's stricken,

17  what he may have considered, but did not put in place.

18      Go ahead.

19          MS. BROWN:  Actually could I just call a

20  sidebar quickly?

21          THE COURT:  I don't see any reason for it.  Go

22  ahead.

23  Q.   Why didn't you take any action?

24          THE COURT:  No, sustained.  The point is no

25  action was taken.

```
1          Go ahead.
2     Q.  Were there meetings held at that time regarding
3     Ms. Cloutier?
4     A.  Yes, there were.
5               MS. SULLIVAN:  Objection.
6     Q.  And now you testified that as City Manager you were
7     in charge of hiring and firing, is that right?
8     A.  That's correct.
9     Q.  And did you in fact ever fire anyone?
10    A.  I did terminate employees.
11    Q.  Is there a procedure that is followed for
12    termination?
13    A.  We --
14              MS. SULLIVAN:  Objection.
15              THE COURT:  No, overruled, he can tell us the
16    procedure for termination.
17    A.  The procedure for termination is generally that the
18    department heads come to me -- unless it's a department
19    head, the department heads come to me and provide me
20    with information, make the recommendation, and I
21    consider that, and if I deem it to be an appropriate
22    action then I ask the law department and, um, the HR
23    department to start preparing the necessary paperwork.
24    Q.  And how is the decision conveyed to the employee?
25              MS. SULLIVAN:  Objection.
```

1          THE COURT:  Overruled.  You're telling us the

2    procedure?

3          THE WITNESS:  Yes.

4    A.  There's a letter that's drafted up with my signature

5    that is handed to the employee.

6    Q.  Who signs the letter?  Oh, I'm sorry, you said you

7    signed the letter.

8    A.  Yes, I sign the letter.

9    Q.  All right.  Those events that you just described,

10   did those events occur in the case of Ms. Cloutier?

11   A.  No, they did not.

12         MS. SULLIVAN:  Objection.

13         THE COURT:  That may stand.

14   Q.  Did you ever see a letter of the sort you just

15   described for Ms. Cloutier?

16         MS. SULLIVAN:  Objection.

17         THE COURT:  Overruled.

18   A.  I never saw one.  I would have had to sign it.  And

19   I don't know what happened after I left in March of

20   2014, but I never signed a letter of that effect.

21   Q.  In the case of union employees, what if anything

22   follows a termination?

23         MS. SULLIVAN:  Objection.

24   A.  There's a grievance.

25         THE COURT:  No, I'm going to sustain this as

1   far as union procedures go.  The case is not about union

2   procedures.  I understand what marginal relevance you

3   think there may be, but there has to be some limits

4   here.  Yes, sustained.

5               MS. BROWN:  All right.

6   Q.  After Ms. Cloutier was removed from the library on

7   October 29th, what was her status with the City?

8   A.  She was on unpaid leave.  If she had sick time, she

9   could have used sick time, vacation time.  But to my

10  knowledge all of her sick time had been -- from her

11  years of service, it had all been used.

12  Q.  So what -- I don't know if there's more, but what

13  generally are the circumstances under which an employee

14  may be on unpaid leave?

15              MS. SULLIVAN:  Objection.

16              THE COURT:  He may tell us.  Overruled.

17  A.  They may ask for it, um, or they may be in a

18  situation like I've just described, I've certainly come

19  across that where an employee is out, they, um, don't

20  have any other leave to fall back on, they're still

21  considered an active employee, um, you know, but they

22  don't have any sick or vacation or personal leave to

23  compensate them during that time, so they -- sometimes

24  unions --

25              MS. SULLIVAN:  Objection.

```
 1              THE COURT:  Yes, we'll stop it there.  But
 2   there are a variety of circumstances, some of which
 3   involve the unions.
 4              THE WITNESS:  Well -- correct.
 5              THE COURT:  All right, we'll leave it at that.
 6              MS. BROWN:  All right.
 7   Q.  I'd like to show Mr. Lynch Exhibit 45.
 8   A.  (On screen.)
 9              THE COURT:  We're just not going to have a
10   full review of municipal government.
11              THE WITNESS:  That's what I get paid for, so.
12              THE COURT:  You may.  I don't.
13              (Laughter.)
14   Q.  Mr. Lynch, do you recognize this document?  Do you
15   want me to scroll so you can see it all?
16   A.  Yes, I do.
17   Q.  (Scrolls on screen.)  All right.  And what is it?
18   A.  This is the letter that was delivered on October
19   29th to Ms. Cloutier indicating that, um, we could no
20   longer accommodate her --
21              MS. SULLIVAN:  Objection.
22   A.  -- in the job because she didn't have the --
23              MS. SULLIVAN:  Objection.
24              THE COURT:  Yeah, we'll stop it at that point.
25   We've been over and over this letter.  The jury is
```

1    reading it.  I'm sure they have some idea what people

2    think it is.

3            Go ahead.

4            MS. BROWN:  Thank you.

5    Q.  Who made the decision that Ms. Cloutier couldn't be

6    accommodated?

7            MS. SULLIVAN:  Objection.

8            THE COURT:  No, overruled, that's an

9    appropriate question.

10   A.  Could I go back up to the beginning of the letter?

11   Q.  (Scrolls up.)

12   A.  This would be the city physician.

13   Q.  Did you -- so before this letter was given to

14   Ms. Cloutier, um, and you may have testified to this, so

15   I apologize, but did you review this letter?

16   A.  I did not.

17   Q.  What's the role -- what is the role of the city

18   physician as you understand it?

19   A.  The city physician is, um -- was brought on to

20   assist the, um, the City through the worker's comp team

21   in assessing medical information, um, again in an effort

22   to help us control some of our costs.  We used to send

23   some of this work out, but we wanted to bring it in, so

24   we had someone more on board to review the information

25   and to provide us with her medical opinion.

1    Q.  You said that the decision, as you understand the

2    decision contained in this letter, was made by the city

3    physician.  Does that type of -- is that, um, the kind

4    of decision that the city physician typically makes?

5                MS. SULLIVAN:  Objection.

6                THE COURT:  I don't understand the question.

7    Q.  Is that part of the city physician's role?

8    A.  Yes.

9    Q.  And did you ever have a conversation with

10   Dr. Gilbert about this opinion that she rendered?

11   A.  No.

12   Q.  And --

13               MS. BROWN:  If I could just pull up Exhibit

14   70.

15               (On screen.)

16   Q.  And, Mr. Lynch, do you recognize this letter?

17   A.  Um, I recognize -- yes.

18   Q.  Did you see this letter at the time it was sent?

19   A.  I'm sure I did.

20   Q.  This letter is addressed to the City Council.  What

21   can the City Council do in response to this letter?

22               MS. SULLIVAN:  Objection.

23               THE COURT:  Sustained.

24   Q.  What did you do in response to this letter, if

25   anything?

```
1              MS. SULLIVAN:  Objection.
2    A.   Nothing, it wasn't sent to me.
3              THE COURT:  Well, I'll let that stand.
4    Q.   Now we've seen this letter, we've seen some other
5    letters, um, written by Ms. Cloutier -- well, actually
6    I'll withdraw that.
7         Did you see any other letters written by
8    Ms. Cloutier or her counsel complaining of harassment,
9    discrimination, or retaliation between the filing of the
10   MCAD and the end of October of 2013?
11   A.   Yes, I did.
12   Q.   How if at all did those letters affect your
13   treatment of Ms. Cloutier?
14             MS. SULLIVAN:  Objection.
15             THE COURT:  Overruled.
16   A.   They didn't affect it, I sought to treat
17   Ms. Cloutier the same as I would treat every other
18   employee in terms of the procedures that we followed and
19   the rules that she would abide by and the manner in
20   which we would treat her.  Although I will say that, you
21   know, it did put us a little bit on notice that we had
22   to be somewhat careful.
23   Q.   Just any of those letters that you saw, were any of
24   them to you?
25   A.   No, nothing was ever sent to me.
```

1   Q.  And now the MCAD complaint that we've heard about in

2   February of 2012, um, how if at all did that affect your

3   treatment of Ms. Cloutier?

4              MS. SULLIVAN:  Objection.

5              THE COURT:  Overruled.

6   A.  Again it didn't affect it at all.  You know I wanted

7   to treat her the same way I treated every other

8   employee.  Again I probably was a little bit more

9   cautious and wanted us all to be a little bit more

10  cautious for the, um, you know with the concern that we

11  could, you know, end up with claims being made that we

12  hadn't.  So I wanted to make sure that we didn't come

13  anywhere close to that line.

14  Q.  All right.  Thanks.

15             MS. BROWN:  I have no more questions of

16  Mr. Lynch at this time.

17             THE COURT:  Any cross-examination, having in

18  mind he's been on the stand before?

19             MS. SULLIVAN:  Possibly one question, your

20  Honor.

21

22  CROSS-EXAMINATION BY MS. SULLIVAN:

23  Q.  Isn't it true, Mr. Lynch, that you did approximately

24  150 hours of surveillance of Ms. Cloutier, correct?

25  A.  Um, I don't know that.

 1   Q.   Okay.  And, um, are you aware of any other employee

 2   in the City upon whom you've done that amount of

 3   surveillance who had an MCAD claim?

 4   A.   I don't know how many hours we keep track of

 5   anyone's surveillance.

 6              MS. SULLIVAN:  Thank you.

 7              THE COURT:  All right.

 8         Nothing further for this witness?

 9              MS. BROWN:  Nothing further, your Honor.  All

10   right, we will call Attorney O'Connor.

11              THE COURT:  She may be recalled.

12              MS. BROWN:  Yes, recalled.

13              (Witness enters.)

14              THE COURT:  Again, Ms. O'Connor, we swore you

15   earlier this morning.  But you recognize that you are

16   still under oath?

17              THE WITNESS:  Yes, Judge.

18              THE COURT:  And you may proceed, Ms. Brown.

19              MS. BROWN:  Thank you, your Honor.

20

21   DIRECT EXAMINATION BY MS. BROWN:  (Recalled witness.)

22   Q.   Attorney O'Connor, earlier you described the

23   different departments of the law department.  Would you

24   just state what they are again?

25              THE COURT:  No.

1           MS. BROWN:  No?  Okay.

2           THE COURT:  Get to it.

3    Q.  Can you describe the kinds of things that you do as

4    City Solicitor briefly?

5           MS. SULLIVAN:  Objection.

6           THE COURT:  Overruled.

7    A.  As City Solicitor I would oversee generally the

8    departments that I referenced earlier today.  I would

9    also generally oversee matters of litigation as well as,

10   um, various in-house issues that would arise pertaining

11   to all the departments of the city, including the school

12   department where there's 2,000 employees, and, um, will

13   often respond to requests for opinions from the various

14   boards, commissions, councils, and school committees.

15   And I'm in a great many other things in terms of

16   litigation and other matters.

17   Q.  Do you know how much correspondence the law

18   department receives on a daily basis?

19          MS. SULLIVAN:  Objection.

20          THE COURT:  Overruled.

21   A.  I don't know actually the volume of correspondence.

22   Q.  We've seen some documents in this case that have a

23   stamp on them, "Law Department Received"?

24   A.  Yes.

25   Q.  Does the fact that a document has that stamp on it

1    mean that you read it that day?

2    A.   Where I personally read it?  No.  Every document

3    that comes into the law department is stamped.

4    Q.   Does the law department handle complaints about

5    working conditions from individual employees?

6              MS. SULLIVAN:  Objection.

7              THE COURT:  Overruled.

8    A.   No, we do not.  We represent the City, um, we do not

9    represent individual employees.  Individual employees

10   are represented either by private counsel at times, but

11   more generally by their union.

12   Q.   Now the -- again the worker's comp office is part of

13   the law department.  Are lawyers involved in the

14   worker's comp issues?

15             MS. SULLIVAN:  Objection.

16             THE COURT:  Overruled.

17   A.   Attorneys will work with the worker's comp office

18   generally as it pertains to representation of the City's

19   interests before the -- what's referred to as the

20   Industrial Accidents Board.

21             MS. SULLIVAN:  Objection, your Honor.

22             THE COURT:  Well, I'm not going to let this go

23   very far, but I'm going to let that stand.  All right,

24   the attorneys are involved.

25        Go ahead, Ms. Brown.

1  Q.  You testified earlier that you had no role in the

2  medical decisions related to worker's comp claims and

3  you were instructed to answer "Yes" or "No."  What did

4  you do mean by that?

5            MS. SULLIVAN:  Objection.

6            THE COURT:  Overruled.  She may now explain.

7  You may explain.

8            THE WITNESS:  Yes, your Honor.

9  A.  I mean would you mind repeating the question?  It

10  just got a bit --

11  Q.  Earlier you testified that you had no role in the

12  medical decisions of the worker's comp team?

13  A.  Correct.

14  Q.  What did you mean by that?

15  A.  Exactly that, that the, um -- that's why we have a

16  city physician.  So where decisions are made with

17  respect to worker's comp matters and they involve a

18  medical component, those are made by the, um, by the

19  doctor primarily, but there may be some input from our

20  nurse case manager.

21  Q.  And other than practice before the Department of

22  Industrial Accidents, is there anything else that

23  lawyers would be involved in with medical -- with

24  worker's comp issues?

25            MS. SULLIVAN:  Objection.

1          THE COURT:  Could you ask the question again?

2    Forgive me.

3    Q.  Other than actually practicing before the Department

4    of Industrial Accidents, what other role, if any, do

5    lawyers have with the worker's comp team?

6          MS. SULLIVAN:  Objection.

7          THE COURT:  Overruled.

8    A.  I mean there may be a request for an opinion if

9    something is covered under a statute.  As a quick

10   example of something of that nature, um, say what could

11   be referred to as a "going and coming rule" --

12         MS. SULLIVAN:  Objection.

13         THE COURT:  Well, she's giving an example, but

14   that example has nothing to do with this case, but

15   that's not wrong, she's giving us an example.  But

16   generally lawyers may be involved in giving legal advice

17   on behalf of the City about the reach of the worker's

18   compensation statute.

19         THE WITNESS:  Put much better than I had.

20   Thank you, your Honor.

21         THE COURT:  Move on, Ms. Brown.

22         MS. BROWN:  Thank you, your Honor.

23   Q.  And, um, let's see.  Prior to any, um, meetings

24   regarding this litigation, had you met the plaintiff

25   before?

```
 1              MS. SULLIVAN:  Objection.

 2              THE COURT:  Overruled.

 3   A.  I met the plaintiff on a single occasion, um, when

 4   she specifically requested to meet with me.

 5   Q.  And when was that?

 6   A.  It was many years prior, um, I believe it was

 7   somewhere around like 2010, 2011.

 8   Q.  Was it just you and her?

 9              MS. SULLIVAN:  Objection.

10              THE COURT:  Yeah, sustained.

11   Q.  What was the purpose of the meeting?

12              MS. SULLIVAN:  Objection.

13              THE COURT:  Sustained.

14              MS. BROWN:  Okay.

15   Q.  So other than that meeting, you never met her again?

16              MS. SULLIVAN:  Objection.

17              THE COURT:  Well, sustained.  You're leading

18   the witness.

19   Q.  Did you ever meet her again after that time?

20              MS. SULLIVAN:  Objection.

21              THE COURT:  When, if at all, did you ever see

22   her again after that meeting?

23              THE WITNESS:  I might have seen her, but I --

24   I might have seen her, but I did not have any

25   interaction with her other than that singular meeting.
```

```
1              THE COURT:  Ever, up until the time that her
2     daily work ceased?
3              THE WITNESS:  That's correct.
4              THE COURT:  All right.  Anything else for this
5     witness?
6              MS. BROWN:  Yeah, I have quite a few questions
7     for this witness.
8              THE COURT:  Go ahead.
9     Q.  All right.  Let me ask you about the surveillance.
10         Did you authorize surveillance to take place of
11    Ms. Cloutier?
12             MS. SULLIVAN:  Objection.
13             THE COURT:  Overruled.
14         Did you?
15    A.  It is -- it was recommended by the city physician
16    and, um, it was reported to me that that's what the city
17    physician recommended, and I had no objection to the
18    office moving forward with that.
19    Q.  And when did that occur?
20    A.  It occurred, I believe, around, um, 2012, but in
21    relation to, um, her, um, initial injury that -- at a
22    time when it became evident that it was prolonged,
23    sometime after the physician examined her.
24    Q.  In your earlier testimony you said that there were
25    two rounds of surveillance.  What did you mean by that?
```

1        MS. SULLIVAN:  Objection.

2        THE COURT:  Overruled.

3   A.  So the -- there was a defined period of time as it

4   related to the first injury, and then when there was the

5   claim for a second injury, sometime after that there was

6   another limited round of surveillance.

7   Q.  Did you view the surveillance?

8        MS. SULLIVAN:  Objection.

9        THE COURT:  Yes, um, rather overruled.  You

10  may answer.

11  A.  I did, I specifically recall, um --

12       THE COURT:  No, no, the answer to that is

13  "Yes," you reviewed it.

14       THE WITNESS:  Yes.

15  A.  Uh-huh.

16  Q.  And what did you see?

17       MS. SULLIVAN:  Objection.

18       THE COURT:  Yeah, sustained.  The best

19  evidence is the document itself.

20       MS. BROWN:  It's a video, your Honor.

21       THE COURT:  I know that.

22       MS. BROWN:  Okay.

23  Q.  And what happened after you reviewed the

24  surveillance?

25       MS. SULLIVAN:  Objection.

1          THE COURT:  Well, based upon viewing the

2    surveillance videos, what if anything did you do?

3    A.  I recorded to the manager the results of the

4    surveillance, basically what, um --

5          THE COURT:  What you thought they showed.

6          THE WITNESS:  Right, what I thought they

7    showed and what others thought they showed, others

8    meaning the doctor.

9    Q.  What were the City's options at that point?

10          MS. SULLIVAN:  Objection.

11          THE COURT:  No, sustained.

12    Q.  Following from your reports, did you believe the

13    City had particular options at that point?

14          THE COURT:  No, come to the sidebar.

15

16          AT THE SIDEBAR

17          THE COURT:  You've been at such pains to show

18    that she was not terminated, that she was placed on this

19    disability status.

20          MS. BROWN:  Yes, your Honor.

21          THE COURT:  Now I'm assuming that she's going

22    to say, in a form of the words, that the lady is a fraud

23    here.

24          MS. BROWN:  Yes.

25          THE COURT:  Of course you are, and it's

```
 1   immaterial.
 2              MS. BROWN:  Could I explain why?
 3              THE COURT:  Yes.
 4              MS. BROWN:  As you Honor knows, there was a
 5   note with terms and it wasn't anchored in any kind of
 6   agreement.
 7              THE COURT:  Yes.
 8              MS. BROWN:  But it can be anchored.
 9              THE COURT:  Can she?
10              MS. BROWN:  Well, she can testify that there
11   was some discussion.
12              THE COURT:  She can?
13              MS. BROWN:  I mean I can argue that.
14              THE COURT:  And you're going to waive the
15   attorney-client privilege?
16              MS. BROWN:  No, she won't --
17              THE COURT:  Well you can't do it, you can't be
18   both a shield and a sword.  Indeed under Massachusetts
19   law, of course claiming the privilege can be used as a
20   basis for drawing an adverse inference.  I mean you've
21   heard me say that I think this unanchored note is the
22   plaintiff's avenue to a jury verdict, and I do, and so
23   I'm fascinating by the note.  And I will certainly allow
24   you to examine concerning the note to place it in time,
25   who was there, and what was said and why.
```

```
1          Go ahead.

2               MS. BROWN:  All right.

3

4               (In open court.)

5               MS. BROWN:  May I take a minute, your Honor?

6               THE COURT:  Of course you may.

7               (Pause.)

8   Q.  I direct your attention forward a few months to

9   September of 2013.

10  A.  (Looks.)

11  Q.  Were you aware that Ms. Cloutier claimed a second

12  injury around about that time?

13  A.  I'm actually not clear exactly when I became aware

14  of the claim of a second injury as opposed to the

15  assault.

16  Q.  When you say "opposed to the assault," what do you

17  mean?

18               MS. SULLIVAN:  Objection.

19               THE COURT:  No, the objection's overruled.

20  You may answer.

21               THE WITNESS:  Thank you.

22  A.  I just mean that, um, what was clear to me at the

23  time, what I was focused on from the law department

24  standpoint, was that there was a claim of assault and,

25  um, we needed to inform the department head of the
```

```
 1    library as well as other interested parties such as HR,
 2    and the City Manager, and, um, that's what I was focused
 3    on from my perspective as a member of the law
 4    department.
 5    Q.   How did you learn about Ms. Cloutier's claim of
 6    assault?
 7    A.   I believe she sent me directly a letter informing me
 8    that, um, she had been assaulted by, um, Vicky Woodley,
 9    our librarian.
10              MS. BROWN:   And then could I show the witness
11    Exhibit 25, please.
12              THE COURT:   You could.
13              MS. BROWN:   Thank you.
14              (On screen.)
15    Q.   Is this the letter you're referring to?
16    A.   It is, yes.
17    Q.   And what did you do in response to this letter, if
18    anything?
19    A.   I informed Ms. Woodley, Vicky, of the -- of the
20    allegation.
21              MS. SULLIVAN:   Objection, your Honor.
22              THE COURT:   Overruled.
23    A.   And I --
24              THE WITNESS:   Thank you, your Honor.
25    A.   And I also informed the City Manager and HR and, um,
```

1    suggested that we will have to do obviously an

2    investigation into the allegation and ultimately make a

3    determination.

4    Q.  And what did you do?

5            MS. SULLIVAN:  Your Honor, may I have a

6    sidebar?

7            THE COURT:  No.  Go ahead.

8    Q.  What did you do next?

9    A.  We did just that.  I met with Mary Callery from HR

10   and we interviewed the, um, the only, um, sort of

11   witness other than the library director herself, who

12   denied it, but we interviewed the witness who was

13   identified in the communication, and that was the

14   custodian, Mr. Hickey.

15   Q.  Why didn't you interview Ms. Cloutier?

16           MS. SULLIVAN:  Objection.

17           THE COURT:  Overruled.

18   A.  I can't personally contact her without going through

19   her attorney, but more fundamentally I felt that from

20   this letter it was very detailed and I felt like I had

21   from this letter her version of her allegations, what

22   she was basing it on and what she claimed happened.

23   Q.  You just said "I can't contact her without going

24   through her attorney."  Why can't you?

25           MS. SULLIVAN:  Objection.

1          THE COURT:  Overruled.

2    A.  Because the standards of conduct for attorneys and

3    the rules of ethics would prevent me from doing so.

4          THE COURT:  When did you learn -- when did you

5    first learn -- in any aspect of the employment relations

6    you had with the City, that she was represented by

7    counsel?

8          THE WITNESS:  Back, your Honor, I think around

9    2012 when I received a communication from Attorney

10   Sullivan, to which I responded.

11         THE COURT:  Right, and at least it was your

12   belief that from then going forward up to the end of her

13   daily employment, that Ms. Sullivan has been her

14   attorney?

15         THE WITNESS:  I did have that belief, yes.

16         THE COURT:  And, um, it's fair to say, because

17   that's the law and ethics, that's correct as far as --

18   and I'm not saying that you should believe this witness,

19   it's up to you whether you believe the witness or

20   disbelieve the witness, it's like any other witness, but

21   once a person is represented by a lawyer, then in

22   dealing with that person -- not on a day-to-day basis,

23   but dealing with that person with respect to complaints

24   or any issue, you're supposed to talk with the lawyer

25   because lawyers have that mediating role on behalf of

1  their respective clients.  So you can't go behind the

2  back of the lawyer and try to deal with the client of

3  the lawyer once you know the person is represented by a

4  lawyer.  It's a fair rule and we, the courts, enforce

5  that rule about all lawyers who are members of our bar,

6  and so do the state courts.

7       Go ahead.

8  Q.  And since -- did you reply either to Ms. Cloutier or

9  her lawyer?

10  A.  No, I didn't respond to Ms. Cloutier, who had sent

11  me the letter, and I did not receive any letters from

12  her attorney.

13  Q.  And do you know what -- when you received this

14  letter, September 21st -- (Shows.)  And do you know what

15  Ms. Cloutier's work status was at that point?

16              MS. SULLIVAN:  Objection.

17              THE COURT:  Say again the date?  No,

18  overruled.  She can tell us what you understood.

19  A.  At that time I believe my understanding was that,

20  um, her department head didn't know where the employee

21  was, and at some point in time, I believe prior to this

22  letter or perhaps because of this letter, I was made

23  aware of the absence of the employee at work without any

24  communication to her department head.

25              MS. SULLIVAN:  Objection.

1           THE COURT:  That may stand.

2    Q.  And, I apologize, did you state what her status was?

3           MS. SULLIVAN:  Objection.

4    A.  Just essentially AWOL to put it in a -- that was my

5    understanding, that she was absent without any

6    authorization or understanding from her department head.

7           THE COURT:  That may stand.

8    Q.  And did she return to work, if you know?

9    A.  She did, yes.

10   Q.  And do you know when that was?

11   A.  Um, it would have been the beginning of October.

12   Q.  Did you hear from her before she returned to work?

13   A.  Did I?

14   Q.  Yeah.

15   A.  Um, actually, yes, she had sent, I believe, another

16   letter to me.

17          MS. BROWN:  Can I show Attorney O'Connor

18   Exhibit 16.

19          (On screen.)

20   Q.  And is this the letter that you're referring to?

21          MS. BROWN:  And perhaps you can just scroll

22   through it.

23          (On screen.)

24   A.  Yes, that's addressed to me.  It's CCed to her

25   attorney and her union.

```
 1    Q.   In this letter Ms. Cloutier claims that her pay has
 2    been docked?
 3              MS. SULLIVAN:  Objection.
 4    Q.   Um, my question will be do you know whether that was
 5    the case?
 6              MS. SULLIVAN:  Objection.
 7              THE COURT:  Overruled.
 8         You don't know?
 9    A.   I didn't know and I wouldn't know.
10              THE COURT:  I have a juror question.  Go back
11    to this incident about the alleged assault.
12              THE WITNESS:  Yes.
13              THE COURT:  And I think you may have testified
14    to this.  But in your investigation, did you talk with
15    Ms. Woodley?
16              THE WITNESS:  Yes, on the telephone.
17              THE COURT:  All right.
18              THE WITNESS:  Yes.
19              THE COURT:  But because of the hearsay rules
20    we can't have her tell us what Ms. Woodley said to her.
21    But you talked to her.
22         And you also talked with the custodian?
23              THE WITNESS:  I sat down with the custodian
24    and had a detailed series of --
25              THE COURT:  You talked to him.
```

```
 1              THE WITNESS:  -- and I had a detailed series
 2    of questions.
 3              THE COURT:  But not with Ms. Cloutier, even
 4    after asking her attorney to talk with her, right?
 5              THE WITNESS:  I did not ask her attorney to,
 6    um --
 7              THE COURT:  You didn't reach out to her
 8    attorney and you didn't talk to her?
 9              THE WITNESS:  And I didn't talk to her because
10    I had her detailed statement in the letter.
11              THE COURT:  Go ahead, Ms. Brown.
12    Q.  Ms. O'Connor, what was your -- well, first of all,
13    did you respond to this letter, this October 3rd letter?
14    A.  No, again, it was sent to me, um, by the employee,
15    her union was CCed and her attorney, and, um, I did not
16    respond to it.  No.
17    Q.  What was -- did you -- what if any was your reaction
18    to this letter?
19    A.  Let me just take a moment to just skim through it
20    again.
21    Q.  Sure.
22              MS. BROWN:  And the letter has not been yet
23    scrolled.
24              (Moved on screen.)
25    A.  Hold on.  Could you scroll up just a bit?  I'm
```

```
 1    sorry.  No, down.  Sorry.
 2              (Scrolled down.)
 3    A.  Okay.  (Reads.)  Okay.
 4        So -- wait a minute, there's more.  (Reads.)
 5    Could you repeat the question?
 6    Q.  What was your reaction to the letter?
 7    A.  My reaction to this letter and other similar letters
 8    was that, um, it was inappropriate that they were coming
 9    directly to me, um, but substantively my reaction to
10    these letters was that I found that they were
11    inaccurate, um, they were self-serving letters, and as
12    an attorney I thought --
13              MS. SULLIVAN:  Objection, your Honor.
14              THE COURT:  No, she may answer.  She may tell
15    us her reaction.
16              THE WITNESS:  I'm sorry, Judge.
17    A.  As an attorney I felt that the letters were
18    essentially seemed to be written in anticipation or as a
19    continuation of a lawsuit, um, to enhance someone's
20    position.
21    Q.  What if anything did you do differently following
22    receipt of this letter?
23    A.  Nothing.  However I just would like to make clear
24    that --
25              MS. SULLIVAN:  Objection, your Honor.
```

```
 1              THE COURT:  Yeah, sustained.  You can't just
 2   go on.  You can always correct something you said that
 3   was wrong.  If you said something was wrong, you can
 4   always go back and correct it.  But unless you're
 5   correcting, she gets to ask the questions.
 6              THE WITNESS:  Okay, thank you, your Honor.
 7   Q.  Do you need to correct anything?
 8              MS. SULLIVAN:  Objection, your Honor.
 9              THE COURT:  That question is all right.
10        Do you?
11              THE WITNESS:  No.
12              THE COURT:  No.
13        Go ahead.
14   Q.  Okay.  Did you have any other responses to this
15   letter or reactions to this letter that you haven't told
16   us about?
17              MS. SULLIVAN:  Objection.
18              THE COURT:  Overruled.
19   A.  Yes, and that is I did not have a belief at all or a
20   concern as to the individual's safety at the library and
21   the reason that I didn't --
22              MS. SULLIVAN:  Objection, your Honor.
23              THE COURT:  She may give us her views.
24   A.  -- the reason that I didn't at this point is that
25   (A) when the assault was, um, brought to my attention,
```

1    it was promptly investigated and the conclusion of the

2    investigation was that it was unsubstantiated, and

3    having been involved in an earlier incident with the

4    plaintiff where she had claimed that she was the victim

5    of --

6            MS. SULLIVAN:  Objection, your Honor.

7            THE COURT:  No, where she had claimed she was

8    a victim of --

9            THE WITNESS:  -- the victim of a murder plot,

10   um, and I didn't find that to be credible after it was

11   looked at, that's how I -- I didn't feel that there was

12   any justification in this, despite her saying it, as to

13   her safety at the library at the hands of essentially

14   Vicky Woodley.

15           THE COURT:  That's it for this witness, isn't

16   it?

17           MS. BROWN:  No.

18           THE COURT:  All right, then come to the

19   sidebar.

20

21           AT THE SIDEBAR

22           THE COURT:  Don't take this critically at all,

23   I think you're both doing fine, at least in terms of

24   time.  So I'm going to ask for that.

25       Can we get this to the jury on Monday?  They'd

1   love that.

2              MS. BROWN:  I would say yes.  I mean I don't

3   think I have too much.  But I haven't even talked to

4   her.

5              THE COURT:  Oh, I understand that.  I was just

6   testing.

7              MS. BROWN:  Okay.  I don't have a lot more.

8              THE COURT:  I have a habit of testing.

9   Sometimes counsel accede to my suggestions.

10         All right.  Look, if I tell them they're getting

11   it on Monday, then they're getting it on Monday.

12         All right?

13              MS. BROWN:  How long with Ms. Woodley?

14              THE COURT:  We can't tell.  And I don't mean

15   it critically at all.  She's slower than you are,

16   Ms. Sullivan, so she's going to take her time with

17   Ms. Woodley.  Though we're not going to waste time here.

18   We've heard a lot.

19         So we've got Woodley.  We're about done with her.

20   And thank you for standing up to me.  If you want to

21   call Gagnon, I don't see why, but go ahead.

22              MS. BROWN:  For a couple of library questions.

23   Just very brief.

24              THE COURT:  A couple?

25              MS. SULLIVAN:  I'm going to object to that

```
 1    because they're involved in protected activity --
 2              THE COURT:  Well, and maybe those objections
 3    will be sustained.
 4              MS. BROWN:  I think it goes to her
 5    credibility.
 6              THE COURT:  And credibility is very much at
 7    issue here.  But you've seen my reasoning, you've got it
 8    laid out for the jury.  To me this has been, from the
 9    judge's perspective, the most troublesome part of the
10    case, is bending over backwards to give you all the
11    relevant evidence and preventing you from wandering off
12    -- and I mean this to all counsel, into things that have
13    nothing to do with this case.  And I'll keep trying.
14         So let's say Tuesday?
15              MS. BROWN:  Tuesday would be safe, yes.
16              THE COURT:  Guaranteed, right?
17              MS. SULLIVAN:  From my perspective I don't
18    know who they're calling, how many witnesses, and --
19              THE COURT:  They're calling a couple.  But
20    don't you think Tuesday?  You know how I'm going to
21    rule.  You've seen my rulings.  I'm not going to change
22    my rulings.
23              MS. SULLIVAN:  I think it's a waste of time,
24    but, yes, I agree.  But I think we could finish on
25    Monday.
```

```
 1              THE COURT:  So maybe Monday, but definitely
 2     Tuesday.  Okay, fine.
 3              MS. SULLIVAN:  Your Honor, if I may?  I just
 4     want to note that the witness is now testifying to
 5     things that they previously said were attorney-client
 6     privileged, so I'm going to be asking for a ruling on
 7     that in accordance with your Honor's previous sidebar.
 8              THE COURT:  Well, to the extent she has so
 9     testified, she's waived it.  To the extent.  We'll see
10     where we go.
11
12              (In open court.)
13              THE COURT:  You know what I'm doing over
14     there, I'm asking how much longer is the case going to
15     go?  And I guess I'm asking because I feel bad we're not
16     going to sit tomorrow and Friday.  I'm obliged -- and
17     all the lawyers knew this going in, to be in the
18     Northern District of New York tomorrow and Friday, and
19     that's out by Albany.  In any event we're going to
20     resume, and I know I can count on you, on Monday.
21              But now I think there is, at least in terms of
22     timing, some good news.  It may be we will give you the
23     case on Monday.  No guarantees.  We will certainly give
24     you the case on Tuesday.  So please schedule things so
25     you could be with us all day on Monday, and if it
```

1   doesn't get to you on Monday, it will get to you on

2   Tuesday, all day on Tuesday.

3        So for those afternoons, please be ready to sit,

4   because the case may conclude on Monday.  That would

5   mean we'd have to hear all the evidence, let the

6   attorneys argue to you, I have to explain the law, but

7   we may need you all day on Monday.  And if we don't

8   conclude on Monday, it's pretty definite -- as definite

9   I can make anything, we'll conclude on Tuesday.

10       Now the break now is my responsibility.  It's not

11  lawyers, they have stepped up the pace, they've focused

12  on the things that we ought focus on, all the lawyers,

13  and so I apologize that we're not sitting in this case

14  Thursday and Friday.  But you have not heard all the

15  evidence and therefore you must keep your minds

16  suspended, do not discuss the case either among

17  yourselves nor with anyone else.  When you get to the

18  weekend, have a good weekend, and we'll see you here

19  promptly at 9:00 Monday morning.

20       We'll stand in recess until that time.  I'll

21  remain on the bench.

22            THE CLERK:  All rise for the jury.

23            (Jury leaves, 1:00 p.m.)

24            THE COURT:  I was going to count the time, but

25  we're going to be well within the time, so that's not

1   necessary.

2        So Monday's hard work in the sense that here's how

3   we'll do it.  It makes no sense to -- though your motion

4   for directed verdict may be filed at the close of the

5   plaintiff's case, we're clearly going to go on and see

6   if we finish the evidence.

7        Once we finish the evidence, I will then entertain

8   the motion, we'll see if anything's left standing.  If

9   anything is left standing, we'll go right into a charge

10  conference, which is appropriate and which I am bound to

11  give you, and so be prepared for that.

12       I should also say that in this case I think that

13  it will make more sense to the jury if I charge the jury

14  first.  So have in mind that's how we will proceed.  I

15  follow the Massachusetts procedure, the party that bears

16  the burden of proof gets to argue last, so Ms. Sullivan

17  will argue last.

18       Understand when I say I'll go first as to the

19  charge, that means that it has the advantage that you

20  know what the charge is, because I will have given it to

21  the jury.  But also I'm not waiting for an objection, no

22  one puts a spin on my charge without me correcting it

23  right at that time, because I'm out there with my

24  charge.  And while you may of course say "As the judge

25  told you, see how this has been proved or see how the

1    proof fails" or something, but you can't change the law.

2    If you do, I will correct it in the middle of your

3    closing argument.

4         So the case still could be settled.  If you do not

5    settle it, have a good weekend and we'll see you Monday

6    morning at 9:00.

7              MS. BROWN:  Could I just ask you --

8              THE COURT:  You could.

9              MS. BROWN:  The verdict form --

10             THE COURT:  The verdict form, as I perceive

11   it, is as follows.  Assuming that all of the defendants

12   stay in the case, the verdict form is going to be like

13   this, "We find for" and then I name the individual

14   defendants and the City.  That's a complete verdict for

15   the City.  Or that the next option is "We find for," and

16   I use names, "Diane Cloutier against" and I will -- I

17   think I'll go Ms. Gagnon first, Ms. O'Connor, Mr. Lynch,

18   and right after him the City of Lowell, because the only

19   way they get to the City of Lowell is through Mr. Lynch,

20   something which we will discuss in the charge.  And then

21   those are individual checkmarks, "No," "Yes," you know,

22   and they check off who they find against.  And then an

23   award of compensatory damages of "blank."  And then I

24   have to have another question, I have to charge, because

25   I think punitive damages are at least possible in this

1    case, and the law is that I must so charge, so I charge

2    about punitive damages, and I then list each one

3    individually and they give an amount as to the punitive

4    damages if any punitive damages there be.  But that's a

5    separate and an additional burden of course on the

6    plaintiff.  And I'll make that clear.

7          All right, have a good weekend.  9:00 should the

8    case not settle.  We'll recess.

9                (Adjourned, 1:05 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  C E R T I F I C A T E

 2

 3

 4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

 5   hereby certify that the forgoing transcript of the

 6   record is a true and accurate transcription of my

 7   stenographic notes, before Judge William G. Young, on

 8   Wednesday, February 28, 2018, to the best of my skill

 9   and ability.

10

11

12

13   /s/ Richard H. Romanow 04-09-18
     _____
14   RICHARD H. ROMANOW  Date

15

16

17

18

19

20

21

22

23

24

25
```