1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3                                   No. 1:15-cv-12780-WGY

4

5    DIANE CLOUTIER,
             Plaintiff
6

7
     vs.
8

9

10   CITY OF LOWELL, et al,
             Defendants
11

12                          * * * * * * * * *

13

14
                         For Jury Trial Before:
15                       Judge William G. Young

16

17                       United States District Court
                         District of Massachusetts (Boston)
18                       One Courthouse Way
                         Boston, Massachusetts 02210
19                       Monday, March 5, 2018

20

21                          * * * * * * * *

22

23              REPORTER: RICHARD H. ROMANOW, RPR
                       Official Court Reporter
                     United States District Court
24        One Courthouse Way, Room 5510, Boston, MA 02210
                       bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3    LANA SULLIVAN, ESQ.
         Law Office of Lana Sullivan
 4       233 Needham Street
         Newton, Massachusetts 02464
 5       (617) 454-1015
         E-mail: Lana@lanasullivanlaw.com
 6       For the plaintiff

 7

 8    RACHEL M. BROWN, ESQ.
      HANNAH B. PAPPENHEIM, ESQ.
 9       City of Lowell Law Department
         375 Merrimack Street, 3rd Floor
10       Lowell, Massachusetts 01852
         (978) 670-4050
11       Email: Rbrown@lowellma.gov
         For the defendants
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    I N D E X

2
    WITNESS                 DIRECT  CROSS  REDIRECT  RECROSS
3
4   CHRISTINE P. O'CONNOR  (Continued.)

5       By Ms. Brown:          5

6       By Ms. Sullivan:          10

7
    VICTORIA WOODLEY  (Recalled.)
8
        By Ms. Brown:                      39
9
        By Ms. Sullivan:    19                      41
10
11  PAMELA B. COLT

12      By Ms. Pappenheim:  45            56

13      By Ms. Sullivan:          52

14
    SUSAN FOUGSTEDT
15
        By Ms. Pappenheim:  57
16
17  CHARGE CONFERENCE (In recess.)...................... 86

18
        By Ms. Sullivan:          93
19
20  MOTION JNOV......................................... 98

21  JURY CHARGE........................................ 102

22  CLOSING ARGUMENT BY MS. BROWN...................... 131

23  CLOSING ARGUMENT BY MS. SULLIVAN................... 151

24  JURY QUESTION IN AFTERNOON......................... 179

25
```

1                         E X H I B I T S

2

3      EXHIBIT 85................................    32

4      EXHIBIT 86................................    34

5      EXHIBIT 87................................    38

6      EXHIBIT 88................................    41

7      EXHIBIT 89................................    66

8      EXHIBIT 90................................    67

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S
2              (Jury enters, 9:00 a.m.)
3              THE COURT:  Good morning, ladies and
4    gentlemen.  Welcome back.  Again I thank you for the
5    wonderful tone you've set throughout these proceedings.
6    We'll see -- there's no pressure on anyone, but we'll
7    see if we're not in a position to give you this case
8    today.
9          And, Ms. O'Connor --
10         Would you remind the witness that she's still
11   under oath.
12             THE CLERK:  I'd like to remind you that you're
13   still under oath.  Do you understand?
14             THE WITNESS:  I do.
15             THE COURT:  And you may proceed.
16             MS. BROWN:  Thank you, your Honor.
17
18   DIRECT EXAMINATION BY MS. BROWN:  (Continued.)
19   Q.  Good morning.
20   A.  Good morning.
21   Q.  Attorney O'Connor, as a general matter do you know
22   when law department employees are in work or not?
23             MS. SULLIVAN:  Objection.
24             THE COURT:  I don't understand the question.
25   "When they are in work?"

```
 1                    MS. BROWN:  When they are present in the
 2       office.
 3                    THE COURT:  All right.  I'll allow that one
 4       question.
 5            As a routine, when do you expect your employees to
 6       be in the office?
 7       A.  I would expect them in the office, um -- our office
 8       hours are 8:00 till 5:00 generally, and obviously Monday
 9       through Friday.  Although now our office hours changed,
10       so we get out at noon.  I don't know if that was --
11                    THE COURT:  Well, there's your answer.  All
12       right.
13       Q.  Do you know whether Karen Gagnon, the worker's comp
14       agent, was at work during the weeks of October 7th and
15       October 13th, 2013?
16                    THE COURT:  Do you know of your own knowledge
17       because you were there and you saw it, not looking at
18       some payroll records or something, do you know?
19       A.  Well, actually put that way, I wouldn't have known
20       on a day-to-day basis.
21                    THE COURT:  Exactly.  But that's how we have
22       to put it, because otherwise it would be hearsay.
23                    THE WITNESS:  Yes.
24                    THE COURT:  So you don't really know.  All
25       right.
```

```
 1   Q.  Do you know as a general matter whether she was --
 2             THE COURT:  Not as a general matter, she
 3   doesn't have a basis for knowledge except the records of
 4   the office.
 5             MS. BROWN:  Okay.
 6             THE COURT:  It's hearsay.  Move on.
 7             MS. BROWN:  Okay.
 8   Q.  Attorney O'Connor, you heard Dr. Gilbert's testimony
 9   last week that she determined Ms. Cloutier couldn't be
10   accommodated in the library given the new doctor's
11   restrictions?
12             MS. SULLIVAN:  Objection.
13             THE COURT:  Well, we'll strike out the
14   characterization and we'll narrow it down to "You heard
15   the doctor's testimony last week, you were here in the
16   courtroom?"
17             THE WITNESS:  Yes, I did, your Honor.
18             THE COURT:  And you have that testimony in
19   mind?
20             THE WITNESS:  I do.
21             THE COURT:  And now a question.
22   Q.  What role, if any, did you play in the doctor's
23   determination?
24             MS. SULLIVAN:  Objection.
25             THE COURT:  No, overruled, she may have that.
```

1  A.   As I testified, I didn't play any role in the

2  doctor's determination, it was purely a medical

3  determination.

4  Q.   When the city physician makes a determination that

5  an employee is unfit for duty, what happens?

6            MS. SULLIVAN:  Objection.

7            THE COURT:  Well, what's the general process?

8            MS. BROWN:  Procedurally, yes, your Honor.

9            THE COURT:  All right, overruled.  You may

10  have it.

11  A.   Generally speaking, um, if a determination is made

12  that an employee is not fit for duty, then they are not

13  allowed back to the workplace until they are fit for

14  duty or fit for light duty.  If it happens the -- if the

15  employee is currently working and the determination is

16  made, which does happen from time to time, then the

17  employee would have to leave the workplace.

18  Q.   And how if at all did the fact that Ms. Cloutier had

19  filed an MCAD complaint in February of 2012 and had

20  written letters to you affect your treatment of her?

21            MS. SULLIVAN:  Objection.

22            THE COURT:  Overruled.

23  A.   Not at all.

24            MS. BROWN:  Your Honor, I have a couple more

25  questions, but I'd like to request a sidebar.

```
1                    THE COURT:  You may.

2                    MS. BROWN:  Thank you.

3

4                    AT THE SIDEBAR

5                    THE COURT:  Sounds to me like that's a good

6      place to stop, but it's your case.

7                    MS. BROWN:  Yes, um, the only question is last

8      week you had instructed the jury as to the ADA

9      reasonable accommodations --

10                   THE COURT:  Right.

11                   MS. BROWN:  -- and the issue with Ms. Cloutier

12     was that she was on light duty, and so when the

13     plaintiff complains of light duty, it's often not

14     performing the core functions of the job.  So I wondered

15     if I could ask for a clarification that the employer was

16     not obligated to, um, allow an employee to work where

17     they cannot perform the essential functions of --

18                   THE COURT:  Well, I think I've already charged

19     that, and I will so charge it, but it's not a matter of

20     evidence.

21                   MS. BROWN:  Ms. Cloutier was allowed to be --

22     we often allow employees to work on light duty --

23                   THE COURT:  And you can argue that.

24                   MS. BROWN:  I thought you --

25                   THE COURT:  I will also charge it.
```

```
 1              MS. BROWN:  Okay, because I thought there was
 2     some kind of confusion --
 3              THE COURT:  But it's not a matter of evidence.
 4     So you're done with her, right?
 5              MS. BROWN:  Yes.
 6              THE COURT:  Fine.
 7         You do want to examine her further?  I mean you've
 8     already examined her.
 9              MS. SULLIVAN:  Yeah, I'd like about 10 minutes
10     or so.
11              THE COURT:  All right.  Go ahead.
12
13              (In open court.)
14              MS. BROWN:  No further questions at this time.
15              THE COURT:  Thank you, Ms. Brown.
16         Ms. Sullivan?
17              MS. SULLIVAN:  Thank you, yes.
18
19     CROSS-EXAMINATION BY MS. SULLIVAN:
20     Q.  Ms. O'Connor, if Mr. Cloutier had provided the City
21     with additional medical information from her doctor
22     following October 29th, 2013 and clarifying her work
23     restrictions, would the City had allowed her to return
24     to work?
25     A.  Well, that's a question that would have to have been
```

1   reviewed by the doctor.  As far as the letter that she

2   received, um, clearly that was an option that was

3   spelled out in the letter and that was the intent, as I

4   understood it, behind it.

5   Q.  And so you would agree with me that if in fact

6   Ms. Cloutier's doctor provided information after October

7   29th stating that she could work at the same light duty

8   restrictions, you would have returned her immediately to

9   work, correct?

10  A.  Again I would not have been the person returning her

11  to work, it would have been the same process that we've

12  already gone through.  So if she had contacted the

13  worker's comp office and supplied an updated doctor's

14  restriction note that had been modified in some way, in

15  the same way that the City allowed her to work for 16

16  months on light duty, um, then those notes would have

17  been provided to the doctor and the doctor would have

18  made that determination as to whether an accommodation

19  could be made, if one was even sought.

20  Q.  Thank you.

21          MS. SULLIVAN:  Your Honor, I'd like to show

22  the witness what's been marked as P and Q.

23          THE COURT:  Show her?

24          MS. SULLIVAN:  I mean -- yeah.  Sorry.

25          THE COURT:  This of course now is cross-

```
 1   examination after you have called the witness as part of
 2   your case, but you may show her the documents.
 3             MS. BROWN:  Your Honor, I think it's beyond
 4   the scope.
 5             MS. SULLIVAN:  No, it's actually not.
 6             THE COURT:  Well, it's not -- you've called
 7   the witness so I will have to make that determination.
 8   I hear the objection.  P and Q.
 9             MS. SULLIVAN:  All right.
10             MS. BROWN:  Your Honor, I object, these were
11   excluded.
12             MS. SULLIVAN:  No, they were not excluded.
13             THE COURT:  Please, please, please, please,
14   let me do my job.
15             (Pause.)
16             MS. SULLIVAN:  May I inquire of the witness,
17   your Honor?
18             THE COURT:  No, they are excluded.
19        Anything else for this witness?  Your rights are
20   saved.
21   Q.  Were you aware that in fact the City did receive
22   documentation following October 29th, 2013 from
23   Ms. Cloutier's providers reaffirming that in fact she
24   could work on light duty, and those were provided in
25   April of 2014 and maintained in the law department's
```

```
 1    files?

 2              MS. BROWN:  Objection.

 3              THE COURT:  Come to the sidebar.

 4

 5              AT THE SIDEBAR

 6              THE COURT:  (Reads.)

 7              MS. SULLIVAN:  I only want them for purposes

 8    of notice, your Honor, I don't even really care what

 9    they say.

10              MS. BROWN:  We filed a motion in limine on

11    these documents.  These documents were produced as part

12    of the DUA hearing, it's not clear to me how they --

13    Ms. Cloutier got copies of them, but they weren't

14    produced by Ms. Cloutier as a -- they were part of the

15    unemployment hearing.

16              MS. SULLIVAN:  No.

17              THE COURT:  They may have been.  If they're --

18              MS. BROWN:  They're also excluded already.

19              MS. SULLIVAN:  No, they were not excluded.

20              THE COURT:  Remember, trials are living things

21    and so it seems to me it's germane that the documents

22    existed if they got into the law files of the City.  Let

23    me ask a few questions to see about that.

24         But they won't be in for the truth, simply for the

25    fact that they got them.
```

```
 1                    MS. SULLIVAN:  All right.

 2

 3                    (In open court.)

 4                    THE COURT:  I'm going to show you these two

 5     documents.  Take a look at them and take a look at the

 6     dates that they bear there.

 7          Do you see them?

 8                    THE WITNESS:  April 24th and April 23rd.

 9                    THE COURT:  Right.

10          Do you have any recollection of those documents on

11     or about the dates that they bear?

12                    THE WITNESS:  No, I don't, Judge.

13                    THE COURT:  Do you have any recollection of

14     those documents coming into the possession of the law

15     department in the City of Lowell?

16                    THE WITNESS:  I don't personally.  If they

17     came in, they would have come into our worker's comp

18     office.  I wouldn't -- as a normal course of my day-to-

19     day functioning, I wouldn't see records unless they were

20     specifically brought to my attention.

21                    THE COURT:  Yeah, I'll exclude them.

22          Anything else for this witness, Ms. Sullivan?

23                    MS. SULLIVAN:  Yes, I'd like to just show the

24     witness a few more documents.

25                    THE COURT:  All right.
```

```
 1              MS. SULLIVAN:  They're official, um --
 2              THE COURT:  Well, you can't testify what they
 3    are.
 4              MS. SULLIVAN:  Sure.
 5    Q.  All right, I'm showing you -- (On screen.)  Okay.
 6         Can you see that, Ms. O'Connor, what's on the
 7    screen?
 8              THE COURT:  Does this have an identification?
 9              MS. SULLIVAN:  Yes, it's AU for
10    identification, it's a City of Lowell Accounts --
11              THE COURT:  Well, no, let's see if she knows.
12              MS. SULLIVAN:  I'm sorry.
13              THE WITNESS:  Yes, I do.
14              MS. SULLIVAN:  Okay.
15    Q.  Is that your signature that appears on the first
16    page of the document, your initials on the second page
17    of the document?
18    A.  (Looks.)  Yes, the initials on the second page of
19    the document, um, I'm sorry about that, they're very
20    tiny, but they do appear to be mine.  And the signature
21    is definitely mine.
22    Q.  Okay.
23              MS. SULLIVAN:  Your Honor, I'd like to offer
24    these documents into evidence.
25              MS. BROWN:  I object.
```

1           THE COURT:  You object?

2           MS. BROWN:  Yes.

3           THE COURT:  Well -- (Reads.)

4           MS. SULLIVAN:  I'm offering them as business

5      records, your Honor.

6           THE COURT:  I understand that.

7           MS. SULLIVAN:  Okay.

8           THE COURT:  Let me just ask you, Ms. O'Connor,

9      what are these?  Without getting into the details, what

10     is it that you signed off on?

11          THE WITNESS:  The Department is required to

12     sign every invoice that comes into the City, whether I

13     am personally part of it or not.

14          THE COURT:  So having done that, what is this

15     one?

16          THE WITNESS:  This is an invoice for services

17     related to surveillance that was done.

18          THE COURT:  Oh, sustained.  Your rights are

19     saved.

20     Q.  And did you fill out, um, similar invoices for the

21     subsequent five rounds of surveillance that were done of

22     Ms. Cloutier?

23          MS. BROWN:  Objection.

24          THE COURT:  The objection is sustained.  We've

25     been over this.

1             MS. SULLIVAN:  Okay.

2  Q.  And certain of the surveillance that was performed,

3  um, was of Ms. Cloutier -- was into Ms. Cloutier's home

4  in darkness, correct?

5             MS. BROWN:  Objection.

6             THE COURT:  Overruled.

7  A.  Into her home into darkness, is that the question?

8  Q.  Certain of the surveillance that was taken of

9  Ms. Cloutier was from the outside of her home with the

10  investigator zooming into her home while it was dark at

11  night, correct?

12  A.  I don't know that I agree with that entire

13  characterization.

14  Q.  And in fact, um, that would have no bearing

15  whatsoever on her work capacity, would it?

16             MS. BROWN:  Objection.

17             THE COURT:  No, she may have that.

18  A.  Well, surveillance in general, you're going to have

19  surveillance that doesn't --

20  Q.  Can you answer my question, please.

21             THE COURT:  No, no, I think she's trying to.

22             THE WITNESS:  I'm trying to.

23  A.  The nature of surveillance is you are going to have

24  parts of surveillance that don't technically have any

25  bearing, it just gets captured on film, and then there

1    are parts that do have bearing, as was the case here,

2    and those parts in this case obviously, um --

3    Q.   Well, you just said a moment ago you weren't sure

4    what was on the video, correct?

5    A.   I said I didn't entirely agree with your

6    characterization, um, of zooming in in darkness.

7                MS. SULLIVAN:   Thank you, your Honor.

8                THE COURT:   Nothing further?

9                MS. BROWN:   (Silence.)

10               THE COURT:   All right, nothing further for

11   this witness?

12               MS. BROWN:   Nothing further, your Honor.

13   Thank you.

14               THE COURT:   Thank you.

15        Now do I understand Ms. Woodley is going to be

16   recalled?

17               MS. BROWN:   Yes.

18               THE COURT:   She may be recalled.

19               MS. BROWN:   She's going to need some

20   assistance.

21               THE COURT:   All right.

22               (Witness in wheelchair.)

23               THE COURT:   And if you'd simply remind the

24   witness that she remains under oath.

25               THE CLERK:   I'd like to remind you, ma'am,

1   that you're still under oath.  Do you understand?

2                THE WITNESS:  Yes, I do.

3                THE COURT:  And just pull the mic a little

4   closer, please.

5                (Pulls in microphone.)

6                THE COURT:  Now you wish to cross-examine this

7   witness, as is your right, Ms. Sullivan, and you may

8   proceed.

9                MS. SULLIVAN:  Thank you, your Honor.

10

11  CROSS-EXAMINATION BY MS. SULLIVAN:

12  Q.  Ms. Woodley, um, did you work at the library last

13  week?

14  A.  Last week?  Um, a few days.

15  Q.  You did.  And you were there for the grand reopening

16  of the library after, um, the flood, correct?

17  A.  Yes, I was there on Wednesday.

18  Q.  Okay.  Were you there on any other days last week?

19  A.  Um, I think I was there Tuesday and I was there for

20  an hour and a half on Thursday and I was not there

21  Friday or Monday.

22  Q.  Now, the library was renovated about 15 years ago,

23  is that fair to say?

24  A.  In 2002.

25  Q.  Okay.  And as part of that renovation there was a

1  new air conditioning system that never really worked

2  correctly, is that fair to say?

3          MS. BROWN:  Objection.

4  A.  Yes, they did but --

5          THE COURT:  No, overruled.  Overruled.  She

6  may answer.

7      This is cross-examination and you can answer.

8          THE WITNESS:  Okay.

9  A.  Yes, they put in a new HVAC, um, heat and air

10  system.

11  Q.  Okay.  And do you recall that in the summer of 2013,

12  um, you sent out a bunch of instant messages to staff

13  commenting on how hot it was in the library and how

14  stuffy it was?

15  A.  No, I don't remember that.

16  Q.  You don't recall sending, um, instant messages about

17  how poorly the air conditioning system was functioning?

18  A.  Not specifically, no.

19  Q.  I'm going to show you what's been previously marked

20  Exhibit 39.

21  A.  (Looks.)

22  Q.  Can you see that?

23  A.  Not yet.  (On screen.)  Yes, I can now.

24  Q.  Okay.  What's been marked as Exhibit 39 is a series

25  of instant messages from you to staff about a "chiller

1   not functioning in the library."  Do you now recall

2   this?

3   A.  Yeah, I do now.

4   Q.  Okay.  And I'm also going to show you Exhibit 40.

5   (On screen.)

6   A.  Yes.

7   Q.  Do you see that?  At Exhibit 40 is another -- would

8   you agree with me that's another series of instant

9   messages regarding the air conditioning in the library?

10  A.  Yes, it seems to be a status update on it.

11  Q.  Okay.  And in this Exhibit 40 you write, um,

12  "Hallelujah, the AC is working again," correct?

13  A.  Yes.

14  Q.  Now you also ask staff to let you know if the

15  blowers in each area still aren't working, is that true?

16  A.  Yes.

17  Q.  Okay.  And then -- so you confirmed -- it's about

18  halfway through the page it says "Diane Cloutier 19,"

19  um --

20  A.  I see it.  Okay.

21  Q.  Do you see that?

22  A.  Yes.

23  Q.  Okay.  And would you agree with me that Ms. Cloutier

24  was communicating to you that all of the vents shut off

25  -- "All of the air conditioning vents shut off two hours

1    before the library closed"?

2    A.   Yes, that's what it says here.

3    Q.   Okay.  So you would agree that the AC was not

4    working that night, is that a fair assumption?

5    A.   If they never turn back on, then, yes, I agree.

6    Q.   Okay.  And Ms. Cloutier is also indicating in this,

7    um, IM, that the blower vent in the circulation office

8    "only blows room temperature air all day long," correct?

9    A.   That's what it says here, yes.

10   Q.   All right.  Now in the summer of 2013, when

11   Ms. Cloutier requested windows be open on the first

12   floor where she worked, there were two staff computers

13   in the circulation office, right?

14   A.   Probably, but I don't know exactly how many there

15   were.  But at least that many.

16   Q.   Okay.  Would you agree with me that there was a

17   computer for Ms. Colt and that there was another

18   computer that was shared by approximately six library

19   assistants and three library aides when they were

20   working on bins and pull lists?

21   A.   There was at least that many, yes.

22   Q.   Okay.  Do you have any recollection that there were

23   more than that?

24   A.   I can't remember when we were moving people in and

25   out of there, I think it was later than that.

1    Q.   Okay.  And would you also agree with me that

2    Ms. Colt's desk in the circulation office was right in

3    front of the only two windows in the room and the other

4    staff computer was approximately 8 to 10 feet away from

5    those two windows?

6    A.   Yes.

7    Q.   And would you also agree with me that after mid July

8    of 2012, um, you chose not to assign Ms. Cloutier any

9    bins or pull lists, correct?

10   A.   Right.  It wasn't a choice, it had to do with her

11   restrictions.

12   Q.   Okay.  And, um -- well, she had no restrictions that

13   actually said she couldn't do bins or pull lists, did

14   she?

15   A.   The restrictions said what she could and could not

16   do with her arms and hands, the affected arms and hands,

17   so she said she could not do those tasks because it

18   would require two arms and hands.

19   Q.   Okay.  Now, you in fact assigned her work doing bins

20   in July of 2012, isn't that fair to say?

21   A.   Yes.

22   Q.   Okay.  So you knew she could in fact use her arms

23   and her hands?

24   A.   I was going by whatever her restrictions said.

25   Q.   Well, you observed her using her arms and hands?

1    A.   I didn't assign her those things, I think that this

2    is just something that she was doing and then eventually

3    she said she couldn't do that anymore.  I -- you make it

4    -- okay.

5    Q.   Well, you never -- she never in fact said she

6    couldn't do that anymore, in fact her doctor's note said

7    exactly the opposite, and she told you the opposite,

8    didn't she?

9                MS. BROWN:  Objection.

10   A.   I don't --

11               THE COURT:  Sustained.  The question's

12   argumentative, but you may ask a question.

13               MS. SULLIVAN:  Okay.

14   Q.   Well, isn't it true that Ms. Cloutier told you that

15   she in fact could do all these tasks and did do them and

16   you chose not to give them to her because she --

17   A.   I don't recall that.  No, I don't recall that.

18               THE COURT:  And again now this is cross-

19   examination, it's perfectly all right to ask questions

20   that suggest things, but the evidence is what the

21   witness says.  It's up to you whether you believe the

22   witness, disbelieve the witness, believe parts of what

23   the witness says.

24   Q.   And you were named in Ms. Cloutier's initial MCAD

25   complaint in 2012, correct?

1   A.  Yes, I was.

2   Q.  I just want to go back to the Circ. office for a

3   moment.

4       So you would agree with me that the one shared --

5   there was one shared-staff computer in that office, um,

6   that was used for people who were doing bins and pull

7   lists, correct?

8   A.  It was a shared computer.

9   Q.  Okay.  Now, would you agree with me that, um, since,

10  um -- since Ms. Cloutier was at the library, the

11  configuration of the circulation office has changed?

12  A.  Yes, it has.

13  Q.  It doesn't look the same today as it did back when

14  Ms. Cloutier was there, right?

15  A.  There are more, um, desks and more computers in it.

16  Q.  Okay.  Now, Ms. Cloutier had light-duty restrictions

17  at the library from June of 2012 through October of

18  2013, is that fair to say?

19  A.  Yes.

20  Q.  Okay.  And that was pursuant to the shoulder injury

21  she had suffered in June of 2012, right?

22  A.  Right.

23  Q.  Is there any library policy regarding what tasks

24  library assistants must do while on light duty?

25  A.  No, it has to do with whatever your restrictions say

1   on your light duty.

2   Q.   And isn't it true that you, as the library director,

3   would decide what tasks to assign to a library employee

4   on light duty?

5   A.   No, I think that their supervisor, if they wanted to

6   confer with me, I would, you know, give them the

7   information as to, you know, what the restrictions are.

8   Q.   Is it your testimony that you were not involved at

9   all with -- you do not get involved at all in light-duty

10   restrictions?

11   A.   I do speak with the supervisor of the person who has

12   the restriction so we can decide, you know, what they're

13   going to do, but, no, generally I don't -- the day-to-

14   day things.   Because the person who's supervising them

15   knows better about what kinds of tasks are available for

16   somebody to do.

17   Q.   Do you recall a library assistant named Mary Nagle?

18   A.   Yes, I do.

19   Q.   Okay.   Now, isn't it true that she was placed on

20   light duty in 2011 by her doctor?

21              MS. BROWN:   Objection.

22              THE COURT:   Yes, sustained.

23   Q.   Were you aware that both Ms. Nagle and Ms. Cloutier

24   had the same doctor who filled out both their light-duty

25   work restrictions?

```
1              MS. BROWN:  Objection.
2              THE COURT:  Sustained, we're not going into
3     somebody else.
4              MS. SULLIVAN:  May I have a sidebar, your
5     Honor?
6              THE COURT:  You may.
7
8              AT THE SIDEBAR
9              THE COURT:  This is the question of a
10    "comparable employee."  Now you haven't established that
11    this is comparable employee, but it's your position that
12    she is?
13             MS. SULLIVAN:  She is.  And not only that, I
14    have e-mails saying that she was directly involved and
15    linked to work restrictions.
16             THE COURT:  Yeah, well, that's a question
17    that's separate from my first question.
18        She is a comparable employee?
19             MS. BROWN:  I mean she had an injury several
20    years before.  She was also a library assistant.  I
21    think one of the critical things is that the doctor was
22    a different doctor at that time.
23             THE COURT:  What difference does it make?
24             MS. BROWN:  Because it's the doctor who would
25    use -- who would review the similar work restriction and
```

1    that -- and you heard from Dr. Gilbert last week that

2    she read the work restriction and said, "This simply

3    can't be accommodated."  She wasn't --

4              THE COURT:  I don't --

5              MS. BROWN:  She wasn't there to make that kind

6    of determination, it was Nagle, so --

7              THE COURT:  So she wasn't there.  I don't know

8    that that makes a difference.  I'm going to allow a few

9    questions.  A few.

10

11             (In open court.)

12             THE COURT:  And just so I'm clear,

13   Ms. Woodley, Ms. Nagle was also a library assistant?

14             THE WITNESS:  That's correct.

15             THE COURT:  And that's the same job that

16   Ms. Cloutier had?

17             THE WITNESS:  Yes.

18             THE COURT:  And now you may inquire.

19             MS. SULLIVAN:  Thank you, your Honor.

20   Q.  All right.  Would you agree with me, Ms. Woodley,

21   that you and Ms. Fougstedt determined what tasks

22   Ms. Nagle, another library assistant, would be assigned

23   while on light duty in 2011, a year before Ms. Cloutier

24   was placed on light duty?

25   A.  We worked with the supervisor -- her actual

1  supervisor to figure out if there was something she

2  could do with her work restrictions.

3  Q.  In fact you worked directly with Ms. Gagnon, did you

4  not?

5  A.  I don't recall, but perhaps.  I don't recall.

6          MS. SULLIVAN:  Your Honor, I'd like to show

7  the witness what's been marked as Exhibit GK.

8          THE COURT:  Yes, the document may be shown.

9          MS. SULLIVAN:  Okay.

10          (On screen.)

11          THE COURT:  That refreshes your recollection?

12          THE WITNESS:  Yes.  Thank you.

13          THE COURT:  All right.

14      And so not to leave it up in the air, I'm taking

15  it that it refreshes your recollection that you worked

16  with Ms. Gagnon?

17          THE WITNESS:  Uh-huh.

18          THE COURT:  All right.

19      Go ahead, Ms. Sullivan.

20          MS. SULLIVAN:  Okay.

21  Q.  Now, in, um, this -- you recognize this e-mail, this

22  is an e-mail from you to, um, Ms. Gagnon on February

23  11th, 2011 regarding Ms. Nagle's light-duty work

24  restrictions, correct?

25          MS. BROWN:  Objection.

1          THE COURT:   Now the document's not in

2   evidence, you used it to refresh her recollection and

3   it's done that.

4          MS. SULLIVAN:   Okay.

5   Q.   All right.   So this is, um -- do you recognize this

6   e-mail?

7   A.   Yes.

8          MS. SULLIVAN:   Okay, I'd like to move for its

9   admission into evidence, your Honor.

10          MS. BROWN:   I object.

11          THE COURT:   Sustained.

12   Q.   Now, do you recall, Ms. Woodley, that you

13   communicated with Ms. Gagnon about the job you were

14   seeking to assign Mary Nagle when she came back on light

15   duty, do you recall that?

16   A.   Yes, according to this e-mail I did communicate with

17   her.

18   Q.   And do you recall that you informed her that you

19   were going to give Ms. Nagle essentially a data entry

20   job?

21   A.   That's what it says there, yes.

22   Q.   And do you recall telling her that you weren't sure

23   if Ms. Nagle could use her left hand to type, but you

24   thought it might be a little slow for her if she can

25   only use one hand?

1          MS. BROWN:  Objection.

2    A.  Yes.

3    Q.  And do you recall also communicating to Ms. Gagnon

4    --

5          THE COURT:  Well, in view of the answer, I'm

6    going to let that stand.

7          MS. SULLIVAN:  Okay.

8          THE COURT:  All right.  Now the document's not

9    in evidence.  Do you have any other questions?

10          MS. SULLIVAN:  Yes.

11          THE COURT:  You may have a few questions along

12    this line.  Go ahead.

13          MS. SULLIVAN:  Okay.

14    Q.  All right.  And would you also agree with me that

15    you, um, felt that that would be an appropriate task, um

16    --

17          THE COURT:  She can't testify as to what

18    someone else felt.  Let's move on.

19    Q.  Did you believe the data-entry task for light duty

20    that you wanted Ms. Nagle to do involves lifting more

21    than -- anything more than a few sheets of paper?

22    A.  No, that's what we were trying to avoid, having her

23    lift anything heavy.

24    Q.  Okay.  And you would agree with me that in fact, um,

25    you treated Ms. Cloutier completely differently when she

1    came in with light-duty work restrictions in 2012,

2    correct?

3    A.  No.

4    Q.  Would you agree with me that you suspended

5    Ms. Cloutier on May 14th, 2013?

6              MS. BROWN:  Objection.

7              THE COURT:  No, overruled.

8    A.  I don't recall the exact date, but I remember I

9    suspended her once.

10   Q.  I'm going to show you what's been identified as

11   "BS."  (On screen.)  Do you see that?

12   A.  Yes.

13   Q.  Does that refresh your recollection as to whether

14   you suspended Ms. Cloutier on May 14th, 2013?

15   A.  It must be, that's the date on the letter.

16   Q.  And do you recognize this -- that's your signature

17   on the letter?

18   A.  Yes.  Yes.

19             MS. SULLIVAN:  Your Honor, I'd like to move

20   for admission of this into evidence.

21             MS. BROWN:  I object to that.

22             THE COURT:  No, it may be admitted.  This will

23   be admitted as Exhibit 85 in evidence.

24             (Exhibit 85, marked.)

25   Q.  Now, before Ms. Cloutier was escorted -- the

1    question is withdrawn.

2         Were you aware Ms. Cloutier was going to be

3    escorted out of the library on October 29th, 2013 before

4    it happened?

5    A.   No, I wasn't.

6    Q.   Okay.  And you were informed that it happened after

7    it happened, is that fair to say?

8    A.   Yes, that's correct.

9    Q.   Do you recall any communications with, um, library

10   staff either that day or the day after, um, regarding,

11   um, the fact that Ms. Cloutier had been escorted out?

12   A.   With library staff?  Communication with library

13   staff?

14   Q.   Anybody who worked at the library.

15   A.   I think so.  Yes, I think I spoke with somebody.

16   Q.   Do you recall who you spoke with?

17   A.   I think I spoke with Susan Fougstedt about it.

18   Q.   Okay.  And do you recall what you said?

19   A.   No.

20   Q.   Okay.

21         MS. SULLIVAN:  I'd like to show the witness

22   what is GL.  Uh-huh.

23              (On screen.)

24   A.   (Looks.)

25   Q.   Do you see the e-mail, this document?

```
 1    A.   Yes.

 2    Q.   Do you recognize this document?

 3    A.   Yes, but let me just read what it says.  (Reads.)

 4    Yes.

 5    Q.   Okay.

 6              MS. SULLIVAN:  Your Honor, I'd like to move

 7    for admission of this item into evidence.

 8              THE COURT:  No objection?

 9              MS. BROWN:  I don't object to this, your

10    Honor.

11              THE COURT:  GL is admitted, Exhibit 86.

12              MS. SULLIVAN:  Thank you.

13              (Exhibit 86, marked.)

14    Q.   Now in this e-mail, um -- let me back up.

15         You titled this e-mail "Good news for you,"

16    correct?

17    A.   Uh-huh.

18    Q.   Just make sure you answer verbally so the Court

19    Reporter --

20    A.   Oh, yes.

21    Q.   Thank you.  And was it fair to say Ms. Fougstedt

22    wasn't at work that day?

23    A.   Yeah, according to this it looks like she was on

24    vacation.  I don't know if I called her or anything.

25    Aside from this e-mail, I can't remember.
```

1   Q.  Okay.  Now, you communicated to Ms. Fougstedt that

2   the -- that "The ball was now in her court," referring

3   to Ms. Cloutier, correct?

4   A.  Yes.

5   Q.  Okay, and then you wrote that, "I heard that she

6   sent a letter to HR and the law department telling them

7   she is suing them for harassment.  She also sent that

8   letter to all the City Councilors."

9           MS. BROWN:  Objection.

10  Q.  My question is --

11          THE COURT:  Well, wait a minute.  The

12  objection is overruled.  You may ask your question.

13  Q.  Ms. Woodley, you wrote "I heard that she sent" --

14          THE COURT:  No, no, you just read it, that was

15  my concern.

16          MS. SULLIVAN:  Okay.

17          THE COURT:  But it's in the letter and you

18  read it.  You can ask her a question.

19          MS. SULLIVAN:  Okay.

20  Q.  Why did -- from whom did you hear that Ms. Cloutier

21  sent a letter to HR and the law department telling them

22  that she --

23  A.  I cannot recall where I heard that.

24  Q.  Okay.  But that was your understanding at the time?

25  A.  Um-hum.

1    Q.   Just make sure you answer verbally so the Court

2    Reporter can --

3    A.   Yes.

4    Q.   Okay.   Thank you.

5         And do you recall receiving a response to this

6    e-mail from Ms. Fougstedt?

7    A.   I don't know.

8    Q.   I'm showing you what's been marked Exhibit --

9    identified as Exhibit GN.   Do you see that?

10   A.   Yes, but I don't see the top part of this though.

11   Q.   (On screen.)   Do you see it now?

12   A.   Yes.

13   Q.   Okay.   Does this refresh your recollection as to

14   whether you received a response from Ms. Fougstedt as to

15   the news you imparted to her?

16   A.   (Reads.)   Yes, I just don't remember what our

17   conversation was about.

18   Q.   Okay.

19   A.   As far as what she said.

20   Q.   So is it your testimony that after she wrote "OMG, I

21   will call you today" --

22               MS. BROWN:   Objection.   Objection.

23               THE COURT:   Wait a minute.   Wait a minute.

24   The document is not in evidence.

25               MS. SULLIVAN:   Okay.

1    Q.   You recognize this e-mail though, correct?

2    A.   I recognize it's from me, at least part of it.

3    Q.   Okay.

4              MS. SULLIVAN:   I'd like to move for its

5    admission into evidence, your Honor.

6              MS. BROWN:   I'd object under 803.

7              THE COURT:   No, overruled.   It may be

8    admitted.   These are agents of the defendant talking.

9    Well, in light of the objection, it may be admitted at

10   least as to the City, not as to the evidence.   They're

11   agents of the City.

12        And you want such a limitation, right?

13             MS. BROWN:   I'm sorry, I want such an

14   invitation?

15             THE COURT:   You want such a limitation?

16             MS. BROWN:   Oh, a "limitation," I thought you

17   said "invitation."   Oh, yes, thank you, your Honor.

18             THE COURT:   All right.   Now on this one it may

19   be admitted in evidence with the limitation as Exhibit

20   87.

21        This one, in light of the objection and the

22   posture of the case, you've got four different entities

23   you're going to be asked about, Ms. Gagnon -- well,

24   they're people and I don't mean them any disrespect, and

25   one entity, the City, it's Ms. Gagnon, Ms. O'Connor,

1   Mr. Lynch, and the City.  This is admissible only as to

2   the City.  Because we don't know that any of these three

3   individuals ever saw these e-mails, joined in them, or

4   the like.

5        So these people -- I think there's no dispute, you

6   can infer that Ms. Woodley and Ms. Fougstedt are

7   employees of the City and so this is admissible as

8   against the City.  But only the City.

9        Go ahead, Ms. Sullivan.

10            (Exhibit 87, marked.)

11  Q.  After Ms. Fougstedt wrote, "OMG, I will call you

12  today and tell you my feelings, don't want to e-mail

13  it," you had a conversation with Ms. Fougstedt, correct?

14  A.  I would say probably and I don't remember what it

15  was -- what was said.

16  Q.  Okay.  Were you happy that Ms. Cloutier had been

17  escorted out of the library?

18  A.  I was glad that there was some type of resolution to

19  what was going on.

20  Q.  Thank you.

21            (Pause.)

22            MS. SULLIVAN:  I'll just reserve a few

23  questions.  That's all.

24            THE COURT:  Well, are you done with this

25  witness at this time?

1          MS. SULLIVAN:  Yes, your Honor.

2          THE COURT:  All right.

3      You have no further questions?

4          MS. BROWN:  I just have a few questions, your

5  Honor.

6          THE COURT:  Very well.

7

8  REDIRECT EXAMINATION BY MS. BROWN:

9  Q.  Ms. Woodley, how many evenings did Ms. Cloutier work

10  in the library?

11          MS. SULLIVAN:  Objection.

12  A.  Usually it was one.

13          THE COURT:  No, the objection's sustained, I

14  think that's beyond the scope.

15          MS. BROWN:  Um, there was a --

16          THE COURT:  No, that's my ruling, it's beyond

17  the scope.

18          MS. BROWN:  Okay.

19  Q.  Just for clarification.  Isn't the circulation

20  office part of the public floor of the library?

21          MS. SULLIVAN:  Objection.

22          THE COURT:  Overruled.

23  A.  It is a separate room when the door is almost always

24  kept closed.

25  Q.  You said, when Attorney Sullivan asked you, that you

```
 1   didn't treat Mary Nagle and Ms. Cloutier differently
 2   when they came back with work restrictions.  What did
 3   you mean by that?
 4   A.  I tried to find --
 5            MS. SULLIVAN:  Objection.
 6            THE COURT:  Overruled.
 7   A.  I tried to find a way for them to do some type of
 8   tasks with their limited -- with their restrictions.  So
 9   I did that for both of them.
10            MS. BROWN:  I'd like to show the -- and
11   actually if we could just get our screen set up, the
12   witness what's been premarked as GI.
13            (On screen.)
14   Q.  Now, Ms. Woodley, do you recognize this document?
15   A.  Yes, it's an e-mail that I would have sent out, um,
16   with a schedule attached to it.
17   Q.  And --
18            MS. BROWN:  Your Honor, I would move to admit
19   this under Rule 801(d)(1).
20            MS. SULLIVAN:  Objection, your Honor.
21            (Pause.)
22            THE COURT:  No, that's not hearsay, it's
23   instructions.  It may be admitted.  And GI is admitted,
24   Exhibit 88.
25            MS. BROWN:  Thank you, your Honor.
```

1              (Exhibit 88, marked.)

2    Q.  Ms. Woodley, in the first line of this e-mail, um,

3    it states "I haven't heard anything new about Diane

4    Cloutier.  She is still out."  What did you mean to

5    convey by that?

6              MS. SULLIVAN:  Objection.

7              THE COURT:  Overruled.

8    A.  That nobody was going to see her on the schedule

9    because she -- as far as we knew was still out, but I

10   didn't know why or when she's coming back.

11   Q.  And what's the date of this e-mail?

12   A.  Okay, October 31st, 2013.

13   Q.  I thank you.

14             MS. BROWN:  No more questions.

15             THE COURT:  Nothing further for this witness,

16   Ms. Sullivan?

17

18   RECROSS-EXAMINATION BY MS. SULLIVAN:

19   Q.  Isn't it true that you had multiple communications

20   with Mr. Lynch and Ms. O'Connor about Ms. Cloutier

21   throughout 2012 and 2013?

22             MS. BROWN:  Objection, your Honor.

23             THE COURT:  Sustained, beyond the scope.

24   Q.  And would you agree with me that Ms. Nagle did not

25   have a MCAD complaint?

```
 1                MS. BROWN:  Objection.
 2                THE COURT:  Sustained.  The scope now is the
 3     couple of questions that Ms. Brown just asked.  That's
 4     the scope.
 5                MS. SULLIVAN:  Thank you.
 6                THE COURT:  Nothing further then for this
 7     witness?
 8                MS. SULLIVAN:  No.
 9                THE COURT:  You may step down.  And of course
10     she may have assistance.
11          So with the opportunity to cross-examine
12     Ms. Woodley, Ms. Cloutier rests, correct?
13                MS. SULLIVAN:  Right.
14                THE COURT:  Come to the sidebar.
15
16                AT THE SIDEBAR
17                THE COURT:  Are you moving now or do you want
18     to reserve?
19                MS. BROWN:  We're going to move for a directed
20     verdict now.
21                THE COURT:  Fine.  I'm going to take it under
22     advisement.
23          But one other thing you could help me out on.  Are
24     you going to put any more witnesses on in your
25     affirmative case?
```

1          MS. BROWN:  Yes, we have three witnesses who

2    will be quite -- very short.

3          THE COURT:  I trust they will.

4       Then one of you -- perhaps who's not calling the

5    witness, can get for me a hardcopy of that handwritten

6    note that I thought was fairly significant.

7       Do you know what I'm talking about?

8          MS. BROWN:  Yes.  Yes.  Sure.

9          THE COURT:  Ms. Sullivan introduced it.  But

10   I've got three people.  So one of you who's not

11   examining the witness --

12         MS. BROWN:  It's going to be me.  Hannah is

13   going to be doing the --

14         THE COURT:  That's fine.

15      So, Ms. Brown, just pass that note up to

16   Ms. Gaudet.  I want to be looking at it.  All right?

17         MS. BROWN:  And I do have a motion written for

18   a directed verdict, which I'll give to you.

19         THE COURT:  And that's fine.

20         (Pause.)

21         MS. BROWN:  Oh, your Honor?  One of the

22   witnesses we have is Beth Brassel, who was the, um --

23         THE COURT:  The note --

24         MS. BROWN:  We would like to bring her up just

25   for 5 minutes just to explain what she meant by it,

1 because Ms. Cloutier has introduced into evidence that

2 she thought it was a murder plot.

3          THE COURT:  I think that's far afield.  We're

4 not going into that.  She says what she said.  We're not

5 going to get into this.  That's far afield.  So now

6 we've got two witnesses.  That's fine.

7

8          (In open court.)

9          THE COURT:  Now, you recall, for good and

10 sufficient reasons, we took Ms. Woodley out of order,

11 she was called by the defense, but since Ms. Sullivan

12 never had a chance to cross-examine her, we've been

13 waiting to give her that chance, and she had it this

14 morning.

15      So now you've heard all the evidence you're going

16 to hear from Ms. Sullivan for Mr. Cloutier, but the

17 people who have been sued and the City, they haven't

18 rested yet, and they've got some more.

19      And, Ms. Pappenheim, you may call your next

20 witness.

21          MS. PAPPENHEIM:  The City defendants would

22 call Ms. Pamela Colt.

23          THE COURT:  She may be called.

24          (PAMELA B. COLT, sworn.)

25

```
 1              * * * * * * * * * * * * * *
 2              PAMELA B. COLT
 3              * * * * * * * * * * * * * *
 4
 5    DIRECT EXAMINATION BY MS. PAPPENHEIM:
 6    Q.   Could you please state your name.
 7    A.   Pamela B. Colt.
 8    Q.   And, Ms. Colt, do you know the plaintiff in this
 9    case, Diane Cloutier?
10    A.   Yes.
11    Q.   How do you know Ms. Cloutier?
12    A.   From working at the library.
13    Q.   What was your position at the library?
14    A.   My current position?
15    Q.   Yes.
16    A.   Reference librarian.
17    Q.   And in 2012 to 2013, what was your position?
18    A.   Head of circulation.
19    Q.   And as head of circulation, in what capacity did you
20    work with Ms. Cloutier?
21    A.   I was her supervisor.
22    Q.   Okay.  Now, as the former head of circulation, are
23    you familiar with the duties of a library assistant?
24    A.   Yes.
25    Q.   And what are those?
```

1   A.   They work at a public desk, do the bins, and pull

2   list.

3   Q.   How long is a library assistant shift?

4   A.   7 hours.

5   Q.   How long is a typical public desk shift?

6   A.   4 hours.

7   Q.   Now, how long were you Ms. Cloutier's direct

8   supervisor?

9   A.   9 years.

10   Q.   In your capacity as her supervisor over those 9

11   years, did you observe her work?

12   A.   Yes.

13   Q.   How closely did you work together?

14   A.   Well, we worked in the same office.

15   Q.   Which office was that?

16   A.   The circulation office.

17   Q.   Now, what opinions, if any, did you form as to

18   Ms. Cloutier's work ethic?

19          MS. SULLIVAN:  Objection.

20          THE COURT:  That's pretty open-ended.

21      One of the, um -- we've talked about this duty

22   under the law as to someone who has a disability to be

23   reasonably accommodated by the employer, but part of

24   that law is that the person perform the essential tasks

25   of the job.  So I take it that's why this witness has

1    been called.  So if you're going to ask her about that,

2    that's all right, but just --

3         You're not here as a superpersonnel board of the

4    City to decide whether the City makes proper personnel

5    decisions or not and how you feel about that is not

6    significant.  I keep saying this is a case about

7    retaliation that's forbidden by federal law.  I'm not

8    saying there was any or was not any.  But that's what

9    the case is about.  So that's the question you want,

10   what I posed.

11             MS. PAPPENHEIM:  Can I have a brief sidebar,

12   your Honor?

13             THE COURT:  Yes, you may.

14

15             AT THE SIDEBAR

16             THE COURT:  Why do you want her, what is she

17   going to cover?

18             MS. PAPPENHEIM:  She is going to testify to

19   the duties, those core duties, but it is also the City's

20   position that Ms. Cloutier has put her work ethic at

21   issue and it's a credibility issue here.

22             THE COURT:  No.  So first, yes, but the

23   second, no.  And you may have the first one.

24

25

```
 1              (In open court.)
 2              THE COURT:  And, Ms. Pappenheim, of course you
 3    may ask whether she did or could perform those duties,
 4    as we discussed.
 5              MS. PAPPENHEIM:  Thank you, your Honor.
 6    Q.  Ms. Colt, were you aware that Ms. Cloutier had a
 7    work injury in June of 2012?
 8    A.  Yes.
 9    Q.  After her injury, did Ms. Cloutier's workload
10    change?
11    A.  Yes.
12              MS. SULLIVAN:  Objection.
13              THE COURT:  Well, you don't lead the witness,
14    but I'll allow that to stand.
15    Q.  How so?
16              MS. SULLIVAN:  Objection.
17              THE COURT:  Overruled.
18    A.  She could no longer work at a public desk or do the
19    bins or pull list.
20    Q.  What tasks did you observe Ms. Cloutier doing during
21    that time?
22    A.  She did complete registrations or data entry and
23    made phone calls.
24    Q.  Now, how long does it take to do calls typically in
25    a day?
```

1          MS. SULLIVAN:  Objection.

2          THE COURT:  I didn't understand, "How long

3   does it take to" --

4          MS. PAPPENHEIM:  Do the calls.

5          THE COURT:  Overruled.

6   Q.  You can answer.

7   A.  Oh, about half an hour to 45 minutes.

8   Q.  And on a typical day, how long did the data entry

9   take?

10          MS. SULLIVAN:  Objection.

11   A.  A couple of hours.

12          THE COURT:  Overruled.  I'm sorry.  You may

13   answer.

14   A.  A couple of hours.

15   Q.  Now, did you ever ask Ms. Cloutier to do any

16   additional tasks?

17   A.  No.

18   Q.  Why not?

19          MS. SULLIVAN:  Objection.

20          THE COURT:  Overruled.

21   A.  I couldn't think of any other things that she would

22   have been able to do.

23   Q.  Now, you stated that Ms. Cloutier did most of her

24   work in the circulation office?

25          MS. SULLIVAN:  Objection.

1           THE COURT:  Again you're leading the witness.

2   Sustained.  Don't lead the witness.

3   Q.  Ms. Colt, when was the circulation office available

4   for her to use?

5   A.  I'm sorry?

6   Q.  When if ever was the circulation office available

7   for Ms. Cloutier to use?

8   A.  Almost all the time.

9   Q.  Now, could you describe the windows on the first

10  floor of the library for us?

11          MS. SULLIVAN:  Objection.

12          THE COURT:  Overruled.

13  A.  They were large, um, no screens.

14  Q.  And we've heard testimony that the air conditioning

15  in the library was unreliable.  How did it work in the

16  circulation office?

17          MS. SULLIVAN:  Objection.

18          THE COURT:  The question may be asked.

19  Overruled.

20      How did it work?

21  A.  It wasn't too bad, it was fairly reliable in the

22  office.

23  Q.  Did you ever tell Ms. Cloutier she was not allowed

24  to have a window open in the circulation office?

25  A.  No.

```
 1              MS. SULLIVAN:  Objection.
 2              THE COURT:  No, the answer may stand.
 3  Q.  Did you ever hear anyone else tell Ms. Cloutier she
 4  could not have a window open in the circulation office?
 5              MS. SULLIVAN:  Objection.
 6              THE COURT:  Overruled.
 7  A.  No.
 8  Q.  Ms. Colt, have you ever met, um, one of the
 9  defendants in this case, outside of the scope of the
10  litigation, Ms. Christine O'Connor?
11  A.  No.
12              MS. SULLIVAN:  Objection.
13              THE COURT:  Overruled.
14  Q.  Have you ever met Ms. Gagnon outside the scope of
15  this litigation?
16  A.  No.
17  Q.  And what about the defendant, Bernard Lynch?
18  A.  No.
19              MS. PAPPENHEIM:  Thank you, those are all the
20  questions I have.
21              THE COURT:  Any questions for this witness?
22              MS. SULLIVAN:  Yes, your Honor.
23              THE COURT:  Go ahead.
24              MS. SULLIVAN:  Thank you.
25
```

1    CROSS-EXAMINATION BY MS. SULLIVAN:

2    Q.  Ms. Colt, you met with counsel from the law

3    department to prepare for your testimony here at trial

4    today, correct?

5    A.  Yes.

6    Q.  Who from the City's law department did you meet

7    with?

8    A.  Rachel Brown and Hannah Pappenheim.

9    Q.  Was counsel in the library last week taking pictures

10   of the circulation office?

11             MS. PAPPENHEIM:  Objection.

12   A.  Um, I don't think so.

13             THE COURT:  In view of the answer, do you

14   press the objection?

15             MS. PAPPENHEIM:  No, your Honor.

16             THE COURT:  It's withdrawn.

17   Q.  You never saw any of Ms. Cloutier's work restriction

18   notes, correct?

19             MS. PAPPENHEIM:  Objection, scope.

20             THE COURT:  No, overruled.

21   A.  I don't remember.

22   Q.  Well in fact you never were presented with any of

23   her work restriction notes, is that fair to say?

24             MS. PAPPENHEIM:  Objection.

25   A.  I don't remember.

1          THE COURT:  Overruled.  You may answer.

2          THE WITNESS:  All right.

3   Q.  Do you recall --

4          THE COURT:  But I didn't catch it and that's

5   important.  You never were presented with any of

6   those --

7          THE WITNESS:  I don't think so.  But I don't

8   remember though for sure.

9          THE COURT:  Thank you.

10  Q.  In 2012 and 2013, you had a different job than you

11  have now, is that fair to say?

12  A.  Yes.

13  Q.  Okay.  And that job kept you on the second floor of

14  the library, um, and the first floor of the library, um,

15  the second floor reference desk and the first -- I'm

16  sorry, the ground floor desk most of the time, correct?

17  A.  No.

18  Q.  You also had duties as -- is it your testimony you

19  did not man the reference desk on the second floor in

20  2012 and 2013?

21  A.  Um, not as often.

22  Q.  And you -- but you did man those desks, did you not?

23  A.  I guess so.

24          MS. PAPPENHEIM:  Objection.

25          THE COURT:  No, the objection is overruled,

1    and, um, her answer may stand.

2    Q.   And would you agree with me that you also manned the

3    desk on the ground floor in 2012 and 2013?

4    A.   Occasionally.

5    Q.   Well you actually were there quite a bit because

6    that's where the holes were and you dealt with customer

7    complaints and those type of things at that desk quite a

8    bit, did you not?

9    A.   Not down there.

10   Q.   And you also -- you speak another language, correct?

11   A.   I speak --

12              MS. PAPPENHEIM:   Objection.

13              THE COURT:   The objection's sustained.

14   Q.   One of your duties was maintaining a foreign

15   language, um, collection at the library, correct?

16   A.   Part of it.

17   Q.   Okay, and so that put you in the stacks on the first

18   floor quite a bit, did it not?

19   A.   Not very much.

20   Q.   Isn't it true that you did not in fact work with

21   Ms. Cloutier or observe her working much at all in 2012

22   and 2013 due to the nature of your role at that time?

23   A.   No, that's not true.

24   Q.   And isn't it also true that, um, in the circulation

25   office, um, there were two computers, is that -- in 2012

1   and 2013, is that fair to say?

2   A.  I don't remember for sure.

3           MS. PAPPENHEIM:  Objection.

4           THE COURT:  The objection is overruled.  Her

5   answer, "I don't remember," may stand.

6           MS. SULLIVAN:  Okay.

7   Q.  As you sit here today, you can't agree with me one

8   way -- or you can't -- question withdrawn.

9       And you would agree with me, would you not, that

10  in 2012 and in 2013 there was one staff computer in that

11  office that was used by library assistance shared by

12  them all to do things such as bins, is that fair to say?

13  A.  I don't remember for sure.

14  Q.  And it would be next to impossible for Ms. Cloutier

15  to have done the calls in that office given the

16  configuration of the office at that time, isn't that

17  fair to say?

18  A.  No.

19  Q.  Now, um, would you agree with me -- isn't it also

20  true that, um, assigning tasks such as pull lists, bins,

21  and calls, were not at all assigned by you, they were

22  assigned by Ms. Fougstedt or Ms. Woodley, correct?

23  A.  Yes.

24  Q.  Did you ever see Ms. Cloutier's medical records at

25  any point in time during her employment?

```
 1    A.   No.
 2    Q.   Is it your memory under oath that you never were
 3    provided physical therapy records?
 4    A.   That's true.
 5              MS. PAPPENHEIM:   Objection.
 6              THE COURT:   In view of the answer, do you
 7    press the objection?
 8              MS. PAPPENHEIM:   No.
 9              THE COURT:   It's withdrawn.   That may stand.
10    Q.   You were not named in Ms. Cloutier's first MCAD
11    complaint, correct?
12    A.   Right.
13              MS. PAPPENHEIM:   Objection.
14              THE COURT:   The objection is overruled.   Her
15    answer may stand.
16              MS. SULLIVAN:   Thank you.
17              THE COURT:   All right.
18         Nothing further for this witness, Ms. Pappenheim?
19              MS. PAPPENHEIM:   Just one question, your
20    Honor.
21              THE COURT:   You may.
22
23    REDIRECT EXAMINATION BY MS. PAPPENHEIM:
24    Q.   Ms. Colt, did you observe Ms. Cloutier doing the
25    daily calls?
```

```
 1    A.   Yes.

 2    Q.   And where did you observe her doing those?

 3    A.   In the circulation office.

 4    Q.   Thank you.

 5              THE COURT:   Nothing further for this witness?

 6    I hear none.   You may step down.   Call your last

 7    witness.

 8              MS. PAPPENHEIM:   The City defendants would

 9    call Ms. Susan Fougstedt.

10              THE COURT:   She may be called.

11              (SUSAN FOUGSTEDT, sworn.)

12

13              * * * * * * * * * * * * * *

14              SUSAN FOUGSTEDT

15              * * * * * * * * * * * * * *

16

17    DIRECT EXAMINATION BY MS. PAPPENHEIM:

18    Q.   Could you please state your name.

19    A.   Susan Fougstedt.

20    Q.   And, Ms. Fougstedt, do you know the plaintiff in

21    this case, Diane Cloutier?

22    A.   Yes.

23    Q.   How do you know Ms. Cloutier?

24    A.   Um, we work together at the Pollard Library.

25    Q.   And, um, what position was Ms. Cloutier in at the
```

1    Pollard Memorial Library?

2    A.   Library assistant.

3    Q.   And what department was she in?

4    A.   Circulation.

5    Q.   Now how long have you worked at the Pollard Memorial

6    Library?

7    A.   17 1/2 years.

8    Q.   And where's the library in relation to City Hall?

9    A.   It's next door in a separate building.

10   Q.   And what is your current position there?

11   A.   Assistant director.

12   Q.   What was your position before that?

13   A.   Reference librarian.

14   Q.   As assistant library director, what are your main

15   duties?

16   A.   I assist the director in the day-to-day operations

17   including, um, supervising the staff and I, um, do

18   purchasing and billing, and, um, collection development

19   of adults -- the adult collection.

20              MS. PAPPENHEIM:  And I'd like to put up a

21   chalk for Ms. Fougstedt just to describe to us the

22   structure of the -- the organizational structure of the

23   library.

24              MS. SULLIVAN:  And I do object, your Honor,

25   because it wasn't produced in discovery.

1          THE COURT:  Well, no, she's not an expert and

2     this is not going to be evidence.

3          You want this as a chalk, right?

4          MS. PAPPENHEIM:  Yes, your Honor.

5          THE COURT:  Now a chalk is not evidence, it's

6     something that is -- that's where the name comes from,

7     in the days before we had all this magnificent

8     electronic equipment we used to have blackboards and

9     you'd have an auto accident case and you'd say to the

10    witness, "Go to the board, draw the intersection," and

11    the witness would.  And then you'd say, "Well, where was

12    your car?"  And the witness would draw it.  "Where was

13    the other car the first time you saw it?"  The witness

14    would draw that.  "Mark it 1A."  "Mark the other one,

15    B."  And to the extent that helps you understand a

16    witness's testimony, that's fine.  But they made this

17    up.  Nothing the matter with that.  They prepared this

18    for this litigation.  It is not evidence.  To the extent

19    you are aided in understanding this witness's testimony,

20    that's fine, but it's not evidence, it's not going back

21    to the jury room.  We'll mark it Chalk A.  So Chalk A,

22    you may use it as a demonstrative.

23          MS. SULLIVAN:  May we have a sidebar, your

24    Honor?

25          THE COURT:  I thought I did that okay, but --

```
 1    yes, you may have a sidebar.

 2

 3               AT THE SIDEBAR

 4               THE COURT:  When did she first see this?

 5               MS. PAPPENHEIM:  This morning.

 6               THE COURT:  Yeah.  Okay.

 7          Any more to be said?

 8               MS. PAPPENHEIM:  No.

 9               (Judge leaves sidebar.)

10               MS. BROWN:  Your Honor?

11               (Judge returns.)

12               MS. SULLIVAN:  My objection to it is that it's

13    not accurate.

14               THE COURT:  Well, fine, it's just a chalk.

15               MS. BROWN:  We weren't sure if we could go

16    ahead with it?

17               THE COURT:  Oh, you may use it as a chalk.

18    She may cross-examine concerning it.  I've explained

19    what it is as a chalk.

20               MS. BROWN:  Thank you.

21               THE COURT:  But it may be shown to the jury as

22    a chalk.

23

24               (In open court.)

25               THE COURT:  Go ahead.
```

 1   Q.   Ms. Fougstedt, would you just walk us through the

 2   organizational structure of the library?

 3            MS. SULLIVAN:   Objection.

 4            THE COURT:   No, overruled.

 5   A.   All of the assistant director, the custodian, and

 6   the part-time literacy director, reports to the library

 7   director, and then the different heads of departments

 8   report to me, and under them are library assistants,

 9   pages, aides.

10            THE COURT:   And over what period was this

11   organization in effect as far as you know?

12            THE WITNESS:   Well, it says it's the proposed

13   2013 budget, so it's probably early 2012, when they were

14   doing the budget for the 2013.

15            THE COURT:   And how long thereafter did it

16   stay that way?   If you know.

17            THE WITNESS:   I don't know.

18            THE COURT:   You don't know.   All right.

19        So this is back in 2012, as best you know, and for

20   some period thereafter?

21            THE WITNESS:   Right.

22            THE COURT:   All right.

23        Go ahead, Ms. Pappenheim.

24   Q.   So, Ms. Fougstedt, who do library assistants in the

25   circulation department report to?

1    A.   The head of circulation.

2    Q.   Now, who makes the schedule every day for the

3    library?

4    A.   There's a master that's there, but whoever opens the

5    library, with either myself, um, a coordinator or Vicky

6    --

7    Q.   I'm sorry?

8    A.   -- would make -- would just make the daily schedule.

9    Q.   Could you describe for us how the schedules are

10   made?

11   A.   The director creates a weekly master schedule and

12   that's left in her office and whoever opens the library

13   would take the daily one, go down to the circulation

14   office and see if anyone had called in, um, sick or late

15   or maybe there was a mistake on the schedule, and that

16   would be adjusted and then distributed to, um, the desks

17   in the library.

18   Q.   When you say "adjusted," how would that be done?

19               MS. SULLIVAN:  Objection.

20               THE COURT:  She may tell us the procedure, if

21   there was a standard procedure.

22        Was there a standard procedure?

23               THE WITNESS:  Yes.

24               THE COURT:  Sure, you can tell us.

25   A.   Well, if someone called in sick, then someone else

1    would have to take their place if they were doing the

2    public desk.

3    Q.   Physically how would that change be made on the

4    schedule?

5                MS. SULLIVAN:  Objection.

6                THE COURT:  No, again the standard procedure,

7    you may tell us.

8    A.   It would just be crossed out and inked in, or

9    penciled in.

10               MS. PAPPENHEIM:  I'd like to show the witness

11   a document that's been marked for identification as

12   Exhibit GD.

13               THE COURT:  "G" what?

14               MS. PAPPENHEIM:  "GD."

15               THE COURT:  "Gd."

16               MS. PAPPENHEIM:  And I have a physical copy

17   for the witness because it's multiple pages.

18               THE COURT:  All right.

19   Q.   Now, Ms. Fougstedt, do you recognize this document?

20   A.   Yes.

21   Q.   What is it?

22   A.   It's schedules for mostly July of 2012.

23   Q.   Now, are schedules such as this kept in the ordinary

24   course of business at the Pollard Memorial Library?

25               MS. SULLIVAN:  Objection.

1          THE COURT:  Overruled.

2    A.   Yes.

3    Q.   And were these schedules kept in the ordinary course

4    of business?

5          MS. SULLIVAN:  Objection.

6          THE COURT:  Overruled.

7          MS. PAPPENHEIM:  May we have a sidebar on

8    this, your Honor?

9          THE COURT:  You may.  May I have it.

10

11         AT THE SIDEBAR

12         MS. SULLIVAN:  Your Honor, these schedules

13   were typed by Ms. Woodley for payroll purposes, the

14   handwriting on there is Ms. Woodley's, they were never

15   shared with --

16         MS. PAPPENHEIM:  They were.

17         THE COURT:  Wait a minute.  Wait a minute.

18         MS. SULLIVAN:  They were not shared with

19   staff.  So what she just testified to, these are not

20   those schedules, these are schedules that were

21   maintained for payroll purposes.  The staff did not see

22   them.

23         THE COURT:  Well, did she see them,

24   Ms. Pappenheim?

25         MS. PAPPENHEIM:  Did Ms. Fougstedt see them?

1    Yes.  And she'll testify that the handwriting on them

2    was hers.

3              THE COURT:  All right.

4              MS. PAPPENHEIM:  And they --

5              MS. BROWN:  They were maintained --

6              THE COURT:  Wait a minute.  Wait a minute.  In

7    fairness it's Ms. Pappenheim's witness and she seems to

8    be doing just fine.  You can speak to her, if you have

9    some problem.

10         The foundation is not complete.  We'll let her

11   finish the foundation.  Assuming it comes out the way

12   Ms. Pappenheim says, I'm going to admit it.

13

14              (In open court.)

15              THE COURT:  Go ahead, Ms. Pappenheim.

16   Q.  Ms. Fougstedt, looking at this exhibit, whose

17   handwriting is written on it?

18              THE COURT:  It has many pages, so if you would

19   just thumb through them and assure yourself before you

20   answer.

21   A.  It has both mine and it looks like some of Vicky's.

22              THE COURT:  And that you mean Ms. Woodley?

23              THE WITNESS:  Ms. Woodley, yes.

24              THE COURT:  All right.

25   Q.  And how was the staff aware of these changes to the

1    schedule?

2    A.   I would Xerox a copy and put it in all the desks.

3              MS. PAPPENHEIM:   Your Honor, I would move to

4    enter Exhibit GD into evidence.

5              MS. SULLIVAN:   Objection for the reasons

6    stated earlier.

7              THE COURT:   Noted, but overruled.   This may be

8    admitted as Exhibit 89 in evidence.

9              (Exhibit 89, marked.)

10   Q.   All right.   Now I'd also like to show the witness a

11   document marked for identification as Exhibit GE.   Again

12   I have a hardcopy for the witness.   (Hands up.)

13   Q.   Ms. Fougstedt, do you recognize this document?

14   A.   Yes.

15   Q.   What is it?

16   A.   This schedules, um, some of August through October

17   of 2013.

18   Q.   And whose handwriting is on these schedules?   You

19   can take a second if you need to.

20   A.   Um, mine and -- um, it's mostly mine and some of the

21   directors, Ms. Woodley.

22             THE COURT:   So that I'm following, this is the

23   same type of document but for a different time period?

24             THE WITNESS:   Yes.

25             THE COURT:   Yeah.

1    MS. PAPPENHEIM:  Your Honor, I'd move to enter

2    Exhibit GE into evidence.

3    THE COURT:  And you object for the reasons

4    earlier stated?

5    MS. SULLIVAN:  That's correct.

6    THE COURT:  Noted, but overruled.  It may be

7    admitted Exhibit 90.

8    (Exhibit 90, marked.)

9    Q.  Now, Ms. Fougstedt, as assistant library director,

10   are you familiar with the duties of library assistants?

11   A.  Yes.

12   Q.  And what are the core duties of a library assistant?

13   MS. SULLIVAN:  Objection.

14   THE COURT:  Overruled.

15   A.  They work the public desk and do pull lists and

16   bins.

17   Q.  And for the public desk, what is the typically shift

18   like?

19   A.  It's typically 4 hours.

20   Q.  Now I'm going to ask you to describe each one of

21   those tasks for us in a bit more detail.

22   Could you describe what is involved in public desk

23   time?

24   MS. SULLIVAN:  Objection.

25   THE COURT:  Overruled.

1  A.  They answer the phone, they, um, wait on patrons,

2  and check out materials to them.  Um, there's a book

3  drop at both circulation desks that people bring their

4  books back into and they check those in.  Um, there's

5  some entry of new cards for patrons.  And, um -- that's

6  it.

7  Q.  All right.  And could you describe the task you

8  describe as the "bins," what's involved in that

9  assignment?

10  A.  Well, people belong to the consortium so the bins

11  arrive through a delivery service and it's either

12  materials coming back to us from other libraries or it's

13  materials coming to us from our patrons, they requested

14  the materials and it comes on to us in a bin.  And then,

15  um, whoever is assigned the bins, checks them in.

16  Q.  And could you describe the "pull list" for us?

17  A.  Um, the "pull list" is a report that's done every

18  day and when someone requests an item, either in our

19  library or in another library, it's, um, brought up on

20  this pull list.  And the head of circulation, um, does

21  that report and distributes it among the library

22  assistants.  It's probably 100, maybe 100 items that's

23  divided among the library assistants.

24  Q.  Who assigns the pull list?

25  A.  It's the head of circulation.

1   Q.   Okay.   Now, at some point in 2012, did you become

2   aware that Ms. Cloutier had filed a complaint with the

3   Massachusetts Commission Against Discrimination?

4   A.   Yes.

5   Q.   Do you remember when that was?

6   A.   Since February of 2012.

7   Q.   Were you named in that complaint?

8   A.   Yes.

9   Q.   How did you feel when you found out Ms. Cloutier had

10   named you in an MCAD complaint?

11              MS. SULLIVAN:   Objection.

12              THE COURT:   Overruled.

13   A.   Um, it was painful and distressing.

14   Q.   How did your behavior towards Ms. Cloutier change

15   after the MCAD complaint?

16   A.   It didn't.

17              MS. SULLIVAN:   Objection.

18              THE COURT:   The objection is overruled.   The

19   answer may stand.

20   Q.   How did Ms. Cloutier's workload change after the

21   MCAD complaint?

22              MS. SULLIVAN:   Objection.

23              THE COURT:   Overruled.

24   A.   It didn't, but that was the same year she had that

25   injury in June, so then it was lighter.

1  Q.   Okay.  How did you become aware that Ms. Cloutier

2  suffered a workplace injury in June?

3  A.   I had been out on medical leave so I wasn't aware

4  until I came back.

5  Q.   How long had you been out?

6  A.   About four weeks.

7  Q.   And when did you come back?

8  A.   It was around the 4th of July, so it was either the

9  3rd or the 5th.

10  Q.   And when you came back, what was your understanding

11  of Ms. Cloutier's work capabilities?

12            MS. SULLIVAN:  Objection.

13            THE COURT:  No, sustained on that foundation.

14  Q.   Were you aware that her work capabilities had

15  changed?

16            MS. SULLIVAN:  Objection.

17            THE COURT:  Well, I'm not so sure about your

18  use of the word "capabilities."

19        When you came back, what did you understand her

20  work restrictions, if any, to be?

21            THE WITNESS:  I understood she could make

22  calls, check in items that were on a cart, and that she

23  could do the bins.

24  Q.   Did you -- what was Ms. Cloutier not able to do, if

25  you knew?

1          MS. SULLIVAN:  Objection.

2          THE COURT:  Again it's the phraseology.

3     What did you understand she was restricted from

4  doing?

5          MS. PAPPENHEIM:  Yes, your Honor.

6          THE COURT:  All right, you may tell us.  What

7  did you understand?

8          THE WITNESS:  She couldn't work on the public

9  desk and she could not do the pull list.

10          MS. PAPPENHEIM:  I'd like to show the witness

11  Exhibit 65.

12          THE COURT:  It may be done.

13  Q.  (On screen.)  Ms. Fougstedt, do you recognize this

14  document?

15  A.  (Looks.)  Yes.

16  Q.  What is it?

17  A.  These were instant messages that Diane sent to me.

18  Q.  Did you receive these messages when they were sent?

19  A.  No.

20          MS. SULLIVAN:  Objection.

21          THE COURT:  The objection is overruled.  The

22  answer may stand.

23  Q.  Why not?

24          THE COURT:  Well, sustained on that

25  foundation.

1    Q.   When did you first read the messages?

2              MS. SULLIVAN:  Objection.

3              THE COURT:  Well, that assumes something not

4    in evidence.  Sustained.

5    Q.   At some point did you receive these messages?

6    A.   Yes.

7    Q.   And when was that?

8    A.   I finally opened my instant message account on July

9    12th.

10   Q.   And what did you do when you saw them?

11             MS. SULLIVAN:  Objection.

12             THE COURT:  Overruled.

13   A.   I went down to the circ. office and saw Diane and

14   apologized to her because I hadn't had the right system

15   open.

16   Q.   Okay.  All right.  And after you saw these messages,

17   did you understanding of Ms. Cloutier's work

18   restrictions change?

19             MS. SULLIVAN:  Objection.

20             THE COURT:  No, sustained.  You're leading the

21   witness.

22   Q.   After receiving these instant messages and talking

23   to Ms. Cloutier, did you do anything differently?

24             MS. SULLIVAN:  Objection.

25             THE COURT:  Overruled.

1    A.   I made sure that there was someone to help her do

2    the bins.

3    Q.   Now normally how would you expect an employee to

4    handle a situation in which she was assigned work and

5    she could not perform it?

6              MS. SULLIVAN:   Objection.

7              THE COURT:   Sustained.

8              (Pause.)

9              MS. PAPPENHEIM:   So I'd like to show the

10   witness, um, I believe it's Exhibit 89 now, GD.

11             MS. BROWN:   GE.

12             MS. PAPPENHEIM:   GD, Exhibit 89, I believe.

13   And I have copies for the jurors, a couple of copies for

14   them to look at as well.

15             THE COURT:   The Clerk may pass them out.

16   They're in evidence.   And I've instructed you, you may

17   keep them if you wish, you'll have them in the jury room

18   when the case is over.   But you need not.

19             (Passes out to jury.)

20             THE COURT:   And we really do expect to get

21   this case into your hands today.

22   Q.   So, Ms. Fougstedt, looking at this first page, whose

23   handwriting is on the page?

24   A.   Mine and Victoria's -- Ms. Woodley's.

25   Q.   And can you tell, from looking at this sheet, how

1   many bins Ms. Cloutier was assigned on July 9th?

2   A.   Yes.

3   Q.   How many?

4   A.   Three.

5   Q.   Can you just sort of explain to us how you can tell?

6   A.   Um, well 7 bins came in, because the Number 7 is

7   circled next to the bins, and then there's a number

8   above each person's name, the number of bins they should

9   do.

10  Q.   Okay.  And if you look at the page for Friday, July

11  13th.

12  A.   (Looks.)

13  Q.   Whose handwriting is below the bins assignment?

14  A.   It's mine.

15  Q.   Okay.  And is this the day after you received

16  Ms. Cloutier's IMs?

17  A.   Yes.

18  Q.   Now still looking at this page, are public desk

19  assignments marked on this schedule?

20  A.   Yes.

21  Q.   How are they marked?

22  A.   By the different public desks and then by time.

23  Q.   Okay.  So where it says, um, "Ground Circulation"

24  under Friday, July 13th?

25  A.   Yes.

1    Q.   Is that what you were referring to?

2    A.   Yes, "Ground Circulation" is a public desk.

3    Q.   All right.  And if you look at the entry for July

4    16th, which is a bit out of order, I'm sorry, all the

5    way on the right-hand side of the page, whose

6    handwriting is that?

7    A.   Mine.

8    Q.   Okay.  And when was the last day you remember

9    assigning a bin to Ms. Cloutier?

10   A.   July 16th.

11   Q.   So from July of 2012 until September of 2013, what

12   was Ms. Cloutier assigned to during her shifts at the

13   library?

14              MS. SULLIVAN:  Objection.

15              THE COURT:  Well, you're asking her to look at

16   these schedules and then draw a conclusion, I take it?

17   Q.   Well, who assigned -- who made these assignments on

18   the schedules?

19   A.   I did those.

20   Q.   All right.  Did you make the assignments from July

21   2012 until September of 2013?

22   A.   Um, yes.

23   Q.   And what did you assign Ms. Cloutier to do during

24   her shifts at the library?

25   A.   On the schedule it said "Calls."

1    Q.  Did she do anything else?

2              MS. SULLIVAN:  Objection.

3              THE COURT:  I think what you're asking her is

4    "Did you assign her to do anything else?"  Is that your

5    question?

6              MS. PAPPENHEIM:  No, your Honor.

7              THE COURT:  Well, did she do anything else

8    asks her to testify of her own knowledge.

9         Do you know what she did during that period?

10             THE WITNESS:  Um, one thing, yes.

11             THE COURT:  Well, you can tell us the one

12   thing.

13             THE WITNESS:  She had asked if she could do

14   data entry.

15   Q.  And what is "data entry"?

16   A.  Um, mostly it's, um, filling in information on a

17   patron's card that hadn't been done at the time the

18   patron was registered.

19   Q.  And in a typical day, how long would data entry

20   take?

21             MS. SULLIVAN:  Objection.

22             THE COURT:  Overruled.

23   A.  We probably write 10 to 20 new card applications a

24   day, so probably an hour and a half to two hours.  But

25   -- well, yeah.

1    Q.   Okay.   And when you say she was assigned to "calls,"

2    what do you mean by "calls"?

3    A.   When our patrons requested an item, um, a call slip,

4    when the item was checked in, a call slip would pop up

5    and it would have their name and a contact information.

6    And if they were contacted by phone, then that was the

7    call.   So you were making them aware that the materials

8    had arrived.

9    Q.   How would they be contacted if not by phone?

10   A.   If they had e-mail or now they have texts.

11   Q.   And how did the e-mail alerts go out?

12   A.   Um, the MDLC sent those.   The consortium sent those

13   out.

14   Q.   All right.   And how long did calls typically take in

15   one day?

16            MS. SULLIVAN:   Objection.

17            THE COURT:   Overruled.

18   A.   It varied with volume, but I wouldn't think more

19   than 45 minutes to an hour.

20   Q.   Did you observe Ms. Cloutier doing any tasks other

21   than calls and data entry?

22   A.   Um, once I saw her opening DVDs and, um, taking

23   out -- taking them out and putting them -- we had a file

24   drawer at the desk and she was putting them in the file

25   drawer.

1    Q.   Was that just the one time?

2    A.   It was just one time, yeah.

3    Q.   Okay.  Now I'd like to direct your attention to the

4    summer of 2013.

5        Was the air conditioning in the library -- was

6    there air conditioning in the library at that time?

7    A.   Some places there was.

8    Q.   All right.  When you say "some places," could you

9    describe what you mean by that?

10                 MS. SULLIVAN:  Objection.

11                 THE COURT:  No, overruled.  She may tell us.

12   A.   I recall that there was usually air conditioning in

13   the circ. office and in the reference room and in some

14   of the other offices on the second floor.

15   Q.   Now during that time, what if anything did

16   Ms. Cloutier communicate to you about the windows on the

17   first floor of the library?

18   A.   I had several items from her asking if I knew where

19   the custodian was and she wanted to have the windows

20   opened.

21   Q.   Did you have any special way of getting ahold of the

22   custodian?

23                 MS. SULLIVAN:  Objection.

24                 THE COURT:  Um, no, sustained in that form.

25   Q.   How would you get ahold of the custodian?

1    A.  You would have to -- well, if it was the City Hall

2    custodian, you could leave a message on the telephone.

3    If it was our custodian, um, you'd have to look for him.

4           THE COURT:  And by "our custodian," I

5    understand the library had a custodian whose primary

6    duties was taking care of the library?

7           THE WITNESS:  Yes.

8    Q.  Now, are windows on the first floor of the library

9    any different in any way than windows on the second

10   floor?

11          MS. SULLIVAN:  Objection.

12          THE COURT:  Overruled, if you know.

13   A.  They seemed heavier to open.

14          THE COURT:  On the first floor?

15          THE WITNESS:  On the first floor.

16   Q.  Could you physically have opened windows for

17   Ms. Cloutier on the first floor?

18   A.  I couldn't, no.

19   Q.  As far as you were concerned, was Mr. Cloutier

20   allowed to have windows opened?

21          MS. SULLIVAN:  Objection.

22          THE COURT:  No, you may ask that question.

23   Well, when you say as far as she was concerned, um --

24   let's ask it this way.

25          So far as you know was there any general orders by

1   anybody that pertained to Ms. Cloutier and opening

2   windows?

3                THE WITNESS:  No.

4                THE COURT:  That pertained to the staff as a

5   whole in opening windows in this period?

6                THE WITNESS:  No, we preferred for them not to

7   be opened, if there was air conditioning.  But, no.

8   Q.  Now, why couldn't you just instruct the custodian to

9   open a few windows when they arrived in the morning?

10               MS. SULLIVAN:  Objection.

11               THE COURT:  I sustained on this foundation.

12  Q.  So aside from the air conditioning that you just

13  testified to, when the air conditioning was working you

14  wanted the windows shut, um, aside from that were there

15  any reasons you didn't want the windows open?

16               MS. SULLIVAN:  Objection.

17               THE COURT:  Sustained.  You're leading the

18  witness.

19  Q.  What reasons were there, if any, for having the

20  windows closed?

21               MS. SULLIVAN:  Objection.

22               THE COURT:  Were there any, other than the air

23  conditioning?

24               THE WITNESS:  Yes.

25               THE COURT:  All right.  What were they in this

1    period?

2              THE WITNESS:  Um, well, there were no screens

3    so, um, dust and pollen got in, which wasn't really good

4    for our materials, or maybe people had allergies, and,

5    um, insects, flies, and bees would sometimes come in.

6    And it was one day that a bird flew in and was there for

7    a couple of days.

8              MS. PAPPENHEIM:  I'd like to show the witness

9    Exhibit 42.

10             THE COURT:  Okay.

11             (On screen.)

12   Q.  Do you recognize this document?

13   A.  Yes.

14   Q.  What is it?

15   A.  Um, it's different instant messages from Diane to me

16   and it looks like maybe Vicky sending back responses.

17   Q.  Okay.  Now, did you ever yell at the custodian, Ed,

18   for opening windows for Ms. Cloutier?

19   A.  No.

20             MS. SULLIVAN:  Objection.

21             THE COURT:  No, it's untimely.  That may

22   stand.

23   Q.  Now, if you look at the bottom of Ms. Cloutier's

24   chat where it says "As you know," "As you know Floor 2

25   reference and some offices have adequate AC, but Floor 1

```
 1   has little or none."
 2          Do you agree with that statement?
 3   A.  No.
 4               MS. SULLIVAN:  Objection.
 5               THE COURT:  (Pause.)  I'm going to sustain the
 6   question in that form.  You may inquire about the
 7   subject.
 8          Do you have much more for this witness?
 9               MS. PAPPENHEIM:  No, your Honor, not much
10   more.
11               THE COURT:  By which you mean less than 5
12   minutes?
13               MS. PAPPENHEIM:  Um, yes, your Honor.
14               THE COURT:  All right.  Fine.  Go ahead.
15          So sustained.
16               MS. PAPPENHEIM:  Okay.
17               (Pause.)
18   Q.  Did Floor 1 have adequate air conditioning?
19               MS. SULLIVAN:  Objection.
20               THE COURT:  Sustained.  Don't lead the
21   witness.
22   Q.  Where, if at all in the library, was the air
23   conditioning adequate?
24               MS. SULLIVAN:  Objection.
25               THE COURT:  In her view?
```

1    Q.   In your view.

2                THE COURT:   During this period.   All right,

3    you can answer.

4         What do you think?

5    A.   Um, I was in the circ. office every day doing the

6    schedule so that I felt the circ. office had air

7    conditioning, and, um, the reference department seemed

8    to have air conditioning, and a couple of the offices on

9    the second floor.

10   Q.   Okay.   Now how do you get into the circ. office?

11               MS. SULLIVAN:   Objection.

12               THE COURT:   Overruled.

13   A.   Well, the door's locked, so you would need a key.

14   Q.   Where are the keys?

15   A.   Where are they?

16   Q.   Yeah.

17   A.   All the circ. staff have their own key, to that door

18   and the staff room.

19   Q.   Okay.   So other than, um, what you've already

20   testified to, um, finding a custodian, having a window

21   open in the circ. office, um, the circ. office air

22   conditioning, did you offer any other solutions to

23   Ms. Cloutier with regard to this windows issue?

24               MS. SULLIVAN:   Objection.

25               THE COURT:   Overruled.

1    A.  Well, we have fans, um, at the public desk and I

2    recall seeing a fan on the desk where Diane worked, and

3    I also at one point had said she could sit in the

4    reference department if that would be more comfortable

5    for her.

6    Q.  Did she take you up on your offer?

7    A.  No.

8              MS. SULLIVAN:  Objection.

9              THE COURT:  That may stand.

10   Q.  All right.  Now earlier we saw Exhibit 87, it was an

11   e-mail, if I could just --

12             MS. PAPPENHEIM:  Um, it was Exhibit 87, the

13   e-mail.

14             (Pause.)

15   Q.  Okay.  So, Ms. Fougstedt, you saw earlier an e-mail

16   between Ms. Woodley and yourself, I believe it was

17   October 30th?

18   A.  Yes.

19   Q.  Do you remember seeing that today?

20   A.  Yes.

21   Q.  Do you remember it said "Oh, My God" -- "OMG," I'm

22   sorry.

23   A.  Yes.

24   Q.  Why did you write "OMG"?

25   A.  Because I was really amazed.

```
 1    Q.   Why were you amazed?

 2              MS. SULLIVAN:  Objection.

 3              THE COURT:  It's my fault.  Forgive me.  And,

 4    Ms. Pappenheim, if you would ask the question again.

 5              MS. PAPPENHEIM:  I asked why Ms. Fougstedt was

 6    amazed.

 7              THE COURT:  Overruled.

 8         Why?

 9    A.   Um, I was surprised that, um, maybe something could

10    be done about a staff person that was unable to function

11    very much.

12              (Pause.)

13              MS. PAPPENHEIM:  Those are all the questions I

14    have, your Honor.

15              THE COURT:  All right.

16         Do you wish to examine this witness?

17              MS. SULLIVAN:  Yes, I do, your Honor.

18              THE COURT:  Well, I think we'll take a brief

19    recess, but we're only to going to recess for 15 minutes

20    because when we get to arguing and my explanations of

21    the law, the data will come at you much faster and we

22    need a break between those two.  So we'll take a

23    15-minute recess until 5 minutes after 11:00.

24         You have not heard all the testimony, so keep your

25    minds suspended, do not discuss the case among
```

1   yourselves nor with anyone else.  The jury may stand in
2   recess for 15 minutes.  I'll remain on the bench.
3                  THE CLERK:  All rise for the jury.
4                  (Jury leaves, 10:50 a.m.)
5                  THE COURT:  Please be seated.  You may step
6   down.
7          Let's use this time -- here's copies of the
8   verdict slips for each of you.  And I want to use this
9   time to talk over the charge.  I recognize that there is
10  a pending motion for a directed verdict which will be
11  renewed at the close of all the evidence and, Ms. Brown,
12  I asked you for a document, but you haven't given it to
13  me, and I would like that document before I rule on it.
14  So I'm not going to rule on it now.
15         So let's assume that the case goes to the jury
16  against the three individuals and the City of Lowell,
17  here's how the charge is going to go.
18         My charge is always filed in the same format and I
19  will charge the jury first as to their function.  Their
20  verdict must be unanimous as to each of the questions we
21  put to them.  They are impartial based upon the
22  evidence.
23         I then charge them as to my function, to teach
24  them the law.  They must take the law as I give it to
25  them.

1          I turn then to the sources of proof in this case.

2     I explain the difference between direct and

3     circumstantial evidence.  I give what I think you will

4     find is a stock charge on witnesses and the credibility

5     of witnesses.  There are no experts in this case.  So

6     there's the witnesses.  We also have the exhibits.

7     There are stipulations.  There are -- there is

8     deposition testimony.  I will explain each one again,

9     emphasizing the power that the jury has with respect to

10    them.

11         I do make reference to things that are not

12    evidence.  Specifically I will refer to the fact that

13    it's not evidence of anything that there is a case, um,

14    that doesn't prove anything not does it disprove

15    anything.

16         I will make reference to counsel, um, and say that

17    the, um -- that counsel was not there and they are not

18    themselves sources of evidence.  I will say if you've

19    made things clear for the jury, well, then that's fine,

20    but you are not the sources of evidence.

21         I will say that I am not the source of evidence.

22    Focusing them on the evidence, I will give a stock

23    charge that they may draw reasonable inferences from the

24    evidence.  I will emphasize that the burden of proof on

25    Ms. Cloutier is a fair preponderance of the evidence,

1    more likely to be true than not true.

2         Then when we get to the elements of the case, I

3    will say that -- that as to the first element, the proof

4    of protected activity -- and understand I'm going first

5    here, that there's little dispute about that and I will

6    refer to --

7         What's the exhibit number of the MCAD complaint?

8              MS. BROWN:  I believe it's 19.

9              MS. SULLIVAN:  That's correct.

10             THE COURT:  All right, I will refer to it by

11   exhibit number and I will tell them that that's

12   protected activity and I will say that letters making

13   reference to that are themselves protected activity.

14        I will tell them that the key dispute, of course,

15   is whether she was retaliated against because of that

16   protected activity, and I'll say that's very much in

17   dispute.  But I'm going to skip over it and then get to

18   the issue of a job action.

19        Now here, while it's strikingly in dispute as to

20   how to characterize that job action, there's little or

21   no dispute that there was a job action, she was worse

22   off after she was escorted off the premises than she was

23   before that and that's a job action.  While it may

24   affect damages, if any damages there be, there's little

25   doubt that that was a job action, whether she was

1    dismissed, fired, or whether she was removed because she

2    was unable at that time to do the -- to do the job.

3        Then I'll come back to retaliation.  I will say

4    she -- by engaging in protected activity she doesn't

5    have a bubble around her, she may be treated as any

6    other, um, employee, held to the same -- with reasonable

7    accommodation, held to the same standard as any other

8    employee, and when we get to the job action, the

9    question is was that job action taken in retaliation for

10   her protected activity?  I will charge as to a mixed

11   motive and point out that the retaliation has to be the

12   but-for cause, that if they would have come to this same

13   conclusion even if, um, one of the motives was

14   retaliation, that's not enough.

15       I will emphasize that they must treat each of the

16   people sued individually and as to each person they must

17   find the retaliatory motive and they must find the

18   action taken to effectuate the job action.  I will

19   explain that it is only -- if they do not find Mr. Lynch

20   liable, they cannot find the City of Lowell liable.  If

21   they find Mr. Lynch liable, but he was acting only on

22   his own, not believing that he was implementing the

23   policy of the City, he could be liable, but the City of

24   Lowell is not.

25       I will get to damages.  I will charge on back pay,

1    I will charge on front pay, I will charge on the pay she

2    would have gotten when she reached retirement age

3    reduced to present value.  I will charge on emotional

4    damages.  I will point out that punitive damages are

5    something apart and separate and require additional

6    proof that the conduct of the specific individual or the

7    City, if you find the City liable, was extreme and

8    egregious and such that it requires, in the nature of a

9    fine, to prevent the person or the City from engaging in

10   such activity again, and I've indicated how they may

11   write that out.

12        I will reserve my instructions, common

13   instructions about how they deliberate together until

14   you've had your closings, and then I will charge them as

15   to how they deliberate together.

16        Questions about the charge, Ms. Sullivan?

17        MS. SULLIVAN:  Um, just an exception to the

18   mixed-motive charge, your Honor.

19        THE COURT:  Well, it's required by the law.

20   That is the law.

21        All right.  Questions, Ms. Brown?

22        MS. BROWN:  Thank you, your Honor.

23        On the protected activity, I believe the letters

24   have to be both good faith and reasonable and I intend

25   to argue that they were not.

```
 1              THE COURT:  I think that's fair.
 2              MS. BROWN:  So I would like an instruction.
 3              THE COURT:  And I will so instruct.
 4              MS. BROWN:  Thank you.
 5         And also on damages, we would request a mitigation
 6    of damages.
 7              THE COURT:  Oh, of course, and I should have
 8    figured that in and I will.
 9              MS. BROWN:  On punitive damages, punitives
10    can't be assessed against the City.
11              THE COURT:  And that's correct and I will
12    point that out.
13              MS. BROWN:  And I hate to say this, but I
14    don't believe the City is only liable through Mr. Lynch.
15              THE COURT:  You're -- believe me I have such
16    enormous respect for you by saying it, so don't hate to
17    say it.  But there has to be a policy and the only
18    policymaker here or as I -- taking everything
19    Ms. Cloutier's way, Mr. Lynch is the chief executive, he
20    is the one responsible to the legislature, the City
21    Council, he's the top executive.  How could the City be
22    liable for anybody else, even someone who's not
23    presently in the city?
24              MS. BROWN:  I may be incorrect but my
25    understanding was that that was a -- sort of a 1983-type
```

```
 1   characterization?
 2              THE COURT:  Yes.
 3              MS. BROWN:  But under the Rehabilitation Act
 4   for retaliation, I believe the City can be liable
 5   through its employees on retaliation.
 6              THE COURT:  And I stand corrected, I will
 7   check that, and I so much respect what you say.
 8              MS. SULLIVAN:  Your Honor, if I may have one
 9   other exception?  I think under 151(b) punitives are
10   available.  I don't know --
11              THE COURT:  Against the City?
12              MS. SULLIVAN:  Absolutely.
13              THE COURT:  I think not.  But you can brief it
14   or you can -- we're going to have another recess before
15   we go to -- before we commit it to the jury, you can
16   bring some authority to my attention.
17        We'll recess for 5 minutes.
18              MS. BROWN:  Your Honor, I just got the
19   document on the -- I apologize, I didn't realize I was
20   supposed to run up with it.
21              THE COURT:  Yes.  I expected to be working on
22   this.
23              MS. BROWN:  Yes.  And that is our motion, it's
24   not ripe yet, but --
25              THE COURT:  No, but I will entertain it and
```

1    we'll take another brief recess.  We'll recess until 5

2    after 11:00.  We'll recess.

3                    (Recess, 11:02 a.m.)

4                    (Jury enters, 11:05 a.m.)

5

6    CROSS-EXAMINATION BY MS. SULLIVAN:

7    Q.  Ms. Fougstedt, did you ever see Ms. Cloutier's work

8    restriction notes?

9    A.  Um, yes, some of them.

10   Q.  Do you recall seeing a July 11th, 2012 note?

11   A.  I'm not sure.  What does it say?

12   Q.  Were you aware that her doctor released her to do

13   desk time and pull lists and to do bins with assistance,

14   were you aware of that?

15   A.  Desk time?  No, I wasn't.

16   Q.  Is it your testimony that you never spoke to

17   Ms. Cloutier about what she could or could not do?

18   A.  Well, when I -- at her injury, you mean?

19   Q.  Right.

20   A.  When I first came back, no, but, um, after I saw

21   those IMs I talked to her.

22   Q.  And she told you that she could do particular tasks,

23   did she not?

24   A.  She asked if she could do data entry and that she

25   needed help with the bins.

1  Q.  So she did tell you she could do the bins with

2  assistance, correct?

3  A.  Yes.

4           MS. PAPPENHEIM:  Objection.

5  Q.  Okay.  And --

6           THE COURT:  Wait a minute.  The objection's

7  overruled.  That may stand.

8  Q.  So in fact she could do the bins if you just gave

9  her assistance, is that fair to say?

10  A.  Um, what is that now?

11  Q.  I'm sorry?

12  A.  What was the question?

13  Q.  You in fact assigned Ms. Cloutier bins, did you not?

14  A.  Yes.

15  Q.  Okay.  And she could do bins with assistance.  In

16  fact you -- on some days you gave her assistance before

17  you stopped, correct?

18  A.  Yes.

19  Q.  Right, and then you chose at some point not to give

20  her bins thereafter?

21  A.  I didn't choose it, no.

22  Q.  Who chose it?

23  A.  I think she did.

24  Q.  Is it your testimony under oath that she chose not

25  to do bins?

1    A.   I'm pretty sure on the 16th she told me she couldn't

2    do bins.

3    Q.   Why are you pretty sure about the 16th?

4    A.   That was that Monday following the Friday where I

5    asked someone to help her.

6    Q.   And there was no new doctor's note that you can

7    recall around the 16th, correct?

8    A.   I'm not sure.

9    Q.   Um, would you agree with me that the custodian

10   assigned to the library had a pager?

11   A.   No.

12   Q.   So is it your testimony -- is it your testimony

13   under oath that the custodian could not be contacted by

14   pager if needed?

15   A.   I don't recall that he had a pager.

16   Q.   Now, you, um -- you testified earlier that you

17   assigned Ms. Cloutier work on the schedule as did

18   Ms. Woodley, correct?

19   A.   I said that was my writing and her writing.

20   Q.   There generally was no one else who assigned

21   Ms. Cloutier tasks that took 10 to 15 percent of her

22   day, correct?

23   A.   Not during that time, no.

24   Q.   It was just you and Ms. Woodley, right?

25   A.   It was mostly me.

1    Q.   Okay.  And, um, did you ever count how many patrons

2    Ms. Cloutier was helping during the course of her

3    workday?

4              MS. PAPPENHEIM:  Objection.

5              THE COURT:  Overruled.

6    A.   No.

7    Q.   So you can't say whether she was helping 5 or 15 or

8    500 throughout her workday, right?

9    A.   I can't, no.

10   Q.   Okay.

11             MS. SULLIVAN:  No further questions, your

12   Honor.

13             THE COURT:  Nothing further for this witness?

14             MS. PAPPENHEIM:  No, your Honor.

15             THE COURT:  You may step down.

16        The defense rests?

17             MS. BROWN:  Yes, and we renew our motion for a

18   --

19             THE COURT:  Yes, of course.

20             (Witness steps down.)

21             THE COURT:  All right.  Well, now I do know in

22   the sense that now I understand the schedule and here's

23   what's going to happen.  We're going to take another

24   15-minute recess because under the rules I have to do

25   some legal talky-talk with them.  When we're back, I've

1    decided that the best way to understand this case is for

2    me to instruct you as to the law first.  So that -- if

3    we come back at 11:30, it will take me probably until

4    12:10 or 12:15 to instruct you as to the law.  Because

5    I'll be standing and talking to you, information will

6    come rapidly, so we'll take another brief recess, 5 or

7    10 minutes, and then the attorneys will get a chance to

8    argue to you, to sum up and argue their conclusions.

9          Now under the rules of court, they each get a half

10   an hour, but that's not an invitation for them to take a

11   half an hour, but they get a half an hour and of course

12   we'll give it to them, and that will take us to sometime

13   after 1:00, but I think we can hold on until then.

14   We've ordered lunch for you.  Once they've argued to

15   you, the case will be yours.

16         So now you have heard all the evidence you're

17   going to have in this case.  No more evidence.  But

18   please keep your minds suspended, do not discuss the

19   case among yourselves nor with anyone else because the

20   lawyers' closings, they really are important, that's

21   their chance to put it all together, to marshal it for

22   you, its strengths and its weaknesses, and I have to

23   give you detailed instructions as to the law.  My

24   instructions at the beginning of the case, really before

25   you were picked, were just general, now I have to give

1    you detailed instructions having presided over the case.

2    So keep your minds suspended, do not discuss the case

3    either among yourselves nor with anyone else.  You may

4    stand in recess until 11:30 and I'll remain on the

5    bench.

6                 THE CLERK:  All rise for the jury.

7                 (Jury leaves, 11:20 a.m.)

8                 THE COURT:  Please be seated.

9         I have -- and I have had the opportunity to read

10   the defense's written motion -- well, in all fairness,

11   because let's get the procedure right, you, Ms. Brown,

12   renew the motion, now at the close of all the evidence,

13   to set yourself up for a judgment notwithstanding the

14   verdict, correct?

15                MS. BROWN:  Yes, your Honor, that's right.

16                THE COURT:  Yes.  Of course.  I just have two

17   questions, because maybe you want to stand easy and get

18   ready for closing argument, and my two questions are,

19   um, this -- and I'll put them to Ms. Sullivan first.

20        What Ms. Brown has referred to as this

21   "disembodied notes of the witness," Exhibit --

22        What's the number of this exhibit?

23                MS. BROWN:  Oh, gosh.  Um, I apologize, I'm

24   not --

25                THE COURT:  Well, we know what exhibit we're

```
 1   talking about, Ms. Sullivan?

 2              MS. SULLIVAN:  Yes.

 3              THE COURT:  So as you recall the testimony,

 4   whose notes are these?

 5              MS. SULLIVAN:  Those are Ms. Callery's notes

 6   from October 4th, 2013.

 7              THE COURT:  And at least -- because I must

 8   draw all inferences your way here, that's at a meeting,

 9   and who's there at that meeting?

10              MS. SULLIVAN:  Mr., um -- Ms. Callery and

11   Ms. Gagnon, um, Ms. O'Connor, um, and Mr. Rossetti.

12              THE COURT:  All right.

13         And what's your recollection about the testimony?

14              MS. BROWN:  My recollection is that the notes

15   are Ms. Callery's.  They do not have a date.

16   Ms. Callery testified she didn't know when they were

17   written.  She said they were possibly around that time.

18   She doesn't know.

19              THE COURT:  At such a meeting with those

20   people?

21              MS. BROWN:  And I don't believe she testified

22   there was a meeting.  She was shown an entry log, I

23   think it was an e-mail entry.  There was no evidence

24   that there was actually a meeting.

25              THE COURT:  I really think the better part of
```

```
 1    valor, since we're going to have a jury verdict shortly,
 2    is to deny this motion, um, especially as to Ms. Gagnon,
 3    it does seem to me that the evidence is very thin
 4    indeed.  But I'm going to deny the motion and let you
 5    stand easy and we'll do the charge at 11:00 --
 6         Do you have a position -- a question for you,
 7    Ms. Brown --
 8              MS. BROWN:  Sure.
 9              THE COURT:  -- and you've been very helpful, I
10    have no hesitancy in saying.  As I said to one of the
11    law clerks as we walked out, "Wow," when Ms. Brown
12    corrected me and advised me in a way contrary to the
13    interests of the City, that's the highest ethics of an
14    attorney, and she comes way up in my estimation."  And
15    so you do.
16         Now let me ask you this question.  What about
17    under 151(b), punitive damages against the City?
18              MS. BROWN:  My understanding is punitive
19    damages can never be assessed against the City.
20              THE COURT:  Under state law as well as
21    federal?
22              MS. BROWN:  Yes.
23              THE COURT:  And neither one of you have any
24    legal authority to support it?
25              MS. SULLIVAN:  I do, your Honor.
```

```
1              THE COURT:  And it is?

2              MS. SULLIVAN:  Um -- and this was at Page 36

3    of my proposed jury instructions, but I'm happy to share

4    it.

5              THE COURT:  Okay, thank you, but what's the

6    citation?

7              MS. SULLIVAN:  Sure.  *Haddad vs. Wal-Mart*

8    *Stores*, 455 Mass. 91.  *Bain vs. Springfield*, 424 Mass.

9    758.

10             THE COURT:  Wait a second.  455 Mass. 91.  And

11   *Bain --* and say that citation.

12             MS. SULLIVAN:  Sure, 454 Mass 758.

13             THE COURT:  All right.

14             MS. SULLIVAN:  *Clifton vs. MBTA*, 445 Mass.

15   611.

16             THE COURT:  Thank you.

17             MS. SULLIVAN:  Also -- I have other ones.  Do

18   you want several more?

19             THE COURT:  I think those will be enough to

20   apprise me.

21             MS. SULLIVAN:  Okay.

22             THE COURT:  Thank you very much.

23        All right, we'll start again at 11:30.  We'll

24   recess until that time.  We'll recess.

25             THE CLERK:  All rise.
```

1        MS. BROWN:  Your Honor, I should mention

2    there's a U.S. Supreme Court case, **Newport**, which says

3    that punitives are not assessed against the City.

4        THE COURT:  But that's under federal law?

5        MS. BROWN:  Yes.

6        THE COURT:  And you're right, but it's brought

7    in the state court as well.  And so assuming these cases

8    say that, and I obviously don't impugn Ms. Sullivan,

9    I'll check it out and I will at least give them that

10   opportunity.

11       We'll recess.

12       MS. SULLIVAN:  Your Honor, if I may?  Also --

13   I just want to be clear.  There is no reasonable good

14   faith requirement, as your Honor charged the jury at the

15   beginning of the case, with regard to the filing of the

16   MCAD complaint.  So I just want to make that clear.

17   Participation, there is no requirement.

18       THE COURT:  I'll properly charge the jury.

19       MS. SULLIVAN:  Great.  Thank you.

20       THE COURT:  All right.  We'll recess.

21       (Recess, 11:25 a.m.)

22       (Resumed, jury enters, 11:35 a.m.)

23       THE COURT:  Now, ladies and gentlemen, we come

24   now to the part of the trial where I teach you the law

25   that you must follow and apply in resolving the factual

 1     disputes in this case.  I made mention of it at the

 2     beginning of the case, when you were all sitting back

 3     there, but that was necessarily general and more

 4     sweeping, and now, having presided over the case, I can

 5     be much more focused.

 6         This is like a law school class.  If you have any

 7     questions about what I explain to you now, by all means,

 8     once you get back in the jury room, write your question

 9     out, we'll have you back in here, I will explain it

10     further.  You are asked to follow -- you are instructed

11     to follow this law in order to do justice, so you have

12     to know what it is.  If you have any question about the

13     law, ask your question.  I must keep explaining it to

14     you until you understand it.  Also this will prove to

15     you that I work in the afternoon.

16             (Laughter.)

17         So now we'll start with you.  As I said at the

18     outset, all 12 of you are going to deliberate, there are

19     no alternates on this jury.  You're all equal.  You are

20     going to determine the disputed facts -- and there are

21     disputed facts in this case, you are going to determine

22     them fairly and impartially, without any bias, without

23     any prejudice, without any sympathy for anyone, without

24     any desire that anyone have revenge, just that cool

25     careful sifting of the evidence so that here, in this

1    courtroom, justice truly may be done.

2        My job is to teach you the law.  I will have to

3    make reference to the evidence, but as I make reference

4    to the evidence, in no way does that signal, on my part,

5    that I think anything's been proved or not proved, not

6    my business, not my authority, and I will not say

7    anything about it except to explain the law.  What I'm

8    trying to do for you is build for you a mental framework

9    of the law within which you, and you alone, can

10   determine where the truth lies and how justly this case

11   ought be resolved.

12       Please don't grab onto something I say and say to

13   yourself, "Ah, the case turns on this or that."  By the

14   same token, don't think that because I will take the

15   time to analyze out every way your analysis could go,

16   every possible way you could analyze this case, that I

17   think anything's been proved or anything has not been

18   proved.  You just need the full legal picture.  And

19   that's what I try to give you.

20       Now we're talking about "proof" here.  I keep

21   using that word.  This is a so-called civil case.  No

22   one alleges any criminality here by anybody.  The burden

23   of proof in a criminal case doesn't apply here, that's

24   proof beyond a reasonable doubt.  Ms. Cloutier brought

25   the case, she's the plaintiff, she does bear the burden

1    of proof.  What is the burden of proof?

2         The burden of proof on a plaintiff, such as

3    Ms. Cloutier, is proof by a fair preponderance of the

4    evidence.  Now when I say "preponderance of the

5    evidence," I don't mean who called the most witnesses or

6    who called the most witnesses on any particular topic, I

7    mean what's most persuasive to you, the jurors, what's

8    most likely true here?  That's what you're asked.

9         Now if on all the evidence, on any one of the

10   particular things I tell you Ms. Cloutier has to prove,

11   something else is more likely true, she hasn't proved

12   it.  If on all the evidence you believe that evidence

13   tends equally to two equal but opposite conclusions, she

14   hasn't proved it.  But so long as on all the evidence

15   that you believe that evidence tends more likely to be

16   true the way she would have it, then you may say that

17   has been proved by a fair preponderance of the evidence.

18        What do we mean by "proof"?  Proof can be in two

19   ways under the law, direct evidence or circumstantial

20   evidence.  Direct evidence is evidence of a person's own

21   senses directly -- and we have some evidence, evidence

22   from her, evidence from others, that qualifies as

23   "direct evidence," that is "I was there and this person

24   said that" or "this person didn't say that."  "I was

25   there.  I heard it.  I knew what was going on.  I saw

1    it."   That's direct evidence.

2         Circumstantial evidence is direct evidence of a

3    circumstance that by itself doesn't prove the point, but

4    if you believe that evidence, then -- and you believe

5    that that circumstance took place, then, combined with

6    other direct evidence or other circumstantial evidence,

7    you could conclude that the point either has or has not

8    been proved.

9         Ms. Cloutier may prove her case on direct

10   evidence, entirely on circumstantial evidence, or on any

11   combination of direct and circumstantial evidence.

12        The three people she sued and the City of Lowell,

13   they have nothing to prove, they don't have that burden

14   of proof, but you see they've come forward and they have

15   put on evidence and they'll make argument and the like,

16   and just as Ms. Cloutier, you're entitled to believe

17   their evidence or disbelieve it or believe parts of it

18   and disbelieve other parts.

19        The sources of evidence in this case are -- I went

20   back over them, I think there are four.

21        First, not that it may be the most important, but

22   it's the thing that occurs to me first, the first source

23   of evidence, the first tool that you have is the

24   testimony of these witnesses.

25        Now if I let a witness testify to something, any

1    witness, makes no difference who called that witness to

2    the witness stand, then you can believe that testimony

3    if you, as reasonable men and women, choose to believe

4    it.  Equally you have the power to disbelieve and

5    disregard that testimony as though the witness never

6    gave the testimony, never took the stand, you can just

7    blot it out.  And between those two extremes, you may

8    believe part of what a witness had to say about

9    something and disbelieve other things that the witness

10   had to say about an event.

11        Now how do you do it?  You may use everything you

12   know about these witnesses, everything you heard them

13   say.  How they appeared both on direct and cross-

14   examination.  What was the opportunity of the witness to

15   understand, to remember, accurately to testify and

16   explain to you something that was going on here?  Does

17   the witness stand to gain or lose anything depending

18   upon how this case comes out?  Is the witness alive

19   with, employed by, friends with, hostile to, against

20   somebody else in the case?  Did that color the witness's

21   testimony?  I don't suggest that it did, all I say is

22   you may consider it.

23        You are not prevented from reaching a verdict in

24   this case because certain witnesses testified to one

25   version of an event and other witnesses testified to

1   another version of the same event and they were all

2   under oath and they can't all be right.  As reasonable

3   men and women, you can resolve those differences, you

4   can determine where the truth lies.  What is more likely

5   to be true here?  That's the power that's invested in

6   the jury.

7          And as we've gone along here, you have heard me

8   say repeatedly, "This is a retaliation case, keep your

9   eye on the ball, it's a retaliation case," and then

10  having said that, allowed examination about other

11  events, other occurrences, and while I'm entirely

12  responsible for that, whether I let it go too far or not

13  far enough, I'll be held responsible for that, but as I

14  said during the course of the trial, the reason I let it

15  go on as far and as long as I did is that the position

16  of each side here is that the other side is not just

17  mistaken, they're not truthful, and therefore each side

18  gets to put on evidence from which you could conclude

19  that the other side wasn't being truthful about

20  something.  And if you think that, well then that could

21  bear on whether you believe that witness's testimony

22  about the things that are central to this case.  That's

23  credibility, and credibility is for you.  You determine

24  what it is you believe.

25          Now in doing so you don't just have the testimony

1    of the witnesses, you have all these exhibits in writing

2    and the like.

3         Now with an exhibit your analysis is twofold.

4    First, you want to take a look at the exhibit and you

5    want to see it really is what it purports to be.  Each

6    one of these witnesses had something to say about an

7    exhibit, they identified it, they told us what they

8    thought it was.  Now do you believe that?  Is this

9    really the thing?  And then if this really is the

10   report, the schedule, the e-mail, the document, if it

11   is, then what does it tell you about the case?  How does

12   it fit?  What does it tell you about what was going on,

13   what people were thinking and the like?

14        You have the same power with exhibits as you do

15   with witnesses.  If it's got a number and it's back

16   there with you in the jury room, you can accept it, you

17   can believe it, but equally you can disbelieve it and

18   disregard it.  A couple of exhibits I put limitations

19   on, you have to keep those limitations in mind and apply

20   it.  But other than that, following the limitations, you

21   can believe it, you can disbelieve it and blot it out,

22   you can believe parts of it.

23        We had some deposition answers read and I told you

24   that they were evidence and just like evidence -- the

25   evidence from witnesses, you can believe what was said

1    in a deposition, disbelieve what was said at trial,

2    believe parts of what was said at a deposition or

3    disbelieve what was said at a deposition, your power is

4    the same.  But the reason they read the answers in --

5    given in deposition, is so you can compare them with the

6    testimony of the witnesses, the better to decide whether

7    you believe the witness or disbelieve the witness.  So

8    you want to compare that with what the witness said at

9    trial, maybe it backs it up, maybe it makes it more

10   believable, it persuaded you of something, but maybe it

11   undercuts it, takes away from it, makes it less

12   believable because on an earlier occasion the witness

13   said something else.

14       And finally we've got a stipulation, a stipulation

15   about the production of documents, as I recall, and did

16   they have documents.  No one disagrees with that.  You

17   can take that as a given, that's evidence, that's not

18   disputed.

19       And that's the evidence in the case.  What do you

20   do with it?  Well, I've told you that you may use all

21   your good judgment in evaluating it.  You are allowed to

22   draw from the evidence you have reasonable inferences,

23   logical deductions, common sense.  You don't check your

24   common sense at the door to the jury room, just the

25   reverse, I charge you to apply your common sense to the

1    evidence in this case so that justice may be done.  But

2    you cannot guess, you cannot speculate.  You're not

3    interested here in "perhaps," "maybe," "possibly," even

4    be "probably," it's what's proved by a fair

5    preponderance of the evidence, what's more likely to be

6    true than not true.

7         Let me give you an example of a reasonable

8    inference that has nothing to do with this case, I love

9    it, I give it as my example in every charge, but it will

10   teach you, I hope, both what you can do and what's

11   forbidden.

12        Suppose we have the witness and he testifies he's

13   walking along the road and he looks out over a field of

14   barley -- that's what they make scotch from and it's got

15   gray tassels on the top standing up there, and the

16   witness testifies that he sees in an irregular course

17   through the field the stalks of barley are lying down.

18   Now that's the testimony.  And suppose you believe that,

19   that's a witness you believe, but that's all the

20   testimony you have.  From that testimony, standing

21   alone, you could infer something went through that

22   field.

23        I mean if it was a Noreaster like we had last

24   weekend, like big winds, all the barley would have been

25   knocked over, but while it's a reasonable inference

1    something went through there, you don't know what, an

2    adult, a child, a big animal, somebody on a dirt bike,

3    an off-road vehicle?  You would need more evidence to

4    decide what it was that went through the field.  So,

5    yes, reasonable inferences, but no guess work, no

6    speculation, no "maybes," no "possiblys."

7         Now I'm going to have Ms. Gaudet now pass out to

8    you the verdict slips.  You'll only need the one back

9    from the forelady, but I think you can follow my

10   instructions better if you're looking at the verdict

11   slip, the questions we're going to ask you as I'm

12   explaining the specifics of the law.  And while we're

13   passing those out, let me say a few things that are not

14   evidence and ought not affect your deliberations.

15        First, the conduct of counsel.  Now I've got no

16   problem with the conduct of counsel, but I mention to

17   you, as I did at the outset, that they weren't there,

18   they don't know what went on, they weren't part of it,

19   and if they were, they couldn't be the lawyers in the

20   case.  So there may be evidence that Ms. Sullivan has

21   been Ms. Cloutier's lawyer for sometime, and I mean

22   there's some documents in this case that she sent, and

23   there's evidence that Ms. Brown and Ms. Pappenheim work

24   in the law department in the City, but that's why they

25   have a law department, to defend them.  There's no

1    evidence that any of these lawyers personally know the

2    evidence.  They're teachers.  And so if you react to the

3    law -- well, let me first say something affirmative.

4         If the lawyer persuades you by the questions or

5    candidly now they're going to get a chance to argue, so

6    if they stand up and argue to you and that persuades you

7    of something, either for Ms. Cloutier or for the City

8    and the three people that have been sued, that's just

9    what lawyers should do, it's their highest calling, and

10   that's fine.  But if you liked the way a lawyer behaved,

11   that's not how to decide the case.  Or more to the

12   point, if the way a lawyer behaved grated on you, you

13   really didn't like that, don't hold that against any of

14   the litigants here.  That's not fair.  They're doing the

15   best they can.  They're officers of the court.  I'll be

16   responsible for how they have presented things.

17        Now, equally important, if you've come to think

18   that I think anything at all about this case, I most

19   earnestly instruct you to disregard it.  And I tell you

20   as I know my own heart, and I say it during the course

21   of this case, that I don't care how the case comes out,

22   I truly don't, I'm not involved in the case.  I've got

23   plenty to do up here to decide what the appropriate

24   ruling is on the various objections.  That's my job.  I

25   do it.  But I have no view about how this case comes

1    out.

2         Now I do have a bias and it's this.  I believe

3    that you 12 men and women will do justice in the case.

4    I believe that passionately.  But I have no clue to give

5    you, all I do is instruct as to the law.  Now let's get

6    to it.

7         As the plaintiff Ms. Cloutier has four things to

8    prove, we'll just name the four things and then I'll go

9    through each one.  If she fails to prove any one of the

10   four, you can stop your analysis.

11        First, she has to prove that she engaged in

12   protected conduct.  Second, she has to prove that one or

13   more of the people she's sued -- and I'll be more

14   detailed about this, retaliated against her because she

15   engaged in protected activity.  And third, she has to

16   prove that because of that retaliation -- it's not just

17   that there was retaliation, that because of that

18   retaliation a job action was taken against her.  And if

19   she proves those three things, then she can recover

20   damages, money damages, because that's all that we can

21   deal with in the courts.  Let me go over each one of

22   those.

23        Now after having presided over the case, and of

24   course it's for you, you know there really isn't too

25   much dispute about Points 1 and 3.  There's a great deal

1   of dispute about Point 2 and there's a dispute about

2   whether there's any damages and the like.  But let me go

3   over then the points where there isn't too much dispute.

4        Well, first, did she engage in protected activity?

5   Well, it's hard to think that she didn't in view of

6   Exhibit 19.  Exhibit 19 is her complaint -- if it's

7   authentic, and I leave that for you, if that's

8   authentic?  It's not for me to say.  But if that's

9   genuine, if that's the real thing, if that's her

10  complaint to the Massachusetts Commission Against

11  Discrimination, the law is that's protected activity.

12  That doesn't have to be true, it doesn't have to be

13  proved, and the reason for that is crystal clear.

14       In order to ferret out discrimination -- and you

15  can see what she was complaining about in that

16  complaint, in order to ferret out discrimination, which

17  is itself unlawful, we want to encourage people to make

18  complaints to the appropriate authorities and the

19  Massachusetts Commission Against Discrimination is one

20  such appropriate authority.  So if that is a genuine

21  document, that is protected activity.

22       Now that may not be all here because thereafter

23  there are various communications, letters, some by her

24  attorney on her behalf, complaining that after that

25  Exhibit 19 -- and again we know, because I told you at

1    the outset, that the allegations of discrimination here,

2    they're not before you, but that doesn't mean there

3    weren't any to begin with, it just means, as I told you

4    at the beginning, there was insufficient evidence that

5    that was something this case was going to be about.

6    That's all.  But protected activity?  Well, there's

7    Exhibit 19.  And if those letters, or any one of them,

8    if the letter was made in good faith and was reasonable,

9    the letter's protected activity too.  So that's the

10   first point.

11        Now what's that mean, "protected activity"?  That

12   doesn't mean that by claiming discrimination that's

13   against the law an employee suddenly has a bubble around

14   them and you can't take personnel actions against them

15   or that they have to be promoted, that isn't the way the

16   law works at all.  You are not the superpersonnel board

17   of the City of Lowell.  Lowell has the obligation to

18   provide municipal services, in this case library

19   services, to its citizens as efficiently and

20   economically as it can, that's what the taxpayers of

21   Lowell expect and that's what their public officials are

22   supposed to deliver, and so long as they do that in a

23   fair way it makes no difference what we think about it,

24   whether they had rules on opening windows or rules as to

25   who would do what and rules as to how they would either

accept people for worker's comp or say you don't get

worker's comp, or rules of any sort, that's for those

people who the City of Lowell hired to do the various

jobs.  And by gesturing I don't just mean the people who

she sued, I mean all the employees of the City of

Lowell.  But you see, once it's protected activity, what

they cannot do, what is equally a violation of the law,

is they can't retaliate against Ms. Cloutier, they can't

get her, they can't make things worse for her because

she's engaging or has engaged in protected activity.

They are forbidden from doing that.  That makes perfect

sense under the law and that is the legal requirement.

Now I want to say a few words about that, but now

I'm going to skip that for a moment and I'm going to go

to Number 3.  I said she had to prove protected

activity, I've talked about that.  She has to prove

retaliation, that's really disputed here, and that's

entirely for you.  But then she has to prove that a job

action was taken against her.

Now whether -- not whether, but to what extent a

job action was taken against her is very much in dispute

and I have nothing to say about it.  She says she was

fired.  The City folks say, "No, she wasn't fired, we

were told she couldn't do the job so necessarily she's

completely disabled and she goes on complete disability,

1    she's out, but she could come back."  Either way, either

2    way that's a job action.  It's undisputed that once they

3    walk her off the premises, she's worse off than she was

4    the day before.  So that's a job action under the law.

5         If that job action was taken for legitimate

6    reasons, you, the jury, have nothing to say about it.

7    If that job action was taken in retaliation for her

8    filing and then these other -- if they're good faith

9    complaints about retaliation, if they took that action

10   because they're retaliating against her because of

11   protected activity, that's unlawful, they can't do that,

12   and the only effect -- it's still a job action, the only

13   effect is what damages she could get from it and I'll

14   get to damages in a moment.  But now let me go back to

15   Point 2, retaliation.

16        Retaliation is not some mystical legal term, it's

17   what common sense people would think, that retaliation

18   is when you take actions in the workplace because of the

19   protected activity, not because of a fair and a

20   universal personnel system.  Even a personnel system

21   that is fairly accommodating particular disabilities,

22   Ms. Cloutier's particular disability, could be perfectly

23   fair, but if you're doing things against her because of

24   the protected activity, that's retaliation.

25        So the law recognizes the complexities of the

1    human condition, at least it tries very hard to, and you

2    are charged with recognizing those complexities as well.

3    People act from a variety of motives.  So let's just

4    suppose -- don't take anything from what I say, but

5    suppose that among these three people she sued, or the

6    employees of the City, and I'll get to that in a minute,

7    suppose there are one or more people who, yeah, one of

8    their motives is to retaliate against her, "She's a

9    thorn in the side and, um, let's -- let's get rid of

10   her."  Suppose that's one of those motives.  Now

11   standing alone, that's unlawful, but what Ms. Cloutier

12   has to prove here is that the job action that was taken

13   against her was because of retaliation.  If retaliation

14   was one of the motives, but there were other motives,

15   and the City's employees would have come out the same

16   way notwithstanding the retaliation, she doesn't win,

17   even though one or more of the City employees had as a

18   motive retaliation.

19        Now you're instructed, and the verdict slip is

20   laid out this way, if she hasn't proved retaliation here

21   -- we'll assume some assumptions and look at the verdict

22   slip.  If she doesn't prove any protected activity, well

23   the City wins and the City folk win, that's how I'll

24   refer to it.  If there was protected activity but no

25   retaliation, the City folk win.  If there was protected

1   activity and retaliation that caused a job action, she

2   wins.  And, um -- but now you have to be specific and

3   you see your choices.

4        If the City folk are going to win across the

5   board, you check the first choice there.  If

6   Ms. Cloutier wins, you check for her.  But then you have

7   to look and you have to look specifically and separately

8   at each of the three people who she's sued here -- we'll

9   talk about them first, and for each of those three

10  people ask yourself two questions.  Is the person you

11  are considering, did that person play a significant role

12  in the job action, were they a significant cause of the

13  job action, what they did was that a significant cause

14  of the job action?  If the answer to that question is

15  "Yes," then ask yourself, is that person, that specific

16  person -- and each one of them has taken the stand,

17  you've looked at each one of them, was that person

18  actuated -- herself in the cases of Ms. Gagnon and

19  Ms. O'Connor, or himself in the case of Mr. Lynch, was

20  that person actuated, were they motivated out of

21  retaliation?  And if the answer to both questions is

22  "Yes," and the job action which resulted then is

23  actuated by retaliation, then you may find for

24  Ms. Cloutier and against the person or persons that you

25  have checked.

1          Now what about the City of Lowell?  A city is not
2     a person.  I can't today -- actually there was a
3     "Mr. Lowell," but he's long gone.  I can't go up to the
4     City of Lowell and find anyone and say, "Oh, Mr. Lowell,
5     you are responsible -- you are the City," the City is
6     not embodied as a person, it's an entity, and it's
7     capable of suing and being sued and here it's being
8     sued.  So as to the City you have to ask yourself a
9     slightly different question, for the City, were any of
10    its employees -- not just these three, any of its
11    employees, were -- the same two questions, were they
12    instrumental, were they the significant cause of the job
13    action taken against Ms. Cloutier, and if they were,
14    whoever it was, was their motivating, their animating
15    cause, was it retaliation to get her?
16         And it's not -- people in the workplace may
17    dislike other people in the workplace, that happens, but
18    that's not what this case is about, she doesn't have to
19    be the most likable person, she doesn't have to have
20    friends, maybe they just don't like her, but just not
21    liking her and taking an action against her isn't what
22    the law forbids, it may be sad but it's not what the law
23    forbids, the law forbids retaliation for protected
24    activity.  So were any of those employees, any group of
25    them, any of them that actually caused, were a

1    substantial producing cause of the job action, were they

2    animated by retaliation?  That's very much disputed and

3    I leave it to you.

4          So now we're through protected activity,

5    retaliation, and, um, job action.  So all that's left

6    then is damages.

7          Now by charging you on damages, it doesn't mean

8    that I think that any damages have been proved or not

9    proved, and the fact, if it is a fact, if you were to --

10   I'm assuming now that you find for Ms. Cloutier -- again

11   I caution you, it doesn't mean that I think that, but

12   you need to know the whole picture.  Let's say you find

13   for Ms. Cloutier against one or more of the three people

14   or against the City -- and you could find for the three

15   people, but find against the City, and let's say that,

16   then you come to calculate the damages.

17         Now the damages could be nominal.  You could

18   conclude -- though she testified as to substantial

19   damages, you could disbelieve that and you could say,

20   "You know really, you know, even though they did this,

21   there really aren't any damages here" and find 0 or find

22   a dollar, but here's what she's entitled to under the

23   law, if you believe evidence of damages.

24         So the first thing then is you've got to go back

25   and evaluate this job action and let's assume it the

1   City's way first, the City folks' way.  Let's assume

2   that she was just taken off the rolls for a complete

3   disability and a reasonable person -- it's not judged by

4   what's going on in her mind, it's judged by what a

5   reasonable person would do, so a reasonable person, once

6   they've calmed down and gotten home and was able to

7   analyze these documents and sorted them out, came to

8   believe, "Gee, you know, they think I can't do any

9   work," and a reasonable person then would have gone to

10  doctors and gotten more notes and would have -- and if a

11  reasonable person then would have come back to the City

12  and said, "Look, I can work -- yeah I've got to be

13  accommodated, but I can work, I can do the job, I was

14  doing it, and I was doing the job, those various jobs,"

15  if that's what a reasonable person would have done --

16  and what the City's job action was was not firing her,

17  but was putting her on this 100 percent disability and

18  in essence over time taking her off the rolls, and you

19  find a reasonable person would have done that and the

20  City would have taken her back, if that's what you

21  think, oh, then she can get damages and here's what the

22  damages are.

23       Even if a wrong was done to her, she was removed

24  from the premises and that was retaliation, she can't

25  just now retire and say, "Pay me damages," she's got to

1   mitigate her damages, that is she's got to go out into

2   the workforce, find whatever work a reasonable person

3   could find, with the limitations that she has, and then

4   she's got to do that work, and whatever she's paid for

5   that work, the City isn't responsible, she's got to do

6   that, and that reduces her damages.  All right?

7         So if you find that she could have gotten work, it

8   wouldn't pay as much but she could have gotten work, but

9   after whatever period you find would have elapsed before

10  the thing could have been straightened out and she could

11  have been taken back as the library assistant, oh, then

12  she is entitled to damages and those damages are the

13  difference between what she would have been paid by the

14  library, what she is being paid on the other job, for so

15  long as into the future it would have taken to sort the

16  thing out.

17        Now let's take it Ms. Cloutier's way.  She claims

18  she was fired and that was it, she couldn't go back.

19  Let's say she proves that she was retaliated against and

20  the job action was firing her, well then she's entitled

21  to recover the same difference of -- I'll break it down

22  into what we call "back pay."  "Back pay" is the

23  difference between what she has earned from the firing

24  up to today compared to what the City would have paid

25  her up to today.  She's entitled to that.  But she's

1    also entitled to "front pay," that is if she could have

2    kept on working -- and you have testimony as to her age

3    and you've observed her, so "front pay," she's entitled

4    to the pay that she would have been paid into the

5    future, having in mind the chance of raises in the job

6    she now has, the chance of raises in the municipal

7    workforce in Lowell into the future for so long as a

8    reasonable person in her situation, but a reasonable

9    person, so long as they would have worked.  And that

10   front pay is not just that, but if her retirement would

11   have vested -- because municipal employees, if you

12   believe her testimony, are entitled to a pension, this

13   is a funded pension, then she would have been entitled

14   to that pension for so long into the future as you could

15   expect her to live and draw that pension.  But you must

16   perform an arithmetic assessment here and reduce that,

17   the front pay and the pension to present value.  Here's

18   what we mean.

19       If your verdict goes entirely her way and you

20   assess such damages, the damages are payable now, but in

21   the real world while the past damages -- that just

22   brings her up to where she should have been, the future

23   damages would never be paid out to her now under a

24   judgment, so you have to reduce that by the reasonable

25   amount that you think she could earn if she properly and

 1    reasonably invested the lump sum that you give her today

 2    so that at the end of her life it would be as equivalent

 3    as it could be to what she would have earned over the

 4    time she would have worked and drawn her pension if she

 5    had a reasonably expected life expectancy.

 6         Now she's testified to that and you could accept

 7    that testimony -- don't take it from me that you

 8    shouldn't, I'm simply saying you don't have to, you have

 9    to follow the analysis that I just explained to you and

10    based upon the data that you have, you have to give her,

11    if you find she's proved it, fair compensation in the

12    matter I have explained it.  And you put that down --

13    just give me the figure down there, under there of

14    "Assess compensation damages."

15         Now you may be interested in who pays that and I

16    will tell you, that is jointly and severally liable for

17    everyone, including the City, that you've checked.  If

18    you've checked under only one person, but not the City,

19    that person is liable.  If you've checked all four,

20    they're all equally liable, and she gets to try and

21    collect from the people and the City as you would

22    collect a judgment.  It makes no difference who pays it,

23    that's the amount she is entitled to.  That's

24    proceedings that do not concern you.  If you have two

25    individuals and the City, those two individuals and the

```
 1   City are jointly liable and the like.

 2        Then we get down to the bottom and the bottom

 3   talks about punitive damages, that's going to be argued

 4   to you.  Punitive damages -- because you would have

 5   found a violation of Ms. Cloutier's civil rights,

 6   punitive damages are available against each of the

 7   individuals and against the City, but only if she proves

 8   something more, she proves that what happened here was

 9   so excessive, so egregious, so improper, that it is

10   necessary -- and you are the conscience of the community

11   here, it is necessary to punish the person -- that's

12   what "punitive" means, "punish," punish the person or

13   the City who engaged in such conduct.  And so I've left

14   the possibility of four places.  You write in the name

15   of the City or the person as to who you think should be

16   punished and you write in the amount that you think the

17   punishment should be, and those are punitive damages.

18   That's like a fine and that goes against the individual

19   or it goes against the City.  They can't look to anybody

20   else to pay that, that is a fine against them for

21   engaging -- it should be enough so the person will never

22   do this again.  And it's not compensatory.

23        But understand it's perfectly logical here -- I'm

24   about done but I just want you to understand the logic

25   of this.  A logical verdict is -- and again I don't
```

1    care, but so you understand what a logical verdict is.

2    A logical verdict is simply to make one check applying

3    to the City folks, the case over, or you can find for

4    Ms. Cloutier and if you find for Ms. Cloutier, I imagine

5    it's against somebody or the City or all of them or some

6    of them, so you just check who it's against, as I've

7    explained.  Then the damages.  They can be as broad as

8    I've said.  If they are not proven -- and again you

9    can't speculate, you can't guess, they should just be

10   nominal damages of a dollar.  They've got to be proved.

11   And then punitive damages are something more, different,

12   extra.  However, you could find that she proved no

13   compensatory damages or nominal damages, because you

14   really can't tell, but you think punitive damages, as

15   I've explained to you, are appropriate, so you can so

16   assess punitive damages.  It is all left to you.  But

17   not now.

18        Now we'll take -- I need to confer with them,

19   because I may have left something out, I may have

20   misstated something and the lawyers get a chance to

21   bring that to my attention now.  And then we'll take a

22   brief recess, we'll be back for the lawyers' arguments,

23   and the case will be in your hands.

24        Counsel.

25

```
 1                    AT THE SIDEBAR
 2              THE COURT:  Ms. Sullivan, I thought that was
 3    pretty good.
 4          What do you say?
 5              MS. SULLIVAN:  Yes, I would just ask if there
 6    would be -- perhaps be a pretext instruction because
 7    under Rule 51(b), I don't need to show anything more.
 8    And if they disprove the reason for the action, then the
 9    jury is --
10              THE COURT:  I'm satisfied with the
11    instruction.
12          Okay, satisfied?
13              MS. BROWN:  Yes.
14              THE COURT:  Fine.
15              (Pause.)
16              MS. BROWN:  Oh, actually I haven't had an
17    opportunity to look at the case that Ms. Sullivan cited,
18    so I'm just going to renew our objection.  But I assume
19    that you looked it up.
20              THE COURT:  You can assume that.  I have it on
21    the bench.  It says what she says.
22              MS. BROWN:  Okay.  Thank you, your Honor.
23
24              (In open court.)
25              THE COURT:  Now because I'm longwinded, 8
```

1   minutes, till 25 of 1:00.  So keep your minds suspended

2   because this final argument of the lawyers, that really

3   is important.  I've given you the law, but the lawyers

4   get a chance to sum up.  So keep your minds suspended,

5   don't start talking about the case either among

6   yourselves nor with anyone else.  We'll start at 25

7   minutes of 1:00 with the final arguments of the

8   attorneys.  We'll recess.

9              THE CLERK:  All rise for the jury.

10             (Jury leaves, 12:30 a.m.)

11             (Resumed, jury enters, 12:45 a.m.)

12             THE COURT:  Now is the time where the lawyers

13  will sum up, quite candidly argue to you, seek to

14  persuade you from the evidence that you have seen and

15  heard.  And this really is what we think of when we

16  think of an attorney, to stand before an American jury

17  and argue on behalf of the client.  Now because it's

18  Ms. Cloutier, she bears this burden of proof by a fair

19  preponderance of the evidence.  Under the rules of

20  court, though she's gone first throughout, now she gets

21  a chance to go last.  So we'll hear first from

22  Ms. Brown.

23       I do caution you as to both Ms. Brown and

24  Ms. Sullivan, if a lawyer says something to you now and

25  your memory of the evidence is different, your memory

1    governs, not what the lawyer says to you, because the

2    lawyers weren't there.

3         Ms. Brown.

4         MS. BROWN:  Thank you, your Honor.

5

6    CLOSING ARGUMENT BY MS. BROWN:

7         Good morning, ladies and gentlemen -- or good

8    afternoon, and thank you again for your service coming

9    every day, taking notes, making questions, it's really

10   appreciated.

11        So the elements here, protected activity, adverse

12   action, causation, and damages.  What I'm going to do is

13   I'm going to talk to you about each of them, but first,

14   before I begin, I'll walk you through it.  Here's the

15   most simple thing.  There's no causation, "A" didn't

16   cause "B."  Your only question is why was Ms. Cloutier

17   told to leave the library on October 29th, 2013?  That's

18   really what you're here for.  And the answer the

19   defendants have shown you is very simple.

20        The city physician, she came here last week, she

21   sat right here and she told you, she made a

22   determination that Ms. Cloutier can't be accommodated

23   given her doctor's new restrictions.  Now these

24   defendants over here, they didn't make that decision,

25   again "A" didn't cause "B," they don't make medical

1    decisions, you heard it from all of them and from the

2    doctor, they don't work in the library, what they do is

3    they come into City Hall -- it's a different building,

4    they come into City Hall every day just looking to do

5    their jobs, busy demanding jobs, and now here they are

6    in court.

7         Before I get to the elements of the case I just

8    want to talk a little bit about credibility because

9    that's really at the core of your function, you're

10   trying to determine, you know, "Who should we believe?"

11   We heard from a lot of people.  They said different

12   things.  "Who are we going to believe?"

13        Now I want to talk about Ms. Cloutier.  You saw

14   how some of the times when I asked her questions she was

15   evasive with her answers.  We talked about the October

16   29th letter probably more times than you care to

17   remember.  You can read that letter, it's Exhibit 45.  I

18   urge you to read it.  The letter doesn't say anything

19   about windows, it doesn't say anything about asthma, and

20   as is clear on these things, she says, "It doesn't have

21   that word, it doesn't have that word 'asthma,'" but

22   really that's what it's about.

23        She says now that basically she could do all of

24   her tasks at the library, she could do them, she told

25   people she could do them.  You heard from the library

1    people, Ms. Colt, from Ms. Fougstedt, and Vicky Woodley,

2    they said she didn't tell them that.  And in any event

3    she remained on light duty, it's undisputed, doing only

4    calls, data entry, for 16 months, even though she could

5    do all these things?

6         When I asked her, "Wasn't it the case that you

7    were taken off desk time in July of 2012?"  Something

8    she admitted in her deposition.  You heard me read her

9    deposition.  She said, "No."  So I said, "Well, what's

10   that mean, what's the basis for that denial?"  The basis

11   was the one time, the one occasion, the three hours with

12   the headset, that's the reason for denying that she'd

13   been taken off the task.

14        I show you these pictures that Ms. Cloutier took,

15   these are pictures that Ms. Cloutier took the day that

16   she was examined by the city physician.  She tells you

17   that these are pictures of a public restroom.  Have any

18   of you ever seen a public restroom that looked like

19   this, that had a medical table and medical instruments?

20   She also told you "There weren't any medical instruments

21   if the exam room I was in."  But you can see them,

22   they're right there before your eyes.

23        She also told you, when she got the, um -- the new

24   work -- the work restriction note dated October 9th,

25   2013, she said, "That couldn't have been from my doctor,

1    it's not his signature."  But this is another note she

2    gave you -- and this is in evidence, these are both in

3    evidence, Numbers 56 and 69, take a look at them.  Have

4    you ever seen two signatures that look more identical

5    than these?

6         She says Susan Fougstedt immediately assigned her

7    to heavy lifting after she came back from her injury in

8    June of 2012.  Now you've heard that Ms. Fougstedt

9    wasn't even there, she was out on medical leave, she

10   didn't come back for another 10 days or so.  She says,

11   "They didn't let me have help with my tasks with the

12   bins."  Again you can -- you heard from the witnesses,

13   you heard from Vicky Woodley, you heard from Susan

14   Fougstedt, you heard from Pam Colt, "She was a lot of

15   help."  But you don't even have to take their word for

16   it, or only their word for it, you can see it in black

17   and white, you can look at the schedules that we saw

18   this morning, it's written right on it, "Give Diane

19   help."  You can look at an e-mail, it's Exhibit 62, it

20   says "Diane needs help."

21        So you can see with your own eyes that a lot of

22   the things that Ms. Cloutier has told you are just not

23   true, are demonstrably not true, and this is just a --

24   you know a few examples.  So how do you believe anything

25   she says?  And you also heard from no other witnesses to

1    support her side.  Now she didn't have to bring other
2    witnesses, but I'd ask you to consider that, you didn't
3    hear from anyone else saying the same things that
4    Ms. Cloutier says.
5         Now, you may be thinking, "Well, okay, maybe I
6    don't believe her, but the City can't retaliate against
7    her even so, right?"  And that's true, we can't do that.
8    But the credibility issue is critical and it is for you,
9    because really think about it, the whole reason we're
10   here today is because of what Ms. Cloutier has said,
11   it's because of her story.  So if you don't believe her
12   and you don't believe her story, then you're not going
13   to be able to find for her.  So let me get back to the
14   elements of this charge that the judge has already
15   talked about.
16        So the first thing, "protected activity," and as
17   the judge has told you, we all agree that when she filed
18   her MCAD complaint in February of 2012, that's a form of
19   protected activity, but bear in mind that's 21 months
20   before October of 2013, and you have to ask yourselves
21   is it really credible that retaliation would occur 21
22   months later, sort of, um, for this action of February
23   of 2012?  And also bear in mind that the MCAD complaint,
24   it doesn't name two of the defendants over there,
25   Ms. Gagnon and Ms. O'Connor, they're not defendants in

1   the MCAD, only the City and Mr. Lynch are, and some

2   other people.  And you can see it.

3          Now there's also these letters, um, the judge

4   talked to you a little bit about that, and one of the

5   questions that you're going to have to decide is, is

6   there just one act -- is there just one instance of

7   protected activity or are there more, are these letters

8   also forms of protected activity?  And I expect that

9   Ms. Cloutier's lawyer will argue they are.  But the

10  letters, they have to be reasonable and they have to be

11  in good faith, and I encourage you, these are some of

12  the letters -- they're not all of the letters, there are

13  many letters and you'll have them in your packet, but I

14  encourage you to read them, to really look at them, to

15  look at what they say.  And for one thing look at how

16  long they go on, um, or when they start.  There may be

17  an earlier one actually, but this example, it's from

18  September of 2012.  It's already accusing the law

19  department of wanting to fire Ms. Cloutier back in

20  September of 2012.  Nothing happened.

21         Take a look at Number 72.  This is a letter from

22  Ms. Cloutier's lawyer, Lana Sullivan, to Karen Gagnon,

23  copying the City Council.  I urge you yet again to cast

24  aside your base impulse to punish my client.  And then

25  look at Number 20 -- and again just examples, it's from

1    Diane Cloutier to Christine O'Connor, copying the City

2    Council, and here she says that Ms. O'Connor, along with

3    the City Manager, "are engaged in a plan to bully me, a

4    desperate plan, so that if I go away, so does my MCAD

5    claim."  Which by the way doesn't make any sense because

6    even if Ms. Cloutier were to go away, why would her MCAD

7    claim go away?  It's not going to go anywhere.

8         And the reason I'm showing you these things is you

9    want to also think about what's being -- what's actually

10   the actual basis for these letters or the purported

11   basis for these letters?  You know it's things like

12   scanning books for a day.  She's a library assistant,

13   scanning books?  It's wearing a headset for a few hours.

14   It's a call that was placed to a physical therapist.

15   It's being scheduled for an Independent Medical Exam.

16   And you heard from the doctor again, most people who

17   have worker's comp injuries welcome Independent Medical

18   Exams, it's another chance for a second opinion, it's a

19   way to try to help you improve, get better.  So why

20   would a person refuse to go to an Independent Medical

21   Exam?

22        So ask yourselves are these letters reasonable,

23   were they written in good faith or are they actually

24   trying to put Ms. Cloutier in the bubble, the bubble

25   that the judge talked about?  Are they trying to further

her MCAD complaint?  Are they trying to protect her from

having any bad actions taken against her?

Now legally she can't live in the bubble, that's

exactly right, just because she's filed an MCAD

complaint or done whatever she's done, she doesn't get

legal protection, but she can try to live in the bubble.

And you heard from Mr. Lynch that the only difference in

his treatment of Ms. Cloutier following her MCAD

complaint was maybe that there was just a little more

caution.  And now if you find that these letters are not

reasonable and in good faith -- and they have to be

both, then the only protected activity that Ms. Cloutier

has is the 2012 MCAD complaint, and again that's 21

months before the October event.

All right, so the next element is the job action

and again you heard from the judge, the job action

doesn't have to be a termination, and some of you might

have been a bit surprised with that because you're like,

"Well, why have we heard all this stuff about a

termination, you know we've been hearing a lot about

that?"  But it's important because of this, because

Ms. Cloutier says she was fired and if she's not fired

then her story, maybe not legally, but really her story

crumbles, because what kind of a retaliation case is it

when you're asking someone to leave and they can come

1    back two days later, for example?

2         But the judge is correct, she did leave, and in

3    fact she didn't -- she was unpaid at that point.  She

4    had, as you heard, exhausted her sick leave, despite the

5    generous allocation that carried over for 16 years, and

6    so, you know, there was an action.  But you still have

7    to think about what kind of an action it was because it

8    goes again to the credibility of the story, how it all

9    makes sense, how does this all hang together for you?

10        So you heard from Karen Gagnon and you heard from

11   Mary Callery and you heard from Diane Cloutier and

12   they're the ones you heard from about what happened that

13   day, and again there were apparently other people, but

14   you didn't hear from anyone else.  So ask yourselves,

15   did it happen the way Ms. Cloutier said?  Did Mary

16   Callery come out and say, "We're going to walk you all

17   the way up the sidewalk," loudly, tell her she couldn't

18   come back, or was it more the way they described it, did

19   they come over to her, give her her letter that she

20   didn't want to read, quietly tell her that, you know,

21   "Given your restrictions you can't be accommodated now,"

22   and tell her, as they told you, that, um, you know, "If

23   you get updated prescriptions, bring them in and, you

24   know, maybe you can come back then, you should be able

25   to come back if you can be accommodated," and then, at

1    the end of the day, walk out with her?  What's the way

2    it happened?  And again if you find she didn't get

3    terminated, wasn't fired that day, then I would suggest

4    to you that her story does evaporate.

5         At the same time I don't want you to get hung up

6    on that question because even if you do think she was

7    fired or as good as fired or just that, you know, there

8    was a job action against her, again there's still no

9    causation, and I'm going to get back to that, but first

10   I just want to say a little bit about damages, you know,

11   and the judge talked about damages.  It's Ms. Cloutier's

12   burden to prove her damages, if you were to find for

13   her.

14        And she's thrown out a few figures.  You're going

15   to have to do, you know, some math to try to work out

16   what exactly is meant here, but I would suggest to you

17   there's no -- there's been no proof of damages, there's

18   been no real sort of hard evidence on what exactly is in

19   play here in terms of money.  And the same for emotional

20   distress damages, you heard nothing specific about that,

21   you just heard that she was, you know, upset at the way

22   it had happened.

23        And then there's mitigation.  Now mitigation is

24   important in this case and it's been alluded to and

25   basically that means that Ms. Cloutier has a duty under

1    the law, she has a duty to reduce the amount of damage

2    that she experiences.  And so you're going to have to

3    ask yourselves, did she do that?  If you get that far.

4         Now she received the work status form that we were

5    looking at just now.  Let me just put it up again.  (On

6    screen.)  She received this on October 30th, remember,

7    she told you that.  And if you go to the October 29th

8    letter -- again Exhibit 45, the October 29th letter,

9    that letter refers expressly to this form, it talks

10   about Dr. Casparian, it talks about the work

11   restrictions from October 9th, 2013.  So she has both

12   things and she has both things the next day when she's

13   gone to her car, opened the letter, read it, and then

14   she receives the documentation.

15        And what does she do?  She doesn't do anything.

16   She doesn't call her doctor.  You heard her say she

17   doesn't think this is even her doctor's note.  So why

18   doesn't she pick up the phone and call Lahey and say,

19   "You know what's going on here?  I don't think this

20   right.  Something's up," or, you know, just tell him, "I

21   need an updated restriction note, you know I can do

22   these things, I'm not incapacitated the way that you've

23   written here"?  Because again the way that this is

24   written here -- and you have this document, there's a

25   set of lift-carrying options and they're at 10:00,

1   10:25, etc., they're all checked "enable" at this time

2   for Ms. Cloutier.  And so if you find that she didn't

3   mitigate from Day 1, um, there's no damages -- there's

4   perhaps a dollar, I don't know, but there's no damages.

5           Also bear in mind she's got a college degree and

6   she's working part-time at a grocery store and that's

7   fine, but you didn't see any cover letters, you didn't

8   see any e-mails, you didn't see any evidence of any

9   efforts that she has made to try to, you know, improve

10  her work situation, to find any other work, and that's

11  mitigation as well.  Ms. Cloutier does have a duty to

12  try to mitigate her damages.

13          So let's get back to causation, so that's the --

14  the final part, and that's really the question, you

15  know, who did what to whom and why did they do it?  And

16  -- all right.  I want you to think for a moment about

17  what Ms. Cloutier's story is, what she would have you

18  believe.  So here's the idea.

19          Rather than coming up with a reason to terminate

20  Ms. Cloutier, if that's what the defendants wanted to

21  do, this is what they did instead.  They somehow

22  obtained this work status form, not from her doctor, she

23  says, but the City somehow got it.  Then they managed to

24  persuade an experienced medical professional,

25  Dr. Gilbert, they managed to persuade her to give them

1    the kind of opinion that they wanted so Ms. Cloutier

2    would have to go.  And then this is, you know, perhaps

3    the icing on the cake, they decided to do it, um, by

4    giving her this letter in which the letter tells her

5    exactly how she can come back to work.  Is that language

6    that you would see in a termination letter, that "You

7    will not be allowed to work -- return to work until such

8    time as the City can implement a reasonable

9    accommodation for you," or does Ms. Cloutier simply read

10   what she wants to read and tell you what she wants to

11   tell you?

12         And again this whole scheme that the defendants

13   came up with to, um, use this kind of bizarre sort of

14   pseudotermination where the letter says you can come

15   back to work, um, this is all done because of an issue

16   about the windows in the library and whether or not they

17   can be opened in a separate building where none of these

18   people work and where, by the way, you've heard for

19   yourselves that Ms. Cloutier was always allowed to have

20   a window open in the circulation office and that was

21   where she did her work or where she could do her work,

22   um, and also where the air conditioning mostly worked.

23   So that's the story.  Does it make any sense?  Would you

24   even have thought of that?  Who could even think of that

25   story except Diane Cloutier?  And also even thinking

1   about this story, there's nothing from which to build

2   it, she hasn't presented any evidence here.

3        Now she's going to come up and argue, through her

4   lawyer, and she's going to ask you to speculate based on

5   unconnected threads.  You've heard that surveillance was

6   done.  You've heard that in fact people did observe

7   Ms. Cloutier doing strenuous things outside of work,

8   more strenuous than she was doing in work.  Remember in

9   work she was doing the calls, she was doing data entry.

10  But you heard testimony today that that would really

11  only take a few hours a day, and nonetheless she

12  remained, she remained at the city on her light duty.

13  And you heard Bernard Lynch testify that in December of

14  2012 he saw the surveillance video, but still the

15  plaintiff was allowed to remain, she was allowed to

16  remain on her light duty.

17       And you know you've heard evidence that there were

18  e-mails, meetings about the plaintiff, and of course

19  there were, she did generate a lot of work.  You've seen

20  that some of the meetings involved attorneys.  Again of

21  course they did, she had an open lawsuit.  She had --

22  she had written a lot of accusatory letters to a lot of

23  people.  You heard it from her, she wrote to Vicky

24  Woodley, Mary Callery, Karen Gagnon, Chris O'Connor, she

25  said, "I wanted to hit everyone I could."  And then

1    there was, you know, an issue of potential fraud

2    relating to the surveillance.

3         And so, yes, the plaintiff was discussed, yes,

4    there were conversations about her, there were meetings

5    about her.  Some of those would be privileged, they

6    wouldn't be disclosed.  But it doesn't mean that anyone

7    retaliated.  It's entirely speculation.

8         So what actually does make sense is this and it's

9    exactly what I told you in the opening argument.

10   Ms. Cloutier had a work injury in June of 2012 and she

11   was on light duty restrictions, she wasn't doing the

12   core functions of her job -- and we'll have a look at

13   the restrictions.  And these again, these are the

14   exhibit numbers and these are the dates, and I would

15   suggest that you take a look at some of these when you

16   go back to the room.

17        Ms. Cloutier talked with her doctors about what

18   she could do.  You could see that there's, you know,

19   actual entries about the pull list, about the desk time,

20   no things that required two hands to do the job, and

21   these were -- and these were the restrictions that

22   remained in place.  And they all state -- up until here

23   they all state that she can lift up to 10 pounds.  She

24   can't lift higher, but she can lift up to 10 pounds.

25        And then Ms. Cloutier claims her second work

injury in September of 2013, and we don't get an injury
report on that, and that is ultimately the worker's comp
injury that was denied as part of the -- the October
29th letter is also the denial of the worker's comp
claim.  And you heard from the city physician that this
is the injury where Ms. Cloutier said she injured
herself by raising her arms like this, that it wasn't
medically plausible that that could have happened.  In
any event, she has her work injury.  And, by the way,
would you leave work for almost a month and not tell
your department head?

        So the first -- after she's out for her second
injury in September of 2013, the next set of work
restrictions that the worker's comp office receives is
on the 2nd of, um, October, 2013, and they're very
brief, they just say "same restrictions," and you heard
from Karen Gagnon, you heard from Dr. Gilbert, the city
physician, that wasn't enough, "This person's been out
of work for an extended period, she's claimed a second
injury, we need to know a little bit more about what her
actual restrictions are."  It sounds reasonable.  And so
Karen Gagnon sought clarification from the doctor.  And
you can see that, it's Exhibit 81, and it is an
important exhibit.  And so she writes and says, you
know, "Can you tell us more?" and she includes a blank

1   work status form, right, so he can fill it out and make

2   things a bit clearer.  And then we get the response, the

3   fax that comes into the law department goes to Karen

4   Gagnon eventually, and that response is at Exhibit 82.

5          Now Karen isn't in the office when it comes in and

6   so the nurse case manager sends the content to

7   Dr. Gilbert, and you saw that in the e-mail, and

8   Dr. Gilbert does find this new work restriction note

9   kind of odd because really how do you function if you

10  can't lift things?  So she asks the nurse case manager,

11  you know, "Try to find out a bit more, let's get some

12  more information," but no more information comes in.

13  And then when Karen's back in the office later, digging

14  out from her desk, she sees the form herself and she

15  asks Dr. Gilbert to provide a medical opinion because

16  she sees that this restriction is different from these

17  restrictions, right?  "So what are we going to do?  Give

18  us your opinion."

19         So Dr. Gilbert does that, she gives her medical

20  opinion, and she gave it to you, she came in and she

21  told you, and you've heard from all of them, from

22  Dr. Gilbert, from Bernie Lynch, from Karen Gagnon, from

23  Christine O'Connor, they don't make medical opinions,

24  that's the role of the city physician, and so she gives

25  her opinion -- nobody asks her for a particular one,

1  nobody influences her, that the plaintiff can't be

2  accommodated under these restrictions.  And, you know,

3  really how could we accommodate those restrictions?

4      Does mean that she believed the plaintiff was

5  really as incapacitated as the form says?  Well, you've

6  seen she was skeptical about that, right?  But she had

7  no -- she had nothing else to go on at that point, we

8  had tried to get more information, it hadn't come in,

9  she had examined the plaintiff before -- and when there

10  was a difference in her observations she had sent the

11  plaintiff for an IME, the Independent Medical Exam,

12  which is kind of the way you get a tie-breaker, and the

13  plaintiff had refused to go.  So she just gave her

14  opinion, plain and simple, that "On those restrictions

15  Ms. Cloutier can't be accommodated.  It's impossible to

16  have her at work, she can't live 0 pounds."  And when a

17  city physician finds an employee isn't fit for duty,

18  that employee has to leave work, that's city procedure,

19  you heard it from the city manager.  And that's why, at

20  the end of the day, you can't find for any of the

21  defendants here.

22      I'd ask you to set aside whether you think

23  everything was done perfectly here -- you know there was

24  a lot of stuff going on.  I'm sure people made mistakes,

25  some things you may have done differently, but that's

```
 1   not relevant to the case.  What she has to show you is
 2   that the reason I just explained to you why she was told
 3   to leave the library that day, that's not the real
 4   reason, it's a sham reason, it's a cover-up, the real
 5   reason was this retaliatory motive that somebody had and
 6   managed to enact, but that can't be right because look
 7   at what you know.
 8              THE COURT:  5 more minutes, Ms. Brown.
 9              MS. BROWN:  Thank you.
10        Bernard Lynch.  He didn't make the decision to
11   tell the plaintiff to leave, he was kept abreast of it,
12   but that's all.  And remember also, he hadn't even met
13   the plaintiff since 2011.
14        Christine O'Connor didn't make the decision to
15   tell the plaintiff to leave, she was told about it, um,
16   but she didn't have any input into it, it was a medical
17   decision.  And remember also she's not even a defendant
18   in the 2012 MCAD and she's only met the plaintiff once,
19   in 2011.
20        And Karen Gagnon didn't make that decision either,
21   she didn't make the decision that the plaintiff had to
22   leave.  She did write the letter at the city physician's
23   direction and she delivered it with Mary Callery.
24        And Mary Callery, by the way, she didn't know
25   about the decision to ask Ms. Cloutier to leave until
```

that morning she was told to go over with Karen Gagnon

to accompany her.  But she didn't make that decision.

And Ms. Gagnon didn't know the plaintiff well

either.  You heard Ms. Cloutier say herself that she

didn't even recognize her when she came to the library.

The city physician made the decision that

Ms. Cloutier should leave and really it was the only

thing that she could do with what was before her, which

was Ms. Cloutier's physician's own note, right, saying

she can't lift anything at all.

Now the city physician had no motive at all to

retaliate, she didn't even know about the MCAD, she

didn't even know it existed, and she had received no

letters.  So with her there's no protected activity

whatsoever.

And these defendants again, these defendants

aren't the ones who made the decision, they knew about

it and they followed city procedure based on it, but

that's all.

Now you have this verdict slip and we've gone over

it, it has various checkmarks.  Well, it doesn't have

any checkmarks yet.  (Laughs.)  What I'm asking you to

do is very very simple, I'm asking you to -- again don't

check your common sense at the door, find the verdict,

the only verdict that makes sense and the only verdict

1    that's just, one check mark here for the defendants.

2    Thank you very much.

3                THE COURT:  Ms. Sullivan.

4                MS. SULLIVAN:  Thank you, your Honor.

5

6    CLOSING ARGUMENT BY MS. SULLIVAN:

7         Members of the jury, this is a case about

8    retaliation.  Ms. Cloutier was fired because she engaged

9    in protected activity.  It's really that simple.  The

10   issue in the case is whether the defendants fired

11   Ms. Cloutier because she filed a complaint with the

12   MCAD, wrote multiple letters accusing city officials of

13   harassment and retaliation, and requested continuing

14   accommodations, and threatened to file a second MCAD

15   complaint?  The answer to that question is "Yes."

16        What you have before you is a timeline.  You'll

17   see where she initially filed her MCAD complaint, then

18   you'll see the time period that ensued thereafter where

19   she wrote 10 letters regarding issues that she believed

20   were retaliatory, a sort to life task that nobody else

21   had to do, a headset task that nobody else had to do, an

22   examination that was rendered after she had already

23   submitted about five doctors' notes, a suspension

24   request to open windows, then the timeline continues to

25   really where we are today, which is the crux of the

1    case, three letters written on 9-21, 10-3, and 10-21,

2    the last of those letters was received on 10-23-13, six

3    days later she was escorted out of the library.  That

4    letter, members of the jury, is the straw that broke the

5    camel's back.  I'll get to that shortly.

6         Now you heard Ms. Cloutier tell you how she began

7    working as a library assistant at the library in 1988,

8    she was there for 16 years.  You heard her tell you why

9    she went to the MCAD in February of 2012, and the judge

10   has explained to you that is an agency that handles

11   issues such as discrimination for people in the

12   workplace over medical impairments.  She had exhausted

13   the chain of command at that time with regard to issues

14   that were happening at the library and she had gone to

15   -- and people such as Ms. Fougstedt, the assistant

16   library director, the library director, Ms. Woodley, the

17   director of human relations, Ms. Callery, the City

18   Solicitor, Christine O'Connor, and the City Manager,

19   Bernard Lynch, were all aware of what was going on.

20   There was no one else to go to and she needed help.

21        Now, you heard the three main reasons why

22   Ms. Cloutier filed that complaint, that the work

23   restrictions her physician had ordered due to her vision

24   impairment were not being accommodated, that she was

25   repeatedly being singled out and asked for doctors'

1  notes and medical information by Ms. Woodley, the

2  library director, and that Ms. Cloutier and her visual

3  impairment were the subject of an instant message or an

4  e-chat between two librarians who discussed how they

5  were going to murder her, make it look like a suicide --

6             MS. BROWN:  Your Honor, I know this is --

7             THE COURT:  No, it is the closing and she may

8  make her argument.  Reference has been made to that.

9  She may make her argument.

10      Go ahead.

11             MS. SULLIVAN:  -- and also compared her to

12  Adolph Hitler.

13      Apparently these libraries felt comfortable

14  targeting Ms. Cloutier and her visual impairments

15  without fear of punishment given the hostile work

16  environment that had been fostered for years against

17  Ms. Cloutier at the library.  You heard Ms. Cloutier

18  tell you that a goal in filing that complaint was simply

19  to get this discrimination to stop and so she could do

20  her job in peace.  That didn't happen.

21      In the MCAD complaint she filed in February of

22  2012 she did name the City of Lowell, Mr. Lynch,

23  Ms. Woodley, Ms. Fougstedt, and the two librarians who

24  wrote the e-chat.  Ms. Woodley and Ms. Fougstedt were

25  the ones who supervised Ms. Cloutier and assigned her

1   particular tasks on the daily schedules,

2   notwithstanding, you know -- notwithstanding the chalk

3   that was shown to you today, in fact -- about the

4   alleged chain of command in the library, in fact the

5   day-to-day tasks were assigned by Ms. Woodley and

6   Ms. Fougstedt, not Ms. Colt.  Those two women,

7   Ms. Woodley and Ms. Fougstedt, held a position of

8   authority and control over Ms. Cloutier, and you can

9   imagine that they weren't happy when she filed this

10  complaint against them, and they used that power and

11  authority against her to retaliate against her in the

12  terms and conditions of her work.  That's what happened

13  here.

14        Now you heard plenty of testimony about how in

15  June of 2012 Ms. Cloutier suffered a shoulder injury

16  when she was closing the heavy windows in the library.

17  Again that's important not because she hurt herself, but

18  because the windows were open.  She was allowed to have

19  open windows as she had been since 1998 in the library.

20  That's how she got injured after all.  Now nobody

21  disputes that that injury occurred or that Ms. Cloutier

22  continued to work full time after that injury and didn't

23  miss any work -- didn't miss any time off from work

24  because of it.

25        After that injury Ms. Cloutier gave Ms. Woodley

1    notes from her PCP, her Primary Care Physician,

2    indicating that while she recovered she needed to be on

3    light duty.  However, having been named in the 2012

4    complaint, neither Ms. Woodley nor Ms. Fougstedt were

5    inclined to accommodate Ms. Cloutier's light-duty work

6    restrictions.

7         Now you heard that on July 11th, 2012,

8    approximately two weeks after she was injured, she saw

9    an orthopedic surgeon.  That surgeon released her to do

10   -- and you can look at the note in the record, July

11   11th, 2012, released her to do certain tasks that she

12   had done in the past including pull lists, desk time for

13   up to two hours, and bins, and she could do all these

14   things, as the e-mails you've seen or the instant

15   messages you've seen have shown you, with assistance to

16   your co-workers, minimal assistance, 5 minutes of

17   assistance, to the extent these tasks involved heavy

18   lifting.  This does not mean she was 100 percent healed,

19   it meant she was released to do the tasks with a tiny

20   bit of assistance from her co-workers, assistance mind

21   you that had been available to every staff member in the

22   library over the course of the approximately 15 years

23   Ms. Cloutier had worked there without ever having to ask

24   for permission from Ms. Woodley or Ms. Fougstedt.

25   That's what co-workers do for one another and what had

1    been the practice for years in the library.

2         Now certainly Ms. Woodley and Ms. Fougstedt could

3    have assigned Ms. Cloutier pull lists, up to two hours

4    of desk time, bins, tasks which prior to her shoulder

5    injury in 2012 comprised approximately 10 to 15 percent

6    of her workday.  I'll submit to you that all the

7    witnesses you heard today have been prepared by counsel

8    for the law department, they all work for the law

9    department, and so today for the first time if they're

10   telling you that these tasks took 5 minutes or less, it

11   simply should not be credited.  Ms. Cloutier worked

12   there for 16 years and she told you what her job

13   consisted of.

14        The rest of her day, as you can see from looking

15   at the schedules too by the way, was devoted to doing a

16   myriad of other tasks or duties including helping

17   patrons, that was the core, that was the key, that was

18   the crux of the job.  She did data entry.  She did

19   calls.  Mind you calls was not just a task that involved

20   picking up the phone, it was a task that involved taking

21   a heavy cart of books, pushing it between floors,

22   advising the patrons of the status of their requests,

23   and sorting library materials based on their intended

24   destination.  Ms. Cloutier did that task, those calls,

25   and they saw her each and every day using her arms and

1    using her hands throughout this entire period of time.

2    So it simply isn't credible to say that she couldn't do

3    anything and that they relied on these alleged doctors'

4    notes -- relied on the doctors' notes to interpret it to

5    mean something else.

6        Obviously when you look at the schedules you can

7    see if a person obviously -- if a person wasn't assigned

8    to a desk, he or she would have had to necessarily been

9    doing something else to fulfill the rest of the 7 hours

10   of her workday.  So you should be aware that on the

11   schedules, while there were some specially-assigned

12   tasks, they're not all inclusive of what a library

13   assistant did each and every day.

14       So instead of maybe giving her assistance for

15   these tasks, which comprised approximately 10 to 15

16   percent of her workday, Ms. Woodley and Ms. Fougstedt's

17   attitude was, "You have to do these tasks without help

18   from your colleagues or you can't do them at all."  They

19   actually -- as the instant messages showed and the

20   testimony showed, in July and August of 2012 they

21   actually instructed Ms. Cloutier's co-workers not to

22   help her, chastised her when she asked them for a

23   minimal amount of help, and then punished her for asking

24   for more assistance -- for even asking for more

25   assistance by assigning her work -- more work.  Still

1    Ms. Cloutier continued to do a job which included

2    assisting her co-workers on and off the desk, helping

3    patrons, and all the other myriad of other things she

4    told you about as she had done for years.

5         Now certainly by September of 2012 Ms. Woodley and

6    Mr. Fougstedt continued to be irritated that

7    Ms. Cloutier wasn't, in their opinion, healing fast

8    enough from her injury and kept repeatedly questioning

9    her doctor's prohibition against no heavy repetitive

10   lifting.  She didn't have a manual labor job, she had a

11   clerical administrative job to which these tasks at most

12   comprised 10 or 15 percent of her workday, if that.

13        Now, the problem became in the fall of 2012 that

14   Ms. Woodley and Ms. Fougstedt, with the backing of the

15   law department and Ms. Gagnon, started to create these

16   tasks for her, tasks that no one else had to do, that no

17   one could do, that were quite frankly bizarre.  Those

18   two tasks were the sort to light task and the headset

19   task.  Ms. Cloutier could do a pull list, a normal pull

20   list, with minimal assistance from her colleagues, that

21   was the sort to light task, and the headset task was a

22   new task that would require her to be at a desk -- as

23   you heard her testify she was there for over 3 hours --

24   for hours that would violate her vision restriction.

25   There was nothing legitimate about these tasks, they

1    were intended to harass, and in fact Ms. Cloutier was

2    not reprimanded for not doing them.  That shows that

3    clearly they weren't necessary and they shouldn't have

4    been created in the first place.  Nobody else ever did

5    them.  She wasn't disciplined after.  Why were they even

6    created in the first place?  Because there was this

7    simmering retaliatory "theme," if you will, bubbling

8    under the surface.

9          Now, Ms. Cloutier certainly wrote plenty of

10   letters telling the law department and Ms. Gagnon, over

11   and over again, "These things are retaliatory.  Why am I

12   being asked to do this?  Nobody else is being asked to

13   do this.  Why can't I just do my job like everyone else?

14   I can."  But that seemed to fall on deaf ears because

15   again she wrote letters about the sort to life and the

16   headset test came up, and then she was ordered to go to

17   an exam for no apparent reason after which time

18   surveillance was ordered.

19         Now, beginning in November of 2012, not --

20   specifically on November 9th, 2012, a day after

21   Ms. Cloutier wrote a letter to Ms. Gagnon saying "Stop

22   retaliating against me, please stop retaliating against

23   me," um, she was put under surveillance.  The first

24   round of private video surveillance of Ms. Cloutier

25   occurred on November 9th, 2012.  And you heard the

testimony from -- you heard Ms. Gagnon's testimony that this was not something she could order on her own, each and every one of the rounds of surveillance she had to go to the City Solicitor and get permission.

Now who did the surveillance?  They retained two companies, Absolute Investigations and Sean Mustaffa of SM Investigations.  Sean Mustaffa of SM Investigations was a business partner of Dr. Gilbert.  Ask yourselves is that normal?  Is that reasonable?  Have you ever heard of any doctor who is a business partner with a private investigator?  There's something wrong with that.

Now, these two investigator firms conducted four rounds of surveillance of Ms. Cloutier over several months, over 110 hours of video surveillance. Approximately 8 hours is sufficient in any case, when an employee who's actually out on worker's compensation is not working, to sort of check on the whereabouts.  This is 110 hours.  They weren't looking to see what -- they weren't looking for anything legitimate, they were looking to see what dirt they could dig up on her because they wanted to use it against her and/or then would use it to discredit her in her MCAD complaint. That's what it was for.

Now, you heard testimony about the end of May,

1    2013, um, where -- in which, um, Ms. Woodley again had

2    an outburst about the MCAD matter and suspended

3    Ms. Cloutier because she claimed she wouldn't speak to

4    her about sick time.  Now and for the jury's

5    consideration, a letter that, um, Ms. Cloutier wrote

6    about that issue to Ms. Callery, which in turn was

7    immediately forwarded to Mr. Lynch and Ms. O'Connor is

8    that Exhibit 38.  And what happened next?  Well, that

9    letter of course led to more retaliation.

10        Now in the summer months of 2013 -- so now on this

11   timeline we're sort of over here  (Indicates.)

12   Ms. Woodley, suddenly and without explanation, now

13   refused to allow her to open the windows.  You heard

14   plenty of testimony about that, we don't need to go over

15   it again, except to say that they were aware that

16   Ms. Cloutier had asthma, so this became another

17   retaliatory tool, "Oh, no, she can't open the windows."

18   Everyone else for years was able to open the windows.

19        Ms. Cloutier was not confined to a circulation

20   office as they would have you believe today, she worked

21   at the library, she worked on the busiest floor of the

22   library, which was the first floor of the library, um,

23   and there were -- and as you saw earlier in the case

24   there were photographs -- that the library is a huge

25   place and if the air conditioning's not working, you

1    can't breathe, so you either need working air

2    conditioning or open windows.  And Ms. Cloutier actually

3    had to get a doctor's note to open the windows.  Ask

4    yourself is that reasonable or normal?  It is not.  An

5    employee should not have to get a doctor's note to

6    simply have windows open on a floor.

7         So this -- so this -- and as you heard, there was

8    no policy about the windows at the library, this was a

9    ad hoc thing that was dreamed up again by Ms. Woodley

10   and Ms. Fougstedt, who were irritated with Ms. Cloutier.

11        Now, you'll recall that Exhibit 55 was the

12   doctor's note, of August 1st, 2013, it's the

13   pulmonologist's note, that stated "The patient must be

14   allowed to either have functioning air conditioning or

15   be allowed to open windows," that note was given to both

16   Woodley and Callery, and again it was forwarded to

17   Mr. Lynch and Ms. O'Connor, both of whom admitted to

18   being aware of the situation and nothing was done.  How

19   easy would it have been to just say "Let have some

20   windows open."  They chose not to do so.  Ms. Cloutier

21   simply continued to have asthma attacks at work in the

22   library due to this refusal to let her open the windows

23   so she could breathe without distress.

24        Now, on September 3rd, 2013, as you will recall,

25   Ms. Cloutier wrote another letter, this to Ms. Woodley,

copied to Ms. Callery, about the windows again.  This

infuriated Ms. Woodley further.  A week later, on

September 10th, 2013, Ms. Woodley approached her on the

first floor of the library, got in her face, and afraid

that she was going to be hit by Ms. Woodley, she put --

you heard the testimony about how she put her arms up to

shield herself and in the process reinjuring her injured

shoulder.  All of that's confirmed by the medical

documentation and so forth.  Ms. Woodley herself

testified that she clapped her hands loudly in front of

Ms. Cloutier and stated, "Are you happy now?"

Now, you also heard Ms. Cloutier testify that

after the altercation she immediately notified

Mr. Robinson of her union and asked him to tell

Ms. Callery that this had transpired.  There's no

dispute in this case that the City accepted liability

and paid Ms. Cloutier approximately $1500 for the wages

she lost that she was out during those three weeks.  So

the period of time from September 11th, 2013 through

October 6th, 2013, there's no dispute about that, the

City accepted liability and paid for that.

Now, as I said a moment ago, Ms. Cloutier went to

her doctor the day after, um, the assault and he kept

her out of work that day and the next day and wrote a

note saying, um -- wrote a note saying that she would --

1   she would be having an MRI and would be out of work for

2   an undetermined period of time.  So that was one form of

3   notice Ms. Cloutier gave the City, but that wasn't the

4   only form of notice because then we have these three

5   letters.

6        So mind you Ms. Cloutier got no FMLA paperwork

7   while she was out of work at any point in time.  That's

8   procedure.  That's policy.  It's federal law that an

9   employer has to give an employee, after he or she is out

10  of work for more than 3 days due to a serious medical

11  condition -- which is what this was, the City knew and

12  they just chose not to give her the paperwork.

13       Now, on September 21st, which is the first letter

14  on this board in front of you, um, Ms. Cloutier wrote a

15  letter directly to Ms. O'Connor, again stating what

16  happened on September 10th with Ms. Woodley.

17  Ms. O'Connor testified she knew about the incident, but

18  she never spoke to Ms. O'Connor, responded to her

19  letter, or followed it up with Ms. Cloutier or her

20  attorney, who was representing her in her MCAD matter.

21  Ms. O'Connor had no concern about Ms. Woodley's

22  outrageous behavior, which was a violation of the City's

23  violence prevention policy.

24       Having heard nothing from anybody at the City,

25  Ms. Cloutier wrote Letter Number 2, and that was the

1   letter dated October 3rd, 2013.  In that letter

2   Ms. Cloutier expressly stated, um, that she -- that her

3   doctor had returned her to work as of October 7th under

4   the same work restrictions that had been in place before

5   she was out and provided a copy of her doctor's work

6   restrictions, and they were supposed to be the same as

7   before.  For the first time Ms. Cloutier also now

8   requested transfer to the senior center branch of the

9   library out of a concern for her safety around

10  Ms. Woodley.  She wrote also that if the City would not

11  allow the transfer, then it should at least start

12  honoring her asthma restrictions and let her open

13  windows.  Upon receipt of that letter, a fifth round of

14  private video surveillance of Ms. Cloutier was ordered

15  by the law department under Ms. O'Connor.

16       Now, the next day, so on October 4th, 2013,

17  Ms. O'Connor, Ms. Callery, and Ms. Gagnon held a meeting

18  to discuss the legality of possible actions they were

19  contemplating with regard to Ms. Cloutier.  Ms. Callery

20  testified that she wrote the notes that appeared in

21  Exhibit 74.

22       These are those notes.  There were several

23  options, those options included "senior center, new

24  position's budget, term, settlement MCAD, and

25  involuntary requirement."  We'll get to that a little

1   later, we know which option they chose, which was

2   "term."

3        Now, Ms. Cloutier returned to work at the library

4   on October 7th, resumed doing her work as she had been,

5   again they refused to let the windows be opened, and

6   again, as the testimony reflected, there was another

7   meeting between Ms. Gilbert, Ms. Gagnon, Ms. O'Connor,

8   regarding Ms. Cloutier's return to work.  They knew she

9   was there, they knew she was working, and she continued

10  to work.

11       Now, the next day, on October 8th, there was a

12  memo, you will recall, that Ms. Cloutier received from

13  Ms. Woodley, copied to those same individuals,

14  Ms. O'Connor, Ms. Callery, Ms. Gagnon, Ms. Fougstedt,

15  stating that in Ms. Woodley's opinion Ms. Cloutier's

16  pulmonologist's request to open windows was neither

17  reasonable nor practical and for the first time in

18  approximately 16 years there was a concern about insects

19  flying through the open windows and that she was now

20  allegedly committed to an insect-free environment.  Now

21  of course that memo was only given to Ms. Cloutier, not

22  to any other library staff member, and Ms. Cloutier

23  testified that she was prohibited from having open

24  windows on the first floor where she worked even as

25  other staff members on the ground floor, on the second

```
1    floor, everywhere else in the library, were able to have

2    open windows, even on the first floor, as they please.

3    But if Ms. Cloutier was in sight and the windows were

4    near her and Ms. Fougstedt or Ms. Woodley saw that --

5    well, they wouldn't actually have seen that because the

6    windows weren't open, but if they did see that, they

7    would have said, "You can't have them open."

8          Now, that not only is important -- and you heard

9    Ms. Brown talked about how Ms. Cloutier thought that the

10   termination letter -- because it doesn't say "asthma" in

11   it, it couldn't be the same thing.  No, that's not what

12   we're talking about here, what we're saying is that the

13   letter, which was carefully crafted by counsel, mind

14   you, and because it would be too obvious to write the

15   word "termination" -- they would know how retaliatory --

16   it would be so obviously retaliatory to write the word

17   "termination" in there, um, what -- what it was was the

18   motive that was behind this, they were sick and tired of

19   hearing about Ms. Cloutier's complaints, her protected

20   activity, and her accommodation requests.  That's what

21   that letter was -- the October 29th letter was a

22   reaction to.  So what it says -- you have to keep in

23   mind who wrote it and what it says to determine whether

24   you should just accept it at face value.

25         So in that October 8th memo to Ms. Cloutier
```

Ms. Woodley said she found it unacceptable that
Ms. Cloutier was out of work due to Ms. Woodley's attack
on her and that she would be seeking guidance from the
law department about her work restrictions, that there
would be a meeting with Ms. Cloutier and HR that might
result in disciplinary action.

You heard testimony about a checklist that
appeared in the law department on October 10th.  Now
I'll submit to you that the 10 -- if you go back in the
jury room, the 10-2 letter, the signature on that one
does not at all match the one on the 10-9-2013 letter.
You also heard the testimony from Ms. Cloutier that she
never heard, saw, talked to her doctor after October 2nd
when she saw him, ever again.

Now, so how this checklist appeared is not clear.
In any event, what is clear is upon allegedly reviewing
this checklist and an unfinalized chart note, so
somebody got it somehow from Ms. Cloutier's doctor,
Dr. Gilbert's reaction was "Shoot me, laugh my ass off,
amazing how she functions, and we know she can lift and
use her right arm.  Can't wait to see what Chris had to
say regarding not feeling safe."  That last remark, of
course, was a reference to the fact that Ms. Cloutier
had confided in her doctor, in that preliminary chart
note, that she didn't feel safe at work and that somehow

1    the law department had obtained these notes.

2         Now, if you look at the schedules from that period

3    of time you'll note that the next day, October 11th,

4    2013, Ms. Cloutier is back on the schedule doing calls,

5    so clearly they had no issues and no concerns about her

6    work capacity, nor could they.  Again, just jumping

7    ahead, on October 28th they had private surveillance of

8    her helping a patron on her hands and knees and working

9    in the library.  They knew she could work.  So this

10   whole business about her being unable to work is a

11   pretext, it's a pretext, which is a lie, and it's a

12   pretext to cover up unlawful retaliation.

13        Now, again let's get to the third letter, October

14   -- well, the earlier one, on October 23, 2013

15   Ms. Cloutier wrote her third and final letter.

16             THE COURT:  5 more minutes, Ms. Sullivan.

17             MS. SULLIVAN:  Okay.

18        That was the straw that broke the camel's back.

19   That's Exhibit 27.

20             (Pause.)

21        I'm going to jump ahead.  You're familiar with the

22   facts after this.  And, by the way, there was no

23   documentation, invoices, nothing like that, indicating

24   that Dr. Gilbert ever had a conversation with anyone,

25   and she's a paid witness for the City, as you heard the

1    testimony, and this portion you should direct your

2    attention to, Exhibit 27.

3         Now, um, it's undisputed generally what happened

4    that day, October 29th, and you heard the testimony

5    about how the notes from Ms. Callery that appeared in

6    Exhibit 76, how she recorded that she and Ms. Gagnon

7    gave -- "went over to the library to give Ms. Cloutier a

8    notice from the City Manager."  Now, Ms. -- and

9    Ms. Cloutier was fired.  And you heard that there were

10   many -- and she was fired and she was escorted out.  And

11   you can refresh your recollection of what actually

12   happened on that day by looking at the contemporaneous

13   notes at Exhibit 76.

14        Now, the end result of all this is that, yes,

15   Ms. Cloutier was in fact terminated, they didn't write

16   that word, but that's the effect of what this was.  She

17   represented thereafter, in a myriad of ways, that she

18   was ready, willing, and able to work, she filed for

19   unemployment, she filed another MCAD claim that said, "I

20   was terminated," and nobody ever refuted it.  Even her

21   providers provided additional documentation saying, "We

22   had always returned her to work."  Yet the City still

23   never let her back.

24        Ms. Cloutier's entitled to be compensated for her

25   harm and that power to help, right or wrong, will be in

1    your hands.  You were chosen to decide this case.  She

2    doesn't get to come back tomorrow or next month and have

3    another trial, this is it, it's a one-shot deal.  She's

4    waited several years to get to this day.  To figure this

5    out you can take into account one primary thing, the

6    harms and losses the defendants caused.  You should

7    weigh the difference, as the judge instructed you, in

8    Ms. Cloutier's life before her termination and

9    afterward.  One of the harms here is salary, the wages

10   she's lost.  The back pay is the difference in lost

11   wages from the date of termination until today.  Judge

12   Young explained to you what front pay is.  Ms. Cloutier

13   also testified that she planned on working in the City

14   until she retired at Age 70.  She calculated both those

15   numbers for you, back pay and front pay, at

16   approximately $750,000.

17        Now, if she had her pension -- she also testified

18   she lost her pension and if she hadn't -- but if she

19   hadn't, she would have received 50 percent of her

20   earnings every month, which comes out to approximately

21   $250,000.  And none of these numbers include inflation.

22        Now, Ms. Cloutier suffered emotional distress.  As

23   you heard her testify, she lost her livelihood, she

24   supports her elderly mother, and the career where she

25   was planning on working till she retired.  At Age 55,

1   finding a comparable new job is simply not easy.

2   She, um, I don't think any -- I would suggest an amount

3   commensurate with front pay, um, but I'll leave that to

4   your good judgment when you're figuring out emotional

5   distress damages that go into that compensatory damages

6   number.  And I don't make any apologies for asking for a

7   financial verdict because there's nothing else that

8   substitutes for it in this court, as you heard the judge

9   say.  So please don't think of this as a prize,

10  Ms. Cloutier doesn't want any prizes, she wants justice

11  and reasonable compensation that will fully and fairly

12  compensate her for the harm done.

13      The last category is punitive damages.  This is

14  for egregious conduct.  I will submit to you that this

15  conduct that you've heard about through the course of

16  this trial was egregious by a public employer, by

17  high-level city officials who should have known better,

18  one of whom was an attorney, conducting over 150 hours

19  of surveillance, laughing their ass off when

20  Ms. Cloutier was assaulted by a supervisor who she had

21  been complaining had been retaliating against her ever

22  since she filed her MCAD complaint, showing her the door

23  for requesting windows open at work so she could

24  breathe, and upon stating that she intended to file a

25  second MCAD claim over it, escorting her out of her

1   place of employment in front of all of her colleagues

2   where she worked for years.  That's egregious.  As the

3   judge said, this must be a meaningful number that bears

4   a reasonable relationship to the monetary damages you

5   award.  But hopefully it would inspire the defendants to

6   change their ways so that this doesn't happen again.  If

7   the numbers aren't meaningful, it's insignificant, it's

8   going to be a mere slap on the wrist to defendants and

9   things will continue on as usual in the City of Lowell.

10  It has to be a number that will make them understand

11  "This is not okay."  I will leave that number to your

12  good judgment.

13        Above all remember this.

14              THE COURT:  Sum up, Ms. Sullivan.

15              MS. SULLIVAN:  This is Ms. Cloutier's only day

16  in court, this is the only time she can come before a

17  jury and receive proper compensation for the harms the

18  defendants have caused.  This is the only time she can

19  receive justice.  We are confident you will give her

20  that.

21        Thank you.

22              THE COURT:  All right.  Now just a very few

23  words about how you deliberate together.

24        Madam Forelady, as forelady you don't do all the

25  talking, nor do you keep your mouth shut.  Really I'm

1    talking to all of you.

2         When you get there in the jury room, set things up

3    so that each and every one of you gets a chance to

4    express your views about whatever aspect of the case you

5    are discussing in circumstances where all the rest of

6    you can reflect and react to the views being expressed.

7    In other words, now is the time to discuss this case

8    altogether.  The deliberations of a jury are the

9    deliberations of all 12 of you together, not 8 of you

10   talking about the case and 1 of you looking out at the,

11   um -- somebody's got an Elmo or a some big doll over

12   there in Vertex, and I look at it -- (Laughter.)  It's

13   the frog, I'm sorry, it's over there, and I see you've

14   seen it.  Don't be looking at that.  Now is the time to

15   talk about the case.  And I'm serious, these are

16   deliberations of all 12 people.

17        It's probably not a good idea to take a straw vote

18   right at the beginning, and the reason for that is you

19   might think then that, having so expressed yourself,

20   you're bound and determined to stick to that position.

21   If you have any strong view about any aspect of this

22   case, by all means stick to it.  We ask you for your

23   verdict, we do not demand it.  So if you've got a strong

24   view, of course you can stick to it.

25        The verdict must be unanimous as to each of these

questions.  And if you get so that you leave something

blank with the idea that -- for instance I'm just

picking this out, you don't have to say anything about

punitive damages if you decide not to award punitive

damages, but -- and I'm just giving this as an example,

I'm not making any suggestion, but that's a

determination, so you all have to agree, and you have to

agree as to each response you make on the verdict slip.

It's not 11 of you thinking one thing and 1 of you

thinking something else but going along so you can all

go home.  That's not fair.  That violates your oath.

And you people have taken your oath very seriously, it's

obvious by the care and attention that you have shown on

each of the days of trial here.  The.

The verdict must be unanimous.

        At the same time jury deliberations are just that,

they're the deliberations of a duly-qualified 12-person

jury.  So if the views of your fellow jurors, who have

seen the same evidence you've scene, heard the same

evidence, been here every day of the trial, if they

persuade you, that's fine, if you're really persuaded.

Deliberations are meant to see if you can come to a

unanimous verdict.  So it's perfectly appropriate to be

persuaded, there's just no going along here.

        Let me talk about the mechanical things so that

```
1    you're comfortable with them.

2         You may take your notes back to the jury room and

3    you may use your notes.  Don't pass your notes to fellow

4    jurors, they're only for you, they're not evidence, use

5    them to refresh your recollection about what you heard

6    considering the evidence.

7         Once we send you out to the jury room, Ms. Gaudet

8    will come back in here and she'll go over the exhibits

9    with the lawyers to make sure you have all the 85, 86

10   exhibits, then she'll bring them all back to you.  Now

11   you can start your deliberations right away or you can

12   start having lunch --

13        Which is to be delivered?

14             THE CLERK:  1:00, but that's --

15             THE COURT:  1:00, so you don't get lunch until

16   1:00, but lunch will be delivered from the cafeteria.

17             Once I send you out to deliberate, you are

18   very much in charge.  As I say, if you have any

19   questions about the law, write them out, they'll be a

20   Court Security Officer outside your door, give the Court

21   Security Officer the question, he sets things up in

22   here, I have proceedings this afternoon, but you come

23   first, I'll suspend what I'm doing, we bring you back in

24   here, I answer the question, send you back out.

25             If for any reason you decide that you just assume
```

 1    stop for the day and come back at 9:00 tomorrow, tell us

 2    that, we'll stop, come back at 9:00 and keep going.  If

 3    you are deliberating and it's about 10 of 5:00, I'll ask

 4    Ms. Gaudet to come in and say, "Well, are you close,

 5    shall we wait?" but I've told you I'm not keeping you

 6    after 5:00, so I'm not.  And if you aren't, we'll bring

 7    you back in, because I have some special instructions.

 8    And that frequently happens if your deliberations go

 9    more than a day.  And there's no pressure on you as far

10    as time.  So I need to bring you in and explain those

11    instructions.  Other than that, we leave you alone.

12         Now once you have reached a verdict, this is how

13    we take a verdict.  Just announce to the Court Security

14    Officer, just tell him you've reached a verdict, don't

15    give it to him, you keep the verdict.  It's the forelady

16    who fills out your unanimous verdict, she signs her

17    name, she dates it.  And you keep it.  We set things up.

18    Everybody comes in.

19         And Ms. Gaudet says to you, "Ladies and gentlemen,

20    have you agreed upon a unanimous verdict?"  I assume if

21    that's why you're back, you say "Yes," she'll say "Pass

22    the verdict slip," it gets passed, I look at it first.

23    And I look at it only to see that it's logical.  And,

24    for instance, if it has no marks on it, I won't know

25    what to do.  If you find both for the City folks and the

1   next blank below it, for Ms. Cloutier, I don't know what

2   to do.  But so long as it's logical, then, um, I will

3   accept the verdict.

4        Again, if you find for Ms. Cloutier, it can be

5   against one or all four of the people or entities sued,

6   but I need to know which and I need to know what are the

7   compensatory damages, though we've explained to you the

8   concept of nominal damages.  If you find punitive

9   damages, write that in and against what entity or person

10  they apply, or if you don't, leave that blank.  But I've

11  emphasized to you that's a finding.

12       If its logical, I give it to Ms. Gaudet and I say

13  "The verdict is in order, it may be recorded," and

14  she'll ask you to stand up.  It's the one time in the

15  whole proceeding where you stand up, the rest of us sit

16  here and look at you.  And if you stand there, in the

17  jury box, and you're satisfied with the consciousness of

18  your duty faithfully performed, you will have done

19  what's required of you.

20       The word "verdict" comes from two Latin words,

21  they mean "to speak the truth," and that's what's asked

22  of you, to speak the truth about this disputed evidence.

23  The jury may retire and commence their deliberations.

24  I'll remain on the bench.

25            THE CLERK:  All rise for the jury.

1           (Jury leaves, 1:45 p.m.)

2           THE COURT:  Please be seated.  Let's just get

3      our mechanics worked out.

4           You're of course free to go.  You know that we

5      will have lunch sent in to them at 1:00.  Stay here now

6      and go over the exhibits with Ms. Gaudet.

7           If there's a question and I can reach you in 5

8      minutes time, I will consult you before answering the

9      question.  I do have proceedings here this afternoon,

10     but it's a lovely large courtroom and so you're welcome

11     to hang around here if you give counsel the tables.

12          You know my schedule, I'm going to be here till

13     5:00.  You know I'll bring them in, if they have not

14     returned a verdict, about 10 minutes of 5:00.  If you

15     want to be in the courtroom, be here at that time.

16          So if you're going to leave, tell Ms. Gaudet how

17     you can be reached so that I may consult you with

18     respect to answering a question.

19          I do thank you and we'll recess and await the

20     verdict of the jury.

21               (Recess, 1:45 p.m.)

22               (Resumed, 4:40 p.m.)

23          THE COURT:  All right.  Ladies and gentlemen,

24     just because I think you're entitled to know, the folks

25     who are just coming into the courtroom, and please be

1    seated, those are judges from Saudi Arabia who are here

2    observing our proceedings and I've been meeting with

3    them and they are certainly welcome.

4         I've received the following question and I'll read

5    it.  "Explain what is retaliation?"

6         Is that the question, Madam Forelady?

7              THE FOREPERSON:  Yes.

8              THE COURT:  Is that the question, ladies and

9    gentlemen of the jury?

10             THE JURY:  (In unison.)  Yes.

11             THE COURT:  To that question I make the

12   following answer.  Here's the answer.

13        Retaliation exists when a person takes an action,

14   in the circumstances of this case, in response to or

15   because of protected activity, an action they would not

16   otherwise have taken.

17        I can stop right there.  But to give an example

18   that has nothing to do with this case.  Suppose -- and

19   nothing really to do with the law, but I think it will

20   illustrate.

21        Suppose in a social situation a person -- and

22   we'll call that person, "Joe," Joe hears a rumor that

23   Steve has said something bad about him, and having heard

24   that rumor that Steve said something bad about him, Joe

25   thinks to himself, "Well, I'm going to get him, I'm

1  going to do something bad to him."  So Joe -- if it's a

2  workplace situation, makes the workplace more

3  unpleasant, plays a prank, does something mean to Steve.

4  That's Joe retaliating against what he believes Steve

5  has done.

6        Now let's come to this case.

7        In this case, if there's protected activity, as

8  I've already told you, that does not create some sort of

9  bubble around Ms. Cloutier, personnel actions that are

10  the normal personnel actions, whether you agree with

11  them or not, can be taken with respect to Ms. Cloutier,

12  just as they could have been taken before.  But if any

13  of these people, or if employees of the City generally,

14  including these people, took other actions to make the

15  workplace more hostile, more unpleasant, and more

16  difficult because of the protected activity, that's

17  retaliation.

18        Now retaliation standing alone doesn't get us to

19  any result here, there has to be the job action as I've

20  already explained to you and the job action has to be

21  because of the retaliation.  It would not have taken

22  place were it not for the retaliation.

23        That's my answer to the question.  You may retire

24  and continue your deliberations.

25        Given the hour, I'm going to wait till about 5:00

1    -- 5 minutes to 5:00.  Ms. Gaudet will knock on the

2    door.  Well, I think that's best.  We'll let you go back

3    and talk about my answer and then we'll bring you in

4    here about 5 minutes of 5:00 and I'll give you

5    instructions and we can continue tomorrow.

6         The jury may retire and continue their

7    deliberations.

8              THE CLERK:  All rise for the jury.

9              (Jury leaves, 4:45 p.m.)

10             (Short recess, 4:45 p.m.)

11             (Resumed, Jury enters, 4:55 p.m.)

12             THE COURT:  Now it's appropriate, consistent

13   with what I've told you, that I excuse you to come back

14   tomorrow morning at 9:00.

15        And you will see that my instructions are

16   different and they're different in one crucial respect,

17   I no longer can say "Keep your minds suspended" because

18   of course you have been hard at work on this case since

19   you commenced your deliberations at about quarter to

20   2:00.  So naturally I don't say that.  But that informs

21   what I'm about to say.

22        You people now know things that the rest of us

23   don't know and we have no right to know, you know the

24   tenor of your deliberations, accordingly it is vital, it

25   really, the whole integrity of these days of trial,

1   turns on your not talking to anyone else about the

2   substance of this case, not doing any research on any of

3   these issues or Googling anyone.  You have the evidence

4   before you.  So important is that, that tomorrow morning

5   at 9:00 -- and I know we can rely on you, at 9:00 I

6   bring you in here and I say "Let the record show that

7   the 12 deliberating jurors are present in the

8   courtroom," and I will ask you on your oath, "Have you

9   followed my instruction to refrain from talking or

10  discussing with anyone the substance of the case?"

11      And now that I've excused you for the day, don't

12  you go on talking about it, going down the hall and down

13  the elevator, because you're not all together.  It's the

14  12 of you who are the judges of the facts in this case.

15  No one's going to go into the jury room except for

16  Ms. Gaudet, to straighten things up or supervise the

17  cleaners, but no one's going to touch anything or get

18  into your materials.  And now the door will be locked

19  and she will see it's unlocked tomorrow.

20      Now, when you get in there, relax but don't start

21  your deliberations until I've had you in here, all 12,

22  and ask you that question, and then you can go on with

23  your deliberations.

24      I will say that it's frequent that jury

25  deliberations continue over into a next day.  Have a

1    good evening.  It's probably a good idea to put this

2    matter out of your mind, come back refreshed, and you'll

3    continue the deliberations at 9:00 tomorrow morning.

4         So you may stand in recess with the instruction

5    not to discuss the case further among yourselves nor

6    with anyone else.  The jury may stand in recess until

7    9:00 a.m. tomorrow morning.  The jury may recess.

8              THE CLERK:  All rise for the jury.

9              (Jury leaves, 5:00 p.m.)

10             THE COURT:  Please be seated.

11        Folks, you're all in recess.  And to my colleagues

12   from Saudi Arabia, I have a meeting to go to, so this

13   has been a great pleasure.  If you have any gear in

14   chambers, you may pick up, because we'll stand

15   adjourned, because I have to leave.

16        We'll recess.

17             (Adjourned, 5:00 p.m.)

18

19

20

21

22

23

24

25

```
1                   C E R T I F I C A T E

2

3

4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

5      hereby certify that the forgoing transcript of the

6      record is a true and accurate transcription of my

7      stenographic notes, before Judge William G. Young, on

8      Monday, March 5, 2018, to the best of my skill and

9      ability.

10

11

12

13     /s/ Richard H. Romanow 04-09-18
       _____
14     RICHARD H. ROMANOW   Date

15

16

17

18

19

20

21

22

23

24

25
```