## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DIANE CLOUTIER, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 1:15-cv-12780-WGY |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF LOWELL, BERNARD F. LYNCH, in his official and individual capacities, CHRISTINE P. O'CONNOR, in her official and individual capacities, MARY M. CALLERY, in her official and individual capacities, KAREN A. GAGNON, in her official and individual capacities, VICTORIA B. WOODLEY, in her official and individual capacities, SUSAN FOUGSTEDT, in her official and individual capacities, SARAH E. GILBERT, in her official and individual capacities, ROBERT SPARKS, individually and as President of Absolute Investigations, Inc. and ABSOLUTE INVESTIGATIONS, INC. and DOES 1-10. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

### PLAINTIFF DIANE CLOUTIER'S MOTION FOR A NEW TRIAL

Pursuant to Fed. R. Civ. P. 59 (a), Plaintiff Diane Cloutier ("Plaintiff" or "Ms. Cloutier") respectfully requests that this Court set aside the verdict rendered on March 6, 2018 [ECF No. 481] and judgment entered on March 29, 2018 [ECF No. 482] and grant her a new trial.  The Court should grant a new trial because the verdict was against the weight of the evidence, substantial errors were made both in admitting and excluding evidence, and the jury instructions were flawed.[1]

---

[1] Ms. Cloutier reserves the right to supplement this motion upon receipt of additional trial transcripts.

**I.     The Trial**

On January 11, 2018, the case was reassigned from Judge F. Dennis Saylor[2] to Judge William G. Young [ECF Docket Nos. 417-418].  On January 25, 2018, the Court ordered the parties to appear for a trial of nine days or less set to commence on February 20, 2018.[3]  On February 20, 2018, a jury of 12 was seated.  No voir dire of the jury with any of the parties' questions was conducted.  The matter was tried on various days selected by the Court over the course of the ensuing three weeks.  The six days of trial were broken up as follows: February 20, 2018 and February 21, 2018 (Week 1); February 26, 2018, February 27, 2018, and February 28, 2018 (Week 2); and a portion of the morning of March 5, 2018 (Week 3) [ECF Docket Nos. 461, 462, 466, 467, 468, 479-480].  On Wednesday, February 28, 2018, the Court advised the jury that the lawyers had "stepped up the pace" and that the case would most likely conclude on Monday. [Exhibit A, Transcript of February 28, 2018 at 161:3-161:14].

---

[2] Judge Saylor presided over all of the merits-based motions in the case including: three defense motions to dismiss and two defense motions for summary judgment.  Judge Saylor referred discovery motions in the case to Magistrate Judge Donald Cabell.

[3] Between January 29, 2018 and February 19, 2018, Defendants filed twelve motions *in limine* and two motions to quash. [ECF Docket No. 434-446]. The evening of February 20, 2018, Defendants filed a so-called "emergency" motion to take a witness, Victoria Woodley, out of order allegedly because medical treatment she was receiving allegedly interfered with the trial and to allow them to begin their case <u>literally</u> in the middle of direct and cross-examination <u>before</u> the testimony of Ms. Cloutier was complete. Although no medical documentation from any physician was supplied to substantiate this request (and Ms. Woodley was *at work* during this time period) [see ECF No. 460; 462], the Court allowed Defendants to interrupt Ms. Cloutier's presentation of her case on Tuesday, February 21, 2018 and call Ms. Woodley at that point in the case as *a defense* witness.  This should not have been allowed.

Ms. Cloutier had subpoenaed Ms. Woodley as a witness and intended to call her later in her case and should have been permitted to examine her first.  After refusing to inform Ms. Cloutier's counsel when, if at all, Ms. Woodley would return for testimony, the Defendants agreed that she would return on the last day of trial, on Monday, March 5, 2018. At that point in time, Ms. Cloutier was allowed to briefly cross-examine her (and thus the jury got to hear from Ms. Woodley twice both in Week One and Week Three; defense counsel also had the opportunity to inform Ms. Woodley as to what the testimony was from every other witness over the past two weeks).  Notably, defense counsel had represented in two "emergency" motions to the Court in the weeks before the trial that Ms. Woodley allegedly could not testify *at all* due to medical incapacity [ECF Docket No. 432,425, 427].  Even members of the venire were not excused due to scheduled medical treatment.

The Court held a brief charge conference with counsel for the parties during a break in testimony on March 5, 2018 and summarized the general topics upon which the jury would be charged. [Exhibit B, Transcript March 5, 2018 at 86:7-92:16]. Thereafter, the Court charged the jury, closing statements were delivered by the parties, and the case was given to the jury the afternoon of March 5, 2018.  Approximately two and a half hours into the deliberations, the jury came back with a question: "Explain what is retaliation?" After responding to the jury question, the Court instructed the jury to deliberate for approximately five more minutes before excusing the jury for the day.  [Exhibit B, Transcript March 5, 2018 at 179:23-182:7]. The following morning, on March 6, 2018, before deliberations resumed, defense counsel requested that a copy of the charge be transcribed by the Court reporter[4] and twelve copies distributed to the members of the jury.[5]   Later that afternoon, the jury rendered a general verdict in favor of the Defendants.[6] Judgment was entered on March 29, 2018.

## II.     Standard of Review

A trial court must order a new trial pursuant to Fed. R. Civ. P. 59(a)[7] when the jury's verdict is "against the clear weight of the evidence, or is based upon evidence which is false, or will result

---

[4] There were no written copies of the charge that had been prepared or distributed to the parties in connection with the charge conference.

[5] Apparently, after the Court reporter completed the transcription, it was given to the jury in the jury room. The parties were not supplied with copies or given an opportunity to review it prior to distribution.

[6] The Court used a general verdict slip although both parties had requested special jury verdict slips. In discussing the verdict slip it had distributed, the Court improperly telegraphed to the jury that a "logical verdict" <u>was a verdict in favor of the Defendants</u> and emphasized that "nominal damages might be appropriate."  The Court stated that "[a] logical verdict is -- and again I don't care, but so you understand what a logical verdict is. A logical verdict is *simply to make one check applying to the City folks, the case [is] over*, or you can find for Ms. Cloutier and if you find for Ms. Cloutier, I imagine it's against somebody or the City or all of them or some of them, so you just check who it's against, as I've explained. Then the damages. They can be as broad as I've said. If they are not proven -- and again you can't speculate, you can't guess, they should just be nominal damages of a dollar." [Exhibit C, Transcript of March 5, 2018 at 126:25-127:10].

[7] Fed. R. Civ. P. 59(a) states that a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." *See* Fed. R. Civ. P. 59(a).

in a clear miscarriage of justice...." *Coffran v. Hitchcock Clinic, Inc.,* 683 F.2d 5, 6 (1st Cir.), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 571 (1982). *See also Wagenmann v. Adams,* 829 F.2d 196, 200-201 (1st Cir.1987) (discussing "manifest miscarriage of justice" standard); *Insurance Co. of North America v. Musa*, 785 F.2d 370, 375 (1st Cir. 1986) (same); *Valm v. Hercules Fish Products, Inc.,* 701 F.2d 235, 237 (1st Cir.1983); *Hubbard v. Faros Fisheries, Inc.,* 626 F.2d 196, 200 (1st Cir.1980); *Milone v. Moceri Family, Inc.*, 847 F.2d 35, 37 (1st Cir.1988). The Court should set aside a verdict if "it is quite clear that the jury has reached a seriously erroneous result." *Borras v. Sea-Land Service, Inc.,* 586 F.2d 881, 887 (1st Cir.1978) (citation omitted).

### III. The Jury Verdict is Against the Weight of the Evidence And a Miscarriage of Justice Would Result if the Jury Verdict Were Allowed to Stand

A. The Court Substantially Erred in Excluding Evidence that Showed that Defendants' Treatment of Ms. Cloutier on October 29, 2013 Was a Pretext for Unlawful Discrimination and By Refusing to Properly Instruct the Jury as to Pretext

The Court excluded evidence that would have unequivocally demonstrated that: (i) an adverse action occurred when Ms. Cloutier was discharged on October 29, 2013 and (ii) the sole reason identified by the City Defendants at the time of discharge was pretextual and probative of the City Defendants' retaliatory animus toward her—an error that was compounded by the Court's failure to provide the jury with proper instruction as to pretext.[8] At trial, the City Defendants falsely

---

[8] Ms. Cloutier had requested that the Court instruct the jury pretext as follows:

> The Defendants have asserted various reasons for why they fired Ms. Cloutier. If Ms. Cloutier convinces you that one or more of those explanations are false, that finding may be used by you to infer a retaliatory motive, and that such motive was taken as a negative factor in the decision to fire Ms. Cloutier. In other words, where an employer fabricates one or more explanations for its actions, that fact may be used by you to infer that retaliation was the true reason for its actions.

*See* ECF Docket No. 447 at 20.

The proposed instruction was based on the following legal citations: *Esler v. Sylvia-Reardon*, 473 Mass. 775, 780-781 & n.7 (2016) (in FMLA retaliation case, proof of pretext may help establish causation); *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 161 (1st Cir. 1998) (same); *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 501, 506-7 (2001) (showing that one or more articulated reasons are false generates inference of discrimination); *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000) ("the trier of fact can reasonably infer from the falsity of

4

claimed that Ms. Cloutier was purportedly placed "on disability" on October 29, 2013 due to a shoulder injury she had sustained due to an assault by her supervisor, Library Director Victoria Woodley, a few weeks earlier that caused her doctor to order her out of work from September 11-October 6, 2013.[9]  Nonetheless, the Court wrongly excluded virtually all post-October 29, 2013

---

the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt"); *Binder v. Long Island Lighting Co.*, 57 F.3d 193, 200 (2nd Cir. 1995) ("Resort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct").

Immediately following the jury charge, at sidebar, the brief exchange between the Court and counsel went as follows:

> The Court: Ms. Sullivan, I thought that was pretty good. What do you say?
> Ms. Sullivan: Yes, I would just ask if there would be perhaps be a pretext instruction because under Rule 51B [transcription error; counsel stated "Chapter 151B"], I don't need to show anything more.  And if they disprove the reason for the action, then the jury is—
> The Court: I'm satisfied with the instruction.
>     Okay, satisfied?
> Ms. Brown: Yes.
> The Court: Fine.

[Exhibit C, Transcript dated March 5, 2018 at 129:1-129:14].

[9] The City Defendants had expressly maintained throughout the case that Ms. Cloutier's shoulder injury/adhesive capsulitis was *not* a disability under either the ADA, the Rehabilitation Act, or Chapter 151B and thus any disability discrimination or failure to accommodate claims could not be predicated on that condition.  Indeed, they made that argument on summary judgment and the Court dismissed Ms. Cloutier's claims in that regard. However, at trial, over Ms. Cloutier's repeated objections, the Defendants were permitted to change their tune and several witnesses (including but not limited to individual Defendants Lynch and O'Connor) were allowed to testify that they were somehow "accommodating" Ms. Cloutier's disability by placing her on "on disability." The Defendants should not have been permitted to have it both ways.  If the law of the case was that the disability discrimination/failure to accommodate claims were *not* before the jury, then the Defendants should not have been permitted to elicit such testimony from witnesses and/or it should have been stricken by the Court.

Incidentally, it is *not* a reasonable accommodation to exclude an employee from the workplace indefinitely, and pay her nothing, when other reasonable accommodations are available that would permit her to fully participate in the workplace. *See e.g.*, 29 C.F.R. 1630.2 (o) (2) & (3).  Reasonable accommodations are acts that permit an employee to perform the essential functions of a desired position, or enable the disabled to "enjoy equal benefits and privileges of employment as are enjoyed by employees without disabilities." *Id.*; MCAD Guidelines: Employment Discrimination on the Basis of Handicap – Chapter 151B (1998) at 26 (same standard).

A reasonable accommodation is a "change in the work environment . . . that enables an individual with a disability to enjoy equal employment opportunities." 29 C.F.R. 1630.2(o).  The accommodation must allow the employee an opportunity for an equal level of achievement, opportunity and participation. 29 C.F.R. Pt. 1630, @ 1630.9; *Keil v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999). *See also Williams v. Phila. Housing Auth. Police Dept.*, 380 F.3d 751, 771-772 (3rd Cir. 2004); *Noon v. IBM*, 2013 U.S. Dist. Lexis 174172 (E.D.N.Y 2013) at 35; *Walters v. Mayo Clinic,* 998 F. Supp. 2d 750, 764 (W.D. Wisc. 2014) (leave not sufficient where other accommodations

5

evidence that would have demonstrated the pretextual nature of this Defendants' reason for ordering Ms. Cloutier to leave the workplace) including:

- Specific evidence relating to Ms. Cloutier's application for unemployment benefits and the City's appeal of an award of unemployment benefits, including the April 29, 2014 hearing at the Department of Unemployment Assistance ("DUA").

- Specific evidence relating to the April 22, 2014 hearing before the Department of Industrial Accidents ("DIA").

- Specific evidence relating to the amounts of money that were paid to Dr. Sarah Gilbert, a independent vendor who also moonlights as the City Physician.

- Specific surveillance evidence commissioned by the City Defendants themselves from October 28, 2013 *showing* Ms. Cloutier working in the Library.

- All medical evidence pertaining to Ms. Cloutier's ability to work from October 2013 through April 2014 except for a doctor's note from October 2, 2013 returning Ms. Cloutier to work and an unauthenticated "checklist" allegedly pertaining to Ms. Cloutier (discussed below).

To place in proper context the relevant facts: On October 29, 2013, Defendant Gagnon and Mary Callery, the Director of Human Relations, entered the Library and told Ms. Cloutier that she needed to gather up all her stuff and leave the Library immediately. All of the medical evidence in the City's possession demonstrated that she could work.[10] [Exhibits 53, 54, 56-57]. They stated that because Ms. Cloutier had physical impairments she could no longer work at the Library and that Ms. Cloutier couldn't come back to work the next day. Ms. Callery handed Ms. Cloutier an

---

available). Indeed, if the City Defendants felt that Ms. Cloutier was disabled on account of the September 2013 reaggravation of her shoulder injury/adhesive capsulitis, one of the ways in which they could have accommodated her was to simply allow her to work *exactly* as she had been since June 2012, when she originally suffered the injury. Instead, on October 29, 2013, just six days after Ms. Cloutier wrote a letter to Defendant O'Connor and stated that she was going to file a second claim against her and others who worked for the City at the MCAD claiming discrimination and retaliation due to her asthma (the issue which precipitated Ms. Woodley's assault upon her) she was fired.

[10] Inexplicably, the Court also excluded Ms. Cloutier's physical therapist notes/evaluation from October 4, 2013--just three days before she returned to work on October 7, 2013-- that showed she clearly had strength in her right arm and that she could use it and that she could return to work with the *same restrictions in place* that she had worked under for approximately a year and a half.

6

envelope with a letter signed by Defendant Gagnon that stated, among other things: "[i]t is the recommendation of this office [the Law Department] to the City's Human Resource office and your Department that you will not be allowed to work at the City" unless you can work "full unrestrictive duty" or "when the City can implement a reasonable accommodation for you." [Exhibit 45].

The letter said nothing about placing Ms. Cloutier "on disability" or that she would receive any "disability" payments. Indeed, enclosed within the *same* envelope as the termination letter was also a copy of a submission to the DIA from Defendant Gagnon, which stated that Ms. Cloutier had no "total, permanent and or partial disability" that precluded Ms. Cloutier from performing her job and noted that Ms. Cloutier had been back at work for the past three weeks. [Exhibit 47] Nor was Ms. Cloutier ever offered any medical leave under the FMLA.[11] [Exhibit 9]. The letter further stated that Dr. Sarah Gilbert, a paid vendor for the City, had allegedly concluded (without examining Ms. Cloutier, speaking to her, or writing up any report)[12] that Ms. Cloutier could not do her job due to what the City called a "significant medical condition."

---

[11] Ms. Cloutier had proposed a jury instruction pertaining to FMLA and an employer's legal obligation to provide it to any employee, but the Court failed to provide any such instruction. [ECF Docket No. 447 at 27]. If the City Defendants truly believed that Ms. Cloutier needed time off to "heal," they would have offered her FMLA in accordance with the law as they knew they were obligated to do. That they failed to do so is evidence of pretext.

Likewise, Ms. Cloutier had proposed a jury instruction pertaining to COBRA and that an employee is only entitled to receive if her employment has ended, but the Court failed to provide any such instruction. [ECF Docket No. 447 at 28]. If the City Defendants truly believed that Ms. Cloutier was "still employed" or "on disability" they would have informed her that she was not entitled to receive COBRA as they were well-aware. *See e.g.*, Exhibit Nos. 77-78 [documents from Human Relations stating the Defendants had terminated Ms. Cloutier's employment and that she should be offered COBRA]. That they failed to do so is also evidence of pretext.

[12] The City Defendants refused to provide a shred of evidence (billing records, notes, etc.) showing that Dr. Gilbert had, in fact, ever had any communications with *anyone* from the City about Ms. Cloutier's shoulder injury in September 2013 or October 2013 save *one* email dated October 10, 2013 in which she made the following comments upon learning that Ms. Cloutier had been assaulted by Ms. Woodley: "[c]ant wait 2 see what Chris [O'Connor] had 2 say re 'not feeling safe'" and "lmao [laugh my ass off]-amazing how she [Ms. Cloutier] functions…**we KNOW she can lift & use r arm!**" (emphasis added). [Exhibit 87]. This email directly contradicted Dr. Gilbert's testimony at trial that she purportedly recommended that Ms. Cloutier be placed "on disability."

After having her employment terminated on October 29, 2013, with no job, on October 30, 2013, Ms. Cloutier proceeded to apply for unemployment benefits. On November 4, 2013, Ms. Callery drafted up DUA paperwork in which she agreed that Ms. Cloutier <u>had been "discharged" from employment when asked to indicate the employee's status</u>. On November 14, 2013, Ms. Cloutier filed her second complaint with the MCAD against the City that included Defendants Lynch, O'Connor, and Gagnon. In December 2013, the DUA approved Ms. Cloutier's application for unemployment because she no longer had a job. Nonetheless, in an effort to further punish and retaliate against Ms. Cloutier for having engaged in additional protected activity by filing her second MCAD complaint, the City Defendants then appealed the DUA decision to award benefits

---

Back in the Fall of 2017, Ms. Cloutier had filed a public records request, seeking among other things, the precise amount of monies paid to Dr. Gilbert by the City through that point in time. The City refused to provide the requested information, so Ms. Cloutier filed an appeal to the Public Records Division ("PRD") of the Massachusetts Secretary of State. On December 20, 2017, the PRD issued an Order instructing the City to provide the public records requested by Ms. Cloutier's counsel within ten (10) business days.

The City refused to comply with the PRD's Order, so Ms. Cloutier subpoenaed the information to trial, but Defendants still refused to comply with the subpoena. Ms. Cloutier brought the issue to the attention of the Court as it was critical that she be permitted to demonstrate just how much money Dr. Gilbert had been compensated for her appearance at the DUA proceedings, her deposition in the case and testimony at trial, overall the amount of money she received from the City over the past several years (believed to be well over $200,000) to show that she was *far* from a "neutral" or independent witness in this matter. (Dr. Gilbert was also a Defendant at one point in the matter and thus was personally required to produce any such records but she *never* did). Although the Court stated that the parties had "stipulated" that the records did not exist [Exhibit A, Transcript February 28, 2018 at p. 48:23-55:9], it did not later explain to jury why that meant that the lack of *any* documentation whatsoever (both with regard to the amount of money the City actually paid her and any notes or records that should have been in the City's files) should cause them to draw an inference that Dr. Gilbert was not an unbiased witness and/or that the City (which, as a public entity, *at the very least* should have had checks indicating what Dr. Gilbert was paid) intentionally lost or destroyed the materials in question.

During the charge conference, the Court told counsel that it planned to instruct the jury:

"There are stipulations. There are -- there is deposition testimony. I will explain each one again, emphasizing the power that the jury has with respect to them."
[Exhibit C, Transcript of March 5, 2018 at p. 87:7].

Then, the extent of the stipulation actually communicated to the jury by the Court was as follows:

"And finally we've got a stipulation, a stipulation about the production of documents, as I recall, and did they have documents. No one disagrees with that. You can take that as a given, that's evidence, that' s not disputed."

[Exhibit C, Transcript of March 5, 2018 at p. 111:14].

to Ms. Cloutier that they had not initially challenged even though there was no legitimate basis whatsoever for doing so.  With the exception of brief testimony from Ms. Cloutier as to the fact that Ms. Cloutier filed for unemployment and the fact that she filed a second MCAD claim[13] the Court did not allow *any* testimony or documentary evidence pertaining to the foregoing—all of which would have demonstrated to the jury that the claim that she was allegedly "on disability" was completely fabricated.

Ms. Callery then claimed in the DUA appeal paperwork that Ms. Cloutier allegedly could not perform the essential functions of her job and no "reasonable accommodation" could be effectuated for her.  At no point in time did anyone from the City *ever* maintain that Ms. Cloutier was "on disability." Indeed, if Ms. Cloutier was "on disability" the City Defendants were legally required to inform the DUA because Ms. Cloutier would then either be ineligible for unemployment compensation altogether and/or any unemployment compensation she received would be offset by any disability pay she received from the City (which, of course, was none, because she was not on disability).

On April 29, 2014, the DUA held a hearing on the City's appeal of the DUA's determination awarding unemployment benefits to Ms. Cloutier.  In connection with this proceeding, Ms. Cloutier personally observed that two letters from her medical providers (i.e., orthopedic surgeon and physical therapist) from April 2014 were given directly to the City and the DUA.  These letters stated that there was no reason why Ms. Cloutier could not work at the Library in October 2013 and that her providers had expressly returned her to work in October 2013 with the same work restrictions that had been in place for approximately a year and half. Nonetheless, the Court refused to allow Ms. Cloutier to introduce these letters into evidence or

---

[13] The second MCAD claim of November 13, 2013 was an agreed exhibit [Exhibits 21-22].

provide her own testimony as to what she observed that day (i.e., any testimony whatsoever as to what the letters said, how they were obtained, who they were given to, etc.) or elicit any testimony from Ms. Callery or Defendant Gagnon (both of whom attended the DUA hearings) on the topic.[14] The point is that the City Defendants *refused to offer* Ms. Cloutier her job back—*even when they got what they purportedly wanted*--clarification" that Ms. Cloutier could work. Their failure to do shows that they intended to permanently discharge her from the workplace and that she was never "on disability"—obviously, if it was all just a "misunderstanding" (which it was not) they would have promptly allowed her to return to the workplace. They never did. This is indicative of pretext.

Moreover, even though Ms. Cloutier's DUA benefits (a total of approximately $6,000) had been exhausted by June 3, 2014, the date of the next DUA hearing, the City Defendants pressed on with the appeal and paid two witnesses to attend DUA hearing (something it had never done before): Dr. Gilbert (who testified that she had never attended any hearings whatsoever for the City), as well as a retired school nurse named Rita Wahl (who had never met Ms. Cloutier)—but none of this evidence was allowed to be presented to the jury. Dr. Gilbert was also enlisted to be the City's medical "witness" before the DIA.[15] Ms. Cloutier was also prepared to testify that she

---

[14] Moreover, although these letters were in the Law Department's *own files*, at trial Defendant O'Connor lied and claimed that no such letters were *ever* given to the Law Department and the City never had them. The Court did not allow Ms. Cloutier to impeach her on this lie because it had refused to allow Ms. Cloutier to testify that she personally observed the letters being handed over to the Law Department, received copies of them when she requested her files from the Law Department, etc. [The Court can also take judicial notice of the fact that at no point in the four year period that the letters were turned over to City did the Defendants ever offer Ms. Cloutier her job back. The letters themselves were also produced by the City Defendants to the Plaintiff in discovery in 2016]. Yet the Court inexplicably refused to allow these letters to be shown to the jury—although a wholly unauthenticated piece of evidence—a "checklist" that mysteriously surfaced in Ms. Cloutier's file in the Law Department-- which was literally the sole piece of evidence upon which the Defendants premised their case was allowed into evidence [Exhibit 69; ECF Docket No. 470].

[15] Again, none of the billing she submitted in connection with the Ms. Cloutier's DUA or DIA proceeding was ever turned over to the Plaintiff. Nor was there ever any evidence that she even *reviewed* any of Ms. Cloutier's medical records (and certainly did not speak to her at any point in time in 2013 or 2014).

10

was present and <u>personally heard</u> when the DIA Judge asked the City why it had terminated Ms. Cloutier's employment <u>when there was no reason why she could not work</u>, the City Defendants refused to answer.

In sum, the Court's blanket exclusion of virtually all post-October 29, 2013 evidence of pretext that Ms. Cloutier tried to present to the jury in order to demonstrate that that she was not "on disability" but rather was permanently discharged from the workplace on October 29, 2013 and that the City Defendants <u>intended</u> that result [16] amounted to prejudicial error.

**B.     The Court Substantially Erred in Admitting Hearsay from Dr. Gilbert and an Unauthenticated Checklist That Was the Linchpin of the Defense**

As noted above, at trial the City Defendants falsely claimed for the first time through the testimony of the Dr. Gilbert that Ms. Cloutier was purportedly placed "on disability" due to a shoulder injury on October 29, 2013. Dr. Gilbert, who was *not* disclosed as an "expert" witness was allowed over Plaintiff's repeated objections to testify as to hearsay and provide "opinions" for which no foundation was or could be laid (at no point in time in September 2013 or October 2013 did Dr. Gilbert *ever* examine Ms. Cloutier, speak to Ms. Cloutier, communicate with Ms. Cloutier's doctor, or provide a shred of evidence in the form of notes, records or bills, etc. showing that what, if any of Ms. Cloutier's medical records she reviewed, or when, why and who asked her to review them).

---

[16] Ms. Cloutier notes that the Defendants had discussed discharging her after Defendant O'Connor received letters from Ms. Cloutier dated September 21, 2013 and October 3, 2013 requesting continuing accommodations and complaining about ongoing discrimination and retaliation at the Library [Exhibits 3, 16, 25]. The "legality" of possible actions regarding Ms. Cloutier (term, settlement-MCAD, etc.) were discussed on October 4, 2013. [Exhibit 27, 5]. Then, shortly after Defendant O'Connor received a third letter from Ms. Cloutier dated October 21, 2013, stating her intention to file another MCAD claim, Ms. Cloutier was fired. [Exhibits 20, 24, 26, 27, 29, 45, 75,76].

11

Dr. Gilbert was also permitted to testify that an unauthenticated "checklist"[17] [Exhibit 69] that magically appeared in the Law Department on October 10, 2013 (of which Dr. Gilbert had no personal knowledge) was signed by Ms. Cloutier's doctor purported to say that Ms. Cloutier's doctor stated had no work capacity.[18] Nonetheless, although the Court appear to recognize the hearsay issue initially, the Court allowed Dr. Gilbert to testify as follows:

---

[17] The October 9, 2013 checklist confirmed that Ms. Cloutier could work (by that point in time she had already returned to work as of October 7, 2013 and was assigned work on the daily Library schedules by her supervisors which obviously involved the use of her hands and right arm) [Exhibit 34] but also contained "checks" in checkboxes that allegedly suggested she had no use of her hands or right arm—a patently absurd contention. Needless to say, no one—including Dr. Gilbert—could reasonably believe that Ms. Cloutier had no use of her hands or right arm. Indeed, Ms. Cloutier reported to work day after day between October 7, 2013 and October 29, 2013, performed her duties, and as noted earlier—<u>was even captured on video surveillance that Defendants had commissioned of her on October 28, 2013—the day before she was escorted out</u>. Inexplicably, the Court did *not* allow Ms. Cloutier to show this footage and related photographs to the jury, however, even though it would have clearly refuted any notion that Ms. Cloutier was somehow too disabled to work.

Ms. Cloutier had asked for a jury instruction regarding an ill-informed, cursory, or biased doctor's opinion, but none was provided. The instruction was follows:

"An employer cannot rely on an ill-informed, cursory, or biased doctor's opinion to immunize itself from liability or otherwise justify a discriminatory or retaliatory employment action. *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 191–92 (3d Cir. 1999) (reliance on doctor's report, without more, does not excuse employer from liability); *Rodriguez v. ConAgra Grocery Products Co.,* 436 F.3d 468, 484 (5th Cir. 2006) ("an employer cannot slavishly defer to a physician's opinion without first pausing to assess the objective reasonableness of the physician's conclusions"); *Gillen v. Fallon Ambulance Service, Inc.,* 283 F.3d 11, 31–32 (1st Cir. 2002) ("the mere obtaining of [a doctor's] opinion does not automatically absolve the employer from liability under the ADA"); *Holiday v. City of Chattanooga*, 206 F.3d 637, 645 (6th Cir. 2000) ("[c]ourts need not defer to an individual's doctor's opinion that is neither based on an individualized inquiry mandated by the ADA nor supported by objective scientific and medical evidence"); *Lafata v. Dearborn Heights School Dist. No. 7,* 2013 WL 6500068 (E.D. Mich. Dec. 11, 2013) (granting judgment in favor of employee where there was evidence available and known to the employer that contradicted doctor's recommendations that employer did not consider in good-faith); *Deppe v. United Airlines,* 2001 WL 902648, at *6-7 (N.D. Cal. 2001) (although employer's doctor stated that the plaintiff was unable to return to work, plaintiff's own physician felt otherwise)."

*See* ECF Docket No. 447 at 18.

[18] Ms. Cloutier rested her case on Wednesday, February 28, 2018. The following day, the City Defendants disclosed the existence of an affidavit from Dr. Kasparyan that they apparently had procured a week earlier and them moved for a "stipulation" as to the alleged authenticity of the checklist. *See* ECF Docket No. 470 at 3.

Counsel for Defendants had apparently contacted counsel for Lahey Medical Center and Hospital (where Dr. Kasparyan works) and pressured Lahey to arrange for Dr. Kasparyan to authenticate the document or else they would run the risk of having supplied a "fraudulent" medical record. *See* Affidavit of N. George Kasparyan at ECF Docket No. 470-2.

Subsequently, however, Dr. Kasparyan provided an affidavit stating that he had signed what Lahey legal asked him to sign but did <u>not recognize his signature</u> on the checklist and could not recall ever having filled the checklist or discussed it with Ms. Cloutier. [Ms. Cloutier had also testified that she never saw or heard of this checklist at any

Q. Okay, so you got that form [the checklist]. What did you do next?

A. I requested, um, Karen -- Karen Gagnon, the comp agent, was out of the office and **I requested that the nurse manager contact Dr. Casparian's [sic] office for more clarification, did he mean this note to say what it says in writing here or was that an error?**

Q. And just to be clear, that would be the second request for clarification to Dr. Casparian [sic]?

A. That's correct.

Q. And what happened?

A. She was -- we never heard back from them. She called numerous times from what I was told.

**MS. SULLIVAN: Objection.**

**THE COURT: Yeah, you can't tell us what was told.**

**But so far as you know, you heard nothing back?**

THE WITNESS: That is correct.

THE COURT: Move on from there.

Q. And then what happened?

A. We had a meeting of the work comp team. **Unfortunately she had been returned, by her treating physician, to light duty and now we have a note [checklist] by her treating physician stating that she may lift nothing. So there is no way the City library department can accommodate that work limitation and still have a functional position in the library.** So I recommended –

**MS. SULLIVAN: Objection, your Honor.**

**THE COURT: No, she may finish her answer.**

You recommended?

**A. I recommended that she go out on full disability, that we were not able to make a work accommodation so she was unable to work given the current limitations as written by her treating physician.**

**THE COURT: To whom did you make that recommendation?**

THE WITNESS: I made the recommendation to the work comp team who would then have to notify the patient. I make the medical recommendation –

**THE COURT: No, no, I've been following your testimony.**

THE WITNESS: Yeah.

---

point in time prior to her termination]. Dr. Kasparyan further stated that he had no memory of ever filling out the checklist, that his usual practice would be to have a personal discussion with the patient, and he had no medical record or recollection that that was accomplished <u>and thus the checklist form would be inconsistent with his practice.</u> *Id* [Dr. Kasparyan further stated that he had no idea how the City of Lowell came into possession of a separate unsigned chart note pertaining to Ms. Cloutier's visit with him on October 2, 2013 that was not finalized]. *Id*. The Court chose not to rule on the Defendants' Motion when the parties returned for trial on Monday 5, 2018 and instructed the parties to wrap up the case so it could go to the jury.

If Ms. Cloutier had known that this was going to happen and that the Defendants were going to continue to be permitted to refer to this unauthenticated checklist as being "from Dr. Kasparyan" with the remaining witnesses on March 5, 2018 and during closing argument (despite the fact that there was no evidence in the record that this was the case and the only competent evidence in the record in this regard—Ms. Cloutier's testimony-- showed exactly the opposite), Ms. Cloutier would have asked to call Dr. Kasparyan as a rebuttal witness (even though the request would have been futile since the Court had *already* promised the jury they were getting the case that day).

13

**THE COURT: But the work comp team is what people?**
THE WITNESS: That would be, um, Karen Gagnon and the nurse case manager.
**THE COURT: All right. When did you make that recommendation?**
**THE WITNESS: Shortly after we were unable --we gave Dr. Casparian [sic] some time to get back to us [about the checklist] I never heard anything back, so all I have was this note.**
**THE COURT: Can you be specific at all as to that?**
**THE WITNESS: Probably two weeks.**
**THE COURT: All right. And how did you make the recommendation, and I mean orally or in writing or how?**
THE WITNESS: **I'm sure that I made the recommendation orally. I honestly don't remember at this time whether I actually put something in writing or not.**
THE COURT: Go ahead, Ms. Brown.
**Q. Were you asked to provide a medical opinion about this form?**
**A. Yes.**
**Q. And was that what you were just referring to, that was your opinion?**
**A. Yes.**

[Exhibit A, Transcript of February 28, 2018 at p. 103:1-104:18 (emphasis added)]

Without the unauthenticated "checklist," the Defendants had absolutely <u>nothing</u> to support the argument that they allegedly believed that Ms. Cloutier was so limited in her ability to work that she should be out "on disability." Moreover, the error in admitting both the checklist and Dr. Gilbert's hearsay testimony about efforts allegedly made to "clarify" with Ms. Cloutier's doctor what the checklist allegedly meant was compounded by the following comments by the Court when charging the jury:

> The Court: So the first thing then is you've got to go back and evaluate this job action and let's assume it the City's way first, the City folks' way. **Let's assume that she was just taken off the rolls for a complete disability** and a reasonable person -- it's not judged by what's going on in her mind, **it's judged by what a reasonable person would do, so a reasonable person,[19] once they've calmed down and gotten home and was able to analyze these documents and sorted them out**, came to believe, "Gee, you know, they think I can't do any work," and a reasonable person then would have gone to doctors and gotten more notes and would have -- and if a reasonable person then would have come

---

[19] There is absolutely <u>no support for the proposition</u> that was Ms. Cloutier has some type of burden to show that she should have gone back to her doctor and asked for "clarification" about a document that did not say she could not work. Indeed, the burden of proof with respect to mitigation lies with the Defendants, <u>not Ms. Cloutier</u>. *Sheriff of Suffolk County v. Jail Officers and Employees of Suffolk County*, 2013 Mass. Lexis 469, *Ryan v. Superintendent of Schools of Quincy*, 374 Mass. 670, 673 (1978). Incorrectly instructing the jury that they should evaluate the case in terms in what Ms. Cloutier allegedly should have done (according to Defendants) is not rooted in the law and was prejudicial error.

14

back to the City and said, "Look, I can work -- yeah I've got to be accommodated, but I can work, I can do the job, I was doing it, and I was doing the job, those various jobs," if that's what a reasonable person would have done --and what the City's job action[20] was was not firing her, **but was putting her on this 100 percent disability and in essence over time taking her off the rolls, and you find a reasonable person would have done that and the City would have taken her back,** if that's what you think, oh, then she can get damages and here's what the damages are.

[Exhibit C, Transcript of March 5, 2018 at p. 121:24-122:22 (emphasis added)].[21]

For the reasons described above, the verdict is based on testimony and evidence regarding an unauthenticated document that was false. As such, it should be set aside.

## C. The Court Substantially Erred in Giving Jury Instructions

An erroneous jury instruction will be reversed if the error "is determined to have been prejudicial based on a review of the record as a whole." *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,* 552 F.3d 47, 72 (1st Cir. 2009). "So long as th[e] language properly

---

[20] The standard is "adverse action" not "job action." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006) (adverse actions are those that "a reasonable employee" would find to be "materially adverse"); *Consedine v. Willimansett East SNF,* C.A. No. 13-30193, 2016 WL 6774242 (D. Mass. Sept. 30, 2016) (adverse actions included plaintiff's requests for accommodations, in addition to her ultimate termination); Alvarez v. City of Lowell, No. 10–P–1853, 2011 WL 6372838, at *4 n.3 (Mass. App. Ct. Dec. 21, 2011) ("[m]aterial disadvantage for this purpose arises when objective aspects of the work environment are affected"); *Cicarelli v. School Dept. of Lowell,* 70 Mass. App. Ct. 787, 791 (2007) (decision not to rehire provisional teacher in retaliation for agreement to be a witness for another teacher was an "adverse employment action" that disadvantaged the teacher).

Ms. Cloutier had requested the following jury instruction:

Next, you have to determine whether the termination was an adverse action. A retaliatory action is unlawful and "adverse," if it well might have dissuaded a reasonable worker from engaging in protected conduct. In this case, the termination had the effect of segregating the workplace, such that the person complaining was removed. Termination is, by definition, an adverse action. If you find that Ms. Cloutier's termination might well have dissuaded a reasonable worker from engaging in protected complaints, then you should find that the termination was an adverse action."

[ECF Docket No. 447 at p. 14]

However, the Court repeatedly referred to "job action" and did not instruct the jury as to an adverse action.

[21] *See also* Exhibit C, Transcript of March 5, 2018 at 117:20-117:25 ("Now whether -- not whether, but to what extent a job action was taken against her is very much in dispute and I have nothing to say about it. She says she was fired. The City folks say, "No, she wasn't fire d, we were told she couldn't do the job so necessarily she's completely disabled and she goes on complete disability.")

15

explains the controlling legal standards and is not unduly confusing or misleading, it will not be second-guessed on appeal." *Johnson v. Spencer Press of Me., Inc.*, 364 F.3d 368, 378 (1st Cir. 2004). The Court "look[s] at the instructions as a whole, not in isolated fragments." *Hatch v. Trail King Industries, Inc.*, 656 F.3d 59, 64 (1st Cir. 2011).

As noted above, the Court charged the jury the afternoon of March 5, 2018. *See* Transcript of March 5, 2018 attached at Exhibit C. Approximately two and a half hours into the deliberations, the jury came back with a question: "Explain what is retaliation?"[22] Needless to say, this question was extremely concerning as the jury had set through a three-week trial in which the Court repeatedly made reference to the fact that it was about retaliation and had just delivered its charge to the jury.  That the jury came back with such a fundamental question at the core of the case signals that they were hopelessly confused and/or mislead by the charge that was given, the applicable legal standard, and what they were asked to decide.

---

[22] The Court addressed the question as follows:

"To that question I make the following answer. Here's the answer. Retaliation exists when a person takes an action , in the circumstances of this case, in response to or because of protected activity, an action they would not otherwise have taken. I can stop right there. But to give an example that has nothing to do with this case. Suppose  -- and nothing really to do with the law, but I think it will illustrate. Suppose in a social situation a person – and we'll call that person, "Joe," Joe hears a rumor that Steve has said something bad about him, and having heard that rumor that Steve said something bad about him, Joe thinks to himself, "Well, I'm going to get him,  I'm going to do something bad to him." So Joe -- if it's a workplace situation, makes the workplace more unpleasant, plays a prank, does something mean to Steve.  That's Joe retaliating against what he believes Steve has done. Now let's come to this case. In this case, if there's protected activity, as I've already told you, that does not create some sort of bubble around Ms. Cloutier, personnel actions that are the normal personnel actions, whether you agree with them or not, can be taken with respect to Ms. Cloutier just as they could have been taken before. But if any of these people, or if employees of the City generally, including these people, took other actions to make the workplace more hostile, more unpleasant, and more difficult because of the protected activity, that's retaliation. Now retaliation standing alone doesn't get us to any result here, there has to be the job action as I've already explained to you and the job action has to be because of the retaliation. It would not have taken place were it not for the retaliation. That's my answer to the question."

*See* Exhibit C.

16

Ms. Cloutier had proposed several jury instructions that defined what "retaliation" is under the law (supported by legal citations). *See generally* ECF Docket No. 447. This included the following:

- Retaliation is a claim of discrimination motivated at least in part by an intent to punish or to rid a workplace of someone who complains.

- Federal and Massachusetts state law prohibit workplace retaliation against an employee who reports what she believes to constitute wrongful discrimination. If an employee witnesses what she believes to be wrongful harassment or retaliation, she is free to report and oppose such conduct. In turn, employers are forbidden from taking adverse actions against employees for complaining about things like harassment based on disability and/or retaliation for engaging in protected activity such as requesting an accommodation or filing an MCAD complaint.

- A retaliatory action is unlawful and "adverse," if it well might have dissuaded a reasonable worker from engaging in protected conduct. In this case, the termination had the effect of segregating the workplace, such that the person complaining was removed.

- Put another way, if retaliation was the straw that broke the camel's back, and led to Ms. Cloutier's termination, you should find in Ms. Cloutier's favor. Retaliation can be a determinative factor, even if other, legitimate considerations are present. Ms. Cloutier need only prove to you that an illegal consideration motivated the adverse conduct, and that absent that retaliatory motive, she would have been treated better.

- A retaliatory motive may take the form of anger or hostility towards an employee for raising complaints. Moreover, equating internal complaints with a bad attitude, emotional instability or dishonesty can demonstrate retaliatory bias.

- However, a retaliatory motive also exists where the employer seeks to "rid the workplace of the complaining employee," even if anger or hostility is not present. For example, it is unlawful to terminate an employee who has complained of harassment to relieve "tension" in the workplace, even where the harasser is deemed more essential than the complaining employee. It is likewise unlawful to transfer a complaining employee in order to make the workspace more comfortable for those that did not complain. Furthermore, it is retaliatory to remove someone engaging in protected conduct, on the grounds that the employee's complaint indicates that they are unhappy in that particular workplace.

During the charge conference, the Court stated that it would tell the jury only that "the question is was that job action taken in retaliation for her protected activity? I will charge as to a mixed motive and point out that the retaliation has to be the but-for cause, that if they would have come to this same conclusion even if, um, one of the motives was retaliation, that's not enough." Counsel for Ms. Cloutier had objected to that instruction, but the Court stated that it would give the instruction as it had indicated. When the Court delivered the charge, it stated: "if retaliation was one of the motives, but there were other motives, and the City's employees would have come out the same way notwithstanding the retaliation, she doesn't win, even though one or more of the City employees had as a motive retaliation." That type of instruction and other similar language in the charge all but ensured that no matter if the jury believed that Defendants had retaliated against Ms. Cloutier she "<u>does not win.</u>"

The Court also made comments that had the effect of amplifying defense arguments (i.e., that Ms. Cloutier was purportedly "on disability" despite the fact that there was no evidence that she ever was) that misled the jury into believing that that certain things were true when they were not as well as inappropriately generated sympathy for the individual Defendants. Such comments including but are not limited to the following:

-- **"maybe they just don't like [plaintiff]…it may be sad but it's not what the law forbids."**

-- "Lowell has the obligation to provide municipal services….to its citizens as efficiently and economically as it can, that's what the taxpayers of Lowell expect and that's what their public officials are supposed to deliver, and **so long as they do that in a fair way it makes no difference what we think about it."**

-- "the City folks say, **"No she wasn't fired, we were told she couldn't do the job so necessarily she's completely disabled and she goes on complete disability, she's out, but she could come back….if that job action was taken for legitimate reasons, you the jury, have nothing to say about it."**

18

-- "damages could be nominal.  You could conclude—**though she [Ms. Cloutier]testified as to substantial damages, you could disbelieve that** and you could say, "You know really, you know, even though they did this, **there really aren't any damages here and find 0 or find a dollar, but here's what she's entitled to under the law, if you believe evidence of damages.**"

--"**let's assume that she was just taken off the rolls for a complete disability and a reasonable person—it is not judged by what's going on in her mind, it's judged by what a reasonable person would do,** so a reasonable person…then would have gone to doctors and gotten more notes and would have—and if a reasonable person then would have come back to the City and said… "look I can work…I can do the job, I was doing it…and what the City's job action was not firing her but was putting her on this 100 percent disability and in essence over time taking her off the rolls, and you find a reasonable person would have done that and the City would have taken her back, if that's what you think, of then she can get damages and here's what the damages are. <u>**Even if a wrong was done to her, she was removed from the premises and that was retaliation**</u>, she can't just now retire and say "pay me damages" she's got to mitigate her damages, that is she's got to go out in the workforce, find whatever work a reasonable person could find, with the limitations that she has, and then she's got to do that work, <u>**the City isn't responsible, she's got to do that and that reduces her damages**</u>."

-- "even a personnel system **that is fairly accommodating to particular disabilities, Ms. Cloutier's particular disability,** could be perfectly fair…"

[Exhibit C, Transcript of March 5, 2018].

The end result of the foregoing was that the jury reached a seriously erroneous result.

## IV.   Conclusion

As the verdict was against the weight of the evidence and a miscarriage of justice would occur if allowed to stand, Ms. Cloutier requests that the Court allow her Motion and grant her a new trial.

19

**DIANE CLOUTIER,**
By Her Attorney,

/s/ Lana Sullivan
Lana Sullivan, BBO No. 649364
Law Office of Lana Sullivan
233 Needham Street
Newton, MA 02464
(617) 454-1015
lana@lanasullivanlaw.com

Dated:  April 26, 2018

**CERTIFICATE OF SERVICE**

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 26, 2018.

/s/ Lana Sullivan
Lana Sullivan